**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**
**CIVIL ACTION NO. 3:19-CV-419-GNS-RSE**

**TAE-AHN LEA**                                                                              **PLAINTIFF**

**vs.**                          **DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**(electronically filed)**

**STEVE CONRAD,** *et al.*                                                      **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \*

Come the Defendants, Steve Conrad ("Conrad"), William Hibbs ("Hibbs"), Kevin
Crawford ("Crawford"), Gabriel Hellard ("Hellard"), Jeffrey McCauley ("McCauley"), Jason
McNeil ("McNeil"), and Kiersten Holman ("Holman"), by counsel, and in support of their Motion
for Summary Judgment, state as follows:

**FACTS**

This action stems from the traffic stop of Plaintiff, Tae Ahn Lea ("Lea"), on August 9,
2018.  This traffic stop was conducted by members of the former 9th Mobile unit within the
Louisville Metro Police Department ("LMPD").  That unit was focused on violent crime.  As such,
they patrolled areas plagued by violent crime, dependent upon where the violent crime was
occurring.  Maps were sent out each week showing where incidents of violent crime had occurred
in the week prior.  Detectives then focused their attention in those areas with high rates of shootings
or homicides.  *See Deposition of William Hibbs, page 74, attached as Exhibit 1.*  The traffic stop
at issue occurred at the intersection of Dixie Highway and Burwell Avenue.  On August 9, 2018,
the 9th Mobile's efforts were focused based on the maps provided to them on August 7, 2018.

These maps reflected activity from the week prior, July 29, 2018 – August 4, 2018.  *See August 7, 2018 Email from Lt. Huckleberry, attached as Exhibit 2*.

On August 9, 2018, 9th Mobile Detectives Crawford and Hellard were at a red light behind Lea on Algonquin Parkway.  Lea made a wide right turn onto Dixie Highway in violation of KRS 189.330 which requires drivers turn into the nearest lane.  Crawford then activated his lights and sirens to initiate a traffic stop of Lea based on the traffic infraction.  No sooner than fourteen seconds after Crawford initiated his lights and sirens, Lea stopped his car.  *See Crawford Body Camera Video, 00:32-00:48, conventionally filed as Exhibit 3*.  Upon approach, Hellard saw Lea make a movement with his right arm and then noticed a baseball bat.  *See Deposition of Gabriel Hellard, pgs. 71-72, attached as Exhibit 4*.  As Crawford was speaking with Lea, Lea's phone rang.  He interrupted his interaction with Crawford to answer the phone and put it on speakerphone.  *See Exhibit 3, 2:07-2:20*.  Crawford then had Lea exit the vehicle, patted him down, and asked a K-9 that was on scene to sniff the vehicle.  The K-9 alerted on the vehicle, and the vehicle was then searched.  *Id. at 6:25-14:40*.  Nothing unlawful was found in the vehicle, and Lea was issued a citation for the traffic infraction.  *Id. at 24:20-24:30*.

Lea is described in the Complaint as being "an honors graduate from Central High School" who was the homecoming king with no criminal record.  *See* DN 1, Paragraph 1.  At the time of the traffic stop, Lea was employed by Oxmoor Ford and already had a strong drive and work ethic.  *See Deposition of Tae Ahn Lea, p.9 attached as Exhibit 5*.  Detectives Crawford and Hellard had never met him before the traffic stop.  They did not have the luxury of taking these facts for granted.  Police are forced to make their determinations based solely on the information available to them at the time of a stop or interaction.

What Crawford and Hellard did know on August 9, 2018 was that Lea was slow to stop his car during the traffic stop which was conducted in a high crime area, there was a baseball bat in the car, he received a phone call during his interaction with Crawford wherein he not only interrupted his police interaction to answer the call but put the phone on speakerphone, and he appeared nervous to Crawford. *See Exhibit 3 at 2:09.* Each of these factors were red flags for Crawford and Hellard, and when taken together, they caused Crawford to reasonably believe that there may be criminal activity afoot. Lea's reaction and perception may have been reasonable to him, but the actions and perceptions of the officers on the scene were also reasonable given their experiences and knowledge as law enforcement officers. The officers acted within the confines of the law while carrying out their duties as law enforcement officers and trying to reduce violent crime. Furthermore, there is no evidence in the record to support a claim that officers were ill trained or unsupervised in such a manner as to lead to constitutional violations.

On June 10, 2019, Lea filed this action. After ruling on Defendants' partial motion to dismiss, the following claims remain: §1983 Unlawful Search and Seizure, §1983 Unlawful Terry stop, §1983 Excessive Force in violation of the Fourth Amendment, §1983 Wrongful Arrest, and §1983 Failure to Train against Chief Conrad and Major Hibbs and state claims of Negligent Training and Supervision against Chief Conrad and Hibbs. As the Defendants are named individually and officially, each of the above listed §1983 claims are also raised against Louisville/Jefferson County Metro Government ("Metro Government") as *Monell* claims.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, 'show that there is no genuine issue as to any material fact' such that 'the movant is entitled to judgment as a matter of law.'"

3

*Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 568 (6th Cir., 2013) quoting *Ventas, Inc. v. HCP, Inc*., 647 F.3d 291, 324 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Barnes v. Kerr Corp*., 418 F.3d 583, 588 (6th Cir. 2005) quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-252 (1986).  In this case, there may be factual disputes; however, these disputes arise from perception rather than law.  All actions taken by officers were permissible under the law.

"The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing - that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) quoting to *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A plaintiff "may not rest upon mere allegations or denial of his pleadings, but…must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

In the case before this Court, Lea has not and cannot put forth any probative evidence to establish a genuine issue of material fact to support the claims.  For summary judgment purposes, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), citing Fed. Rule Civ. Proc. 56(c).   "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*.  In this case, there is no genuine issue of fact as the video evidence reflects that there were no constitutional violations and that at all times the officers acted in good faith.  Therefore, this court should grant Defendants' motion for summary judgment.

## ARGUMENT

### I.    Claims Against Detectives Holman and McNeil

Although Lea named Detectives Holman and McNeil as Defendants in this lawsuit, he has not pursued any claims against them throughout the pendency of this action.  No discovery was served on them, their depositions were not taken, and no information regarding their actions was requested through any source.  There is no information in the record aside from bare assertions set forth in the Complaint to support claims against Holman or McNeil.  Body camera footage establishes that they appeared on scene after the traffic stop had been initiated and after Lea's mother and another individual had arrived at the scene of the stop.  *See Body Camera of Holman, conventionally filed as Exhibit 6 and Body Camera of McNeil, conventionally filed as Exhibit 7*. Holman and McNeil's only involvement was to provide assistance in maintaining the safety of the stop.  Neither Holman nor McNeil took any specific actions with respect to Lea.  Consequently, neither Holman nor McNeil can be determined to have any liability related to Lea's claims.  Any claims asserted against Holman and McNeil should be dismissed.

### II.    *Monell*

When a §1983 claim is made against a municipality such as Metro Government, this court must analyze two distinct elements: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether Metro Government is responsible for that violation.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).  A municipality can be held liable under §1983 only when the municipality itself is responsible for the constitutional violation.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989).  There is no *respondeat superior* or vicarious liability under §1983.  *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).  It is only those cases where "a custom, policy or practice attributable to the

municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights" that municipal liability attaches. *Heyerman v. County of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

"*Monell* is a case about responsibility." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). "The official policy requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id*. at 479-80 (internal quotation marks omitted). "A Plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy, connect the policy to [Metro Government] itself and show that the particular injury was incurred because of the execution of that policy." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.), *cert. denied*, 510 U.S. 1177 (1994). Mere allegations of the Plaintiff are insufficient to defeat a motion for summary judgment. See *Brown v. Shaner*, 172 F3d 927, 929 (6th Cir. 1999). To establish a claim of §1983 municipal liability, plaintiff must "demonstrate that, through its **deliberate** conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) (Emphasis in original). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan Co.,* 520 U.S. at 405. (Internal citations omitted).

In this case, the *Monell* claims fail first because Lea cannot establish that his constitutional rights were violated during the course of the traffic stop at issue. The lack of an underlying constitutional violation is fatal to a *Monell* claim and will be addressed herein with respect to the individual claims. However, even if any constitutional violations occurred, they were not the result of a policy, practice, or custom attributable to Metro Government. Lea's Complaint sets forth several LMPD policies and appears to acknowledge that the policies were sound. Rather, Lea claimed that LMPD, through the use of traffic stops,

> routinely violated the rights of citizens, who were not informed that they were being detained due to a pretextual stop, search, and frisk policy and who were instead misled to believe that they were obligated to exit their vehicles, undergo full-body pat-downs, get handcuffed and have drug dogs and officers comb through every crevice of their vehicles, all while the officers had no reasonable suspicion of criminal activity on the part of the citizen.

*See* Complaint, DN 1, Paragraph 18. The record does not support these allegations. Instead, the record reveals that 2016 saw a record number of homicides and shootings in Louisville, with 117 murders. *See 2018 Preliminary LMPD YTD UCR Annual Comparison, attached as Exhibit 8.* Of those, 70% of the homicides and 75% of the shootings occurred in the First, Second, and Fourth divisions. 75% of the shooting victims were black, and 79% were male. *See Office of Performance, Improvement, and Innovation, Planning Template, attached as Exhibit 9.* In an effort to reduce homicides and shootings which disproportionately impacted black males, many different agencies and organizations within Louisville worked together to focus on the six neighborhoods that accounted for 50% of the homicides in 2016 – Park Hill, Russell, Shawnee, Shelby Park, Smoketown, and Victory Park. *See Violence Reduction Strategy, Office of Safe & Healthy Neighborhoods, March 1, 2017 Presentation, attached as Exhibit 10.*

7

LMPD directed funds towards its "violent crime reduction overtime" initiative.  As part of this initiative, one of the fourteen tools available to police officers was the use of traffic stops as a way to make contact with individuals traveling within the areas most affected by violent crime. Focusing primarily on the areas where violent crime was occurring through a "violent crime reduction overtime" initiative was demonstrated to be an effective tool in combatting violent crime.  *See April 16, 2019 Conrad Statements to Metro Council Public Safety Committee, 16:50-17:40, conventionally filed as Exhibit 11*.  These focus based tools included the use of traffic stops. Simply making a traffic stop, whether or not the stop is of an individual already suspected of being involved in criminal activity, can impact violent crime.  *See Exhibit 4, Hellard Deposition, page 21*.  It is a common approach among police departments to focus on areas of violent crime by "saturat[ing] an area with police presence" in order to deter crime.  *See Report of Dr. Tammy Kochel, p. 4-5, attached as Exhibit 12*.  Focusing police efforts in "hot spots" areas has proven to be an effective tool of law enforcement agencies in deterring violent crime.

Specifically, the use of traffic stops has been shown to reduce gun violence.  *Id. at p. 6*. During his deposition, McCauley was able to confirm this through specific examples.  McCauley testified that he has been told by individuals that he arrested that "we pay attention when we see unmarked vehicles in a neighborhood making traffic stops."  He also testified that he listened to jail phone calls after arresting an individual and heard that individual tell the person on the other end of the call not to do anything because Ninth Mobile was in the area.  *See Deposition of Jeffrey McCauley, p. 31-32, attached as Exhibit 13*.

The previous record number of homicides was set in 2016 at 117.  In 2017, agencies began to focus on reducing violent crime, with LMPD saturating areas of violent crime with personnel via the use of overtime.  Traffic stops were one available tool to use in these efforts.   Improvement

was seen in 2017 with 102 homicides.  The following year, 2018, saw even more significant improvement with a reduction to only 80 homicides.  In August 2019, after the Lea stop, LMPD revised its policies to be more stringent than case law requires with respect to traffic stops, and enforcement activities declined.  2020 and 2021 each surpassed the homicide rates of 2016, with 2021 setting a new record of 188 homicides.  *See "Louisville ends 2021 with record year of homicides, Wave 3 Article, attached as Exhibit 14*.

While Lea claims he felt targeted, the primary goal of members of the Ninth Mobile unit was to "keep people alive."  *See Exhibit 1, Deposition of William Hibbs, page 12*.  The record does not support allegations that LMPD officials encouraged officers to violate LMPD policies or to ignore the constitutional rights of individuals that were involved in traffic stops.  Nor does the record reflect that LMPD officers actually did violate policies or ignore individual constitutional rights.  It further does not support a claim that officers were not adequately trained in handling traffic stops or searches and seizures.

### a.  Failure to Train

The adequacy, or inadequacy, of a police training program can be the basis for §1983 liability "only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  To be a "policy" of deliberate indifference, [LMPD] must have taken a "course of action consciously chosen from among various alternatives" to adopt an inadequate training regimen for its officers.  *Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985).  In order to establish that Metro Government acted with deliberate indifference, Lea must allege either "prior instances of unconstitutional conduct demonstrating that [Metro Government] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause

injury," or that "a single violation of federal rights, accompanied by a showing that [Metro Government] has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation . . ." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (citations omitted); *Bd. of Cty. Comm'rs of Bryan Cty v. Brown*, 520 U.S. 397, 409 (1997) (citations omitted).

Prior to joining the 9th Mobile Division, officers were interviewed and required to show that they knew "a large amount of clearly established supreme court law." *See Exhibit 1, Deposition of William Hibbs, p. 21*. All officers are required to attend in-service training each year. ". . . at the end of in-service they have a presentation on clearly established law. There was always discussion about Terry. There was always discussion about probable cause and reasonable suspicion." *Id. at p. 43*. In addition to regular in-service training which discussed case law concerning traffic stops, LMPD sent training bulletins to all officers on the force addressing these topics. *See Training Bulletins attached as Exhibit 15*.

It will not be sufficient for the Plaintiff to suggest "that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Canton,* 489 U.S. at 391. *Canton* also pointed out that the sufficiency of training for any individual officer does not give rise to liability for the entire program of training that a municipality might offer. *Id*. at 390-391. While Lea's Complaint contains general allegations that LMPD officers had a pattern of violating constitutional rights through the use of unlawful pretextual traffic stops, Lea has failed to specify any allegedly similar traffic stops or establish that LMPD was on notice of the issue and acted with deliberate indifference toward the problem.

To the contrary, what the record has proven is that in response to a significant increase in violent crime, LMPD, along with other agencies, attempted to reduce the violent crime that

predominately impacted African American males.  While the areas wherein LMPD focused its efforts may have been predominately inhabited by African Americans, the focus was based solely on where violent crime was occurring.  With respect to the 9th Mobile, their focus could change weekly based upon the maps that they received each week identifying where violent crime occurred in the week prior.  When Chief Conrad became aware that there were community concerns related to traffic stops being conducted in violent crime areas, the policies relating to traffic stops were modified to be even more restrictive than what the United States Supreme Court requires.  *See June 5, 2019 Conrad Statements to Metro Council Public Safety Committee, 11:45-13:00, conventionally filed as Exhibit 16*.  For example, recognizing the inherent risks to officers during traffic stops, *Pennsylvania v. Mimms* grants officers the authority to remove a driver from his vehicle during a traffic stop for officer safety.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).  Case law does not require officers to provide a reason for removing a driver from his vehicle during a traffic stop.

On August 1, 2019, LMPD enacted the new traffic stop policy wherein it required that officers remove occupants only:

> When the officer has a reasonable and articulable belief that:
> - The subject is armed and/or presents a danger to the officer or another person.
> - The officer has probable cause to believe the subject has committed an arrestable offense or pursuant to a warrant.
>
> Officers may also remove an occupant from a vehicle for the following:
> - To administer field sobriety tests.
> - To conduct a commercial vehicle inspection.
> - To conduct a search of the vehicle (refer to SOP 8.24).
> - When a potentially dangerous situation exists that endangers the officer or another person.

*See S.O.P. 7.12.3, revised Date 8/01/19, attached as Exhibit 17*.  This modification did not occur because of any actual constitutional violations but due to the lack of community support impacting the ability of the attempts to be successful.  *See Exhibit 16 at 5:30-9:00*.

Lea has offered no more than the mere suggestion that better or more training could have prevented his alleged injury.  Lea's own expert did not opine on training beyond that of Crawford's inability to remember specific training that he had received by LMPD.  *See Report of Lou Reiter, p. 14, attached as Exhibit 18*.  There is no evidence in the record that LMPD failed to adequately train its officers simply because Crawford did not remember specific training that he had.  It must also be noted that Crawford no longer worked for LMPD at the time of his deposition on March 24, 2021.  He had already been working for the Jeffersonville Police Department for nearly two years.  *See Deposition of Kevin Crawford, p. 4, attached as Exhibit 19*.  Crawford's inability to fully remember the training of a department that he no longer works for or receives training from does not carry the weight Lea implies that it does.  Lea has failed to identify how inadequate training or supervision caused his alleged injuries.

### b.  §1983 *Monell* Claims Based on Alleged Unconstitutional Traffic Stop Policies, Patterns, Practices, and Initiatives

Lea claims that the use of traffic stops in specific neighborhoods afflicted by violent crime resulted in a pattern or practice of LMPD officers violating the constitutional rights of African American drivers.  Conrad has acknowledged that LMPD began using an approach focusing on people, places, and narcotics in 2017 in response to the record number of homicides in 2016 and general increase in violent crime.  *See April 16, 2019 Metro Council Hearing, Exhibit 11, 15:10-16:*20.  The record directly refutes that Conrad ever stated "that certain people (including black males) and places (including low income black neighborhoods) are 'targeted' and that black males in low income black neighborhoods are much more likely to be pulled over, searched, and

interrogated for traffic offenses as simple as 'wide turns.'" *See DN 1, Paragraph 21*. Instead, Conrad explained that resources were focused in the neighborhoods where violent crime was the highest in an effort to make those neighborhoods safer.

Focusing resources in areas of violent crime is neither a violation of constitutional rights, nor a tactic that will inherently lead to constitutional rights violations. There is nothing in the record establishing that Conrad, Hibbs, or any other high-ranking officials within LMPD knew or should have known of an alleged multitude of constitutional rights violations occurring during traffic stops as part of the violent crime reduction strategy. As noted above, when it became apparent that members of the community viewed the traffic stops unfavorably, LMPD changed the policies to be even more stringent than the law requires. This in no way indicates that the community's misgivings were correct from a legal or constitutional standpoint. However, for policing to be effective, the community must support police efforts. The change in policy makes it clear that Metro Government did not act with deliberate indifference with regard to alleged or perceived constitutional violations resulting from traffic stops in high crime areas. Absent deliberate indifference, the *Monell* claims must be dismissed.

## III.    Individual §1983 Claims

### a.  All Officers are Entitled to Qualified Immunity for Their Roles in the Traffic Stop of Mr. Lea

Qualified immunity "shields 'government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). The burden is on the plaintiff to prove that the defendant is not entitled to qualified immunity. *Id*. "Qualified immunity thus entails two steps that can be undertaken in

any order: (1) whether the public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events." *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 672 (6th Cir. 2020). The United States Supreme Court has held that "all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Immunity applies if reasonable officials could disagree on whether the public official could have reasonably believed that his conduct was lawful." *Waters*, 242 F.3d at 361 citing to *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). "Qualified immunity thus entails two steps that can be undertaken in any order: (1) whether the public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events." *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 672 (6th Cir. 2020). In this case, the videos show that Crawford, Hellard, and McCauley reasonably performed their duties during the course of the traffic stop without violating Lea's constitutional rights.

All officers' actions with respect to the traffic stop were reasonable under the law. The traffic stop was initiated when Lea made a wide right turn in front of Crawford and Hellard. Crawford activated the lights and sirens on his police vehicle. Five seconds later, Lea turned on his turn signal to indicate that he was pulling over. It was not until 14 seconds after the traffic stop was initiated that Lea actually stopped his vehicle. *See Detective Crawford's video, Exhibit 3, 0:32-0:48.* While 14 seconds may not seem long to a lay person, to officers this is a long time.

Evidence of criminal activity, including weapons can be hidden in 14 seconds.  This concern is confirmed on body camera when Hellard can be heard commenting that Lea is not stopping.  *Id.*

In addition to being slow to stop, upon approach to the vehicle, Hellard noted a baseball bat within Lea's immediate reach.  *See Detective Hellard's Body Camera at 1:20, conventionally filed as Exhibit 20.*  Crawford also perceived Lea as being nervous.  Crawford described Lea as breathing fast.  Lea has disputed this fact.  Breathing is difficult to see on body camera, and deference should be given to officers on the scene to ascertain what appears to be rapid breathing.  Furthermore, Lea himself has testified that he was nervous, confirming Crawford's perception.  *See Exhibit 5, Lea Deposition, pgs. 113, 115.*

Once Lea was pulled over and involved in a conversation with Crawford, he received a phone call that he not only interrupted the interaction with Crawford to answer, but he placed on speaker phone.  *See Exhibit 3, Crawford's Video, at 2:07-2:20.*  Crawford testified that this raised concerns that more people could be coming to the scene.  *See Exhibit 19, Crawford Deposition, pgs. 43-44.*  It was at this moment that Crawford had Lea get out of the vehicle.  Crawford then conducted a pat down of Lea.  Following the pat down, Crawford asked McCauley to have the canine sniff the exterior of the vehicle and noted that Lea was acting "pretty nervous."  *See Exhibit 3, Crawford's Video, 3:37-3:40.*  The Canine alerted to the presence of narcotics in the vehicle during the sniff.  *See McCauley Body Camera, 1:55, conventionally filed as Exhibit 21.*  When McCauley advised that the canine had alerted on the vehicle, Hellard handcuffed Lea, explaining that he was not under arrest but that the dog alerted on his vehicle and he was being detained.  *See Exhibit 20, Hellard Body Camera, 6:24-6:43.*  Crawford and McCauley searched the vehicle while Hellard stayed with Lea.  When the vehicle search was complete, Crawford searched Lea's person.

*See Exhibit 3, Crawford Video, 15:00-15:30.* Crawford then completed the citation, and the traffic stop was concluded just short of 25 minutes. *Id. at 24:20.*

*Terry v. Ohio* established the law that police may conduct investigatory stops and conduct a pat down frisk where they have "reasonable cause to suspect that the persons temporarily detained are armed and dangerous." *Arizona v. Johnson*, 129 S.Ct. 781, 782 (2009), *citing Terry v. Ohio*, 392 U.S. 1, 24 (1968). "Traffic stops, which 'resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*' are 'especially fraught with danger to police officers' who may minimize the risk of harm by exercising 'unquestioned command of the situation.'" *Id.*, *internal citations omitted.* For this reason, it has been determined by the United States Supreme Court that officers may not only require the driver to get out of the vehicle during a traffic stop, but that officers may also conduct a pat down "for weapons if the officer reasonably concludes that the driver might be armed and dangerous." *Id.*, *citing Pennsylvania v. Mimms*, 434 U.S.106, 112.

"'Reasonable suspicion' is recognized for being an abstract concept, but this is a product of design, not accident or error, and the Supreme Court has 'deliberately avoided reducing it to a 'neat set of legal rules.'" *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016), internal citations omitted. "The reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000). "Reasonable suspicion exists if 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Pedicini*, 804 Fed.Appx. 351, 355 (6th Cir. 2020). When determining whether reasonable suspicion is present, courts should not consider factors in the analysis "in isolation from one another." *United States v. Pacheco*, 841 F.3d at 391. The totality of the circumstances should be examined to

determine if an officer had a reasonable suspicion to perform a pat down for weapons. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). In examining the totality of the circumstances, it must be determined "whether the individual factors, taken as whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008).

"Officers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" Here, Crawford pulled Lea over in a high crime area, Lea took sixteen seconds to stop his vehicle, he appeared nervous to Detective Crawford, had a baseball bat in the vehicle, answered a phone call, and put the caller on speaker phone. Answering the phone during a traffic stop creates a potentially dangerous situation where more people can show up, outnumber officers, and create danger or harm. *See Video of May 4, 2020 Traffic Stop wherein LMPD officers were surrounded within one minute after subject told his mother where he was pulled over, conventionally filed as Exhibit 22*. When viewed as a whole, Crawford had sufficient information to form a reasonable suspicion. As such, the initial pat down for weapons was justified under the totality of the circumstances and was not violative of the Fourth Amendment.

Crawford asked McCauley to run the canine around the exterior of Lea's vehicle. A dog sniff during a traffic stop is lawful so long as it does not prolong the stop "'beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. U.S.*, 575 U.S. 348, 349 (2015), *quoting Illinois v. Caballes*, 543 U.S. 405, 407. The essential analysis is "whether conducting the sniff adds time to the stop." *Id.* at 349. In this case, the K9 was sniffing the exterior of the vehicle within five minutes of Lea stopping his vehicle. On Crawford's video, Lea stopped his vehicle at 48 seconds, at 3:37 Crawford spoke to McCauley to ask him to have the

K9 sniff, and by 5:28 the K9 was sniffing the vehicle with McCauley.  *See Exhibit 3, Crawford's Video, 0:48-5:28*.  McCauley arrived on scene within three minutes of the stop, before Crawford even had a chance to begin running Lea's driver's license, insurance, registration, or conducting a search for warrants.  McCauley's quick arrival was because Hellard called on the radio to alert other members of the Ninth Mobile of their location and the traffic stop.  *See Exhibit 4, Hellard Deposition, p. 27*.  The vehicle was searched only after the canine alerted.

A warrantless search of a vehicle may be conducted where there is "probable cause to believe that the vehicle contains evidence of a crime." *Nykoriak v. Wileczek*, 666 Fed.Appx 441, 445 (6th Cir. 2016), *internal citations omitted*.  A "positive indication by the canine [is] 'sufficient to establish probable cause for the presence of a controlled substance' to justify the warrantless search." *Id.*, *quoting United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994).  Crawford was still in the process of running Lea's information and checking to see if there were any outstanding warrants when the canine began the exterior sniff.  Because the canine's positive alert provided probable cause to conduct a search of the vehicle, the search and the time that Crawford spent in assisting with the search did not prolong the stop in violation of the Fourth Amendment.  Furthermore, the search of the vehicle was conducted within the confines of the Fourth Amendment as probable cause existed.  The Sixth Circuit has held that an individual may be searched incident to arrest where he is seized after a canine alerts to the vehicle in which he was sitting.  *See United States v. Jackson*, 801 F. App'x 941, 945 (6th Cir.), *cert. denied*, 140 S. Ct. 2789, 206 L. Ed. 2d 952 (2020).

"An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 555 U.S., at 243-244, citing *Anderson,* 483 U.S., at 641, 107 S.Ct. 3034.  Whether a search violated the Fourth

Amendment is again based on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* The initial pat down, search of Lea's vehicle, and search of Lea's person were all objectively reasonable for the foregoing reasons. As such, Crawford is entitled to qualified immunity for these three searches, and McCauley is entitled to qualified immunity for the vehicle search.

The scope of the seizure was also reasonable in this case. Lea was seized during the traffic stop for nearly 25 minutes wherein he was not free to leave. He was handcuffed by Hellard only after the canine alerted to the presence of narcotics in his vehicle. Although he was seized, Hellard explained to Lea that he was not under arrest and was merely being detained. Hellard further explained that he was handcuffing Lea so as to prevent him from running and because it was unknown what may be in the vehicle. *See Exhibit 20, Hellard Video, 6:24-6:43.* The initial seizure was due to a traffic infraction witnessed by Crawford and Hellard and captured on Crawford's body camera. The seizure then continued while Lea's vehicle was searched after the canine alerted. The seizure ended promptly when the citation for the traffic infraction was completed. Because the seizure was based on a lawful traffic stop and all steps taken during the stop were constitutional, all officers are entitled to qualified immunity.

### b. The Individual §1983 Claims Against the Officers Must be Dismissed on the Merits

#### i. §1983 Fourth Amendment Search and Seizure and *Terry* Stop Claims

Lea pleads throughout his Complaint that officers engaged in unlawful pretextual traffic stops. He also claimed that he believed he was targeted prior to the stop and followed by the officers. It is well settled that pretextual stops are not unlawful. "The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. U.S.*, 116 S.Ct. 1769, 1772 (1996). Even where the traffic violation itself

is not the reason the police want to make a traffic stop, so long as a traffic violation has occurred, the stop is lawful.  "[S]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional."  *Whren*, 116 S.Ct. at 1774, quoting *Scott v. United States*, 436 U.S. 128, 138 (1978).  When discussing the constitutionality of pretextual stops, the Supreme Court stated:

> We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.  We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race.  But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.  Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

*Id*.

Defendants deny having intentionally followed Lea.  The map attached as **Exhibit __** clearly demonstrates that based solely on where violent crime occurred in the week prior, it was entirely reasonable for Crawford and Hellard to be travelling on Dixie Highway to get to areas with several shootings the week before without ever targeting Lea.  However, even taking the facts in a light most favorable to Lea for purposes of this motion, if Crawford and Hellard had followed him to see if he would make a traffic infraction warranting the stop, this is not a constitutional violation.  A decision to pull an individual over prior to observation of a traffic infraction is not unconstitutional.  *See United States v. Jackson*, 801 F. App'x 941, 945 (6th Cir.), *cert. denied*, 140 S. Ct. 2789, 206 L. Ed. 2d 952 (2020).  Here, there is no dispute as to the traffic infraction as Lea is seen on video making a wide turn.  Therefore, the initial stop was lawful.  For the reasons set forth above, all actions taken by Crawford, Hellard, and McCauley during the course of the traffic stop were lawful and within the confines of the Fourth Amendment.  Consequently, the §1983 Fourth Amendment claims related to search and seizure and *Terry* stops should be dismissed on the merits.

### ii. §1983 Excessive Force

Lea asserts an excessive force claim that is based on him having been handcuffed. *See DN 1, Count 3*. The Complaint identified this claim as being raised against LMPD Officers. Hellard was the officer that handcuffed Lea. Lea was handcuffed only after the canine alerted to the possibility of drugs in the vehicle. At that time, Detective Hellard had probable cause to believe that Lea was involved in criminal activity. Hellard explained to Lea that he did not want Lea to run. *See Exhibit 20, Hellard Video, 6:24-6:43*. The simple fact that Lea was handcuffed after a canine provided probable cause to believe that criminal activity was afoot does not warrant an excessive force claim. It has been held that:

> In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing.

*Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015), *quoting Morrison v. Board of Trustees of Green Tp.*, 583 F.3d 394, 401 (6th Cir. 2009). Here, Lea never complained that the handcuffs were too tight, Hellard could not have ignored complaints that did not exist, and Lea has never asserted physical injury resulting from the handcuffing. The excessive force claim must be dismissed on the merits.

## IV. §1983 Wrongful Arrest

Lea raises a §1983 Wrongful Arrest claim, asserting that despite a lack of probable cause to arrest him, "the LMPD Officers handcuffed Lea for nearly 20 minutes, held him as an Arrestee and refused to permit him to leave." *See DN 1, Paragraphs 117 - 119*. First, Lea was never arrested. He was detained pending a lawful search of his vehicle based on probable cause. Lea

was specifically advised that he was not under arrest when he was being handcuffed.  *See Exhibit 20, Hellard Video, 6:24-6:43*.  Even if the detention is to be treated as an arrest, Hellard had probable cause to handcuff and detain Lea.  "In order for a wrongful arrest claim to succeed under §1983, a plaintiff must prove that the police lacked probable cause."  *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009), *quoting Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).  "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed."  *Id*., *internal quotations omitted*.  The positive alert by the canine provided probable cause to believe that a crime had been or was being committed.  Handcuffing and detaining Lea until the search was completed was both reasonable and supported by probable cause.  Lea's claim of wrongful arrest must be dismissed.

## V.      Negligent Training and Supervision Under Kentucky Law

Chief Conrad and Major Hibbs are entitled to qualified official immunity for the claims of negligent training and supervision that are brought against them in their individual capacities.  Whether qualified immunity is applicable to an officer's actions is a question of law.  *Bolin v. Davis*, 283 S.W.3d 752, 757 (Ky. App. 2008).  When sued in his individual capacity, an officer is afforded qualified official immunity for the negligent performance of: 1) a discretionary act; 2) done in good faith; and 3) done within the general scope of his authority.  *Yanero*, 65 S.W.3d at 522.

For purposes of qualified official immunity, an act may be characterized as either discretionary or ministerial.  Qualified official immunity shields a public officer from liability for discretionary acts.  Discretionary acts are those that require the exercise of reason in the adaptation of means to an end, and discretion in how or whether the act shall be done.  *Haney v. Monsky*, 311 S.W.3d 235, 240-241 (Ky. 2010).  In other words, qualified official immunity protects public

22

officers from liability for judgment calls or "guesses" made "in gray areas." *Caneyville Volunteer Fire Dept v. Green's Motorcycle Salvage, Inc.,* 286 S.W.3d 790, 810 (Ky. 2009) (quoting *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006)). Such judgment calls or "guesses" involve "the exercise of discretion and judgment" and frequently involve significant deliberation. *Yanero*, 65 S.W.3d at 522. An act or function is discretionary, and protected by qualified official immunity, if it can "be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Haney* at 240 (citing *Upchurch v. Clinton County*, Ky., 330 S.W.2d 428, 430 (1959)).

In this case, there is not any action being alleged on the part of Chief Conrad or Major Hibbs that has to do with Lea's alleged injuries. Neither Chief Conrad nor Major Hibbs directly trained or supervised the individual officers. Therefore, there are no actions or inactions to be analyzed as negligent or discretionary pertaining to Lea's allegations. As such, the claims against Conrad and Hibbs must be dismissed.

### i.    Negligent Training

Neither Conrad nor Hibbs had direct involvement in the training of the officers. Even if Conrad or Hibbs were involved in the training, it is well settled that a supervisor's "decision 'on the content of policies and training is a discretionary function.'" *Finn v. Warren County, Kentucky*, 768 F. 3d. 441, 449 (6th Cir. 2014), citing *Yanero*, 65 S.W.3d at 529. Any input Conrad or Hibbs might have had with respect to the approval of policies and training procedures would have been discretionary, made in good faith, and within the scope of their authority. Accordingly, Conrad and Hibbs are entitled to qualified immunity.

23

ii.    **Supervisory Liability**

As to the claim of supervisory liability, supervision has been recognized time and again in Kentucky as a discretionary function.  In *Haney v. Monsky*, 311 S.W.3d 235 (Ky. 2010), the court said:

> [W]e have found that supervising the conduct of others is a duty often left to a large degree—and necessarily so—to the independent discretion and judgment of the individual supervisor. In *Sloas*, we held that a deputy jailer's act of supervising inmates engaged in a voluntary work program was 'as discretionary a task as one could envision'....

*Id*. at 244, quoting *Rowan County v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006).  Although Hibbs was the Major over the 9th Mobile unit, he was not the direct supervisor for any of the named officers. None of these supervisors who had direct supervision over the officers are defendants in this litigation.  Any role that either Conrad or Hibbs had which could be considered supervisory, would have been within the scope of their authority as Chief and as Major.  There are no allegations concerning this type of supervision and certainly nothing to suggest that Conrad or Hibbs acted inappropriately.  Both Conrad and Hibbs are entitled to qualified official immunity as a matter of law.

**A.  The State Claim of Negligent Training and Supervision Fails on the Merits**

While Kentucky law dictates that Conrad and Hibbs be dismissed pursuant to the doctrine of qualified official immunity, the claim of negligent training and supervision also fails on the merits.  The Complaint contains only generic language with respect to the negligent training and supervision claim, alleging that Conrad and Hibbs "failed to properly train and supervise the LMPD Officers so as to assure that these officers observed and followed applicable Constitutional and LMPD standards . . ."  *See DN 1, Paragraph 127*.  The sole factual basis for the claim is the assertion that Conrad and Hibbs knew or should have known "that by failing to properly train

24

and/or supervise LMPD officers and employing the 'people, places, narcotics' initiative would result in the conduct of targeting motorists solely based on their race and subsequently illegally detaining and searching individuals and their vehicles without a reasonable basis." *Id*. at Paragraph 128. Despite discovery having been conducted, there remains no evidence to support these assertions. The evidence does not establish that LMPD officers were not trained in how to conduct a traffic stop, nor does it establish that Conrad or Hibbs were involved in choosing training materials.

"In recognizing the tort of negligent supervision, Kentucky has adopted the Restatement (Second) of Agency § 213 which illustrates the requirements for establishing a claim of negligent supervision." *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003.) "[A]n employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created." *Booker*, 350 F.3d at 517. Specifically, Conrad and Hibbs must have "had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005).

There is no evidence that either Conrad or Hibbs were aware that any officers involved in the subject traffic top possessed "harmful propensities," nor any evidence to suggest officers were likely to target African Americans and routinely violate constitutional rights as alleged. Consequently, Lea has failed to establish a claim of negligent supervision against either Conrad or Hibbs.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment.

Respectfully Submitted,

MIKE O'CONNELL
JEFFERSON COUNTY ATTORNEY

/s/ *Susan K. Rivera*
Peter F. Ervin
Susan K. Rivera
Assistant Jefferson County Attorneys
First Trust Centre
200 S. Fifth Street, Suite 300N
Louisville, Kentucky 40202
PHONE: (502) 574-3076
FAX: (502) 574-5573
EMAIL: susan.rivera@louisvilleky.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will automatically send copies to all counsel of record.

/s/ *Susan K. Rivera*
Susan K. Rivera

26