1        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF KENTUCKY
2               AT LOUISVILLE

3

4

5   CIVIL ACTION NO. 3:19-CV-419-GNS-RSE

6

7

    TAE-AHN LEA                                    PLAINTIFF
8

9

10              VIDEOCONFERENCE/TELECONFERENCE
11  VS          DEPOSITION FOR THE PLAINTIFF

12

13

14  STEVE CONRAD, et al                         DEFENDANTS

15  * * *                    * * *                    * * *
16

17  DEPONENT:    MAJOR WILLIAM ARTHUR HIBBS
                 (FEBRUARY 17, 2021)
18

19

20

21

22

23            Nancy L. Nunnelley, RMR
         Kentucky Certification No. 20042B131
24              4413 Chenwood Lane
           Louisville, Kentucky 40299
25     Phone: (502) 594-1728  Fax: (502) 267-4156
       Email:  nunnelleycourtreporter@gmail.com

1    APPEARANCES:

2                  (ALL PARTIES AND THE WITNESS APPEARED
                    VIA VIDEOCONFERENCE/TELECONFERENCE)
3
     For the Plaintiff
4
          Sam Aguiar, Esquire
5         Josephine Buckner, Esquire
          Sam Aguiar Injury Lawyers, PLLC
6         1201 Story Avenue
          Suite 301
7         Louisville, Kentucky 40206
          sam@kylawoffice.com
8         jbuckner@kylawoffice.com

9         ALSO PRESENT:  Tae-Ahn Lea
                         Tija Jackson
10

11
     For the Defendants
12
          Peter Ervin, Esquire
13        Andrew Miller, Esquire
          Jefferson County Attorney's Office
14        200 South Fifth Street
          Suite 300N
15        Louisville, Kentucky 40202
          peter.ervin@louisvilleky.gov
16

17
     Videographer
18
          Rich Ramey
19        richramey@bellsouth.net

20

21
                         * * *
22

23

24

25

```
1                           I N D E X

2    EXAMINATIONS                                    Page

3      BY MR. SAM AGUIAR                                4

4

5    EXHIBITS

6    No.        Description                          Page

7     1     Strategic Plan for Louisville Metro Police   33
             Department
8     2     SOP 7.12.7, Strategies and Tactics of Patrol  61
             Stops
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          The videoconference/teleconference

2    videotaped deposition of MAJOR WILLIAM ARTHUR HIBBS

3    taken with the witness being at his home, Louisville,

4    Kentucky, on Wednesday, February 17, 2021, at about

5    the hour of 1:04 P.M., said deposition being taken

6    pursuant to Notice for use in accordance with the

7    Federal Rules of Civil Procedure.

8    ***                    ***                    ***

9          VIDEOGRAPHER:  The date is February 17,

10   2021.  The time is 1:04 P.M.  We are on the video

11   record for the deposition of William Hibbs.  Would

12   you please swear in the witness.

13          THE REPORTER:  Sure.  Do all parties agree

14   to the remote swearing of the witness since we're not

15   in the same place?

16          MR. ERVIN:  Agree.

17          MR. AGUIAR:  Agreed.

18          MAJOR WILLIAM ARTHUR HIBBS, after first

19   being duly sworn, deposed and said as follows:

20   EXAMINATION BY MR. SAM AGUIAR

21          MR. AGUIAR:  Sir, if you could, go ahead

22   and tell us your name, please.

23          MAJOR HIBBS:  Yes, sir.  My name is

24   William A., Arthur, Hibbs, H-I-B-B-S.

25      Q.  Okay.  And are you currently employed?

1       A.  Just kind of started doing some specialized

2  security work for St. Xavier High School.

3       Q.  Okay.  And it's my understanding that you

4  retired as a -- with the rank of major with LMPD, is

5  that correct?

6       A.  Yes, sir.

7       Q.  Did you hold any other -- did you hold any

8  positions with law enforcement other than with

9  Louisville Metro Police Department?

10       A.  I was a police officer for the former

11  Louisville Police Department before we merged.

12       Q.  Okay.  And when did you start?

13       A.  August of 1997 was the beginning of the

14  academy.

15       Q.  Okay.  And if you could, just give me a

16  timeline from August of '97 up until the time you

17  retired, nothing too specific, just, you know, what

18  ranks you held, when you got promoted, up until the

19  rank that you held when you got -- when you left.

20       A.  Yes, sir.  Began the academy in 1997.  Hit

21  the streets after graduation in January of 1998.  I

22  was a patrol officer, I believe -- I know it was for

23  five, five and a half years.  I think 2003 to 2005 I

24  was interviewed for and was introduced into a flex

25  team in the same division that I was working.

1          Do you want the facts of where I was working as

2     I go along with this?

3          Q.   Sure.   That would be good.   Thank you.

4          A.   Okay.   19 -- I'm sorry?   So in 1997 I was

5     -- when I was hired by the former LPD, I began my

6     work in the -- what was then the Fourth Division --

7     district which is now the Second Division.   I did two

8     rotations there, and I went to the Second Division,

9     which is -- Second District, which is now the First

10    Division.   And I went solo in what was then the

11    Second District, which is now the First Division.

12    Rode the beat there for five and a half years, which

13    was Portland, Russell neighborhood, the downtown

14    business district and the Clarksdale Housing Complex,

15    along with the expressways.

16         I then became a flex detective.   And we worked

17    as a team there in the Second Division -- Second

18    District, I'm sorry.   And then when we had merger in

19    2003, because they had an abundance of flex

20    detectives in the Second and a lack of some in the

21    Fifth, they separated them.   So once the department

22    was reinstructed and we became divisions and not

23    districts, I left the First Division and went to the

24    Fifth Division, which was the Highlands, and I worked

25    there till 2005.

1        2005 to 2009 I interviewed for and went to the

2   Major Case Division, which was the Criminal

3   Intelligence Division.  It was a detective spot where

4   we worked high-end cases, larger scale cases.  We

5   were direct support for homicide and robbery.  A lot

6   of stuff was based on property crime, and there some

7   some violent criminal activity also with longer-term

8   investigations.

9        2009 I was promoted to sergeant, either 2009 or

10   beginning of '10.  I went back to the First District

11   -- division, sorry, the First Division, which I was

12   sergeant then on mid watch, which, again, took the

13   Portland area, the Russell area, Beecher Terrace

14   Housing, downtown business area, Clarksdale Housing

15   and the expressways and the hospital districts.

16        Worked there a couple of years.  And then I

17   went to the Forensics Unit in Major Crimes as a

18   sergeant, which I -- I was -- I supervised

19   individuals that were both civilian and sworn,

20   polygraph, the photography unit, video sur -- video

21   forensics, fingerprint squad, the Crime Scene Unit.

22        From there I was promoted to lieutenant.  And

23   that was in -- excuse my times here.  I'm thinking

24   2000 -- I was promoted to lieutenant and did -- for

25   two years I was a lieutenant.  Started out in the

1  Third Division.  I was there for two months.  And

2  then put in for and was moved to the Viper Unit,

3  which was then the Viper Unit, with Major Kevin

4  Thompson, to go over there and reorganize the unit.

5  We constructed and ran Operation Trust.  I worked

6  there as a lieutenant.  I'm assuming I guess it was

7  till 2017 as a lieutenant.  We rebranded, after we

8  made a lot of changes and got more manpower, in

9  September of -- September 27th, 2015, we became Ninth

10 Mobile Division with cameras and uniforms.

11      And then we went from there, I was promoted in

12 2017.  So '15 I went to the old Viper.

13 September 27th of '15 we became Ninth Mobile

14 Division.  I was promoted to major I believe in

15 August of 2017.  So I worked as a lieutenant in that

16 division for the next year and so many months until I

17 was promoted major and stayed in the same division,

18 which is where I was until I retired December 1st of

19 2019.

20      Q.  All right.  Got it.  Why did you retire?

21      A.  I had a plan.  We have a -- there's a

22 liaison on the department that is really good with

23 the retirement system.  I met with him nine years ago

24 now.  And we went to Frankfort, and he -- after we

25 went to Frankfort and look -- at 15 years you're able

1    to evaluate what your future looks like.  You're able

2    to buy ghost years.

3         So I listened to him diligently.  I wanted to

4    make sure I had my ducks in a row for my departure.

5    And I was 15 years on and went with him, evaluated,

6    got to learn what the processes were, bought some

7    ghost years.  And then there were -- there were a

8    couple of ghost trains that left the station through

9    the years.  But this in 2019 going into '20 there was

10   going to be some changes to the pension system, and

11   it was -- I had three dates lined up for that year.

12   It was either going to be August, September or

13   December, and December ended up being the best date.

14        Q.  At the time you retired had you -- had you

15   been notified that Ninth Mobile and narcotics were

16   going to be blended into I guess what's now called

17   Criminal Interdiction Division?

18        A.  It was -- yeah, that was -- those -- that

19   was starting to churn.  It was -- that was -- I also

20   had -- I had a surgery in the middle of November.  So

21   I was beginning to take vacation time.  But I knew

22   that there was a change coming.  But I -- it was also

23   based upon -- there was -- yes, I knew there was a

24   change coming.

25        Q.  Okay.  When you think back to those years

1  in '97 and leading up to that, what made you want to

2  be a police officer?

3      A.   I was a victim of theft when I was 18 years

4  old.  I -- I was at the Kingfish on Dixie Highway.

5  And I came out, I was driving a vehicle, and I came

6  out and they had -- someone had stole my hubcaps.

7  And I'd never taken anything from anyone.  So to have

8  that done to me for something I had worked hard for.

9  And I went to work that night and I didn't go home.

10  I went to a place over off of Crums Lane off Dixie to

11  buy more hubcaps to put back on the vehicle.  I

12  didn't want to take it home.

13      And that set with me.  And I didn't understand

14  the -- why someone would take from me.  I didn't -- I

15  didn't appreciate it.  And it kind of set with me

16  that there are -- you know, I was victimized.  I

17  didn't like it.

18      Q.   When you made the transition from Viper

19  into Ninth Mobile, what was your understanding of the

20  changes?  You know, what was taking place that was

21  going to be different between Ninth Mobile versus

22  Viper?

23      A.   When I came in, it was -- Major Thompson

24  was -- had already been there for two months.  And

25  Major Thompson was working closely with the top

1    command staff.  And I didn't ask a lot of questions

2    at that point.  When I got brought up there, it was,

3    we're going to be 4:00 to midnight, 4:00 to 2:00.

4    We're going to -- we have to do some restructuring.

5    We have to do evaluation of the unit.  There's going

6    to be -- again, there was a lot of rotation, just

7    like it was when I was leaving, there was a lot of

8    people that were leaving.  And, again, may have

9    contributed, don't know for sure, to the combination

10   of both units of Ninth Mobile Division and Narcotics.

11        But then we had a lot of people that were

12   leaving.  A lot of commanding officers had left.  We

13   had a transition with top command.  And then when he

14   went in, after two months the lieutenant that was in

15   the division at that point was, I'm assuming, I don't

16   know, he wasn't there very long once I arrived.  And

17   once I took over, once I got up there, it was he had

18   a set place of standards that we were going to meet.

19   We were going to work in violent -- where violent

20   criminal activity was being reported, and that was

21   only where we were going to work.

22        It was -- you know, we were going to -- we have

23   our breaks.  We were going to, you know, make sure

24   there was plenty of officer wellness and people were

25   going to be able to use the restroom and have a good

1    meal and such like that.  But in respect to our time

2    and the shifts, it was going to be more structured.

3    Again, I don't know what it was like before.  I

4    wasn't there before.  I got there two months after

5    he'd already walked through the door.

6         So there was a lot of restructuring.  There

7    wasn't coming in it here, coming in it there.  What I

8    know, what I saw when I walked through the door was

9    4 o'clock is roll call, and we will be on the street

10   working at 5:00.  And that's what it was.  It was --

11   and, again, I don't know -- I don't know what went on

12   before me.  All I know is that there had been a large

13   shift in command, there had been a large shift in

14   detectives.  And when we got there, we went to a

15   facility that was limited.  It was a facility that

16   hadn't been used in awhile, and we had to start from

17   scratch, and we did.

18        Q.  When you look back at your time as major

19   and heading up Ninth Mobile, what are you most proud

20   of in terms of accomplishment?

21        A.  I -- I took great pride in the fact that we

22   sincerely as a group, and this came from top down, we

23   were there to keep people alive.  We -- we said it

24   multiple times with -- within the walls where we

25   worked amongst each other.  It was said publicly.

1        But we sincerely made -- forged a lot of ground

2    with the community.  We met a lot of people.  We knew

3    a lot of people.  We had good communication.  We had

4    established a lot of outreach, which was very

5    satisfying.  The Center For Women and Families alone,

6    we donated over 25,000 pounds of food to.  This was

7    something that -- and I'd always done a little bit of

8    outreach in my career.  But when we got to Ninth

9    Mobile and I knew that we would be -- you know, we

10   were going to be in areas that really needed us, and

11   they were picking up the phone and they were calling

12   us.  I shouldn't say me.  They were reporting their

13   crime.  They were -- they were sincere enough to

14   report the crime, which we in turn got and we were

15   able to evaluate and go show proactivity and some --

16   we were able to be where people wanted us to be.

17       But on top of that we forged a lot of -- we

18   gave people the opportunity to come back out on the

19   front porch and sit down and enjoy their property and

20   enjoy their street and enjoy the children and

21   grandchildren out being out on the road on their

22   tricycles or bicycles.  Took great pride in that.

23       But we sincerely -- you know, there were a lot

24   of models that were introduced to me, you know, there

25   was 21st Century Policing.  There was -- there was

1    the Project Safe Neighborhoods.  There was the

2    Violence Restructure -- Reduction Strategy.

3        And it -- there was a lot of overlap with each.

4    And with each, you know, we drew the best we could

5    from each while we were prioritizing our efforts.

6    And it was very rewarding to see that 2015 there were

7    80 homicides.  And in 2016 there were 117 homicides,

8    101 committed with guns.  And then we went to 102 the

9    next year and then to 80.  And then the year I left,

10   the minute -- the last day that I actually worked

11   there were 72.  There ended up being 92 that year.

12   But the last day that I walked out the door there

13   were 72.

14       I'm not saying it was all me.  It was

15   collaborative.  We worked hand in hand with the

16   divisions.  We worked hand in hand with narcotics.

17   We listened to the community.  We listened to what

18   was being reported.  By that time the detectives had

19   done a lot of work.  There had been a lot of

20   discretion used and capacities where we had built

21   trust with people in the community that were willing

22   to fight for their own community.  And we listened,

23   and we paid a lot of attention to what people were

24   telling us.

25       And it was -- it was strong, and we got to see

1    a large reduction in violent criminal activity, which

2    was my -- that was our goal.  I was tasked with that.

3    I didn't -- there was a lot of things that I got to

4    incorporate.  The models of 21st Century Policing and

5    the models in the Project Safe Neighborhood, you --

6    you interact with the people in the community, and we

7    did.  We made a lot of food donations.  We had a lot

8    of outreach.

9         And we got to, you know, when you're -- I got

10   to meet a gentleman named Malcolm French.  He had

11   a -- he had a spot down on Muhammad Ali where he did

12   outreach for kids.  And we did a Thanksgiving day

13   donation down there.  And there were people lined

14   around the block.  And we had a huge box truck full

15   of food.  We had people inside.  We had people

16   outside.  And a lot of -- there was a lot of people

17   really appreciative.  They -- there was a lot of

18   people that were also -- were hesitant to be so

19   outgoing with thanking us.  That gave a lot of people

20   the opportunity to thank us.  We did so with The

21   Healing Places, we did so -- men and women Healing

22   Places, the Wayside Mission.

23        But when we were dealing with people where we

24   could -- you know, with Malcolm, I was able to know

25   him for a short period of time before he closed that

```
 1   facility and went to a different direction.  But
 2   there was a lot we got to do and a lot of people we
 3   got -- a lot of their lives we were able to touch.
 4   And it benefited the community.  It benefited the
 5   communities they lived in, and it was strong.
 6        Q.   When you think back to 2018, because we're
 7   going to be focusing on August of 2018 a lot in what
 8   I ask you today, which is the Tae-Ahn Lea incident,
 9   what units were there within the Ninth Mobile
10   Division?
11        A.   We had a fugitive team.  We had a fugitive
12   team that was -- they were there, and I can elaborate
13   if you need me to.  There was the major case squad
14   that was working in collaboration with the federal
15   partners, which was then tagged and termed as the
16   LMINTEL Task Force.  And then you had the four street
17   squads.
18        Q.   And the four street squads, how many
19   members were on each squad?
20        A.   It was a -- everyone had a commanding
21   officer.  And there were four to six detectives,
22   depend -- again, there was a lot of attrition over
23   those years because of retirement system.  But -- so
24   we were -- we were pretty strong during '18.  It was
25   everywhere from four, like I said, four to -- four to
```

1    seven, four to eight members, sometimes four to six.

2    There was a K-9.  And we worked on an A/B schedule.

3    So that meant there were two street squads with a K-9

4    detective working one part of the week.  And the

5    second park of the week there were two other squads

6    with a K-9 detective.  So that way you have four

7    squads, you have coverage each day.

8            Q.   Okay.  And then in terms of the selection

9    of detectives to be on -- to be within Ninth Mobile,

10   what did that process entail?  Were you -- would

11   people apply and you interview them, or how did that

12   all work out?

13           A.   There was a lot of vetting.  We -- we had a

14   very extensive interview process.  We wanted

15   individuals that were coming to the unit that had

16   good court history.  And I'm not talking about just

17   numbers.  I'm talking about follow-through with

18   significant cases.  We looked at their activity

19   rates, their runs for service, their -- how many

20   times they went to the property room, just to see how

21   they were managing their time.  We looked at, you

22   know, we contacted not only PIU and PSU, but we also

23   contacted their first line supervisors, and we

24   requested if there was any input they could give us,

25   if there was a problematic individual, if there was

1    someone who showed exemplary levels of, you know,

2    just an overall great officer.

3         You know, we had a -- we had a very diverse

4    group.  We had individuals that grew up and spent

5    their entire life in Portland.  We had one that grew

6    up at 42nd and Market.  We had individuals that

7    wanted to be there because they could still work and

8    police in the environments they grew up, which was

9    strong.

10        We also looked at when they came -- when we

11   were running the division as Viper, we started a task

12   force called Operation Trust.  Kevin Thompson was

13   behind the theory and the work.  I came in, and it

14   was already being done.  So all I did was help run it

15   once it was established.

16        But that allowed the detectives the opportunity

17   to request to come up and work in the Operation Trust

18   to see how the division was -- where it was heading

19   because everybody knew that changes were coming.  It

20   was going to be -- it wasn't going to be what Viper

21   was.  And, again, I didn't pay any attention to what

22   Viper was.  I was in a different capacity then and

23   happy.

24        So once I got promoted, the changes were

25   occurring.  So the detectives that were -- were

1    volunteering to come up for a one-month stint in

2    Operation Trust, it gave us an opportunity to see

3    them on the task force, how they operated, were they

4    cordial, did they do good strong work, did they

5    listen.  Main thing, did they use both ears as

6    opposed to one mouth, which one they use more of.  It

7    was -- it was a good opportunity for us to see who

8    had the desire to be there, who had the skill to be

9    there and then were intelligent enough to come up and

10   work amongst individuals that were going to do good

11   strong work in a safe fashion.

12         That was your question, correct?

13         Q.   Yeah.

14         A.   Did you have any questions about the

15   interview or did you -- was that what you asked?  I'm

16   sorry.

17         Q.   I think -- no, I think you covered it

18   pretty well.  And then once these folks would come in

19   and, you know, you'd determine they'd be a good fit,

20   they got into Ninth Mobile, what was their training

21   program that they would go through before just being

22   put on the streets in a street squad?

23         A.   Well, we were limited by what the

24   department would allow.  And what I mean by that is,

25   is -- and I don't have the training records with me

1   for everybody.  That's got to be obviously accessed

2   by human resources and training.

3        But the -- we -- when the interview process was

4   going on, we asked them, you know, had they done any

5   independent research in regards to the type of work

6   we do.  We asked them what training they had

7   acquired.  So when we were in the interview process,

8   towards the end when they could talk about

9   themselves, it gave us a chance to see who had put in

10  for street level narcotics or who had put in for

11  street level investigations or gang investigations.

12  It gave us -- because when you're -- when you're in

13  the first stages of your career, and a lot of these

14  guys were -- had moved past the beginning.  They had

15  to have three years on to even be considered.

16       But when you're new, it's kind of like going to

17  college, you have certain criteria you have to meet.

18  The department wants you -- this is -- and this is --

19  it's been awhile.  But you got to go through certain

20  things they want you to have no matter what.  And

21  then when you start having more time and the

22  department has more resources, they can allow you to

23  go to more training as discretionary funds and time

24  allow.

25       Did that answer your question?  Was I able to

1   get --

2            MR. ERVIN:  I don't think so.  The

3   question was, what is the training.

4        A.   Well, when they were interviewing for the

5   position, they had to know clearly a large amount of

6   clearly established supreme court law.  So when they

7   were brought into the unit, that was something that

8   was -- roll call discussions every day, day in, day

9   out was, you know, there was a lot of discussion

10  about, you know, does anybody have any questions

11  about what we're doing, anybody have any questions

12  about this, you know, the -- what you do and don't

13  know.  But a lot of the individuals that were brought

14  to the unit had a great understanding and were able

15  to answer questions pertaining to clearly established

16  supreme court law.  So when they got up there, a lot

17  of the training was -- and, again, some of those

18  folks had done one-month stints with Operation Trust,

19  so they kind of had a feel for what it was we were

20  doing.

21           But training-wise there wasn't a lot I could

22  offer.  We had lieutenants, and the major at the

23  time, I was -- he had me running pretty wide open.

24  So he was looking for training opportunities and

25  vetting what could and couldn't be done.  But in

1    respect to -- there were groups that got sent to

2    different -- I know some took K-9 training.  But,

3    again, I can't specifically answer your question

4    properly.  I don't have that information with me.

5    And, again, I've been away for 14 months.  So what I

6    had with them then, again, that was something that

7    was discussed.

8         A lot of the times these individuals go to

9    training, and then we had roll call training about

10   where they'd been.  We even had SWAT come up.  SWAT

11   had come up and done -- a lot of the guys were from

12   SWAT or were going to SWAT.  So there was a lot of

13   communication there in respect to, you know,

14   techniques and safety.

15        But when it come to any other specific

16   training, I just can't elaborate on it.  I don't have

17   those files with me, nor do I have access.

18        Q.   I gotcha.  When you think back to 2018,

19   first off, how many lieutenants did you have working

20   under you?

21        A.   Two, sir.

22        Q.   Okay.  And who were they?

23        A.   Lieutenant Dale Thompson and Lieutenant

24   Gerald Hucka --

25        Q.   Huckleberry?

1           A.   Yes.

2           Q.   Gotcha.  And then if you recall, who were

3    the sergeants that you had over the four street

4    squads?

5           A.   Sergeant Brandon Lincoln, Sergeant Billy

6    Keeling.  I don't know if Rob King had been promoted

7    yet.  And I think we carried a void on that side.  It

8    may have been just been Sergeant Rob King right

9    before he got promoted.  I can't -- I don't recall.

10   I know the two on the other side, though, were Billy

11   Keeling and Brandon Lincoln.

12          Q.   Okay.  And in terms of the -- the

13   detectives, take me through, how would they be -- how

14   were they being monitored and evaluated?

15          A.   Well, a lot of the time -- well, the chief

16   made a directive, it was, you're going to be out --

17   the squads were going to be out with a commanding

18   officer.  That was from the get-go.  There was never

19   a time where there wasn't a commanding officer out on

20   the street.  That was -- that was the way it was

21   established.

22           So they would come in.  Roll call was handled,

23   discussed with the -- that was a big thing from me

24   was I wanted the sergeants to lead roll call.  The

25   lieutenants could attend obviously if there was more

```
 1    knowledge to pass on, and same with me.  But then
 2    once they finished up their division duties, checked
 3    email, met requirements, whether it be for vehicles
 4    or anything they had to do policy-wise, sign off on
 5    policies and such, then they would suit up, discuss
 6    whatever information they had about recurrent trends.
 7    And they would go out and begin their daily
 8    operations.
 9         Q.   Okay.
10         A.   And the sergeant would be with them.
11    Sergeant would be in a vehicle -- they would either
12    team up together or the sergeant would be in a car
13    with them.
14         Q.   And then from time to time, you know, it
15    just happens, there would be things -- there would be
16    citizen complaints that come in in relation to, you
17    know, allegations against a detective, right?
18         A.   Allegations against a -- well, I mean, that
19    would -- that would be if it was filed through PSU, I
20    would get word of it, yes.
21         Q.   Okay.  And that's what I was getting to.
22    So how would you get notice if there was a situation
23    where a citizen took issue with some actions of a
24    detective?
25         A.   There's a couple different ways.  The
```

1   sergeants, you know, they would either say -- a lot

2   of times the sergeants would say, you know, "I had a

3   complaint on scene.  They wanted to talk to a

4   sergeant.  It was handled."  Then there was sometimes

5   they had to, you know, "This is where you can make a

6   formal complaint."  That was a process, you had to

7   give Professional Standards' phone number and

8   address, let them know where to go if they wanted to

9   file a formal complaint.  A lot of that stuff was

10  handled on the streets with a reasonable explanation.

11        Sometimes it came my way.  I got complaints

12  occasionally.  And it wasn't very often.  And the

13  other way, like I said, I'd get -- I'd get contact

14  from PSU occasionally that would say, "We got

15  something came this way; just want to give you a

16  heads up."  "Okay."

17        Q.  How had you instructed your sergeants to

18  handle citizen complaints?  When they came in, you

19  know, what did you tell the sergeants, hey, I want

20  you to do X, Y, Z?

21        A.   Well, these were -- these were -- these

22  were strong sergeants.  They had -- these were guys

23  that had been around the block, and they were good at

24  what they did.  And they were educated.  They could

25  communicate.  But the rules were the rules.  You can

1  -- if they request to speak with a supervisor and you

2  respond and you can handle their complaint, you can

3  let them know that you have handled it or you will

4  handle it.  If they needed follow-up, you could do

5  it.  But the other process was if that wasn't going

6  to meet their needs, they needed -- they were to be

7  advised to go to PSU and there was a phone number and

8  an address.

9       Q.  Okay.  You said sometimes, not too often,

10  the complaints would go directly to you, correct?

11      A.  I remember one time I got a -- somebody

12  called my desk.  I don't have any idea how they got

13  my number.  I don't know if it was a sergeant who

14  gave them my number.  I don't know what it was.  But

15  the individual was -- was irritated because an

16  officer drove by and waved at him.  And that's --

17  that's what it was.  And he called me, and I said, "I

18  will have him stop waving at you."  And he thanked

19  me, and I never had another complaint out of him.

20      Q.  And then in terms of the ones that went

21  through PSU, did you ever have to give any statements

22  to them?

23      A.  Statements, I -- I don't recall any.  I

24  don't -- I went to PSU for -- I believe I had to go

25  to PSU -- it was either I went or they came to me

1   regarding the -- the -- the investigation about

2   traffic stop forms.  And that was -- it was a brief

3   meeting.  I had to go down there something else.  I

4   can't remember what it was.  But I was -- it may have

5   been the same situation.  I was a witness for that.

6   But in all honesty, in two years, that's the only one

7   I remember.  Being a major that's the only one I

8   remember.

9        Q.   And then correct me if I'm wrong, but it's

10  my understanding that -- and this would have been the

11  case while you were there, if the traffic stop is

12  performed, that it's a stops form has to be

13  completed, correct?

14       A.   Correct.  Other than if it was --

15       Q.   And --

16       A.   Yeah, you said it right.  If it was a

17  traffic stop, yes.

18       Q.   And just so I understand, what is a stops

19  form?

20       A.   It's a form that it's -- it -- in a general

21  fashion, it delegates where the stop occurred, and it

22  had a checklist of what you did and if you did and if

23  you did this, you checked this box, that type of

24  thing.  It just -- it was a -- I didn't do any of

25  them -- I didn't do -- I wasn't required to do any

1    because the position I was in I just didn't -- I

2    wasn't around it very often.  But it was just a

3    general format explaining in a brief fashion what you

4    did, where you did and why you did it.

5         Q.   And did you have a chance -- did you have

6    access to those forms if you wanted to review them?

7         A.   I did.

8         Q.   And how would you -- how would you get

9    access to them if you wanted to pull them?

10        A.   It's -- it was on the -- it was on the home

11   -- I'm assuming the home screen.  It's been -- it's

12   been 14 months, sir, I'm sorry.  But it's been

13   14 months.  I don't remember how to -- I couldn't

14   tell you how to navigate to it.  With the command

15   structure I had, there was -- you know, it was the

16   sergeants knew that they were to be doing traffic

17   stop forms.  The lieutenants knew to be following up

18   with them.  If -- you know, there was -- I had a host

19   of things I was required to be doing, and that was a

20   delegated matter.

21        Q.   Okay.  Did you have access to data

22   associated with the traffic stop forms?

23        A.   I'm sure I did.  I -- I assume so.  I don't

24   know.  I'll say yes.

25        Q.   Okay.  For example, if you, you know --

1          MR. ERVIN:  Don't guess.

2          MR. AGUIAR:  What's that, Peter?  Yeah,

3    don't guess.

4          MR. ERVIN:  Yes.  Don't guess.

5     Q.   Well, Major Hibbs, for example, if you

6    wanted to go and review and identify what percentage

7    of stops being performed by your division were on

8    black people, were you able to do that?

9     A.   Yes.

10    Q.   Okay.  Is that something you monitored?

11    A.   Again, I had that -- it was a delegated

12   task with the sergeants and the lieutenants.  And it

13   wasn't something I did.  I didn't monitor it often.

14    Q.   Okay.  When PSU came to you over an

15   investigation of traffic stop forms, were they

16   investigating the forms that we're talking about now?

17    A.   Yes.  They were -- they were -- yes.

18    Q.   What was your understanding of the purpose

19   of that investigation?  What were they looking into?

20    A.   They were looking into to see if there had

21   -- what I remember was, if they had ever been told

22   not to utilize them or if there was a change when

23   they got there.  And that's what I recall from it.

24    Q.   Okay.  And just to be clear, throughout the

25   time that you were in Ninth Mobile, these officers or

```
 1   these detectives throughout the entire time they were

 2   there, they were required to fill out those forms.

 3   There was never a change in that policy, correct?

 4        A.   There wasn't, no.

 5        Q.   Okay.  And did a situation come up where,

 6   you know, these detectives for one reason or another

 7   weren't always filling out these forms?

 8        A.   Again, this was a delegated task to the

 9   sergeants and lieutenants.  If that happened, it was

10   -- it wasn't anything that I delegated -- I was -- I

11   instructed them to do.

12        Q.   Well, let's switch gears.  You'd identified

13   a few different models earlier.  If you could, tell

14   me about the Violence Reduction Strategy.  What was

15   that?

16        A.   The Violence Reduction Strategy, I was

17   introduced to when I was a lieutenant as we ran

18   Operation Trust and had become Ninth Mobile Division.

19   2016 we had 117 homicides, 101 by gun.  And Yvette

20   Gentry and the leader of the Office of Safe and

21   Healthy Neighborhoods, Rashaad, invited me up every

22   Thursday after CompStat to come by.  CompStat was a

23   good day to go because we had -- we had just attended

24   the meeting talking about all the crime that had

25   occurred in the city that week.
```

1    So I could pass on information to the group as

2    we built our model that would assist us with our

3    efforts in the future.  It was strongly based upon

4    community involvement.  It was strongly based upon

5    individuals in the community who had a lot of -- lot

6    of traction with -- you know, we were seeing a lot of

7    victims.  We had -- in the First, Second and Fourth

8    Divisions had seen 75 percent of the homicides that

9    year.  And the individuals that were there building

10   this model were very much in touch with the 14- to

11   24-year-old individuals that were seeing the crime

12   and being victimized.

13   So each person had a lot of weight, carried

14   their own -- carried their -- they had all their

15   resources for, like, so if you were one of the pillar

16   -- I was the pillar for enforcement.  So enforcement

17   was based off of hot spot activity, violent

18   criminals, narcotics, which I was able to communicate

19   with the narcotics division and federal partnership.

20   Where other people there at the table were

21   responsible for outreach and were responsible for

22   re-entering when people were being released from

23   prison.  And they had a host of individuals they

24   utilized or sources they utilized to help individuals

25   when they were at different points of their life with

1    this model.

2         Q.   Are you familiar with the model of Broken

3    Windows Policing?

4         A.   Vaguely.

5         Q.   What's your understanding of what that is?

6         A.   My understanding, it falls along the same

7    line as CPTED, Crime Prevention Through Environmental

8    Design.  If you can promote, you know, a window not

9    being broke, fix the streetlights, make sure bushes

10   are trimmed, it promotes, you know, less crime in

11   that area type thing.  That's my assumption.  I

12   shouldn't guess.  I apologize.

13        Q.   That's okay.

14        A.   My understanding that it was like CPTED,

15   Crime Prevention Through Environmental Design, the

16   way it looks is -- could be a factor in what occurs

17   in the future.

18        Q.   Okay.  At some point, you know, within the

19   strategic plan or within these meetings, were there

20   discussions about People, Places and Narcotics?

21        A.   Not during that -- I don't remember it

22   being in that meeting at all.

23        Q.   Okay.

24        A.   Those meetings were every Thursday.  They

25   were -- I don't remember any of that.

1      Q.   That's okay.   In terms of LMPD would come

2   out with a strategic plan each year, correct?

3      A.   I was -- I have to emphasize, like, I don't

4   know.   I was heavily modelled off of 21st Century

5   Policing and Project Safe Neighborhood because we had

6   federal partnership in the division.   So we were

7   along those guidelines with violent reduction

8   strategy.

9      Q.   Okay.   Sorry.   This is where I want to make

10  sure that this works.   All right.   Can you see -- can

11  you see on the screen a document that at the top says

12  Strategic Plan for Louisville Metro Police

13  Department?

14     A.   Yes, sir.

15           MR. AGUIAR:   Okay.   I've got this in a

16  Dropbox share that I will give to you, Nancy.   We'll

17  mark this seven-page document as Plaintiff's

18  Exhibit 1.

19           THE REPORTER:   Okay.

20       (PLAINTIFF'S EXHIBIT NO. 1 WAS MARKED)

21     Q.   Would you see strategic plans for the

22  Louisville Metro Police Department while you were

23  there?

24     A.   Yes, sir.

25     Q.   This right here is part of the 2018 LMPD

1  strategic plan.  Is that something that would have

2  been provided to you?

3       A.   Yes, sir.  And it was also on the coin.

4       Q.   And what do you mean there on the coin?

5       A.   We had an LMPD coin, and those were the

6  vision, making the community our primary focus,

7  ethical behavior, trustworthy, respect for all and

8  objectivity.  They were all on the coin.

9       Q.   Okay.  Gotcha.  And then what I've got

10 right here is, the second page of this is page 10 of

11 the strategic plan.  And it's got -- it's got goal

12 number 5, and it says, "Through cooperation with our

13 agency partners, formulate and communicate the

14 message that LMPD reduces crime by concentrating on

15 People, Places and Narcotics."

16      Is that something that, you know, it says the

17 goal owner was Jessie Halladay.  Do you know what

18 that means, what Jessie was expected to do here?

19      A.   I don't know what she was expected to do,

20 but I do remember -- I remember the People, Places

21 and Narcotics.  Obviously the partnership that we had

22 formed with narcotics was -- was strong.  There was a

23 lot of communication there between our two divisions.

24 And a lot of the people were the people that were

25 committing most of the violent activity in the

1   community at that time.

2        And the places were based upon the areas where

3   the crime was being reported.  And I should say the

4   most violent criminal activity.

5        Q.   Okay.  In terms of the people, how was, you

6   know, what was your expectation of how your folks

7   would identify these people that were committing the

8   majority of the violent crime?

9        A.   Well, again, we had a lot of individuals in

10  the division that had a lot of experience.  We had

11  some people there that had been there 20 years and

12  some people that had been there four.  So there was a

13  lot of people in the division that had a strong

14  understanding of how -- of certain individuals, knew

15  them.  The major, Major Thompson was an encyclopedia

16  of people that he had dealt with in the past.  And it

17  was -- there was a lot of education about folks, and

18  I should say individuals in the community that were

19  -- that were active.

20       And, you know, with that being said, you had --

21  we encountered a lot of individuals that were being

22  investigated by narcotics, and narcotics encountered

23  a lot of people that were being investigated by us.

24  So there was a lot of communication there about the

25  two and from the two divisions.  So -- but, again, we

1    focus in on the same thing, the same type of model

2    with the violent reduction model.

3           When we get into the Project Safe Neighborhood,

4    it's about, you know, the -- the locations that are

5    prioritized due to the high amount of violent

6    criminal activity.  Sometimes if -- you know,

7    sometimes we knew the people that were in those

8    areas.  Sometimes they were being communicated to us

9    with, you know, from different entities with the

10   ROTCC -- RTCC and Crime Information Center.  We had a

11   lot of information coming to us.  We -- that was one

12   of our strong suits, is we had a lot of information

13   flowing our way.

14          Q.   Okay.  The next page, third page of this

15   document is page 4 of the strategic plan, is goal

16   number one to reduce violent and property crimes each

17   calendar year.  And in particular I'm looking at the

18   second, I guess, column here where it says, "Continue

19   to use a data-driven approach to determine where

20   crime occurs the most and deploy resources to the

21   areas of Louisville/Jefferson County with the highest

22   crime rates."

23          And then over, it says, "Resources Needed,"

24   it's got, "Patrol divisions and Ninth Mobile

25   Division."  Do you recall going through any sort of

1    discussion as it relates to what's being identified

2    here?

3         A.   I don't remember any specific discussion,

4    but I do remember the effort, now that I'm seeing

5    this.

6         Q.   And did you work with Shara Parks on some

7    of these goals?

8         A.   I did.  I don't know about the actual -- I

9    think we all did it together.  We had meetings on

10   Mondays with the colonels, and we had meetings every

11   other week with the chief, and then we had obviously

12   CompStat.  So a lot of this stuff was discussed in

13   those time frames.  But we were -- Colonel Parks and

14   I had a -- we worked pretty tight together, and it

15   was when she needed specific people in specific

16   areas, we were the ones.  She called us a lot.  Don't

17   get me wrong, I mean, the divisions were utilized,

18   too.  But there were no more flex platoons.  We were

19   a resource.

20        Q.   And do you recall specifically, when going

21   through this strategic plan, what areas were

22   identified geographically as -- as the target areas

23   where there were disproportionately high rates of

24   violent crime?

25        A.   What year was this?

1        Q.   2018.

2        A.   Specifically I don't, I don't remember.  I

3    -- by that time we were focusing on our maps quite a

4    bit.

5        Q.   Okay.  And then going to the fourth page of

6    this document, it's page 2 of the strategic plan,

7    it's got some themes.  One is community interaction/

8    legitimacy.  You've already touched on that, correct?

9        A.   Sure.

10        Q.   And in terms of what this states right here

11    is, "Community interaction is one of the LMPD's top

12    priorities as we work towards our goal to make

13    Louisville a safer community through community

14    outreach, transparency, legitimacy and the fair and

15    ethical treatment of all people."

16         You'd agree that that was -- that was a

17    priority --

18        A.   Yes.

19        Q.   -- while you were a major of the Ninth

20    Mobile, correct?

21        A.   Yes, sir.

22        Q.   And then in terms of, you know, in terms of

23    interacting with your detectives and with their

24    commanding officers, how did you -- how did you teach

25    them to make sure that the fair and ethical treatment

1    of all people was being prioritized?

2         A.   Well, again, a lot of the -- a lot of the

3    individuals in the division had a lot of experience.

4    And I -- I'll use the terminology, you draw more

5    flies with sugar.  We were -- we were kind to people.

6    When we were -- when we had the opportunity as senior

7    detectives or commanding officers, we were -- you're

8    good to people and you get more response.

9         And the young team members that were out there

10   that were ready to go and ready to get out there and

11   hit it hard, we showed -- there was a lot of

12   experience, especially with, you know, the K-9

13   handlers.  I mean, we had Detective Tony James, and

14   he was -- he was excellent at what he did.  He had a

15   demeanor, a calm demeanor that was excellent when it

16   came to the newer folks that were being introduced to

17   the unit, to see how it was to speak with someone in

18   all capacities.  It wasn't -- you didn't pick and

19   choose.  You were that way -- you modelled that way

20   continually.  And we did the same as commanding in

21   the division.  You know, we're people, and we treated

22   people like people.

23        Q.   Was there any evaluation of the street

24   squads to determine whether or not there was a

25   disproportionate number of stops being made on black

1   males?

2        A.   No, sir.   The -- the area -- in 2016 when

3   we worked -- while we were building the -- the

4   pillars with Yvette Gentry and Rashaad, the Victory

5   Park and Park Hill were areas that they wanted us to

6   work in.   And they were 88 percent African-American.

7   They were only 10 percent white.   So we encountered a

8   lot of African-American people as we did our -- as we

9   did our course of work.   But it wasn't -- we weren't

10  -- that wasn't our reason for being there.   Our

11  reason for being there was crime.

12       Q.   One of the enforcement tools that Ninth

13  Mobile decided to implement to reduce violent crimes

14  was traffic stops, correct?

15       A.   That was part of it.   I mean, there was

16  many methods.   And, you know, we never just turned

17  out of the parking lot and went left and see what we

18  could get into.   Everything was built upon what these

19  detectives and commanding officers knew or obtained

20  or had a reason for doing -- for being involved in.

21       Q.   And help me understand the purpose of

22  traffic stops as a -- as a tool to reduce violent

23  crime.   What was the -- what was the premise behind

24  that?

25       A.   During those time frames we had a lot of --

1   a lot of stolen cars were being reported that were

2   being used in homicides.  That was early in the game,

3   early in '15 and going into '16.  We had a -- there

4   was -- I think there was even a media approach about

5   vehicle -- the spare fobs left in cars in driveways

6   and such.  But, you know, the detectives also

7   encountered a lot of stolen cars as they were out.

8         Traffic stops, if there was -- you know, these

9   detectives worked a lot of the areas a lot of the

10  time.  If we had reports of crime in a certain area

11  and then we had more reports of crime in that certain

12  area, they'd go back.  They knew a lot of the people

13  that were there.  A lot of the division detectives --

14  a lot of the detectives that were in Ninth Mobile

15  Division, came from the detectives -- the divisions

16  where we were working.  So if there was a trend or a

17  spike or a wanted person that was out there, they

18  were still quite in a lot of communication with their

19  old beat partners.  Some of their beat partners had

20  become detectives.  So there was a lot of

21  communication back and forth.

22        So a lot of the times they went down there they

23  had researched why they were going there, what was

24  going on.  We've got a plume of activity over here,

25  what's -- what do we know.  So if they knew there was

1    somebody wanted, you know, they knew what they drove.

2    They'd worked those beats for years before they got

3    to our division, some of the folks.  So some of the

4    times it was experience.  Sometimes it was off of

5    information they had just been shared.

6         Q.  What is your understanding of what a

7    pretextual traffic stop is?

8         A.  Well, it's -- and it got kind of -- it got

9    a little bit mixed up.  Towards the end on my -- as

10   my last year came up, it was -- they went to a safety

11   stop and investigative stop and a -- ask your

12   question again, please.

13        Q.  Sure.  What's your understanding of what a

14   pretextual traffic stop is?

15        A.  A stop is, you know, is conducted for a

16   minor offense and then it -- you know, it grows from

17   there.

18        Q.  Okay.  Did you ever provide any sort of

19   instruction to detectives within the division to make

20   sure that they're not engaging in pretextual traffic

21   stops?

22        A.  Specific instruction, no.  We -- but,

23   again, we were -- the command staff and roll call

24   discussions were about violent criminal activity in

25   certain areas.  Before we would leave there, there

1    was a jump into what was going on in those areas,

2    what's happening, why do we need to be over there,

3    what's -- what is occurring.

4        So pretextual stops, it's -- it was -- it was

5    never promoted.  It was never something that was,

6    this is something we're going to go do today all day

7    long.

8        Q.   In terms of -- in terms of training that

9    was provided to the officers, what's your

10   understanding of how these detectives were trained

11   regarding when -- when a pat-down is -- is permitted

12   by law?

13       A.   Well, they -- when -- you obviously have to

14   meet the standard for Terry.  But every year we have

15   in-service, and at the end of in-service they have a

16   presentation on clearly established law.  There was

17   always discussion about Terry.  There was always

18   discussion about probable cause and reasonable

19   suspicion.  But there were a number of traffic stops

20   conducted with the detectives in our division,

21   whether it be based off of knowledge they had

22   firsthand or wanted people or a stop that was

23   investigative.  It -- so they knew the parameters of

24   that law.  They knew, you know, what probable cause

25   and what reasonable suspicion they needed to have to

1    begin the Terry aspect of the stop.

2         Q.   And then in terms of training that was

3    given to them, in terms of when they can -- when they

4    can request a K-9 sniff on a vehicle, what was the

5    training that was provided to them on that, to the

6    best of your knowledge?

7         A.   Well, the supreme court law for Rodriguez

8    is, you know, you have your missions that you have to

9    accomplish.  And it's -- the beauty of the way the

10   unit was developed was we had a K-9 dog with them at

11   all times.  So if there was a need or there was an

12   elevation at a stop to where it was needed, they

13   would -- they would utilize the K-9 dog, and they

14   were usually there within that scope of time, a

15   reasonable amount of time while the missions were

16   being completed.

17        Q.   Were the Ninth Mobile detectives trained or

18   instructed to -- on these traffic stops to have a K-9

19   sniff performed each and every time?

20        A.   No.

21        Q.   Okay.  Under what circumstances were these

22   detectives instructed to have a K-9 sniff performed?

23        A.   That would strictly be specific to that

24   stop.  That's something I can't elaborate on that.

25        Q.   Okay.  Well, help me understand a situation

1    where they were instructed that a K-9 sniff would,

2    you know, be something that you would expect or the

3    division, you know, that they would be expected to

4    have done versus one where they wouldn't be expected

5    to have one done.

6         A.   Well, the K-9 handlers were -- they went to

7    training, it was either every Wednesday or every

8    other Wednesday.  I think it was every Wednesday.  So

9    they were instructed by a group that knew the law,

10   knew what the dog should and shouldn't be used for.

11   I didn't interfere with that.  The K-9 unit was very

12   diligent in their training, which, again, was weekly.

13        So the K-9 handlers worked close -- in close

14   proximity with the detectives.  I've seen K-9

15   handlers tell the guys, we're not going to run the

16   dog on this one.  I've seen it.  That was the

17   discussion for them.  Again, that was where

18   experience came into the matter.

19        A lot of that I allowed to be delegated with

20   the sergeants and the K-9 handlers.  That's how they

21   got to know each other.  That's how the working

22   relationships were formed because that was also a

23   learning tool.  When you have someone of your own

24   footing, your own peers, telling you, you don't need

25   to be using -- I'm not going to get my dog out for

1   something like this or every single time.  So it
2   wasn't always utilized.
3        Q.   Were the detectives instructed at all that
4   a traffic stop couldn't be prolonged for a K-9 sniff
5   when there was no other reasonable suspicion of
6   something being in the car?
7        A.   Yes, sir.
8        Q.   And what is your understanding of what they
9   were instructed in terms of, you know, what is a --
10  what is prolonging a traffic stop, what does that
11  mean?
12       A.   If you keep someone past the reasonable
13  amount of time while you satisfy your missions to get
14  a K-9 dog to show up and just run the vehicle.
15  That's my understanding of what you're -- that's my
16  answer to your question.
17       Q.   Okay.
18       A.   But that was -- Rodriguez was pretty much a
19  question, and the question you just asked was on the
20  interview questions when these individuals -- not
21  specifically.  It was a Ninth Mobile interview
22  question:  Could you hold a vehicle longer to get a
23  K-9 dog there?  No.  What were the missions of
24  Rodriguez?  They had to know them.
25       Q.   In terms of, you know, in terms of the

1    models that you went through, were you ever -- were

2    you ever advised to make sure that Ninth Mobile is

3    doing proactive patrolling?

4         A.   Wasn't so much proactive.  We were -- it

5    was prioritized.  We were -- it was -- there was no

6    having to tell us to be proactive.  We -- the work

7    that was -- and the areas that we were, the areas we

8    were working in, due to the intelligence that was

9    being sent our way, I mean, we were busy.  And it

10   wasn't because they were being forced to be busy.

11   They were busy because they were interacting with all

12   the beat partners, the detectives and finding out

13   what was going on and investigating cases.  They were

14   busy.

15        Q.   The street squads in particular, you know,

16   one of the things they would do from time to time is

17   conduct traffic stops, correct?

18        A.   Yes, sir.

19        Q.   Okay.  And what else were they doing in

20   terms of just their day-to-day job function?

21        A.   They had, again, the K-9 dogs had training

22   on Wednesdays.  They also served the warrants.  They

23   assisted federal partners.  Occasionally we had --

24   and I can't remember the names of them, but

25   occasionally on some Wednesdays we worked with the

1   ATF and the federal partners on different programs.

2   A lot of it came in the way of wanted people that

3   were -- had weapons violations and other type want --

4   higher-level wanted capacities.

5          They were -- they did a lot of surveillance.

6   We worked real close hand in hand with homicide.

7   They worked real close with their own fugitive team.

8   So if the fugitive team had pulled off of somebody

9   because they had no movement at a location, even

10  though they were looking for a violent wanted

11  criminal, they would call the street guys and go,

12  "Hey, can I get you-all to check out a couple

13  locations?"  "Sure."  So when you had two teams

14  working, sometimes you delegate -- the sergeants

15  would delegate a couple people to go to certain

16  locations and just monitor.  If there was movement,

17  they'd come back and they'd effect, you know, a stop,

18  an arrest, notify the fugitive team that they'd had

19  some success.

20         They did -- they did some close work with

21  narcotics.  They assisted with search warrants.  They

22  assisted divisions.  There was a lot of -- there's a

23  -- it was vast.  I mean, there was -- they also did

24  their own investigations.  I mean, these -- some of

25  these detectives were looking to get into larger

1    scale investigations, especially on nights when it

2    was cold or rainy.  That gave them a chance to follow

3    up on people that were wanted, people who had -- the

4    division detective had reached out to them and said,

5    hey, I'm looking -- I'm looking to pick up so and so.

6    If we can -- you know, we need to be able to see if

7    we can pick them up.  There was a lot of support done

8    with these detectives.  There was a lot of -- they

9    got to see a broad array of investigation.

10        Q.  Are you familiar with -- would you get

11   stats that showed on an annual basis how many -- how

12   many traffic stops the Ninth Mobile was making?

13        A.  I didn't.  Like I said, a lot of that stuff

14   was -- it was -- I didn't.  I didn't get that.

15        Q.  Okay.  Thinking back, if you'd wanted that

16   data, who would you have went to to pull it for you?

17        A.  I would have gone to either one of my

18   lieutenants or my administrative sergeant.

19        Q.  Okay.  And then in terms of, were you given

20   any sort of data on the percentage of stops that were

21   being made that resulted in the recovery of guns?

22        A.  No, I wasn't.  But I knew that we were --

23   there were a lot of guns being seized.

24        Q.  Were you given any sort of data on the

25   percentage of stops for traffic violations that

1    resulted in the recovery of drugs?

2         A.   No, sir.

3         Q.   Are you familiar with -- gosh, what's it

4    called?  Take off the screen sharing.  The Police

5    Executive Research Forum.  So it was a PERF study

6    done in 2016 and updated in 2018 for Louisville Metro

7    Police about racially-biased policing.

8         A.   I don't recall.

9         Q.   Okay.  Fair to say then that you can't

10   recall any sort of meeting where you sat down and

11   they went through any sort of the stats from that

12   with you?

13        A.   It's -- I don't -- I just don't remember,

14   sir.

15        Q.   You had a busy job.  We're talking four

16   years ago, five years ago.  I'm not going to hold you

17   to it.  I tell you what, it is 2:02 right now.  I'd

18   like to take five.

19        A.   Sure.

20        Q.   So why don't we take five to stretch our

21   legs and come back, and we'll move on to a different

22   topic, okay?

23        A.   Sure.

24             MR. AGUIAR:  All right.  Thank you-all.

25             VIDEOGRAPHER:  The time is 2:02.  We now

1    leave the video record.

2              (RECESS)

3              VIDEOGRAPHER:   The time is 2:08.  We now

4    return to the video record.

5              MR. AGUIAR:  Major Hibbs, as part of -- as

6    part of -- well, I guess at anytime have you reviewed

7    any of the body camera footage as it relates to

8    Tae-Ahn's traffic stop?

9         A.   Yes, sir.

10        Q.   Okay.  And before we pull some of it up,

11   when you reviewed -- did you review -- I guess which

12   officers or which detectives' body camera video did

13   you review?

14        A.   I reviewed Crawford, Hellard, McCauley,

15   Holman, McNeil, and I think that was it.

16        Q.   And then in terms of, you know, in terms of

17   at least what you observed, were you -- were you

18   critical of the stop at all?

19        A.   No, because I wasn't there.  It's -- the

20   determination and the -- how Kevin Crawford will

21   articulate that situation is him.  I wasn't there.  I

22   wasn't in the moment.  So it's hard for me to be

23   critical of it.

24        Q.   Okay.  The decision to remove Tae-Ahn from

25   the vehicle, were you critical of that at all?

1        A.   It will have -- again, it will have to be

2   something that -- I couldn't be critical of it

3   because I wasn't there with Crawford.  I wasn't able

4   to -- I haven't discussed with him any of it.  So his

5   articulation of the situation will be it.  I -- I

6   couldn't be.

7        Q.   Okay.  The initial pat-down of Tae-Ahn

8   outside of his vehicle, do you recall observing that

9   on the body camera?

10       A.   Yes, sir, I do.

11       Q.   Okay.  Were you critical of that at all?

12       A.   That will have to be something that's

13  articulated by Crawford following the guidelines of

14  Terry.

15       Q.   Based on what you saw in the body camera

16  video, was there anything that you observed that led

17  you to believe that Tae-Ahn may have possessed a

18  weapon?

19       A.   Well, I wasn't there.  I couldn't -- I

20  didn't have the viewpoint that Detective Crawford

21  has.  So I -- I can't -- at that point I still can't

22  be critical.

23       Q.   Okay.  In terms of the decision to request

24  McCauley to bring the dog, were you critical of that

25  at all?

1          A.   The way they operate, it will have to be

2    something that's -- for some reason Crawford had a

3    reason to initiate that activity.  It will be

4    something he has to articulate.

5          Q.   In your viewing of the video, you know,

6    what did you observe that led you to believe that --

7    or that, you know, what did you see in the video that

8    provided good, you know, good grounds to bring in a

9    dog over there?

10         A.   Again, I didn't -- I wasn't there.  I

11   wasn't able to see the actions of Mr. Lea from

12   Detective Crawford's vantage point.  I wasn't there.

13   So I can't really answer that question because I just

14   -- I wasn't there.

15         Q.   Later on, you know, Tae-Ahn gets

16   handcuffed.  You recall seeing that?

17         A.   Yes, sir.

18         Q.   Are you critical of the decision to

19   handcuff Tae-Ahn?

20         A.   Well, it's -- I can't be critical of it

21   because in his articulation or in his thought process

22   at the time there was a condition which he felt he

23   should put handcuffs on him.  That will be something

24   he'll have to articulate.

25         Q.   Sure.  In terms of -- in terms of your

1    understanding in a traffic stop type situation, when

2    do grounds exist to, you know, detain -- I guess we'd

3    say, you know, to detain, I guess, the suspect is

4    what we would call them.  I don't know.  And in

5    handcuffs?

6         A.   Well, with my experience I have had people

7    in the past take a very calm, cordial situation, and

8    then the next thing I know -- if I'm involved in a

9    traffic stop, I'm responsible for them, I'm

10   responsible for their safety along with the

11   investigation.  So if somebody bolts, runs out into

12   traffic, attacks someone, and I haven't done the

13   proper procedures in -- I shouldn't say proper

14   procedures, taken the proper procedures allowed in

15   respect to securing his -- making him safe.  If

16   Detective Crawford felt he needed to put handcuffs on

17   him at that point or instruct it to be done, that's

18   something he'll articulate.  In the past I have had

19   people and, again, in a very cordial situation, run

20   from me, a situation that was not, you know, not

21   escalated.  It was calm.  And when the opportunity

22   present itself, the subject ran.

23        Q.   Did you -- did you make any efforts to try

24   to discuss these events with Crawford?

25        A.   I didn't.  I didn't.

1    Q.   Why not?

2    A.   Well, by the time the fan started -- when

3  it started getting hot, when I started realizing that

4  something was -- you know, there was going to be a

5  chief's -- the chief was probably going to initiate

6  an investigation of it, in the position I'm in, in

7  the time I've been on the department, I knew that if

8  I had sat the group down, it's unethical, it's not

9  professional.  I don't want -- I didn't want to get

10  -- that was something that was going to be

11  investigated by a group of Professional Standards

12  Unit detectives.  I didn't want to be in interference

13  of that.  And that's the way it was left.

14    I mean, the -- his commanding officers were

15  with him, you know, every day in, day out, if there

16  was discussion.  I stayed removed from the situation

17  just because of the fact that it's -- it hadn't -- it

18  wasn't ever complained until the chief complained, I

19  believe.  I don't think they ever filed a formal

20  complaint.  So I -- I stayed clear of it until it was

21  time to -- to see what was going to formally happen

22  with the case.

23    Q.   And just to back up, it was my mistake.  If

24  I recall correctly, it was actually -- it was

25  actually Hellard that handcuffed Tae-Ahn, correct?

1        A.   I believe so.

2        Q.   Okay.  Did you ever speak with Hellard

3   about his decision to handcuff Tae-Ahn?

4        A.   I did not.

5        Q.   And there was no PSU investigation that was

6   opened up into Hellard's conduct, correct?

7        A.   I don't know.  I don't remember.  Like I

8   say, I don't know about any of that.

9        Q.   Okay.  Did you -- did you ever speak with

10  Hellard about his actions?

11       A.   I didn't.

12       Q.   And why didn't you speak with Hellard?

13       A.   Because that I knew this wasn't going to be

14  a situation that was just going to be one person.  It

15  was going to be the group.  And Hellard was also in

16  the car with him.  So, again, trying to remain

17  professional in the matter and let the people in

18  charge of the situation be in charge of it and not be

19  any type of interference.

20       Q.   Do you recall in the video if Hellard, you

21  know, makes the statement that "we're going to do 30

22  more of these stops today?"

23       A.   I do remember that part.

24       Q.   Okay.  Was that your expectation as a

25  major, that this street squad was going to be doing,

1  you know, 30 traffic stops a day?

2       A.   No, sir.  I felt like that my

3  interpretation it was a calming effect, it was a

4  calming measure.

5       Q.   Okay.  So to be clear, if I understand you

6  correctly, you know, and we'll have to ask Hellard

7  obviously, but you don't think he was actually trying

8  to suggest that they would do 30 traffic stops.  You

9  think he was saying that just to basically say, hey,

10 this isn't specific to you, calm down, you know, this

11 happens, this happens?

12      A.   My interpretation, my viewing, I thought it

13 was a calming method.

14      Q.   All right.  You'd agree at least, you know,

15 based upon your training and your understanding, that

16 -- that there was a seizure of Tae-Ahn's vehicle,

17 correct?

18      A.   I would have to --

19           MR. ERVIN:  Let me -- let me object to the

20 form of the question to the extent it calls for a

21 legal conclusion.  You may answer, major.

22      A.   Like I said, I'd have to -- it's been

23 14 months since I've looked at that type of document

24 verbiage.  I'd have to review that policy and that

25 law in respect to it.  But once a dog indicated --

1    you moved on me.  I apologize.  Once the dog

2    indicated, they then searched the vehicle.

3         Q.   Okay.  And you agree at least based upon,

4    you know, your training and your understanding of

5    what was taught to you, that Tae-Ahn Lee was

6    searched, correct?

7         A.   Per the indication, correct.

8         Q.   And then at some point, you know, he's not

9    just patted down; he's actually frisked, correct?

10        A.   They pat him down initially, what I

11   remember.  And then after the dog indicates, they did

12   a check, they checked his pockets on both sides,

13   patted him down, frisked him.

14        Q.   Did you ever talk to McCauley about the dog

15   indicating, you know, that situation?

16        A.   I did not.  And, again, that goes back to

17   the training every Wednesday.  I'm not involved in

18   that.  That's something they do on a quite regular

19   basis.  So I steered clear of it.

20        Q.   Do you -- do you know whether or not

21   McCauley's dog was trained to hit on money?

22        A.   Couldn't tell you.  I don't know.

23        Q.   Do you know whether or not any of -- any of

24   the K-9s that were being used in Ninth Mobile while

25   you were there were trained to hit on money?

1          A.   I don't know.

2          Q.   In terms of Hellard's interactions that he

3     had with Tae-Ahn, you were able to observe those in

4     the body camera, correct?

5          A.   Yes, sir.

6          Q.   Were you critical of any of the things that

7     Hellard said or did?

8          A.   I wasn't.  Again, I think it was a calming

9     situation.  He was doing as best he could to calm the

10    situation.  But -- or each -- everybody is different.

11    Each one of those young men and women are different.

12    They all have their own ways of approaching and

13    speaking with people.  So I wasn't critical.

14         Q.   You'd agree that ultimately the only thing

15    that Tae-Ahn was cited for was an improper turn,

16    correct?

17         A.   It's my understanding was a wide turn.

18         Q.   So help me understand with the Ninth Mobile

19    Division in particular, you know, they pull over

20    somebody for an improper turn, and, you know, within

21    minutes they've got a drug dog there.  They've got

22    Tae-Ahn in handcuffs.  They pat him down.  They frisk

23    him.  You know, is that -- was that the expectation

24    of Ninth Mobile on these traffic stops, to, you know,

25    try to, you know, to get so aggressive?

```
 1          A.   I didn't see aggressive.  I don't know what
 2    occurred before they initiated the stop.  When their
 3    body cameras come on, they've -- my understanding is
 4    they first observed him on the Thornton's lot.
 5    That's -- and I didn't read that anywhere.  That's
 6    just what I -- has come my way over the period of
 7    time of this all happening.  But I don't know what
 8    they observed.  I don't know what they suspected.
 9          Being the time that it was, I think they were
10    probably leaving the facility, probably going to get
11    gas.  And then -- because it's right across from the
12    division where they were.  And then when we took out
13    on Algonquin, like I said, I don't know -- I did not
14    discuss this situation with them.  Once I got wind of
15    what occurred and what was originating from the
16    situation, I knew to keep my distance in respect to
17    discussions with the detectives and the sergeant.
18          Q.   In terms of the steps, you know, LMPD, part
19    of -- there's an SOP on the stops, correct, like
20    what, you know, what steps are supposed to be taken
21    within -- it's Strategies and Tactics of Patrol
22    Stops, correct?
23          A.   I'm not sure.  I know there's a stop
24    method.
25          Q.   Okay.  Hold on real quick.  Probably have
```

1    that one.  So, all right.  So, can you see my screen?

2    It should be -- it should look like an SOP.

3         A.   It's there now, yes.

4              MR. AGUIAR:  Okay.  And we'll mark --

5    we'll mark this one as Plaintiff's 2.

6         (PLAINTIFF'S EXHIBIT NO. 2 WAS MARKED)

7         Q.   And what I'm on is SOP 7.12, and it's .7,

8    Strategies and Tactics of Patrol Stops.  And it's got

9    some bullet points here.  Are you familiar -- does

10   this look familiar?  Does this refresh your memory?

11        A.   Yes, sir.

12        Q.   And these are requirements of officers when

13   making traffic stops, correct?

14        A.   Yes, sir.

15        Q.   And the first step is, you know, officer

16   greet the violator and identify himself or herself by

17   name, correct?

18        A.   Correct.

19        Q.   And what's your understanding, what's the

20   purpose of that?

21        A.   It's if you're going to approach somebody,

22   you're going to be asking -- I don't know.  It's to

23   identify yourself to the violator.

24        Q.   Okay.  And you'd agree at least in the

25   video, Crawford doesn't identify himself by name to

1  Tae-Ahn, correct?

2        A.   Don't remember that part of it.  I didn't

3  -- I don't remember.  I sincerely don't remember

4  that.

5        Q.   Okay.  And then the second step is explain

6  the reason for stopping the violator, correct?

7        A.   Correct.

8        Q.   And I would assume that's for obvious

9  reasons.  You know, if we get stopped by the police,

10  we have a right to know why they stopped us, correct?

11        A.   Yes, sir.

12        Q.   And the only thing that's told to Tae-Ahn

13  is that it was an improper turn, correct?

14        A.   Sure.

15        Q.   He was never told, hey, you know, we've

16  got, you know, we've got reason to believe you've got

17  drugs or guns in your vehicle; he was never told

18  that, right?

19        A.   Right.

20        Q.   And then, you know, the officer's then

21  supposed to ask the operator of the vehicle if there

22  was a legitimate reason for doing what he did,

23  correct?

24        A.   Correct.

25        Q.   And Crawford never did that with Tae-Ahn,

1  correct?

2       A.   Not that I remember.

3       Q.   And then the officer, you know, is going to

4  ask, hey, driver's license -- you know, your license,

5  insurance and registration, where is it located,

6  before asking them to retrieve them.  And Crawford

7  does that, correct?

8       A.   I don't recall.  But I remember one part of

9  it when he actually asked him to get his insurance

10  and he had to -- Mr. Lea went up into the upper edge

11  by where the rearview mirror would be.  So I remember

12  some of that.

13       Q.   And then, you know, and then Tae-Ahn also,

14  you know, gets permission from him to go into his

15  pocket, if you remember, to grab his wallet and his

16  license.  Do you recall that?

17       A.   Yes.

18       Q.   And then Crawford, you know, I'm sure you

19  at least observed this, he asked Tae-Ahn several

20  times if he's got drugs or guns or if he's got any

21  weapons on him, correct?

22       A.   Yes.

23       Q.   And Tae-Ahn says no every time, right?

24       A.   Yes.

25       Q.   Okay.  If Tae-Ahn's already been into his

1    pocket and he's already got, you know, and he's

2    already shown he's going to grab his -- you know,

3    grab his wallet, get his license out, if he's been

4    asked several times if he's got any weapons on him

5    and Tae-Ahn's saying no every time, then, you know,

6    what would you want to know from Crawford as to why

7    he still went about patting him down?

8         A.   Well, that's -- that's going to be

9    something he's going to have to articulate.  It's --

10   that's going to be him.  Again, I wasn't looking

11   through his eyes, I wasn't looking from his vantage

12   point.  I don't know what he may have been seeing

13   that wasn't captured in the video.  I don't know.

14        Q.   Hellard -- Hellard at one point straight up

15   tells Tae-Ahn, "We're allowed to pat you down."  Do

16   you recall seeing that?

17        A.   Yes, sir.

18        Q.   Okay.  And to -- to be fair, you know,

19   would it be fair to say that, you know, you'd be

20   critical of Hellard there for not fully explaining to

21   Tae-Ahn when they're allowed to pat him down?

22        A.   That depends on the situation, if it was a

23   situation where the utterance of what he said could

24   have been elaborated on.  I don't know.  I don't know

25   if he felt he needed to cut off what he was saying to

1    get to the other side to assist Detective Crawford.

2    I'm not sure.  I don't know.  He'll have to

3    articulate that.

4         Q.   Sure.  And I guess would it be fair to say,

5    you wouldn't expect your detectives -- not saying

6    Hellard did this.  But you wouldn't expect your

7    detectives to just tell, you know, everyone in a

8    traffic stop that they're allowed to pat them down

9    for any reason at any time, correct?  That wouldn't

10   be -- you don't want your detectives saying that?

11        A.   Depending on the situation.  If they felt

12   that they needed to explain themself, you know, and

13   -- in 21st Century Policing you're supposed to give

14   the person the opportunity to have a voice, talk with

15   them on traffic stops.  So maybe if it's if they

16   asked, you know, and they give that opportunity to

17   provide an answer, it's part of some of the model.

18        Q.   The next step we have here is the officer

19   will give instructions to the violator to follow, you

20   know, remain in the vehicle and buckle up, as he/she

21   reviews documentation and decides what action to

22   take.  That's another requirement under STOPS,

23   correct?

24        A.   Sure.

25        Q.   And you'd agree, at least in terms of -- in

1    terms of this particular traffic stop, you know,

2    several minutes go by before Crawford actually pulls

3    a CourtNet on Tae-Ahn, correct?

4          A.   Sure.  Yes.  Yes.

5          Q.   And several minutes go by before Tae-Ahn --

6    or before Crawford reaches out to MetroSafe to run --

7    to run Tae-Ahn's information, correct?

8          A.   Yes, sir.

9          Q.   The dog has actually already come over to

10   the vehicle and done a sniff before Crawford actually

11   requests for MetroSafe to run Tae-Ahn's information,

12   correct?

13         A.   Yes, sir.

14         Q.   And, in fact, Crawford has already begun

15   his personal search of Tae-Ahn's vehicle before he

16   gets a response from MetroSafe as it relates to

17   Tae-Ahn?

18         A.   Well, he may have been waiting.  It may

19   have been in line.  A lot of times if they're backed

20   up, it's just going to take time.

21         Q.   Sure.  I get it, you know, things might

22   take time.  But Crawford didn't wait to hear from

23   MetroSafe before he started searching the vehicle,

24   correct?

25         A.   As far as what I remember, that's correct.

1    Q.   And then MetroSafe comes back and, you

2    know, they make it clear that -- they make it clear

3    that Tae-Ahn's clear; he's got nothing on his record,

4    correct?

5    A.   Correct.  Yes.

6    Q.   And then Crawford, you know, he still

7    continues to go through the vehicle, correct?

8    A.   Yes, sir.

9    Q.   Did you see any situation in the video

10   where the dog -- where anyone identified the dog hit

11   on anything other than the wallet?

12   A.   What I remember, the dog was on the

13   passenger side right by the passenger door and barked

14   and sat down.  Again, I don't go to training with the

15   animals.  I went out one time to observe.  But the

16   specifics and particulars, they were responsible for

17   what they did and -- and I think he said at 6 -- I

18   remember him checking his watch and saying maybe 6:10

19   indication.  So -- and they were on the passenger

20   side.

21   Q.   This traffic stop altogether takes

22   approximately -- you know, it takes approximately

23   24 minutes, correct?

24   A.   Yes, sir.

25   Q.   And then Hellard, when he's interviewed, he

1    actually said that the average stop takes about

2    30 minutes, correct?

3          A.   I don't remember that part.

4          Q.   Was that your under -- were you aware of

5    that, that the average Ninth Mobile, you know, stop,

6    at least according to Hellard, the ones he was

7    making, were taking an average of 30 minutes?

8          A.   Was he -- was he speaking to Mr. Lea again

9    at that point?  When was -- you said when he was

10   interviewed.  I don't -- when are you talking about?

11         Q.   Did you not review his PSU interview?

12         A.   I did not.

13         Q.   Okay.  Then were you aware that Hellard had

14   ever identified that the average stop, that, you

15   know, his squad's making is about 30 minutes?

16         A.   I wasn't aware that he said that.

17         Q.   Does that surprise you to hear that that

18   street squad, you know, their average stop is

19   30 minutes?

20         A.   It would depend -- you know, that sounds to

21   me like some are less, some are more if it's average.

22   So it would depend on the situation obviously.  It

23   depends on, you know, if they've got more action to

24   take or less.

25         Q.   Do you recall on McCauley's video where

1    he -- you know, he expresses some concern that

2    Tae-Ahn's mother is going to, you know, post the

3    interaction on line and get a thousand likes?

4         A.   I remember it.

5         Q.   And, you know, do you recall him actually

6    saying it's a disease?

7         A.   I do remember it.

8         Q.   Did that -- did that give you any cause for

9    concern?

10        A.   It could have been done better, but he

11   wasn't saying it to her.  He was discussing it with a

12   colleague, and obviously in frustration.  But it --

13   he could have done better.

14        Q.   One of the things that -- that you want to

15   make sure with your officers is that they are, you

16   know, that they don't -- that they don't carry any

17   sort of implicit bias, correct?

18        A.   Correct.

19        Q.   And help me understand, you know, at least

20   from your perspective, what is implicit bias?

21        A.   You're -- you're out committing traffic

22   stops with a little bit more of a -- based off of

23   factors that, whether it may be gender or race or

24   sexual orientation, not because of so much a crime or

25   using -- there may be prejudice involved.

1     Q.   Everybody's different, right?

2     A.   Correct.

3     Q.   And the last thing you want your officers

4 doing is operating with some sort of preconceived

5 notion that because of, you know, that somebody's

6 going to act in a certain way just because of their

7 race, gender or other characteristics, correct?

8     A.   Can you repeat the question, please.

9     Q.   Sure.  You know, I'll rephrase it.

10    You don't want your officers acting with some

11 preconceived notion that a certain person is going to

12 do certain things just because of their race?

13     A.   Yes.

14     Q.   You don't want them acting with a

15 preconceived notion that they're going to do

16 something just because of their gender?

17     A.   Yes.

18     Q.   And when you see those comments by

19 McCauley, does it give you a little bit of concern

20 that perhaps he's operating with some implicit bias?

21     A.   It didn't.  I thought that it was a

22 situation where he was -- like I said, Jeff is --

23 Jeff is from the area.  He was from the neighborhood.

24 He was doing his absolute best he could to explain

25 the situation and bring some understanding of it.

1    And I think he was a bit frustrated.  I don't think

2    it had anything to do with bias.

3         Q.   Help me understand from your perspective

4    what this traffic stop, you know, what it

5    accomplished in terms of fighting violent crime in

6    Louisville.

7         A.   Well, it's -- I believe that week there

8    were five people shot, two at one location, three at

9    another, and three of them were shot on 18th Street.

10   It was more north of that stop.  I do remember that.

11   But, again, leaving the division, they could go down

12   the Dixie Highway corridor, the 18th Street corridor

13   to get to the location where the shootings had

14   occurred.  Three people had been shot, I believe that

15   week in that location.

16        So, again, what they observed and the traffic

17   stop and the reasoning for their investigation is

18   going to be articulated by them.  It's something that

19   they were -- they were acting for some reason from

20   something they observed, and that's going to be

21   something for them to articulate.

22        Q.   If one of the primary purposes of your

23   division is to go out and to fight violent crime,

24   then does it concern you that at least for

25   24 minutes, you know, you've got at least three and

1  then ultimately five of your detectives tasked with

2  fighting this violent crime on the side of Dixie

3  Highway dealing with a kid that, you know, made an

4  improper turn?

5       A.   And your question was, does it concern me?

6       Q.   Yes.

7       A.   It wasn't that it concerned me.  Again, I

8  can't evaluate their reasoning.  I don't know what --

9  what they perceived that they observed.  I don't know

10  what it was that their -- you know, I don't know.  I

11  don't know what prompted the stop.  I don't know what

12  they observed at the Thornton's.  That's the answer I

13  give you.  I don't know what prompted.  It's

14  something that they're going to have to articulate.

15       It's -- again, and they were also headed

16  towards the direction, the ultimate direction where

17  three people were shot previous to that day.  So they

18  were on the 18th Street corridor headed north to

19  where the shootings had occurred earlier.  Not that

20  day, but in time.

21       Q.   And help -- I guess where I'm struggling,

22  help me understand the connection there, you know.

23  Just because Tae-Ahn Lee happened to be driving in

24  the area to where three shootings had been, that's

25  not grounds to somehow connect him to those

1  shootings, is it?

2      A.   No, sir.  And I didn't say that.  What I'm

3  saying is, is they saw something at one location, and

4  they happened to be going the same location where

5  they needed to be in respect to those shootings.  And

6  this incident occurred.  I don't know what they

7  observed between the beginning and the end point.

8      My ultimate goal was for them to be in the

9  areas where the shootings had occurred.  We've

10  already gone over that.  That's my -- my -- when I --

11  the prior task patrol that I expected out of the

12  detectives and the sergeants and the lieutenants was

13  to be in the areas that were heavily designated.

14      So what they did between leaving and getting to

15  that location, they felt they needed to make a stop,

16  and they did.

17      Q.   Okay.  In terms of, you know, in terms of

18  this area of town, it's -- is it my understanding

19  from based upon what you said that the Ninth Mobile,

20  you know, they were -- they were given specific areas

21  to operate in, versus Viper, which had, you know, the

22  discretion to work all around town.  Did I understand

23  you correctly there?

24      A.   Viper did work all around town, and we

25  worked all around town.  I mean, there was -- we had

1    incidents where we had commanding officers and the

2    other divisions call us, we need some help with a

3    situation here, we need some help with a situation

4    here.  We went all over.

5         But we were also the group that fought violent

6    criminal activity, and it's being reported.  So every

7    Tuesday when the new maps would come out showing

8    where these heat plumes of violent criminal activity

9    that were being -- when someone took enough time to

10   care about their own neighborhood and their

11   surroundings to pick up the phone and report what was

12   going on -- and, again, we were only focused on

13   homicide, shootings, wanton endangerments, violent

14   assaults.  If somebody took the time and cared enough

15   to pick up the phone to say, we need help here,

16   that's what we focused on.  That's what showed us

17   where we needed to be and that was our main focus.

18        Did we get pulled away from those locations?

19   Yes, we did.  We had other divisions that didn't have

20   the resources.  Again, flex platoons weren't there

21   anymore.  So if they had a trending situation that

22   we -- they needed some help, we had time, we'd help

23   them.  But in that situation, it's -- they'll have to

24   articulate their origination, where they originated

25   and where, you know, where they ended up.

1      Q.    Throughout your time as major of Ninth

2  Mobile, were any other complaints involving Hellard

3  and Crawford, the actions of them during a traffic

4  stop, were they ever brought to your attention?

5      A.    I believe there was another complaint later

6  on after this one, but I don't recall any before.

7      Q.    Okay.  The one after this one, did you --

8  did you do anything to look into that?

9      A.    I haven't.  I haven't even seen the video.

10      Q.    Okay.  And why not?  Why didn't you watch

11  that video?

12      A.    Because it's along the same lines.  When I

13  got word of what was occurring -- and I think that

14  was one was handled different.  I think they actually

15  did file a complaint.  So once that was done --

16  again, I think.  I don't know.  But I think it was --

17  my belief is that there was something formal set in

18  stone with -- set in place with that one, and at --

19  at that point, again, my hands are out of the

20  situation.

21      Q.    Who was their sergeant?

22      A.    Whose, which one?  The ones that were on

23  this Mr. Lea stop?

24      Q.    Yes.  When we look at Mr. Lea's stop, was

25  that a specific street squad right there?

```
 1          A.   It was.   It was either -- and, again, they

 2    may have been -- it may have been an overlap of the

 3    two.   They all worked together.   So you -- you just

 4    had two sergeants, so in case one sergeant was tasked

 5    somewhere handling a situation that had occurred, the

 6    other sergeant was available to assist in another

 7    location.

 8          So I think -- I think Kiersten Holman was from

 9    one squad that was working that day, and I think

10    McNeil was from another, but they partnered up.   And

11    so I don't even know who the sergeant was working

12    that day.   I don't know.   I don't know if it was both

13    or just one, because neither one of them were in the

14    video.

15          Q.   Okay.   Did -- did Crawford and Hellard, did

16    they have a dedicated sergeant or was it one of the

17    two that you'd identified depending upon who was on

18    duty?

19          A.   I can't remember which.   I think McNeil

20    worked for Keeling, and I think Holman was working

21    for Brandon Lincoln.   But, again, don't hold me to

22    it.   It's been years.   It's been --

23          Q.   I'm not going to hold you to it.

24          A.   So I remember that much of it.   But, again,

25    with it being 6 o'clock at night, I don't know which
```

1   direction the other group of detectives went.  I

2   don't know if the sergeants were with them.  I didn't

3   inquire.

4        Q.   Throughout your time as major of Ninth

5   Mobile, do you recall any situations where Jefferson

6   Circuit judges had -- had suppressed evidence

7   recovered as a result of Ninth Mobile traffic stops?

8        A.   I remember one for Detective George Campos.

9        Q.   Okay.

10        A.   Where there was a stop made.  I think there

11   was a length of time with the dog getting maybe --

12   again, I don't remember the specifics.  But I

13   remember something about a George Campos stop and it

14   being thrown out and there being an issue with length

15   of time the dog got there.

16        Q.   Do you recall in that situation, did you

17   instruct, you know, whether it was your lieutenants

18   or the sergeants, to go through that judge's order

19   with the detectives in roll call?

20        A.   Not in roll call.  And, again, with it --

21   with it getting that kind of publicity, I didn't know

22   if it was going to be a complaint, and I don't know

23   that it was, but I do know that the lieutenant over

24   that division -- or that unit and the sergeant over

25   that unit were both pretty hands on, and it didn't

1   happen again.

2        So, again, I tried to do the best I could to

3   stay out of that situation -- these situations, not

4   knowing if there was going to be a complaint, if

5   there was going to be any formal -- I didn't want to

6   be perceived, again, as coaching or stepping in

7   between what an investigator was going to be doing.

8   I understand that I need to -- was there instruction

9   they needed to follow?  There was a sergeant and

10  there was a lieutenant for that.

11       Q.   Okay.  If you've got a situation where a

12  court rules that, you know, actions of, you know, a

13  Ninth Mobile detective warrant a suppression, is

14  that -- you know, did that at least concern you to

15  the point to where you needed to make, you know, do

16  what you could to make sure that those actions didn't

17  happen again?

18       A.   It was -- I definitely -- it definitely

19  registered, I definitely took notice to it.

20       Q.   Did you -- you know, did you reach out to,

21  whether it was training or anyone else to, you know,

22  make sure at least specifically that this -- that

23  these detectives were instructed to not do that type

24  of thing again?

25       A.   I did not.

1       Q.   In the videos that you watched of the

2  Tae-Ahn Lee stop, is there anything that you saw

3  Tae-Ahn doing that you were critical of?

4       A.   No.   But I, again, I had to -- I wasn't

5  looking through his vantage point.   I wasn't looking

6  through his eyes.   That's something that Detective

7  Crawford is going to have to deal with, articulate.

8       Q.   One of -- one of the things that we were --

9  that we were given as part of this case, and it

10  should be up on the screen right now, it says

11  Strategies and Tactics of Patrol Stops at the top.

12  Do you see this?

13       A.   I do, sir.

14       Q.   Okay.   Are you familiar with these

15  documents right here, this specific document right

16  here that I'm scrolling through?

17       A.   Familiar with it, yes.   Specifically, no.

18  I remember them -- I remember them coming out.

19        What was the date on it, if you don't mind?

20  Can you scroll down so I can see?

21       Q.   Sure.   What I saw on this one at the bottom

22  right here was actually, at least the date of the

23  publication of Robert Magnuson from 2013.   And I

24  would assume it's from a book, but I don't know.   Do

25  you know?

1      A.   I don't know.  But I'm trying to figure out

2  when this traffic stop bulletin was kicked out.  May

3  not be on there.

4      Q.   In terms of -- you know, in terms of a

5  bulletin like this, you know, how was this

6  disseminated to the officers?

7      A.   I think it came via email, and they had to

8  check off on it.

9      Q.   Gotcha.  And within these bulletins from

10  time to time at least, including this one right here,

11  if you keep scrolling through and looking at it, they

12  will cite some case law, correct?

13      A.   Yes, sir.

14      Q.   And part of the reasoning for this, I think

15  we would agree, is at least so the officers are kept

16  abreast of what case law tells them they can and

17  can't do under certain situations, right?

18      A.   Yes, sir.

19      Q.   And one of the things within this bulletin

20  at least we see is, you know, there's a question

21  based upon -- you know, when they got the question

22  and answer, at least it's my understanding looking at

23  this is, it's basically a summary of what the case

24  law is telling you you can and can't do, is that

25  fair?

1          A.    Sure.

2          Q.    And here, you know, question:   "For the

3    officer's protection and others, may he pat down a

4    driver stopped for a traffic infraction whom the

5    officer reasonably believes may be armed and

6    dangerous?"

7          And under that situation the answer at least

8    under the case law is, "Yes, the officer may perform

9    a limited search and pat-down of the driver."

10   Correct?

11         A.    Yes, sir.

12         Q.    But then it says, you know, "This pat-down

13   is not permitted merely as a matter of routine or

14   simply because this stop occurred in a high crime

15   area."   That's at least what this says, correct?

16         A.    Yes, sir.

17         Q.    And at least per your understanding, that's

18   a correct interpretation of what these officers are

19   allowed to do and not allowed to do, correct?

20         A.    Correct.

21         Q.    So, for example, you know, if any of your

22   Ninth Mobile detectives had said, listen, you know, I

23   patted -- I patted this person down because they were

24   in a -- you know, because I stopped them and it was

25   in a high crime area, like 18th where there had been

1    three shootings, but they can't articulate, you know,

2    any reasonable belief that that person was armed and

3    dangerous, then that's something you would be

4    critical of, correct?

5          A.   Depending on the situation.  And, again, if

6    they had a reason to act and they can articulate it,

7    that's, you know, that's what they do.  But it's --

8    my thing is I wasn't there.  In that situation you're

9    describing it would depend on a lot of circumstances,

10   and those are circumstances that I'm not there to

11   evaluate.  But routine, if your question is about

12   routine, routine was not promoted.

13         Q.   Okay.  And then, again, you know, another

14   bulletin right here that was given, Traffic Stop

15   Series 4 of 4.  This is the one where, at least, you

16   know, like you were referencing earlier, that the

17   officers were given a bulletin that specifically goes

18   into Rodriguez, correct?

19         A.   Yes, sir.

20         Q.   And that's the same -- this is the same

21   case, you know, that you were referencing earlier,

22   correct?

23         A.   About the -- this will be about the

24   missions of the stop, correct?

25         Q.   In terms of -- in terms of this one right

1    here, it goes into, you know, the K-9 and the

2    sniff --

3         A.   Yes.

4         Q.   -- and extending the stop, correct?

5         A.   Yes.

6         Q.   And so, again, you know, you'd expect your

7    officers here to be familiar with this case law,

8    correct?

9         A.   Yes, sir.

10        Q.   Okay.  And in particular, you'd expect that

11   these officers should all know that they can't

12   extend, you know, a traffic stop without reasonable

13   suspicion just to conduct a dog sniff, correct?

14        A.   Yes, sir.

15        Q.   At anytime when you were the major of Ninth

16   Mobile did it ever concern you that maybe your

17   officers or your detectives were committing or were

18   engaging in pretextual stops?

19        A.    No, sir.  Again, there was a lot of

20   experience, there was a lot of guidance and command.

21   They were around -- they had commanding officers with

22   them.  That was -- that was a direct order from the

23   chief when it began:  I want commanding officers.

24   Because we had a lot of people fleeing from us in the

25   beginning in stolen cars, which was a reason for a

1    lot of the -- they were using stolen cars to commit

2    homicides.  So if we were going to be out there in

3    any type of enforcement activity and a car was to

4    flee, we wanted a commanding officer there to

5    evaluate the particulars in that situation.  So I

6    knew we had command out there, and I knew we had

7    experience out there.

8         Q.   Were you ever advised, you know, whether it

9    be by Chief Conrad or another ranking officer over

10   you, to -- to make sure that your division was using

11   traffic stops as a tool to -- to target violent

12   crime?

13        A.   No.  It was prioritized and proactive

14   enforcement.

15        Q.   And what do you -- what do you mean there,

16   prioritized and proactive enforcement, is that what

17   you said?

18        A.   I mean, it came down to, you know, when you

19   look at the model for Project Safe Neighborhood, it

20   was -- you don't paint with a broad brush.  You're

21   specific to where violent criminal activity is being

22   reported, and that's it.  It wasn't -- it wasn't --

23   we were going to work, we were going to investigate

24   the situations, and traffic stops were a form of

25   investigation in some capacities.  But when -- it

1    wasn't just drive in and a free for all.  We -- we

2    were particular about what we did, to my knowledge,

3    and sometimes I was with them.  But there was a lot

4    of surveillance.  There was a lot of knowledge going

5    into situations.  So does that answer your question?

6         Q.   I think so, yeah.  How was -- how were the

7    detectives measured on their performance?

8         A.   And there wasn't a measured performance.

9    We knew that there were a couple sergeants that

10   had -- that looked into some training for a couple

11   detectives.  There were sergeants that voiced that

12   some folks weren't -- it took some folks longer to

13   understand that we weren't, you know, we -- we were

14   more of a specific -- you know, we were focusing on

15   violent criminal activity, and that was it.  It was

16   going to be -- of course, unless there was a need,

17   somebody called and needed.

18        But the sergeants were big on making sure

19   everybody was a team and working well together.  And

20   it was -- there wasn't a measure, but we -- we all

21   worked as a team, and we were all -- we held

22   ourselves to a standard.  And what I mean by that is

23   we were knowledgeable and we wanted to utilize our

24   time effectively and efficiently.

25        Q.   Who -- who reviewed your performance while

1   you were a major?

2        A.   Colonel.  I think the last one I received

3   was from Colonel Shara Parks.  I'm not sure.  I don't

4   know if there was one done afterward.  I know that

5   she did one.

6        Q.   And what was your understanding of how you

7   were measured in terms of performance?

8        A.   Well, there were performance standards.

9   And it was everything from excellent.  Excellent was

10  at the top.  I don't know what was at the bottom.

11  There was maybe four or five choices.  I don't know.

12       Q.   Were there any metrics that you were

13  measured on, like number of guns that were recovered?

14       A.   No.  No.  Appearance -- I -- it's been

15  awhile and I haven't -- when I was a major, I only

16  had to do two because I did them for the lieutenants

17  and everybody else was -- it's been long enough to

18  where I have -- I can't remember all that was on it.

19  But there was no measure of how many guns you're

20  getting and all that stuff.

21       Q.   I'm sure you recall that, you know, after

22  Tae-Ahn's incident, you know, drew some scrutiny and

23  some attention, that -- that SOPs were changed in

24  terms of several of the traffic stop policies.  Do

25  you remember that?

1        A.   Yes, sir.

2        Q.   What was your reaction to that?

3        A.   Well, I mean, the chief felt the need to

4    make a change, and a change was made.  It wasn't so

5    much a reaction.  It was -- you know, it -- a part of

6    -- part of being the leader is you have to accept it,

7    and you -- you go -- you take it back to your team,

8    and you implement it.  And the team was -- I -- I got

9    it.  I understood it.  And I sold it to the teams.

10        Q.   Did you and the chief discuss those

11    changes, you know, before they actually went into

12    play?

13        A.   I can't remember a specific conversation.

14    I think there was some discussion as a group.  But it

15    was -- pretty much the discussion I remember was,

16    this is where we're going; do you have suggestions.

17    And I had suggestions.

18        Q.   And that's what I was getting at.  What

19    suggestions did you have?

20        A.   Sir, it's -- I do not remember.  I'm sorry.

21    I just -- there was -- it was the way things were

22    being worded.  I wanted to make sure that -- I just

23    remember there was a -- one of my biggest suggestions

24    was the way the first paragraph of something was

25    worded or something.  I wanted to make sure that

1  people were aware you could still make traffic stops,

2  but you had to be -- you had to know what you were

3  doing.  I can't remember -- I don't remember.  I

4  can't remember the actual verbiage.  I apologize.

5          Q.   After those changes were implemented, did

6  you see any spikes in violent crime?

7          A.   2018 -- 2018, there were 80 homicides,

8  which was low compared to the previous two years.

9  The next year was '19.  Again, it was a year that

10  part of my plan.  The day that I left the division,

11  middle of November, second week of November we were

12  at 72 homicides.  And I say "we" because, you know,

13  we worked with the divisions, we worked with the

14  command staff and we worked with the detectives.  It

15  wasn't us making the change.  We were part of it.

16  But when I left, that year there end up being 92 over

17  all.  And then last year there were 173 obviously,

18  which is horrible.

19          Q.   I heard you correctly earlier, you know, it

20  sounds like second half of November or December was

21  really bad.  If I heard you correctly, when you left,

22  there were at 72, but then they ended the year at 92?

23          A.   Seems like for some reason I remember the

24  last day that I was there, and I don't know -- I

25  don't know what day it was.  I was -- I guess I was

1   in the middle of preparing for a surgery.  So I

2   remember that when I was leaving, I said, how many

3   homicides are we at?  And they said 72.  And then the

4   end of the year, I think there end up being 92.

5        Q.   Do you attribute any of the traffic stop

6   policy changes to -- to any spike in violent crime?

7        A.   I have no way of attributing to that.  I

8   don't know.

9        Q.   All right.  We're about at 3:00, and I'm

10  probably just about done.  So let's take another

11  five, and we'll wrap up, okay?

12       A.   Yes, sir.

13            VIDEOGRAPHER:  The time is 2:57.  We now

14  leave the video record.

15            (RECESS)

16            VIDEOGRAPHER:  The time is 3:03.  We now

17  return to the video record.

18            MR. AGUIAR:  Major Hibbs, like I just

19  indicated off the record, I don't have anything else.

20  You know, 22, 23 years of service to the community, I

21  appreciate that, and I appreciate your time today.

22  And -- and, you know, shouldn't be bugging you again

23  about this.

24       A.   I appreciate it.  Thank you, sir.  I

25  appreciate your words.

```
1         Q.   Thank you.

2              MR. ERVIN:  Thank you, Sam.  Thanks,

3    folks.

4              VIDEOGRAPHER:  The time is 3:04.  This

5    completes the video record.

6

7              (WITNESS EXCUSED AT 3:04 P.M.)

8

9    * * *                    * * *                    * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   STATE OF KENTUCKY

2   COUNTY OF JEFFERSON

3        I, NANCY L. NUNNELLEY, RMR, Notary Public,

4   State of Kentucky at Large, do hereby certify that

5   the foregoing deposition of MAJOR WILLIAM ARTHUR

6   HIBBS was taken at the time and place stated in the

7   caption; that the appearances were as set forth in

8   the caption; that prior to giving their testimony the

9   witness was first duly sworn by me, that said

10  testimony was taken down by me in stenographic notes

11  and thereafter reduced under my supervision to the

12  foregoing 90 typewritten pages and that said

13  typewritten transcript is a true, accurate and

14  complete record of my stenographic notes so taken.

15       I further certify that I am not related by

16  blood or marriage to any of the parties hereto and

17  that I have no interest in the outcome of captioned

18  case.

19       My commission as Notary Public expires July 10,

20  2023.

21       Given under my hand this the 2nd day of

22  March 2021 at Louisville, Kentucky.

23  _____

24                        NOTARY PUBLIC  No. 625762

25

**'**

**'10** [1] - 7:10
**'15** [3] - 8:12, 8:13, 41:3
**'16** [1] - 41:3
**'18** [1] - 16:24
**'19** [1] - 88:9
**'20** [1] - 9:9
**'97** [2] - 5:16, 10:1

---

**1**

**1** [3] - 3:7, 33:18, 33:20
**10** [3] - 34:10, 40:7, 91:19
**101** [2] - 14:8, 30:19
**102** [1] - 14:8
**117** [2] - 14:7, 30:19
**1201** [1] - 2:6
**14** [5] - 22:5, 28:12, 28:13, 31:10, 57:23
**15** [2] - 8:25, 9:5
**17** [3] - 1:17, 4:4, 4:9
**173** [1] - 88:17
**18** [1] - 10:3
**18th** [4] - 71:9, 71:12, 72:18, 81:25
**19** [1] - 6:4
**1997** [3] - 5:13, 5:20, 6:4
**1998** [1] - 5:21
**1:04** [2] - 4:5, 4:10
**1st** [1] - 8:18

---

**2**

**2** [4] - 3:8, 38:6, 61:5, 61:6
**20** [1] - 35:11
**200** [1] - 2:14
**2000** [1] - 7:24
**2003** [2] - 5:23, 6:19
**20042B131** [1] - 1:23
**2005** [3] - 5:23, 6:25, 7:1
**2009** [3] - 7:1, 7:9
**2013** [1] - 79:23
**2015** [2] - 8:9, 14:6
**2016** [4] - 14:7, 30:19, 40:2, 50:6
**2017** [3] - 8:7, 8:12, 8:15
**2018** [8] - 16:6, 16:7, 22:18, 33:25, 38:1, 50:6, 88:7
**2019** [2] - 8:19, 9:9
**2021** [4] - 1:17, 4:4, 4:10, 91:22

**2023** [1] - 91:20
**21st** [4] - 13:25, 15:4, 33:4, 65:13
**22** [1] - 89:20
**23** [1] - 89:20
**24** [2] - 67:23, 71:25
**24-year-old** [1] - 31:11
**25,000** [1] - 13:6
**267-4156** [1] - 1:25
**27th** [2] - 8:9, 8:13
**2:00** [1] - 11:3
**2:02** [2] - 50:17, 50:25
**2:08** [1] - 51:3
**2:57** [1] - 89:13
**2nd** [1] - 91:21

---

**3**

**30** [7] - 56:21, 57:1, 57:8, 68:2, 68:7, 68:15, 68:19
**300N** [1] - 2:14
**301** [1] - 2:6
**33** [1] - 3:7
**3:00** [1] - 89:9
**3:03** [1] - 89:16
**3:04** [2] - 90:4, 90:7
**3:19-CV-419-GNS-RSE** [1] - 1:5

---

**4**

**4** [4] - 3:3, 12:9, 36:15, 82:15
**40202** [1] - 2:15
**40206** [1] - 2:7
**40299** [1] - 1:24
**42nd** [1] - 18:6
**4413** [1] - 1:24
**4:00** [1] - 11:3

---

**5**

**5** [1] - 34:12
**502** [2] - 1:25
**594-1728** [1] - 1:25
**5:00** [1] - 12:10

---

**6**

**6** [2] - 67:17, 76:25
**61** [1] - 3:8
**625762** [1] - 91:24
**6:10** [1] - 67:18

---

**7**

**7** [1] - 61:7
**7.12** [1] - 61:7
**7.12.7** [1] - 3:8

**72** [5] - 14:11, 14:13, 88:12, 88:22, 89:3
**75** [1] - 31:8

---

**8**

**80** [3] - 14:7, 14:9, 88:7
**88** [1] - 40:6

---

**9**

**90** [1] - 91:12
**92** [4] - 14:11, 88:16, 88:22, 89:4

---

**A**

**A/B** [1] - 17:2
**able** [15] - 8:25, 9:1, 11:25, 13:15, 13:16, 15:24, 16:3, 20:25, 21:14, 29:8, 31:18, 49:6, 52:3, 53:11, 59:3
**abreast** [1] - 80:16
**absolute** [1] - 70:24
**abundance** [1] - 6:19
**academy** [2] - 5:14, 5:20
**accept** [1] - 87:6
**access** [4] - 22:17, 28:6, 28:9, 28:21
**accessed** [1] - 20:1
**accomplish** [1] - 44:9
**accomplished** [1] - 71:5
**accomplishment** [1] - 12:20
**accordance** [1] - 4:6
**according** [1] - 68:6
**accurate** [1] - 91:13
**acquired** [1] - 20:7
**act** [2] - 70:6, 82:6
**acting** [3] - 70:10, 70:14, 71:19
**action** [2] - 65:21, 68:23
**ACTION** [1] - 1:5
**actions** [6] - 24:23, 53:11, 56:10, 75:3, 78:12, 78:16
**active** [1] - 35:19
**activity** [16] - 7:7, 11:20, 15:1, 17:18, 31:17, 34:25, 35:4, 36:6, 41:24, 42:24, 53:3, 74:6, 74:8, 84:3, 84:21, 85:15
**actual** [2] - 37:8, 88:4

**address** [2] - 25:8, 26:8
**administrative** [1] - 49:18
**advised** [3] - 26:7, 47:2, 84:8
**African** [2] - 40:6, 40:8
**African-American** [2] - 40:6, 40:8
**agency** [1] - 34:13
**aggressive** [2] - 59:25, 60:1
**ago** [3] - 8:23, 50:16
**agree** [9] - 4:13, 4:16, 38:16, 57:14, 58:3, 59:14, 61:24, 65:25, 80:15
**agreed** [1] - 4:17
**Aguiar** [2] - 2:4, 2:5
**AGUIAR** [10] - 3:3, 4:17, 4:20, 4:21, 29:2, 33:15, 50:24, 51:5, 61:4, 89:18
**ahead** [1] - 4:21
**AHN** [1] - 1:7
**Ahn** [27] - 2:9, 16:8, 51:24, 52:7, 52:17, 53:15, 53:19, 55:25, 56:3, 58:5, 59:3, 59:15, 59:22, 62:1, 62:12, 62:25, 63:13, 63:19, 63:23, 64:15, 64:21, 66:3, 66:5, 66:17, 72:23, 79:2, 79:3
**Ahn's** [10] - 51:8, 57:16, 63:25, 64:5, 66:7, 66:11, 66:15, 67:3, 69:2, 86:22
**al** [1] - 1:14
**Algonquin** [2] - 60:13
**Ali** [1] - 15:11
**alive** [1] - 12:23
**ALL** [1] - 2:2
**allegations** [2] - 24:17, 24:18
**allow** [3] - 19:24, 20:22, 20:24
**allowed** [8] - 18:16, 45:19, 54:14, 64:15, 64:21, 65:8, 81:19
**alone** [1] - 13:5
**ALSO** [1] - 2:9
**altogether** [1] - 67:21
**American** [2] - 40:6, 40:8
**amount** [4] - 21:5, 36:5, 44:15, 46:13
**AND** [1] - 2:2
**Andrew** [1] - 2:13

**animals** [1] - 67:15
**annual** [1] - 49:11
**answer** [11] - 20:25, 21:15, 22:3, 46:16, 53:13, 57:21, 65:17, 72:12, 80:22, 81:7, 85:5
**anytime** [2] - 51:6, 83:15
**apologize** [3] - 32:12, 58:1, 88:4
**appearance** [1] - 86:14
**APPEARANCES** [1] - 2:1
**appearances** [1] - 91:7
**APPEARED** [1] - 2:2
**apply** [1] - 17:11
**appreciate** [5] - 10:15, 89:21, 89:24, 89:25
**appreciative** [1] - 15:17
**approach** [3] - 36:19, 41:4, 61:21
**approaching** [1] - 59:12
**area** [12] - 7:13, 7:14, 32:11, 40:2, 41:10, 41:12, 70:23, 72:24, 73:18, 81:15, 81:25
**areas** [16] - 13:10, 35:2, 36:8, 36:21, 37:16, 37:21, 37:22, 40:5, 41:9, 42:25, 43:1, 47:7, 73:9, 73:13, 73:20
**armed** [2] - 81:5, 82:2
**array** [1] - 49:9
**arrest** [1] - 48:18
**arrived** [1] - 11:16
**ARTHUR** [4] - 1:17, 4:2, 4:18, 91:5
**Arthur** [1] - 4:24
**articulate** [12] - 51:21, 53:4, 53:24, 54:18, 64:9, 65:3, 71:21, 72:14, 74:24, 79:7, 82:1, 82:6
**articulated** [2] - 52:13, 71:18
**articulation** [2] - 52:5, 53:21
**aspect** [1] - 44:1
**assaults** [1] - 74:14
**assist** [3] - 31:2, 65:1, 76:6
**assisted** [3] - 47:23, 48:21, 48:22
**associated** [1] - 28:22

**assume** [3] - 28:23, 62:8, 79:24
**assuming** [3] - 8:6, 11:15, 28:11
**assumption** [1] - 32:11
**AT** [2] - 1:2, 90:7
**ATF** [1] - 48:1
**attacks** [1] - 54:12
**attend** [1] - 23:25
**attended** [1] - 30:23
**attention** [4] - 14:23, 18:21, 75:4, 86:23
**Attorney's** [1] - 2:13
**attribute** [1] - 89:5
**attributing** [1] - 89:7
**attrition** [1] - 16:22
**August** [5] - 5:13, 5:16, 8:15, 9:12, 16:7
**available** [1] - 76:6
**Avenue** [1] - 2:6
**average** [6] - 68:1, 68:5, 68:7, 68:14, 68:18, 68:21
**aware** [4] - 68:4, 68:13, 68:16, 88:1
**awhile** [3] - 12:16, 20:19, 86:15

**B**

**backed** [1] - 66:19
**bad** [1] - 88:21
**barked** [1] - 67:13
**based** [13] - 7:6, 9:23, 31:3, 31:4, 31:17, 35:2, 43:21, 52:15, 57:15, 58:3, 69:22, 73:19, 80:21
**basis** [2] - 49:11, 58:19
**beat** [4] - 6:12, 41:19, 47:12
**beats** [1] - 42:2
**beauty** [1] - 44:9
**became** [4] - 6:16, 6:22, 8:9, 8:13
**become** [2] - 30:18, 41:20
**Beecher** [1] - 7:13
**began** [3] - 5:20, 6:5, 83:23
**begin** [2] - 24:7, 44:1
**beginning** [6] - 5:13, 7:10, 9:21, 20:14, 73:7, 83:25
**begun** [1] - 66:14
**behavior** [1] - 34:7
**behind** [2] - 18:13,

40:23
**belief** [2] - 75:17, 82:2
**believes** [1] - 81:5
**benefited** [2] - 16:4
**best** [6] - 9:13, 14:4, 44:6, 59:9, 70:24, 78:2
**better** [2] - 69:10, 69:13
**between** [5] - 10:21, 34:23, 73:7, 73:14, 78:7
**bias** [4] - 69:17, 69:20, 70:20, 71:2
**biased** [1] - 50:7
**bicycles** [1] - 13:22
**big** [2] - 23:23, 85:18
**biggest** [1] - 87:23
**Billy** [2] - 23:5, 23:10
**bit** [6] - 13:7, 38:4, 42:9, 69:22, 70:19, 71:1
**black** [2] - 29:8, 39:25
**blended** [1] - 9:16
**block** [2] - 15:14, 25:23
**blood** [1] - 91:16
**body** [6] - 51:7, 51:12, 52:9, 52:15, 59:4, 60:3
**bolts** [1] - 54:11
**book** [1] - 79:24
**bottom** [2] - 79:21, 86:10
**bought** [1] - 9:6
**box** [2] - 15:14, 27:23
**Brandon** [3] - 23:5, 23:11, 76:21
**breaks** [1] - 11:23
**brief** [2] - 27:2, 28:3
**bring** [3] - 52:24, 53:8, 70:25
**broad** [2] - 49:9, 84:20
**broke** [1] - 32:9
**Broken** [1] - 32:2
**brought** [4] - 11:2, 21:7, 21:13, 75:4
**brush** [1] - 84:20
**buckle** [1] - 65:20
**Buckner** [1] - 2:5
**bugging** [1] - 89:22
**building** [2] - 31:9, 40:3
**built** [3] - 14:20, 31:2, 40:18
**bullet** [1] - 61:9
**bulletin** [5] - 80:2, 80:5, 80:19, 82:14, 82:17
**bulletins** [1] - 80:9

**bushes** [1] - 32:9
**business** [2] - 6:14, 7:14
**busy** [5] - 47:9, 47:10, 47:11, 47:14, 50:15
**buy** [2] - 9:2, 10:11
**BY** [2] - 3:3, 4:20

**C**

**calendar** [1] - 36:17
**calm** [5] - 39:15, 54:7, 54:21, 57:10, 59:9
**calming** [4] - 57:3, 57:4, 57:13, 59:8
**camera** [1] - 51:7, 51:12, 52:9, 52:15, 59:4
**cameras** [2] - 8:10, 60:3
**Campos** [2] - 77:8, 77:13
**capacities** [4] - 14:20, 39:18, 48:4, 84:25
**capacity** [1] - 18:22
**caption** [2] - 91:7, 91:8
**captioned** [1] - 91:17
**captured** [1] - 64:13
**car** [4] - 24:12, 46:6, 56:16, 84:3
**care** [1] - 74:10
**cared** [1] - 74:14
**career** [2] - 13:8, 20:13
**carried** [3] - 23:7, 31:13, 31:14
**carry** [1] - 69:16
**cars** [5] - 41:1, 41:5, 41:7, 83:25, 84:1
**case** [12] - 16:13, 27:11, 55:22, 76:4, 79:9, 80:12, 80:16, 80:23, 81:8, 82:21, 83:7, 91:18
**Case** [1] - 7:2
**cases** [4] - 7:4, 17:18, 47:13
**Center** [2] - 13:5, 36:10
**Century** [4] - 13:25, 15:4, 33:4, 65:13
**certain** [11] - 20:17, 20:19, 35:14, 41:10, 41:11, 42:25, 48:15, 70:6, 70:11, 70:12, 80:17
**Certification** [1] - 1:23
**certify** [2] - 91:4, 91:15

**chance** [3] - 20:9, 28:5, 49:2
**change** [7] - 9:22, 9:24, 29:22, 30:3, 87:4, 88:15
**changed** [1] - 86:23
**changes** [8] - 8:8, 9:10, 10:20, 18:19, 18:24, 87:11, 88:5, 89:6
**characteristics** [1] - 70:7
**charge** [2] - 56:18
**check** [3] - 48:12, 58:12, 80:8
**checked** [3] - 24:2, 27:23, 58:12
**checking** [1] - 67:18
**checklist** [1] - 27:22
**Chenwood** [1] - 1:24
**chief** [7] - 23:15, 37:11, 55:5, 55:18, 83:23, 87:3, 87:10
**Chief** [1] - 84:9
**chief's** [1] - 55:5
**children** [1] - 13:20
**choices** [1] - 86:11
**choose** [1] - 39:19
**churn** [1] - 9:19
**Circuit** [1] - 77:6
**circumstances** [3] - 44:21, 82:9, 82:10
**cite** [1] - 80:12
**cited** [1] - 59:15
**citizen** [3] - 24:16, 24:23, 25:18
**city** [1] - 30:25
**CIVIL** [1] - 1:5
**Civil** [1] - 4:7
**civilian** [1] - 7:19
**Clarksdale** [2] - 6:14, 7:14
**clear** [7] - 29:24, 55:20, 57:5, 58:19, 67:2, 67:3
**clearly** [4] - 21:5, 21:6, 21:15, 43:16
**close** [5] - 45:13, 48:6, 48:7, 48:20
**closed** [1] - 15:25
**closely** [1] - 10:25
**coaching** [1] - 78:6
**coin** [4] - 34:3, 34:4, 34:5, 34:8
**cold** [1] - 49:2
**collaboration** [1] - 16:14
**collaborative** [1] - 14:15
**colleague** [1] - 69:12

**college** [1] - 20:17
**Colonel** [2] - 37:13, 86:3
**colonel** [1] - 86:2
**colonels** [1] - 37:10
**column** [1] - 36:18
**combination** [1] - 11:9
**coming** [8] - 9:22, 9:24, 12:7, 17:15, 18:19, 36:11, 79:18
**command** [8] - 11:1, 11:13, 12:13, 28:14, 42:23, 83:20, 84:6, 88:14
**commanding** [13] - 11:12, 16:20, 23:17, 23:19, 38:24, 39:7, 39:20, 40:19, 55:14, 74:1, 83:21, 83:23, 84:4
**comments** [1] - 70:18
**commission** [1] - 91:19
**commit** [1] - 84:1
**committed** [1] - 14:8
**committing** [4] - 34:25, 35:7, 69:21, 83:17
**communicate** [3] - 25:25, 31:18, 34:13
**communicated** [1] - 36:8
**communication** [6] - 13:3, 22:13, 34:23, 35:24, 41:18, 41:21
**communities** [1] - 16:5
**Community** [1] - 38:11
**community** [15] - 13:2, 14:17, 14:21, 14:22, 15:6, 16:4, 31:4, 31:5, 34:6, 35:1, 35:18, 38:7, 38:13, 89:20
**compared** [1] - 88:8
**complained** [2] - 55:18
**complaint** [10] - 25:3, 25:6, 25:9, 26:2, 26:19, 55:20, 75:5, 75:15, 77:22, 78:4
**complaints** [5] - 24:16, 25:11, 25:18, 26:10, 75:2
**complete** [1] - 91:14
**completed** [2] - 27:13, 44:16
**completes** [1] - 90:5
**Complex** [1] - 6:14

**CompStat** [3] - 30:22, 37:12
**concentrating** [1] - 34:14
**concern** [7] - 69:1, 69:9, 70:19, 71:24, 72:5, 78:14, 83:16
**concerned** [1] - 72:7
**conclusion** [1] - 57:21
**condition** [1] - 53:22
**conduct** [3] - 47:17, 56:6, 83:13
**conducted** [2] - 42:15, 43:20
**connect** [1] - 72:25
**connection** [1] - 72:22
**Conrad** [1] - 84:9
**CONRAD** [1] - 1:14
**considered** [1] - 20:15
**constructed** [1] - 8:5
**contact** [1] - 25:13
**contacted** [2] - 17:22, 17:23
**continually** [1] - 39:20
**Continue** [1] - 36:18
**continues** [1] - 67:7
**contributed** [1] - 11:9
**conversation** [1] - 87:13
**cooperation** [1] - 34:12
**cordial** [3] - 19:4, 54:7, 54:19
**correct** [64] - 5:5, 19:12, 26:10, 27:9, 27:13, 27:14, 30:3, 33:2, 38:8, 38:20, 40:14, 47:17, 55:25, 56:6, 57:17, 58:6, 58:7, 58:9, 59:4, 59:16, 60:19, 60:22, 61:13, 61:17, 61:18, 62:1, 62:6, 62:7, 62:10, 62:13, 62:23, 62:24, 63:1, 63:7, 63:21, 65:9, 65:23, 66:3, 66:7, 66:12, 66:24, 66:25, 67:4, 67:5, 67:7, 67:23, 68:2, 69:17, 69:18, 70:2, 70:7, 80:12, 81:10, 81:15, 81:18, 81:19, 81:20, 82:4, 82:18, 82:22, 82:24, 83:4, 83:8, 83:13
**correctly** [5] - 55:24, 57:6, 73:23, 88:19, 88:21
**corridor** [3] - 71:12, 72:18

**County** [2] - 2:13, 36:21
**COUNTY** [1] - 91:2
**couple** [7] - 7:16, 9:8, 24:25, 48:12, 48:15, 85:9, 85:10
**course** [2] - 40:9, 85:16
**COURT** [1] - 1:1
**court** [5] - 17:16, 21:6, 21:16, 44:7, 78:12
**CourtNet** [1] - 66:3
**coverage** [1] - 17:7
**covered** [1] - 19:17
**CPTED** [2] - 32:7, 32:14
**Crawford** [23] - 51:14, 51:20, 52:3, 52:13, 52:20, 53:2, 54:16, 54:24, 61:25, 62:25, 63:6, 63:18, 64:6, 65:1, 66:2, 66:6, 66:10, 66:14, 66:22, 67:6, 75:3, 76:15, 79:7
**Crawford's** [1] - 53:12
**crime** [25] - 7:6, 13:13, 13:14, 30:24, 31:11, 32:10, 34:14, 35:3, 35:8, 36:20, 36:22, 37:24, 40:11, 40:23, 41:10, 41:11, 69:24, 71:5, 71:23, 72:2, 81:14, 81:25, 84:12, 88:6, 89:6
**Crime** [4] - 7:21, 32:7, 32:15, 36:10
**crimes** [2] - 36:16, 40:13
**Crimes** [1] - 7:17
**Criminal** [2] - 7:2, 9:17
**criminal** [11] - 7:7, 11:20, 15:1, 35:4, 36:6, 42:24, 48:11, 74:6, 74:8, 84:21, 85:15
**criminals** [1] - 31:18
**criteria** [1] - 20:17
**critical** [14] - 51:18, 51:23, 51:25, 52:2, 52:11, 52:22, 52:24, 53:18, 53:20, 59:6, 59:13, 64:20, 79:3, 82:4
**Crums** [1] - 10:10
**cut** [1] - 64:25

**D**

**daily** [1] - 24:7

**Dale** [1] - 22:23
**dangerous** [2] - 81:6, 82:3
**data** [5] - 28:21, 36:19, 49:16, 49:20, 49:24
**data-driven** [1] - 36:19
**date** [4] - 4:9, 9:13, 79:19, 79:22
**dates** [1] - 9:11
**day-to-day** [1] - 47:20
**deal** [1] - 79:7
**dealing** [2] - 15:23, 72:3
**dealt** [1] - 35:16
**December** [4] - 8:18, 9:13, 88:20
**decided** [1] - 40:13
**decides** [1] - 65:21
**decision** [4] - 51:24, 52:23, 53:18, 56:3
**dedicated** [1] - 76:16
**Defendants** [1] - 2:11
**DEFENDANTS** [1] - 1:14
**definitely** [3] - 78:18, 78:19
**delegate** [2] - 48:14, 48:15
**delegated** [5] - 28:20, 29:11, 30:8, 30:10, 45:19
**delegates** [1] - 27:21
**demeanor** [2] - 39:15
**department** [6] - 6:21, 8:22, 19:24, 20:18, 20:22, 55:7
**Department** [5] - 3:7, 5:9, 5:11, 33:13, 33:22
**departure** [1] - 9:4
**deploy** [1] - 36:20
**DEPONENT** [1] - 1:17
**deposed** [1] - 4:19
**DEPOSITION** [1] - 1:11
**deposition** [4] - 4:2, 4:5, 4:11, 91:5
**describing** [1] - 82:9
**Description** [1] - 3:6
**Design** [2] - 32:8, 32:15
**designated** [1] - 73:13
**desire** [1] - 19:8
**desk** [1] - 26:12
**detain** [2] - 54:2, 54:3
**detective** [8] - 6:16, 7:3, 17:4, 17:6, 24:17, 24:24, 49:4, 78:13
**Detective** [7] - 39:13,

52:20, 53:12, 54:16, 65:1, 77:8, 79:6
**detectives** [44] - 6:20, 12:14, 14:18, 16:21, 17:9, 18:16, 18:25, 23:13, 30:1, 30:6, 38:23, 39:7, 40:19, 41:6, 41:9, 41:13, 41:14, 41:15, 41:20, 42:19, 43:10, 43:20, 44:17, 44:22, 45:14, 46:3, 47:12, 48:25, 49:8, 55:12, 60:17, 65:5, 65:7, 65:10, 72:1, 73:12, 77:1, 77:19, 78:23, 81:22, 83:17, 85:7, 85:11, 88:14
**detectives'** [1] - 51:12
**determination** [1] - 51:20
**determine** [3] - 19:19, 36:19, 39:24
**developed** [1] - 44:10
**different** [14] - 10:21, 16:1, 18:22, 22:2, 24:25, 30:13, 31:25, 36:9, 48:1, 50:21, 59:10, 59:11, 70:1, 75:14
**diligent** [1] - 45:12
**diligently** [1] - 9:3
**direct** [2] - 7:5, 83:22
**direction** [4] - 16:1, 72:16, 77:1
**directive** [1] - 23:16
**directly** [1] - 26:10
**discretion** [2] - 14:20, 73:22
**discretionary** [1] - 20:23
**discuss** [4] - 24:5, 54:24, 60:14, 87:10
**discussed** [4] - 22:7, 23:23, 37:12, 52:4
**discussing** [1] - 69:11
**discussion** [9] - 21:9, 37:1, 37:3, 43:17, 43:18, 45:17, 55:16, 87:14, 87:15
**discussions** [4] - 21:8, 32:20, 42:24, 60:17
**disease** [1] - 69:6
**disproportionate** [1] - 39:25
**disproportionately** [1] - 37:23
**disseminated** [1] - 80:6

**distance** [1] - 60:16
**district** [2] - 6:7, 6:14
**DISTRICT** [2] - 1:1, 1:1
**District** [4] - 6:9, 6:11, 6:18, 7:10
**districts** [2] - 6:23, 7:15
**diverse** [1] - 18:3
**division** [27] - 5:25, 7:11, 8:16, 8:17, 11:15, 18:11, 18:18, 24:2, 29:7, 31:19, 33:6, 35:10, 35:13, 39:3, 39:21, 41:13, 42:3, 42:19, 43:20, 45:3, 49:4, 60:12, 71:11, 71:23, 77:24, 84:10, 88:10
**Division** [21] - 6:6, 6:7, 6:8, 6:10, 6:11, 6:17, 6:23, 6:24, 7:2, 7:3, 7:11, 8:1, 8:10, 8:14, 9:17, 11:10, 16:10, 30:18, 36:25, 41:15, 59:19
**Divisions** [1] - 31:8
**divisions** [11] - 6:22, 14:16, 34:23, 35:25, 36:24, 37:17, 41:15, 48:22, 74:2, 74:19, 88:13
**Dixie** [4] - 10:4, 10:10, 71:12, 72:2
**document** [8] - 33:11, 33:17, 36:15, 38:6, 57:23, 79:15
**documentation** [1] - 65:21
**documents** [1] - 79:15
**dog** [22] - 44:10, 44:13, 45:10, 45:16, 45:25, 46:14, 46:23, 52:24, 53:9, 57:25, 58:1, 58:11, 58:14, 58:21, 59:21, 66:9, 67:10, 67:12, 77:11, 77:15, 83:13
**dogs** [1] - 47:21
**donated** [1] - 13:6
**donation** [1] - 15:13
**donations** [1] - 15:7
**done** [20] - 10:8, 13:7, 14:19, 18:14, 20:4, 21:18, 21:25, 22:11, 45:4, 45:5, 49:7, 50:6, 54:12, 54:17, 66:10, 69:10, 69:13, 75:15, 86:4, 89:10
**door** [4] - 12:5, 12:8, 14:12, 67:13

**down** [28] - 12:22, 13:19, 15:11, 15:13, 27:3, 41:22, 43:11, 50:10, 52:7, 55:8, 57:10, 58:9, 58:10, 58:13, 59:22, 64:7, 64:15, 64:21, 65:8, 67:14, 71:11, 79:20, 81:3, 81:9, 81:12, 81:23, 84:18, 91:10
**downtown** [2] - 6:13, 7:14
**draw** [1] - 39:4
**drew** [2] - 14:4, 86:22
**drive** [1] - 85:1
**driven** [1] - 36:19
**driver** [2] - 81:4, 81:9
**driver's** [1] - 63:4
**driveways** [1] - 41:5
**driving** [2] - 10:5, 72:23
**Dropbox** [1] - 33:16
**drove** [2] - 26:16, 42:1
**drug** [1] - 59:21
**drugs** [3] - 50:1, 62:17, 63:20
**ducks** [1] - 9:4
**due** [2] - 36:5, 47:8
**duly** [2] - 4:19, 91:9
**during** [4] - 16:24, 32:21, 40:25, 75:3
**duties** [1] - 24:2
**duty** [1] - 76:18

## E

**early** [2] - 41:2, 41:3
**ears** [1] - 19:5
**edge** [1] - 63:10
**educated** [1] - 25:24
**education** [1] - 35:17
**effect** [2] - 48:17, 57:3
**effectively** [1] - 85:24
**efficiently** [1] - 85:24
**effort** [1] - 37:4
**efforts** [3] - 14:5, 31:3, 54:23
**eight** [1] - 17:1
**either** [8] - 7:9, 9:12, 24:11, 25:1, 26:25, 45:7, 49:17, 76:1
**elaborate** [3] - 16:12, 22:16, 44:24
**elaborated** [1] - 64:24
**elevation** [1] - 44:12
**email** [2] - 24:3, 80:7
**Email** [1] - 1:25
**emphasize** [1] - 33:3
**employed** [1] - 4:25
**encountered** [4] -

35:21, 35:22, 40:7, 41:7
**encyclopedia** [1] - 35:15
**end** [8] - 7:4, 20:8, 42:9, 43:15, 73:7, 88:16, 89:4
**endangerments** [1] - 74:13
**ended** [4] - 9:13, 14:11, 74:25, 88:22
**enforcement** [7] - 5:8, 31:16, 40:12, 84:3, 84:14, 84:16
**engaging** [2] - 42:20, 83:18
**enjoy** [2] - 13:19, 13:20
**entail** [1] - 17:10
**entering** [1] - 31:22
**entire** [2] - 18:5, 30:1
**entities** [1] - 36:9
**Environmental** [2] - 32:7, 32:15
**environments** [1] - 18:8
**ERVIN** [6] - 4:16, 21:2, 29:1, 29:4, 57:19, 90:2
**Ervin** [1] - 2:12
**escalated** [1] - 54:21
**especially** [2] - 39:12, 49:1
**Esquire** [4] - 2:4, 2:5, 2:12, 2:13
**established** [6] - 13:4, 18:15, 21:6, 21:15, 23:21, 43:16
**et** [1] - 1:14
**ethical** [3] - 34:7, 38:15, 38:25
**evaluate** [5] - 9:1, 13:15, 72:8, 82:11, 84:5
**evaluated** [2] - 9:5, 23:14
**evaluation** [2] - 11:5, 39:23
**events** [1] - 54:24
**everywhere** [1] - 16:25
**evidence** [1] - 77:6
**EXAMINATION** [1] - 4:20
**EXAMINATIONS** [1] - 3:2
**example** [3] - 28:25, 29:5, 81:21
**excellent** [4] - 39:14, 39:15, 86:9

**excuse** [1] - 7:23
**EXCUSED** [1] - 90:7
**Executive** [1] - 50:5
**exemplary** [1] - 18:1
**Exhibit** [1] - 33:18
**EXHIBIT** [2] - 33:20, 61:6
**EXHIBITS** [1] - 3:5
**exist** [1] - 54:2
**expect** [5] - 45:2, 65:5, 65:6, 83:6, 83:10
**expectation** [3] - 35:6, 56:24, 59:23
**expected** [5] - 34:18, 34:19, 45:3, 45:4, 73:11
**experience** [8] - 35:10, 39:3, 39:12, 42:4, 45:18, 54:6, 83:20, 84:7
**expires** [1] - 91:19
**explain** [3] - 62:5, 65:12, 70:24
**explaining** [2] - 28:3, 64:20
**explanation** [1] - 25:10
**expresses** [1] - 69:1
**expressways** [2] - 6:15, 7:15
**extend** [1] - 83:12
**extending** [1] - 83:4
**extensive** [1] - 17:14
**extent** [1] - 57:20
**eyes** [2] - 64:11, 79:6

## F

**facility** [4] - 12:15, 16:1, 60:10
**fact** [3] - 12:21, 55:17, 66:14
**factor** [1] - 32:16
**factors** [1] - 69:23
**facts** [1] - 6:1
**fair** [7] - 38:14, 38:25, 50:9, 64:18, 64:19, 65:4, 80:25
**falls** [1] - 32:6
**familiar** [8] - 32:2, 49:10, 50:3, 61:9, 61:10, 79:14, 79:17, 83:7
**Families** [1] - 13:5
**fan** [1] - 55:2
**far** [1] - 66:25
**fashion** [3] - 19:11, 27:21, 28:3
**Fax** [1] - 1:25
**February** [2] - 4:4, 4:9

**FEBRUARY** [1] - 1:17
**federal** [5] - 16:14, 31:19, 33:6, 47:23, 48:1
**Federal** [1] - 4:7
**felt** [7] - 53:22, 54:16, 57:2, 64:25, 65:11, 73:15, 87:3
**few** [1] - 30:13
**Fifth** [3] - 2:14, 6:21, 6:24
**fight** [2] - 14:22, 71:23
**fighting** [2] - 71:5, 72:2
**figure** [1] - 80:1
**file** [2] - 25:9, 75:15
**filed** [2] - 24:19, 55:19
**files** [1] - 22:17
**fill** [1] - 30:2
**filling** [1] - 30:7
**fingerprint** [1] - 7:21
**finished** [1] - 24:2
**First** [6] - 6:9, 6:11, 6:23, 7:10, 7:11, 31:7
**first** [8] - 4:18, 17:23, 20:13, 22:19, 60:4, 61:15, 87:24, 91:9
**firsthand** [1] - 43:22
**fit** [1] - 19:19
**five** [10] - 5:23, 6:12, 50:16, 50:18, 50:20, 71:8, 72:1, 86:11, 89:11
**fix** [1] - 32:9
**flee** [1] - 84:4
**fleeing** [1] - 83:24
**flex** [5] - 6:14, 6:16, 6:19, 37:18, 74:20
**flies** [1] - 39:5
**flowing** [1] - 36:13
**fobs** [1] - 41:5
**focus** [3] - 34:6, 36:1, 74:17
**focused** [2] - 74:12, 74:16
**focusing** [2] - 16:7, 38:3, 85:14
**folks** [9] - 19:18, 21:18, 35:6, 35:17, 39:16, 42:3, 85:12, 90:3
**follow** [5] - 17:17, 26:4, 49:2, 65:19, 78:9
**follow-through** [1] - 17:17
**follow-up** [1] - 26:4
**following** [2] - 28:17, 52:13

**follows** [1] - 4:19
**food** [3] - 13:6, 15:7, 15:15
**footage** [1] - 51:7
**footing** [1] - 45:24
**FOR** [1] - 1:11
**Force** [1] - 16:16
**force** [2] - 18:12, 19:3
**forced** [1] - 47:10
**foregoing** [2] - 91:5, 91:12
**Forensics** [1] - 7:17
**forensics** [1] - 7:21
**forged** [2] - 13:1, 13:17
**form** [5] - 27:12, 27:19, 27:20, 57:20, 84:24
**formal** [5] - 25:6, 25:9, 55:19, 75:17, 78:5
**formally** [1] - 55:21
**format** [1] - 28:3
**formed** [2] - 34:22, 45:22
**former** [2] - 5:10, 6:5
**forms** [8] - 27:2, 28:6, 28:17, 28:22, 29:15, 29:16, 30:2, 30:7
**formulate** [1] - 34:13
**forth** [2] - 41:21, 91:7
**Forum** [1] - 50:5
**fought** [1] - 74:5
**four** [13] - 16:16, 16:18, 16:21, 16:25, 17:1, 17:6, 23:3, 35:12, 50:15, 86:11
**fourth** [1] - 38:5
**Fourth** [2] - 6:6, 31:7
**frames** [2] - 37:13, 40:25
**Frankfort** [2] - 8:24, 8:25
**free** [1] - 85:1
**French** [1] - 15:10
**frisk** [1] - 59:22
**frisked** [2] - 58:9, 58:13
**front** [1] - 13:19
**frustrated** [1] - 71:1
**frustration** [1] - 69:12
**fugitive** [5] - 16:11, 48:7, 48:8, 48:18
**full** [1] - 15:14
**fully** [1] - 64:20
**function** [1] - 47:20
**funds** [1] - 20:23
**future** [3] - 9:1, 31:3, 32:17

## G

**game** [1] - 41:2
**gang** [1] - 20:11
**gas** [1] - 60:11
**gears** [1] - 30:12
**gender** [3] - 69:23, 70:7, 70:16
**general** [2] - 27:20, 28:3
**gentleman** [1] - 15:10
**Gentry** [2] - 30:20, 40:4
**geographically** [1] - 37:22
**George** [2] - 77:8, 77:13
**Gerald** [1] - 22:24
**get-go** [1] - 23:18
**ghost** [3] - 9:2, 9:7, 9:8
**given** [7] - 44:3, 49:19, 49:24, 73:20, 79:9, 82:14, 82:17
**Given** [1] - 91:21
**goal** [6] - 15:2, 34:11, 34:17, 36:15, 38:12, 73:8
**goals** [1] - 37:7
**gosh** [1] - 50:3
**gotcha** [4] - 22:18, 23:2, 34:9, 80:9
**grab** [3] - 63:15, 64:2, 64:3
**graduation** [1] - 5:21
**grandchildren** [1] - 13:21
**great** [4] - 12:21, 13:22, 18:2, 21:14
**greet** [1] - 61:16
**grew** [3] - 18:4, 18:5, 18:8
**ground** [1] - 13:1
**grounds** [3] - 53:8, 54:2, 72:25
**group** [10] - 12:22, 18:4, 31:1, 45:9, 55:8, 55:11, 56:15, 74:5, 77:1, 87:14
**groups** [1] - 22:1
**grows** [1] - 42:16
**guess** [8] - 8:6, 9:16, 29:1, 29:3, 29:4, 32:12, 36:18, 51:6, 51:11, 54:2, 54:3, 65:4, 72:21, 88:25
**guidance** [1] - 83:20
**guidelines** [2] - 33:7, 52:13
**gun** [1] - 30:19

**guns** [7] - 14:8, 49:21, 49:23, 62:17, 63:20, 86:13, 86:19
**guys** [5] - 20:14, 22:11, 25:22, 45:15, 48:11

## H

**H-I-B-B-S** [1] - 4:24
**half** [3] - 5:23, 6:12, 88:20
**Halladay** [1] - 34:17
**hand** [7] - 14:15, 14:16, 48:6, 91:21
**handcuff** [2] - 53:19, 56:3
**handcuffed** [2] - 53:16, 55:25
**handcuffs** [4] - 53:23, 54:5, 54:16, 59:22
**handle** [3] - 25:18, 26:2, 26:4
**handled** [5] - 23:22, 25:4, 25:10, 26:3, 75:14
**handlers** [5] - 39:13, 45:6, 45:13, 45:15, 45:20
**handling** [1] - 76:5
**hands** [2] - 75:19, 77:25
**happy** [1] - 18:23
**hard** [3] - 10:8, 39:11, 51:22
**he/she** [1] - 65:20
**headed** [2] - 72:15, 72:18
**heading** [2] - 12:19, 18:18
**heads** [1] - 25:16
**Healing** [1] - 15:21
**Healthy** [1] - 30:21
**hear** [2] - 66:22, 68:17
**heard** [2] - 88:19, 88:21
**heat** [1] - 74:8
**heavily** [2] - 33:4, 73:13
**held** [3] - 5:18, 5:19, 85:21
**Hellard** [18] - 51:14, 55:25, 56:2, 56:10, 56:12, 56:15, 56:20, 57:6, 59:7, 64:14, 64:20, 65:6, 67:25, 68:6, 68:13, 75:2, 76:15
**Hellard's** [2] - 56:6, 59:2

## I

**idea** [1] - 26:12
**identified** [6] - 30:12, 37:1, 37:22, 67:10, 68:14, 76:17
**identify** [5] - 29:6, 35:7, 61:16, 61:23, 61:25
**implement** [2] - 40:13, 87:8
**implemented** [1] - 88:5
**implicit** [3] - 69:17, 69:20, 70:20
**improper** [4] - 59:15, 59:20, 62:13, 72:4
**in-service** [2] - 43:15
**incident** [3] - 16:8, 73:6, 86:22
**incidents** [1] - 74:1
**including** [1] - 80:10
**incorporate** [1] - 15:4
**independent** [1] - 20:5
**indicated** [3] - 57:25, 58:2, 89:19
**indicates** [1] - 58:11
**indicating** [1] - 58:15
**indication** [2] - 58:7, 67:19
**individual** [2] - 17:25, 26:15
**individuals** [18] - 7:19, 17:15, 18:4, 18:6, 19:10, 21:13, 22:8, 31:5, 31:9, 31:11, 31:23, 31:24, 35:9, 35:14, 35:18, 35:21, 39:3, 46:20
**Information** [1] - 36:10
**information** [8] - 22:4, 24:6, 31:1, 36:11, 36:12, 42:5, 66:7, 66:11
**infraction** [1] - 81:4
**initial** [1] - 52:7
**initiate** [2] - 53:3, 55:5
**initiated** [1] - 60:2
**Injury** [1] - 2:5
**input** [1] - 17:24
**inquire** [1] - 77:3
**inside** [1] - 10:11
**instruct** [2] - 54:17, 77:17
**instructed** [9] - 25:17, 30:11, 44:18, 44:22, 45:1, 45:9, 46:3, 46:9, 78:23
**instruction** [3] -

42:19, 42:22, 78:8
**instructions** [1] - 65:19
**insurance** [2] - 63:5, 63:9
**Intelligence** [1] - 7:3
**intelligence** [1] - 47:8
**intelligent** [1] - 19:9
**interact** [1] - 15:6
**interacting** [2] - 38:23, 47:11
**interaction** [3] - 38:7, 38:11, 69:3
**interactions** [1] - 59:2
**Interdiction** [1] - 9:17
**interest** [1] - 91:17
**interfere** [1] - 45:11
**interference** [2] - 55:12, 56:19
**interpretation** [3] - 57:3, 57:12, 81:18
**interview** [8] - 17:11, 17:14, 19:15, 20:3, 20:7, 46:20, 46:21, 68:11
**interviewed** [4] - 5:24, 7:1, 67:25, 68:10
**interviewing** [1] - 21:4
**introduced** [4] - 5:24, 13:24, 30:17, 39:16
**investigate** [1] - 84:23
**investigated** [3] - 35:22, 35:23, 55:11
**investigating** [2] - 29:16, 47:13
**investigation** [9] - 27:1, 29:15, 29:19, 49:9, 54:11, 55:6, 56:5, 71:17, 84:25
**investigations** [5] - 7:8, 20:11, 48:24, 49:1
**investigative** [2] - 42:11, 43:23
**investigator** [1] - 78:7
**invited** [1] - 30:21
**involved** [4] - 40:20, 54:8, 58:17, 69:25
**involvement** [1] - 31:4
**involving** [1] - 75:2
**irritated** [1] - 26:15
**issue** [2] - 24:23, 77:14
**itself** [1] - 54:22

## J

**Jackson** [1] - 2:9
**James** [1] - 39:13
**January** [1] - 5:21

jbuckner@ kylawoffice.com [1] - 2:8
Jeff [2] - 70:22, 70:23
JEFFERSON [1] - 91:2
Jefferson [2] - 2:13, 77:5
Jessie [2] - 34:17, 34:18
job [2] - 47:20, 50:15
Josephine [1] - 2:5
judge's [1] - 77:18
judges [1] - 77:6
July [1] - 91:19
jump [1] - 43:1

**K**

K-9 [21] - 17:2, 17:3, 17:6, 22:2, 39:12, 44:4, 44:10, 44:13, 44:18, 44:22, 45:1, 45:6, 45:11, 45:13, 45:14, 45:20, 46:4, 46:14, 46:23, 47:21, 83:1
K-9s [1] - 58:24
Keeling [3] - 23:6, 23:11, 76:20
keep [4] - 12:23, 46:12, 60:16, 80:11
KENTUCKY [2] - 1:1, 91:1
Kentucky [7] - 1:23, 1:24, 2:7, 2:15, 4:4, 91:4, 91:22
kept [1] - 80:15
Kevin [3] - 8:3, 18:12, 51:20
kicked [1] - 80:2
kid [1] - 72:3
kids [1] - 15:12
Kiersten [1] - 76:8
kind [7] - 5:1, 10:15, 20:16, 21:19, 39:5, 42:8, 77:21
King [2] - 23:6, 23:8
Kingfish [1] - 10:4
knowing [1] - 78:4
knowledge [5] - 24:1, 43:21, 44:6, 85:2, 85:4
knowledgeable [1] - 85:23

**L**

lack [1] - 6:20
Lane [2] - 1:24, 10:10

Large [1] - 91:4
large [4] - 12:12, 12:13, 15:1, 21:5
larger [2] - 7:4, 48:25
last [7] - 14:10, 14:12, 42:10, 70:3, 86:2, 88:17, 88:24
law [14] - 5:8, 21:6, 21:16, 43:12, 43:16, 43:24, 44:7, 45:9, 57:25, 80:12, 80:16, 80:24, 81:8, 83:7
Lawyers [1] - 2:5
LEA [1] - 1:7
Lea [6] - 2:9, 16:8, 53:11, 63:10, 68:8, 75:23
Lea's [1] - 75:24
lead [1] - 23:24
leader [2] - 30:20, 87:6
leading [1] - 10:1
learn [1] - 9:6
learning [1] - 45:23
least [21] - 51:17, 57:14, 58:3, 61:24, 63:19, 65:25, 68:6, 69:19, 71:24, 71:25, 78:14, 78:22, 79:22, 80:10, 80:15, 80:20, 80:22, 81:7, 81:15, 81:17, 82:15
leave [3] - 42:25, 51:1, 89:14
leaving [7] - 11:7, 11:8, 11:12, 60:10, 70:11, 73:14, 89:2
led [2] - 52:16, 53:6
Lee [3] - 58:5, 72:23, 79:2
left [11] - 5:19, 6:23, 9:8, 11:12, 14:9, 40:17, 41:5, 55:13, 88:10, 88:16, 88:21
legal [1] - 57:21
legitimacy [2] - 38:8, 38:14
legitimate [1] - 62:22
legs [1] - 50:21
length [2] - 77:11, 77:14
less [3] - 32:10, 68:21, 68:24
level [3] - 20:10, 20:11, 48:4
levels [1] - 18:1
liaison [1] - 8:22
license [4] - 63:4, 63:16, 64:3
lieutenant [11] - 7:22,

7:24, 7:25, 8:6, 8:7, 8:15, 11:14, 22:23, 30:17, 77:23, 78:10
Lieutenant [1] - 22:23
lieutenants [10] - 21:22, 22:19, 23:25, 28:17, 29:12, 30:9, 49:18, 73:12, 77:17, 86:16
life [2] - 18:5, 31:25
limited [2] - 12:15, 19:23, 81:9
Lincoln [3] - 23:5, 23:11, 76:21
line [4] - 17:23, 32:7, 66:19, 69:3
lined [2] - 9:11, 15:13
lines [1] - 75:12
listen [2] - 19:5, 81:22
listened [4] - 9:3, 14:17, 14:22
lived [1] - 16:5
lives [1] - 16:3
LMINTEL [1] - 16:16
LMPD [6] - 5:4, 33:1, 33:25, 34:5, 34:14, 60:18
LMPD's [1] - 38:11
located [1] - 63:5
location [8] - 48:9, 71:8, 71:13, 71:15, 73:3, 73:4, 73:15, 76:7
locations [4] - 36:4, 48:13, 48:16, 74:18
longer-term [1] - 7:7
look [7] - 8:25, 12:18, 61:2, 61:10, 75:8, 75:24, 84:19
looked [5] - 17:18, 17:21, 18:10, 57:23, 85:10
looking [14] - 21:24, 29:19, 29:20, 36:17, 48:10, 48:25, 49:5, 64:10, 64:11, 79:5, 80:11, 80:22
looks [2] - 9:1, 32:16
LOUISVILLE [1] - 1:2
Louisville [13] - 1:24, 2:7, 2:15, 3:7, 4:3, 5:9, 5:11, 33:12, 33:22, 38:13, 50:6, 71:6, 91:22
Louisville/Jefferson [1] - 36:21
low [1] - 88:8
LPD [1] - 6:5

**M**

Magnuson [1] - 79:23
main [2] - 19:5, 74:17
major [18] - 5:4, 8:14, 8:17, 12:18, 16:13, 21:22, 27:7, 35:15, 38:19, 51:5, 56:25, 57:21, 75:1, 77:4, 83:15, 86:1, 86:15, 89:18
Major [7] - 7:2, 7:17, 8:3, 10:23, 10:25, 29:5, 35:15
MAJOR [5] - 1:17, 4:2, 4:18, 4:23, 91:5
majority [1] - 35:8
Malcolm [2] - 15:10, 15:24
males [1] - 40:1
managing [1] - 17:21
manpower [1] - 8:8
maps [2] - 38:3, 74:7
March [1] - 91:22
mark [3] - 33:17, 61:4, 61:5
MARKED [2] - 33:20, 61:6
Market [1] - 18:6
marriage [1] - 91:16
matter [5] - 20:20, 28:20, 45:18, 56:17, 81:13
McCauley [4] - 51:14, 52:24, 58:14, 70:19
McCauley's [2] - 58:21, 68:25
McNeil [3] - 51:15, 76:10, 76:19
meal [1] - 12:1
mean [16] - 19:24, 24:18, 34:4, 37:17, 39:13, 40:15, 46:11, 47:9, 48:23, 48:24, 55:14, 73:25, 84:15, 84:18, 85:22, 87:3
means [1] - 34:18
meant [1] - 17:3
measure [1] - 57:4, 85:20, 86:19
measured [4] - 85:7, 85:8, 86:7, 86:13
media [1] - 41:4
meet [5] - 11:18, 15:10, 20:17, 26:6, 43:14
meeting [4] - 27:3, 30:24, 32:22, 50:10
meetings [4] - 32:19, 32:24, 37:9, 37:10

members [3] - 16:19, 17:1, 39:9
memory [1] - 61:10
men [2] - 15:21, 59:11
merely [1] - 81:13
merged [1] - 5:11
merger [1] - 6:18
message [1] - 34:14
met [3] - 8:23, 13:2, 24:3
method [2] - 57:13, 60:24
methods [1] - 40:16
metrics [1] - 86:12
Metro [5] - 3:7, 5:9, 33:12, 33:22, 50:6
MetroSafe [5] - 66:6, 66:11, 66:16, 66:23, 67:1
mid [1] - 7:12
middle [3] - 9:20, 88:11, 89:1
midnight [1] - 11:3
might [1] - 66:21
Miller [1] - 2:13
mind [1] - 79:19
minor [1] - 42:16
minute [1] - 14:10
minutes [9] - 59:21, 66:2, 66:5, 67:23, 68:2, 68:7, 68:15, 68:19, 71:25
mirror [1] - 63:11
Mission [1] - 15:22
missions [5] - 44:8, 44:15, 46:13, 46:23, 82:24
mistake [1] - 55:23
mixed [1] - 42:9
Mobile [32] - 8:10, 8:13, 9:15, 10:19, 10:21, 11:10, 12:19, 13:9, 16:9, 17:9, 19:20, 29:25, 30:18, 36:24, 38:20, 40:13, 41:14, 44:17, 46:21, 47:2, 49:12, 58:24, 59:18, 59:24, 68:5, 73:19, 75:2, 77:5, 77:7, 78:13, 81:22, 83:16
model [8] - 31:2, 31:10, 32:1, 32:2, 36:1, 36:2, 65:17, 84:19
modelled [2] - 33:4, 39:19
models [5] - 13:24, 15:4, 15:5, 30:13, 47:1

**moment** [1] - 51:22
**Mondays** [1] - 37:10
**money** [2] - 58:21, 58:25
**monitor** [2] - 29:13, 48:16
**monitored** [2] - 23:14, 29:10
**month** [2] - 19:1, 21:18
**months** [9] - 8:1, 8:16, 10:24, 11:14, 12:4, 22:5, 28:12, 28:13, 57:23
**most** [4] - 12:19, 34:25, 35:4, 36:20
**mother** [1] - 69:2
**mouth** [1] - 19:6
**move** [1] - 50:21
**moved** [3] - 8:2, 20:14, 58:1
**movement** [2] - 48:9, 48:16
**MR** [16] - 3:3, 4:16, 4:17, 4:20, 4:21, 21:2, 29:1, 29:2, 29:4, 33:15, 50:24, 51:5, 57:19, 61:4, 89:18, 90:2
**Muhammad** [1] - 15:11
**multiple** [1] - 12:24

## N

**name** [4] - 4:22, 4:23, 61:17, 61:25
**named** [1] - 15:10
**names** [1] - 47:24
**NANCY** [1] - 91:3
**Nancy** [2] - 1:23, 33:16
**narcotics** [9] - 9:15, 14:16, 20:10, 31:18, 31:19, 34:22, 35:22, 48:21
**Narcotics** [4] - 11:10, 32:20, 34:15, 34:21
**navigate** [1] - 28:14
**need** [11] - 16:13, 43:2, 44:11, 45:24, 49:6, 74:2, 74:3, 74:15, 78:8, 85:16, 87:3
**Needed** [1] - 36:23
**needed** [16] - 13:10, 26:4, 26:6, 37:15, 43:25, 44:12, 54:16, 64:25, 65:12, 73:5, 73:15, 74:17, 74:22,

78:9, 78:15, 85:17
**needs** [1] - 26:6
**neighborhood** [3] - 6:13, 70:23, 74:10
**Neighborhood** [4] - 15:5, 33:5, 36:3, 84:19
**Neighborhoods** [2] - 14:1, 30:21
**never** [10] - 10:7, 23:18, 26:19, 30:3, 40:16, 43:5, 62:15, 62:17, 62:25
**new** [2] - 20:16, 74:7
**newer** [1] - 39:16
**next** [6] - 4:16, 14:9, 36:14, 54:8, 65:18, 88:9
**night** [2] - 10:9, 76:25
**nights** [1] - 49:1
**nine** [1] - 8:23
**Ninth** [32] - 8:9, 8:13, 9:15, 10:19, 10:21, 11:10, 12:19, 13:8, 16:9, 17:9, 19:20, 29:25, 30:18, 36:24, 38:19, 40:12, 41:14, 44:17, 46:21, 47:2, 49:12, 58:24, 59:18, 59:24, 68:5, 73:19, 75:1, 77:4, 77:7, 78:13, 81:22, 83:15
**NO** [3] - 1:5, 33:20, 61:6
**north** [2] - 71:10, 72:18
**NOTARY** [1] - 91:24
**Notary** [2] - 91:3, 91:19
**notes** [2] - 91:10, 91:14
**nothing** [2] - 5:17, 67:3
**Notice** [1] - 4:6
**notice** [2] - 24:22, 78:19
**notified** [1] - 9:15
**notify** [1] - 48:18
**notion** [3] - 70:5, 70:11, 70:15
**November** [4] - 9:20, 88:11, 88:20
**number** [9] - 25:7, 26:7, 26:13, 26:14, 34:12, 36:16, 39:25, 43:19, 86:13
**numbers** [1] - 17:17
**Nunnelley** [1] - 1:23
**NUNNELLEY** [1] - 91:3

nunnelleycourtreporter@gmail.com [1] - 1:25

## O

**o'clock** [2] - 12:9, 76:25
**object** [1] - 57:19
**objectivity** [1] - 34:8
**observe** [3] - 53:6, 59:3, 67:15
**observed** [10] - 51:17, 52:16, 60:4, 60:8, 63:19, 71:16, 71:20, 72:9, 72:12, 73:7
**observing** [1] - 52:8
**obtained** [1] - 40:19
**obvious** [1] - 62:8
**obviously** [9] - 20:1, 23:25, 34:21, 37:11, 43:13, 57:7, 68:22, 69:12, 88:17
**occasionally** [4] - 25:12, 25:14, 47:23, 47:25
**occurred** [10] - 27:21, 30:25, 60:2, 60:15, 71:14, 72:19, 73:6, 73:9, 76:5, 81:14
**occurring** [3] - 18:25, 43:3, 75:13
**occurs** [2] - 32:16, 36:20
**OF** [3] - 1:1, 91:1, 91:2
**offense** [1] - 42:16
**offer** [1] - 21:22
**Office** [2] - 2:13, 30:20
**officer** [16] - 5:10, 5:22, 10:2, 11:24, 16:21, 18:2, 23:18, 23:19, 26:16, 61:15, 63:3, 65:18, 81:5, 81:8, 84:4, 84:9
**officer's** [2] - 62:20, 81:3
**officers** [22] - 11:12, 29:25, 38:24, 39:7, 40:19, 43:9, 51:12, 55:14, 61:12, 69:15, 70:3, 70:10, 74:1, 80:6, 80:15, 81:18, 82:17, 83:7, 83:11, 83:17, 83:21, 83:23
**often** [4] - 25:12, 26:9, 28:2, 29:13
**old** [3] - 8:12, 10:4, 41:19
**once** [12] - 6:21, 11:16, 11:17, 18:15,

18:24, 19:18, 24:2, 57:25, 58:1, 60:14, 75:15
**one** [55] - 17:4, 18:5, 19:1, 19:6, 21:18, 26:11, 27:6, 27:7, 30:6, 31:15, 36:11, 36:16, 38:7, 38:11, 40:12, 45:4, 45:5, 45:16, 47:16, 49:17, 56:14, 59:11, 61:1, 61:5, 63:8, 64:14, 67:15, 69:14, 71:8, 71:22, 73:3, 75:6, 75:7, 75:14, 75:18, 75:22, 76:4, 76:9, 76:13, 76:16, 77:8, 79:8, 79:21, 80:10, 80:19, 82:15, 82:25, 86:2, 86:4, 86:5, 87:23
**one-month** [2] - 19:1, 21:18
**ones** [4] - 26:20, 37:16, 68:6, 75:22
**open** [1] - 21:23
**opened** [1] - 56:6
**operate** [2] - 53:1, 73:21
**operated** [1] - 19:3
**operating** [2] - 70:4, 70:20
**Operation** [6] - 8:5, 18:12, 18:17, 19:2, 21:18, 30:18
**operations** [1] - 24:8
**operator** [1] - 62:21
**opportunities** [1] - 21:24
**opportunity** [9] - 13:18, 15:20, 18:16, 19:2, 19:7, 39:6, 54:21, 65:14, 65:16
**opposed** [1] - 19:6
**order** [2] - 77:18, 83:22
**orientation** [1] - 69:24
**originated** [1] - 74:24
**originating** [1] - 60:15
**origination** [1] - 74:24
**ourselves** [1] - 85:22
**outcome** [1] - 91:17
**outgoing** [1] - 15:19
**outreach** [6] - 13:4, 13:8, 15:8, 15:12, 31:21, 38:14
**outside** [2] - 15:16, 52:8
**overall** [1] - 18:2
**overlap** [1] - 14:3,

76:2
**own** [8] - 14:22, 31:14, 45:23, 45:24, 48:7, 48:24, 59:12, 74:10
**owner** [1] - 34:17

## P

**P.M** [3] - 4:5, 4:10, 90:7
**Page** [2] - 3:2, 3:6
**page** [8] - 33:17, 34:10, 36:14, 36:15, 38:5, 38:6
**pages** [1] - 91:12
**paid** [1] - 14:23
**paint** [1] - 84:20
**paragraph** [1] - 87:24
**parameters** [1] - 43:23
**park** [1] - 17:5
**Park** [2] - 40:5
**parking** [1] - 40:17
**Parks** [5] - 37:6, 37:13, 86:3
**part** [17] - 17:4, 33:25, 40:15, 51:5, 51:6, 56:23, 60:18, 62:2, 63:8, 65:17, 68:3, 79:9, 80:14, 87:5, 87:6, 88:10, 88:15
**particular** [6] - 36:17, 47:15, 59:19, 66:1, 83:10, 85:2
**particulars** [2] - 67:16, 84:5
**parties** [2] - 4:13, 91:16
**PARTIES** [1] - 2:2
**partnered** [1] - 76:10
**partners** [7] - 16:15, 34:13, 41:19, 47:12, 47:23, 48:1
**partnership** [3] - 31:19, 33:6, 34:21
**pass** [2] - 24:1, 31:1
**passenger** [3] - 67:13, 67:19
**past** [5] - 20:14, 35:16, 46:12, 54:7, 54:18
**pat** [10] - 43:11, 52:7, 58:10, 59:22, 64:15, 64:21, 65:8, 81:3, 81:9, 81:12
**pat-down** [4] - 43:11, 52:7, 81:9, 81:12
**patrol** [2] - 5:22, 73:11
**Patrol** [5] - 3:8, 36:24, 60:21, 61:8, 79:11
**patrolling** [1] - 47:3
**patted** [4] - 58:9,

58:13, 81:23
**patting** [1] - 64:7
**pay** [1] - 18:21
**peers** [1] - 45:24
**pension** [1] - 9:10
**people** [57] - 11:8, 11:11, 11:24, 12:23, 13:2, 13:3, 13:16, 13:18, 14:21, 14:23, 15:6, 15:13, 15:15, 15:16, 15:18, 15:19, 15:23, 16:2, 17:11, 29:8, 31:20, 31:22, 34:24, 35:5, 35:7, 35:11, 35:12, 35:13, 35:16, 35:23, 36:7, 37:15, 38:15, 39:1, 39:5, 39:8, 39:21, 39:22, 40:8, 41:12, 43:22, 48:2, 48:15, 49:3, 54:6, 54:19, 56:17, 59:13, 71:8, 71:14, 72:17, 83:24, 88:1
**People** [3] - 32:20, 34:15, 34:20
**per** [2] - 58:7, 81:17
**perceived** [2] - 72:9, 78:6
**percent** [3] - 31:8, 40:6, 40:7
**percentage** [3] - 29:6, 49:20, 49:25
**PERF** [1] - 50:5
**perform** [1] - 81:8
**performance** [5] - 85:7, 85:8, 85:25, 86:7, 86:8
**performed** [4] - 27:12, 29:7, 44:19, 44:22
**perhaps** [1] - 70:20
**period** [2] - 15:25, 60:6
**permission** [1] - 63:14
**permitted** [2] - 43:11, 81:13
**person** [7] - 31:13, 41:17, 56:14, 65:14, 70:11, 81:23, 82:2
**personal** [1] - 66:15
**perspective** [2] - 69:20, 71:3
**pertaining** [1] - 21:15
**Peter** [2] - 2:12, 29:2
**peter.ervin@ louisvilleky.gov** [1] - 2:15
**phone** [5] - 13:11, 25:7, 26:7, 74:11, 74:15

**Phone** [1] - 1:25
**photography** [1] - 7:20
**pick** [5] - 39:18, 49:5, 49:7, 74:11, 74:15
**picking** [1] - 13:11
**pillar** [2] - 31:15, 31:16
**pillars** [1] - 40:4
**PIU** [1] - 17:22
**place** [6] - 4:15, 10:10, 10:20, 11:18, 75:18, 91:6
**places** [1] - 35:2
**Places** [5] - 15:21, 15:22, 32:20, 34:15, 34:20
**PLAINTIFF** [2] - 1:7, 1:11
**Plaintiff** [1] - 2:3
**Plaintiff's** [2] - 33:17, 61:5
**PLAINTIFF'S** [2] - 33:20, 61:6
**plan** [9] - 8:21, 32:19, 33:2, 34:1, 34:11, 36:15, 37:21, 38:6, 88:10
**Plan** [2] - 3:7, 33:12
**plans** [1] - 33:21
**platoons** [2] - 37:18, 74:20
**play** [1] - 87:12
**plenty** [1] - 11:24
**PLLC** [1] - 2:5
**plume** [1] - 41:24
**plumes** [1] - 74:8
**pocket** [2] - 63:15, 64:1
**pockets** [1] - 58:12
**point** [14] - 11:2, 11:15, 32:18, 52:21, 53:12, 54:17, 58:8, 64:12, 64:14, 68:9, 73:7, 75:19, 78:15, 79:5
**points** [2] - 31:25, 61:9
**police** [4] - 5:10, 10:2, 18:8, 62:9
**Police** [7] - 3:7, 5:9, 5:11, 33:12, 33:22, 50:4, 50:7
**policies** [2] - 24:5, 86:24
**policing** [1] - 50:7
**Policing** [5] - 13:25, 15:4, 32:3, 33:5, 65:13
**policy** [4] - 24:4, 30:3,

57:24, 89:6
**policy-wise** [1] - 24:4
**polygraph** [1] - 7:20
**porch** [1] - 13:19
**Portland** [3] - 6:13, 7:13, 18:5
**position** [3] - 21:5, 28:1, 55:6
**positions** [1] - 5:8
**possessed** [1] - 52:17
**post** [1] - 69:2
**pounds** [1] - 13:6
**preconceived** [3] - 70:4, 70:11, 70:15
**prejudice** [1] - 69:25
**premise** [1] - 40:23
**preparing** [1] - 89:1
**present** [1] - 54:22
**PRESENT** [1] - 2:9
**presentation** [1] - 43:16
**pretextual** [5] - 42:7, 42:14, 42:20, 43:4, 43:18
**pretty** [7] - 16:24, 19:18, 21:23, 37:14, 46:18, 77:25, 87:15
**Prevention** [2] - 32:7, 32:15
**previous** [2] - 72:17, 88:8
**pride** [2] - 12:21, 13:22
**primary** [2] - 34:6, 71:22
**priorities** [1] - 38:12
**prioritized** [5] - 36:5, 39:1, 47:5, 84:13, 84:16
**prioritizing** [1] - 14:5
**priority** [1] - 38:17
**prison** [1] - 31:23
**proactive** [5] - 47:3, 47:4, 47:6, 84:13, 84:16
**proactivity** [1] - 13:15
**probable** [2] - 43:18, 43:24
**problematic** [1] - 17:25
**Procedure** [1] - 4:7
**procedures** [3] - 54:13, 54:14
**process** [7] - 17:10, 17:14, 20:3, 20:7, 25:6, 26:5, 53:21
**processes** [1] - 9:6
**Professional** [2] - 25:7, 55:11
**professional** [2] -

55:9, 56:17
**program** [1] - 19:21
**programs** [1] - 48:1
**Project** [5] - 14:1, 15:5, 33:5, 36:3, 84:19
**prolonged** [1] - 46:4
**prolonging** [1] - 46:10
**promote** [1] - 32:8
**promoted** [12] - 5:18, 7:9, 7:22, 7:24, 8:11, 8:14, 8:17, 18:24, 23:6, 23:9, 43:5, 82:12
**promotes** [1] - 32:10
**prompted** [2] - 72:11, 72:13
**proper** [3] - 54:13, 54:14
**properly** [1] - 22:4
**property** [4] - 7:6, 13:19, 17:20, 36:16
**protection** [1] - 81:3
**proud** [1] - 12:19
**provide** [2] - 42:18, 65:17
**provided** [4] - 34:2, 43:9, 44:5, 53:8
**proximity** [1] - 45:14
**PSU** [10] - 17:22, 24:19, 25:14, 26:7, 26:21, 26:24, 26:25, 29:14, 56:5, 68:11
**Public** [2] - 91:3, 91:19
**PUBLIC** [1] - 91:24
**publication** [1] - 79:23
**publicity** [1] - 77:21
**publicly** [1] - 12:25
**pull** [4] - 28:9, 49:16, 51:10, 59:19
**pulled** [2] - 48:8, 74:18
**pulls** [1] - 66:2
**purpose** [3] - 29:18, 40:21, 61:20
**purposes** [1] - 71:22
**pursuant** [1] - 4:6
**put** [7] - 8:2, 10:11, 19:22, 20:9, 20:10, 53:23, 54:16

**Q**

**questions** [6] - 11:1, 19:14, 21:10, 21:11, 21:15, 46:20
**quick** [1] - 60:25
**quite** [3] - 38:3, 41:18, 58:18

**R**

**race** [3] - 69:23, 70:7, 70:12
**racially** [1] - 50:7
**racially-biased** [1] - 50:7
**rainy** [1] - 49:2
**Ramey** [1] - 2:18
**ran** [3] - 8:5, 30:17, 54:22
**rank** [2] - 5:4, 5:19
**ranking** [1] - 84:9
**ranks** [1] - 5:18
**Rashaad** [2] - 30:21, 40:4
**rates** [3] - 17:19, 36:22, 37:23
**re** [1] - 31:22
**re-entering** [1] - 31:22
**reach** [1] - 78:20
**reached** [1] - 49:4
**reaches** [1] - 66:6
**reaction** [2] - 87:2, 87:5
**read** [1] - 60:5
**ready** [1] - 39:10
**real** [3] - 48:6, 48:7, 60:25
**realizing** [1] - 55:3
**really** [5] - 8:22, 13:10, 15:17, 53:13, 88:21
**rearview** [1] - 63:11
**reason** [14] - 30:6, 40:10, 40:11, 40:20, 53:2, 53:3, 62:6, 62:16, 62:22, 65:9, 71:19, 82:6, 83:25, 88:23
**reasonable** [8] - 25:10, 43:18, 43:25, 44:15, 46:5, 46:12, 82:2, 83:12
**reasonably** [1] - 81:5
**reasoning** [3] - 71:17, 72:8, 80:14
**reasons** [1] - 62:9
**rebranded** [1] - 8:7
**received** [1] - 86:2
**RECESS** [2] - 51:2, 89:15
**record** [9] - 4:11, 51:1, 51:4, 67:3, 89:14, 89:17, 89:19, 90:5, 91:14
**records** [1] - 19:25
**recovered** [2] - 77:7, 86:13
**recovery** [2] - 49:21, 50:1

**recurrent** [1] - 24:6
**reduce** [3] - 36:16, 40:13, 40:22
**reduced** [1] - 91:11
**reduces** [1] - 34:14
**Reduction** [3] - 14:2, 30:14, 30:16
**reduction** [3] - 15:1, 33:7, 36:2
**referencing** [2] - 82:16, 82:21
**refresh** [1] - 61:10
**regarding** [2] - 27:1, 43:11
**regards** [1] - 20:5
**registered** [1] - 78:19
**registration** [1] - 63:5
**regular** [1] - 58:18
**reinstructed** [1] - 6:22
**related** [1] - 91:15
**relates** [3] - 37:1, 51:7, 66:16
**relation** [1] - 24:16
**relationships** [1] - 45:22
**released** [1] - 31:22
**remain** [2] - 56:16, 65:20
**remember** [50] - 26:11, 27:4, 27:7, 27:8, 28:13, 29:21, 32:21, 32:25, 34:20, 37:3, 37:4, 38:2, 47:24, 50:13, 56:7, 56:23, 58:11, 62:2, 62:3, 63:2, 63:8, 63:11, 63:15, 66:25, 67:12, 67:18, 68:3, 69:4, 69:7, 71:10, 76:19, 76:24, 77:8, 77:12, 77:13, 79:18, 86:18, 86:25, 87:13, 87:15, 87:20, 87:23, 88:3, 88:4, 88:23, 89:2
**remote** [1] - 4:14
**remove** [1] - 51:24
**removed** [1] - 55:16
**reorganize** [1] - 8:4
**repeat** [1] - 70:8
**rephrase** [1] - 70:9
**report** [2] - 13:14, 74:11
**reported** [6] - 11:20, 14:18, 35:3, 41:1, 74:6, 84:22
**REPORTER** [2] - 4:13, 33:19
**reporting** [1] - 13:12
**reports** [2] - 41:10,

41:11
**request** [4] - 18:17, 26:1, 44:4, 52:23
**requested** [1] - 17:24
**requests** [1] - 66:11
**required** [3] - 27:25, 28:19, 30:2
**requirement** [1] - 65:22
**requirements** [2] - 24:3, 61:12
**Research** [1] - 50:5
**research** [1] - 20:5
**researched** [1] - 41:23
**resource** [1] - 37:19
**resources** [5] - 20:2, 20:22, 31:15, 36:20, 74:20
**Resources** [1] - 36:23
**respect** [8] - 12:1, 22:1, 22:13, 34:7, 54:15, 57:25, 60:16, 73:5
**respond** [1] - 26:2
**response** [2] - 39:8, 66:16
**responsible** [5] - 31:21, 54:9, 54:10, 67:16
**restroom** [1] - 11:25
**Restructure** [1] - 14:2
**restructuring** [2] - 11:4, 12:6
**result** [1] - 77:7
**resulted** [2] - 49:21, 50:1
**retire** [1] - 8:20
**retired** [4] - 5:4, 5:17, 8:18, 9:14
**retirement** [2] - 8:23, 16:23
**retrieve** [1] - 63:6
**return** [2] - 51:4, 89:17
**review** [6] - 28:6, 29:6, 51:11, 51:13, 57:24, 68:11
**reviewed** [4] - 51:6, 51:11, 51:14, 85:25
**reviews** [1] - 65:21
**rewarding** [1] - 14:6
**Rich** [1] - 2:18
richramey@
  bellsouth.net [1] -
  2:19
**RMR** [2] - 1:23, 91:3
**road** [1] - 13:21
**Rob** [2] - 23:6, 23:8
**robbery** [1] - 7:5
**Robert** [1] - 79:23
**rode** [1] - 6:12

**Rodriguez** [4] - 44:7, 46:18, 46:24, 82:18
**roll** [8] - 12:9, 21:8, 22:9, 23:22, 23:24, 42:23, 77:19, 77:20
**room** [1] - 17:20
**rotation** [1] - 11:6
**rotations** [1] - 6:8
**ROTCC** [1] - 36:10
**routine** [4] - 81:13, 82:11, 82:12
**row** [1] - 9:4
**RTCC** [1] - 36:10
**Rules** [1] - 4:7
**rules** [3] - 25:25, 78:12
**run** [7] - 18:14, 45:15, 46:14, 54:19, 66:6, 66:7, 66:11
**running** [2] - 18:11, 21:23
**runs** [2] - 17:19, 54:11
**Russell** [2] - 6:13, 7:13

# S

**Safe** [6] - 14:1, 15:5, 30:20, 33:5, 36:3, 84:19
**safe** [2] - 19:11, 54:15
**safer** [1] - 38:13
**safety** [3] - 22:14, 42:10, 54:10
**SAM** [2] - 3:3, 4:20
**Sam** [3] - 2:4, 2:5, 90:2
sam@kylawoffice.
  com [1] - 2:7
**sat** [3] - 50:10, 55:8, 67:14
**satisfy** [1] - 46:13
**satisfying** [1] - 13:5
**saw** [5] - 12:8, 52:15, 73:3, 79:2, 79:21
**scale** [2] - 7:4, 49:1
**scene** [1] - 25:3
**Scene** [1] - 7:21
**schedule** [1] - 17:2
**School** [1] - 5:2
**scope** [1] - 44:14
**scratch** [1] - 12:17
**screen** [5] - 28:11, 33:11, 50:4, 61:1, 79:10
**scroll** [1] - 79:20
**scrolling** [2] - 79:16, 80:11
**scrutiny** [1] - 86:22
**search** [3] - 48:21,

66:15, 81:9
**searched** [2] - 58:2, 58:6
**searching** [1] - 66:23
**second** [6] - 17:5, 34:10, 36:18, 62:5, 88:11, 88:20
**Second** [8] - 6:7, 6:8, 6:9, 6:11, 6:17, 6:20, 31:7
**securing** [1] - 54:15
**security** [1] - 5:2
**see** [26] - 14:6, 14:25, 17:20, 18:18, 19:2, 19:7, 20:9, 29:20, 33:10, 33:11, 33:21, 39:17, 40:17, 49:6, 49:9, 53:7, 53:11, 55:21, 60:1, 61:1, 67:9, 70:18, 79:12, 79:20, 80:20, 88:6
**seeing** [6] - 31:6, 31:11, 37:4, 53:16, 64:12, 64:16
**seized** [1] - 49:23
**seizure** [1] - 57:16
**selection** [1] - 17:8
**senior** [1] - 39:6
**sent** [2] - 22:1, 47:9
**separated** [1] - 6:21
**September** [4] - 8:9, 8:13, 9:12
**sergeant** [18] - 7:9, 7:12, 7:18, 23:5, 24:10, 24:11, 24:12, 25:4, 26:13, 49:18, 60:17, 75:21, 76:4, 76:6, 76:11, 76:16, 77:24, 78:9
**Sergeant** [2] - 23:5, 23:8
**sergeants** [19] - 23:3, 23:24, 25:1, 25:2, 25:17, 25:19, 25:22, 28:16, 29:12, 30:9, 45:20, 48:14, 73:12, 76:4, 77:2, 77:18, 85:9, 85:11, 85:18
**Series** [1] - 82:15
**served** [1] - 47:22
**service** [4] - 17:19, 43:15, 89:20
**set** [6] - 10:13, 10:15, 11:18, 15:17, 15:18, 91:7
**seven** [2] - 17:1, 33:17
**seven-page** [1] - 33:17
**several** [5] - 63:19, 64:4, 66:2, 66:5,

86:24
**sexual** [1] - 69:24
**Shara** [2] - 37:6, 86:3
**share** [1] - 33:16
**shared** [1] - 42:5
**sharing** [1] - 50:4
**shift** [2] - 12:13
**shifts** [1] - 12:2
**shootings** [8] - 71:13, 72:19, 72:24, 73:1, 73:5, 73:9, 74:13, 82:1
**short** [1] - 15:25
**shot** [4] - 71:8, 71:9, 71:14, 72:17
**show** [2] - 13:15, 46:14
**showed** [4] - 18:1, 39:11, 49:11, 74:16
**showing** [1] - 74:7
**shown** [1] - 64:2
**side** [6] - 23:7, 23:10, 65:1, 67:13, 67:20, 72:2
**sides** [1] - 58:12
**sign** [1] - 24:4
**significant** [1] - 17:18
**simply** [1] - 81:14
**sincere** [1] - 13:13
**sincerely** [4] - 12:22, 13:1, 13:23, 62:3
**single** [1] - 46:1
**sit** [1] - 13:19
**situation** [38] - 24:22, 27:5, 30:5, 44:25, 51:21, 52:5, 54:1, 54:7, 54:19, 54:20, 55:16, 56:14, 56:18, 58:15, 59:9, 59:10, 60:14, 60:16, 64:22, 64:23, 65:11, 67:9, 68:22, 70:22, 70:25, 74:3, 74:21, 74:23, 75:20, 76:5, 77:16, 78:3, 78:11, 81:7, 82:5, 82:8, 84:5
**situations** [5] - 77:5, 78:3, 80:17, 84:24, 85:5
**six** [2] - 16:21, 17:1
**skill** [1] - 19:8
**sniff** [8] - 44:4, 44:19, 44:22, 45:1, 46:4, 66:10, 83:2, 83:13
**sold** [1] - 87:9
**solo** [1] - 19:8
**someone** [8] - 10:6, 10:14, 18:1, 39:17, 45:23, 46:12, 54:12, 74:9

**sometimes** [10] - 17:1, 25:4, 25:11, 26:9, 36:6, 36:7, 36:8, 42:4, 48:14, 85:3
**somewhere** [1] - 76:5
**SOP** [4] - 3:8, 60:19, 61:2, 61:7
**SOPs** [1] - 86:23
**sorry** [7] - 6:4, 6:18, 7:11, 19:16, 28:12, 33:9, 87:20
**sort** [8] - 36:25, 42:18, 49:20, 49:24, 50:10, 50:11, 69:17, 70:4
**sounds** [2] - 68:20, 88:20
**sources** [1] - 31:24
**South** [1] - 2:14
**spare** [1] - 41:5
**speaking** [2] - 59:13, 68:8
**specialized** [1] - 5:1
**specific** [14] - 5:17, 22:15, 37:3, 37:15, 42:22, 44:23, 57:10, 73:20, 75:25, 79:15, 84:21, 85:14, 87:13
**specifically** [7] - 22:3, 37:20, 38:2, 46:21, 78:22, 79:17, 82:17
**specifics** [2] - 67:16, 77:12
**spent** [1] - 18:4
**spike** [2] - 41:17, 89:6
**spikes** [1] - 88:6
**spot** [3] - 7:3, 15:11, 31:17
**squad** [8] - 7:21, 16:13, 16:19, 19:22, 56:25, 68:18, 75:25, 76:9
**squad's** [1] - 68:15
**squads** [9] - 16:17, 16:18, 17:3, 17:5, 17:7, 23:4, 23:17, 39:24, 47:15
**St** [1] - 5:2
**staff** [3] - 11:1, 42:23, 88:14
**stages** [1] - 20:13
**standard** [2] - 43:14, 85:22
**Standards** [1] - 55:11
**standards** [2] - 11:18, 86:8
**Standards'** [1] - 25:7
**start** [3] - 5:12, 12:16, 20:21
**started** [7] - 5:1, 7:25, 18:11, 55:2, 55:3,

66:23
**starting** [1] - 9:19
**STATE** [1] - 91:1
**State** [1] - 91:4
**statement** [1] - 56:21
**statements** [2] - 26:21, 26:23
**states** [1] - 38:10
**STATES** [1] - 1:1
**station** [1] - 9:8
**stats** [2] - 49:11, 50:11
**stay** [1] - 78:3
**stayed** [3] - 8:17, 55:16, 55:20
**steered** [1] - 58:19
**stenographic** [2] - 91:10, 91:14
**step** [3] - 61:15, 62:5, 65:18
**stepping** [1] - 78:6
**steps** [2] - 60:18, 60:20
**STEVE** [1] - 1:14
**still** [6] - 18:7, 41:18, 52:21, 64:7, 67:6, 68:1
**stint** [1] - 19:1
**stints** [1] - 21:18
**stole** [1] - 10:6
**stolen** [4] - 41:1, 41:7, 83:25, 84:1
**stone** [1] - 75:18
**stop** [51] - 26:18, 27:2, 27:11, 27:17, 27:21, 28:17, 28:22, 29:15, 42:7, 42:11, 42:14, 42:15, 43:22, 44:1, 44:12, 44:24, 46:4, 46:10, 48:17, 51:8, 51:18, 54:1, 54:9, 60:2, 60:23, 65:8, 66:1, 67:21, 68:1, 68:5, 68:14, 68:18, 71:4, 71:10, 71:17, 72:11, 73:15, 75:4, 75:23, 75:24, 77:10, 77:13, 79:2, 80:2, 81:14, 82:24, 83:4, 83:12, 86:24, 89:5
**Stop** [1] - 82:14
**stopped** [4] - 62:9, 62:10, 81:4, 81:24
**stopping** [1] - 62:6
**Stops** [4] - 3:8, 60:22, 61:8, 79:11
**STOPS** [1] - 65:22
**stops** [28] - 27:12, 27:18, 29:7, 39:25, 40:14, 40:22, 41:8, 42:21, 43:4, 43:19,

44:18, 47:17, 49:12, 49:20, 49:25, 56:22, 57:1, 57:8, 59:24, 60:19, 61:13, 65:15, 69:22, 77:7, 83:18, 84:11, 84:24, 88:1
**Story** [1] - 2:6
**straight** [1] - 64:14
**strategic** [8] - 32:19, 33:2, 33:21, 34:1, 34:11, 36:15, 37:21, 38:6
**Strategic** [2] - 3:7, 33:12
**Strategies** [4] - 3:8, 60:21, 61:8, 79:11
**Strategy** [3] - 14:2, 30:14, 30:16
**strategy** [1] - 33:8
**street** [16] - 12:9, 13:20, 16:16, 16:18, 17:3, 19:22, 20:10, 20:11, 23:3, 23:20, 39:23, 47:15, 48:11, 56:25, 68:18, 75:25
**Street** [4] - 2:14, 71:9, 71:12, 72:18
**streetlights** [1] - 32:9
**streets** [3] - 5:21, 19:22, 25:10
**stretch** [1] - 50:20
**strictly** [1] - 44:23
**strong** [10] - 14:25, 16:5, 16:24, 18:9, 19:4, 19:11, 25:22, 34:22, 35:13, 36:12
**strongly** [2] - 31:3, 31:4
**structure** [1] - 28:15
**structured** [1] - 12:2
**struggling** [1] - 72:21
**study** [1] - 50:5
**stuff** [5] - 7:6, 25:9, 37:12, 49:13, 86:20
**subject** [1] - 54:22
**success** [1] - 48:19
**sugar** [1] - 39:5
**suggest** [1] - 57:8
**suggestions** [4] - 87:16, 87:17, 87:19, 87:23
**suit** [1] - 24:5
**Suite** [2] - 2:6, 2:14
**suits** [1] - 36:12
**summary** [1] - 80:23
**supervised** [1] - 7:18
**supervision** [1] - 91:11
**supervisor** [1] - 26:1
**supervisors** [1] -

17:23
**support** [2] - 7:5, 49:7
**supposed** [3] - 60:20, 62:21, 65:13
**suppressed** [1] - 77:6
**suppression** [1] - 78:13
**supreme** [3] - 21:6, 21:16, 44:7
**sur** [1] - 7:20
**surgery** [2] - 9:20, 89:1
**surprise** [1] - 68:17
**surroundings** [1] - 74:11
**surveillance** [2] - 48:5, 85:4
**suspect** [1] - 54:3
**suspected** [1] - 60:8
**suspicion** [4] - 43:19, 43:25, 46:5, 83:13
**SWAT** [4] - 22:10, 22:12
**swear** [1] - 4:12
**swearing** [1] - 4:14
**switch** [1] - 30:12
**sworn** [3] - 4:19, 7:19, 91:9
**system** [3] - 8:23, 9:10, 16:23

### T

**table** [1] - 31:20
**Tactics** [4] - 3:8, 60:21, 61:8, 79:11
**TAE** [1] - 1:7
**Tae** [37] - 2:9, 16:8, 51:8, 51:24, 52:7, 52:17, 53:15, 53:19, 55:25, 56:3, 57:16, 58:5, 59:3, 59:15, 59:22, 62:1, 62:12, 62:25, 63:13, 63:19, 63:23, 63:25, 64:5, 64:15, 64:21, 66:3, 66:5, 66:7, 66:11, 66:15, 66:17, 67:3, 69:2, 72:23, 79:2, 79:3, 86:22
**TAE-AHN** [1] - 1:7
**Tae-Ahn** [27] - 2:9, 16:8, 51:24, 52:7, 52:17, 53:15, 53:19, 55:25, 56:3, 58:5, 59:3, 59:15, 59:22, 62:1, 62:12, 62:25, 63:13, 63:19, 63:23, 64:15, 64:21, 66:3, 66:5, 66:17, 72:23,

79:2, 79:3
**Tae-Ahn's** [10] - 51:8, 57:16, 63:25, 64:5, 66:7, 66:11, 66:15, 67:3, 69:2, 86:22
**tagged** [1] - 16:15
**target** [2] - 37:22, 84:11
**Task** [1] - 16:16
**task** [5] - 18:11, 19:3, 29:12, 30:8, 73:11
**tasked** [3] - 15:2, 72:1, 76:4
**taught** [1] - 58:5
**teach** [1] - 38:24
**team** [13] - 5:25, 6:17, 16:11, 16:12, 24:12, 39:9, 48:7, 48:8, 48:18, 85:19, 85:21, 87:7, 87:8
**teams** [2] - 48:13, 87:9
**techniques** [1] - 22:14
**term** [1] - 7:7
**termed** [1] - 16:15
**terminology** [1] - 39:4
**terms** [36] - 12:20, 17:8, 23:12, 26:20, 33:1, 35:5, 38:10, 38:22, 43:8, 44:2, 44:3, 46:9, 46:25, 47:20, 49:19, 51:16, 52:23, 53:25, 59:2, 60:18, 65:25, 66:1, 71:5, 73:17, 80:4, 82:25, 86:7, 86:24
**Terrace** [1] - 7:13
**Terry** [4] - 43:14, 43:17, 44:1, 52:14
**testimony** [2] - 91:8, 91:10
**thanked** [1] - 26:18
**thanking** [1] - 15:19
**Thanksgiving** [1] - 15:12
**THE** [4] - 1:11, 2:2, 4:13, 33:19
**theft** [1] - 10:3
**themes** [1] - 38:7
**themself** [1] - 65:12
**themselves** [1] - 20:9
**theory** [1] - 18:13
**thereafter** [1] - 91:11
**they've** [4] - 59:21, 60:3, 68:23
**thinking** [2] - 7:23, 49:15
**third** [1] - 36:14
**Third** [1] - 8:1
**Thompson** [6] - 8:4, 10:23, 10:25, 18:12,

22:23, 35:15
**Thornton's** [2] - 60:4, 72:12
**thousand** [1] - 69:3
**three** [9] - 9:11, 20:15, 71:8, 71:9, 71:14, 71:25, 72:17, 72:24, 82:1
**throughout** [4] - 29:24, 30:1, 75:1, 77:4
**thrown** [1] - 77:14
**Thursday** [2] - 30:22, 32:24
**tight** [1] - 37:14
**Tija** [1] - 2:9
**timeline** [1] - 5:16
**today** [4] - 16:8, 43:6, 56:22, 89:21
**together** [5] - 24:12, 37:9, 37:14, 76:3, 85:19
**Tony** [1] - 39:13
**took** [11] - 7:12, 11:17, 12:21, 13:22, 22:2, 24:23, 60:12, 74:9, 74:14, 78:19, 85:12
**tool** [3] - 40:22, 45:23, 84:11
**tools** [1] - 40:12
**top** [8] - 10:25, 11:13, 12:22, 13:17, 33:11, 38:11, 79:11, 86:10
**topic** [1] - 50:22
**touch** [2] - 16:3, 31:10
**touched** [1] - 38:8
**towards** [4] - 20:8, 38:12, 42:9, 72:16
**town** [4] - 73:18, 73:22, 73:24, 73:25
**traction** [1] - 31:6
**traffic** [44] - 27:2, 27:11, 27:17, 28:16, 28:22, 29:15, 40:14, 40:22, 41:8, 42:7, 42:14, 42:20, 43:19, 44:18, 46:4, 46:10, 47:17, 49:12, 49:25, 51:8, 54:1, 54:9, 54:12, 57:1, 57:8, 59:24, 61:13, 65:8, 65:15, 66:1, 67:21, 69:21, 71:4, 71:16, 75:3, 77:7, 80:2, 81:4, 83:12, 84:11, 84:24, 86:24, 88:1, 89:5
**Traffic** [1] - 82:14
**trained** [4] - 43:10, 44:17, 58:21, 58:25

**training** [25] - 19:20, 19:25, 20:2, 20:6, 20:23, 21:3, 21:17, 21:21, 21:24, 22:2, 22:9, 22:16, 43:8, 44:2, 44:5, 45:7, 45:12, 47:21, 57:15, 58:4, 58:17, 67:14, 78:21, 85:10
**training-wise** [1] - 21:21
**trains** [1] - 9:8
**transcript** [1] - 91:13
**transition** [2] - 10:18, 11:13
**transparency** [1] - 38:14
**treated** [1] - 39:21
**treatment** [2] - 38:15, 38:25
**trend** [1] - 41:16
**trending** [1] - 74:21
**trends** [1] - 24:6
**tricycles** [1] - 13:22
**tried** [1] - 78:2
**trimmed** [1] - 32:10
**truck** [1] - 15:14
**true** [1] - 91:13
**trust** [1] - 14:21
**Trust** [6] - 8:5, 18:12, 18:17, 19:2, 21:18, 30:18
**trustworthy** [1] - 34:7
**try** [3] - 54:23, 59:25
**trying** [3] - 56:16, 57:7, 80:1
**Tuesday** [1] - 74:7
**turn** [6] - 13:14, 59:15, 59:17, 59:20, 62:13, 72:4
**turned** [1] - 40:16
**two** [21] - 6:7, 7:25, 8:1, 10:24, 11:14, 12:4, 17:3, 17:5, 22:21, 23:10, 27:6, 34:23, 35:25, 48:13, 71:8, 76:3, 76:4, 76:17, 86:16, 88:8
**type** [10] - 20:5, 27:23, 32:11, 36:1, 48:3, 54:1, 56:19, 57:23, 78:23, 84:3
**typewritten** [2] - 91:12, 91:13

**U**

**ultimate** [2] - 72:16, 73:8
**ultimately** [2] - 59:14,

72:1
**under** [9] - 22:20, 44:21, 65:22, 68:4, 80:17, 81:7, 81:8, 91:11, 91:21
**understood** [1] - 87:9
**unethical** [1] - 55:8
**uniforms** [1] - 8:10
**Unit** [5] - 7:17, 7:21, 8:2, 8:3, 55:12
**unit** [11] - 7:20, 8:4, 11:5, 17:15, 21:7, 21:14, 39:17, 44:10, 45:11, 77:24, 77:25
**UNITED** [1] - 1:1
**units** [2] - 11:10, 16:9
**unless** [1] - 85:16
**up** [48] - 5:16, 5:18, 9:11, 9:13, 10:1, 11:2, 11:17, 12:19, 13:11, 14:11, 18:4, 18:6, 18:8, 18:17, 19:1, 19:9, 21:16, 22:10, 22:11, 24:2, 24:5, 24:12, 25:16, 26:4, 28:17, 30:5, 30:21, 42:9, 42:10, 46:14, 49:3, 49:5, 49:7, 51:10, 55:23, 56:6, 63:10, 64:14, 65:20, 66:20, 74:11, 74:15, 74:25, 76:10, 79:10, 88:16, 89:4, 89:11
**updated** [1] - 50:6
**upper** [1] - 63:10
**utilize** [3] - 29:22, 44:13, 85:23
**utilized** [4] - 31:24, 37:17, 46:2
**utterance** [1] - 64:23

**V**

**vacation** [1] - 9:21
**vaguely** [1] - 32:4
**vantage** [3] - 53:12, 64:11, 79:5
**vast** [1] - 48:23
**vehicle** [18] - 10:5, 10:11, 24:11, 41:5, 44:4, 46:14, 46:22, 51:25, 52:8, 57:16, 58:2, 62:17, 62:21, 65:20, 66:10, 66:15, 66:23, 67:7
**vehicles** [1] - 24:3
**verbiage** [2] - 57:24, 88:4
**versus** [3] - 10:21,

45:4, 73:21
**vetting** [2] - 17:13, 21:25
**VIA** [1] - 2:2
**via** [1] - 80:7
**victim** [1] - 10:3
**victimized** [2] - 10:16, 31:12
**victims** [1] - 31:7
**Victory** [1] - 40:4
**video** [20] - 4:10, 7:20, 51:1, 51:4, 51:12, 52:16, 53:5, 53:7, 56:20, 61:25, 64:13, 67:9, 68:25, 75:9, 75:11, 76:14, 89:14, 89:17, 90:5
**VIDEOCONFERENC E/ TELECONFERENCE** [2] - 1:10, 2:2
**videoconference/ teleconference** [1] - 4:1
**Videographer** [1] - 2:17
**VIDEOGRAPHER** [6] - 4:9, 50:25, 51:3, 89:13, 89:16, 90:4
**videos** [1] - 79:1
**videotaped** [1] - 4:2
**viewing** [2] - 53:5, 57:12
**viewpoint** [1] - 52:20
**violations** [2] - 48:3, 49:25
**violator** [4] - 61:16, 61:23, 62:6, 65:19
**Violence** [3] - 14:2, 30:14, 30:16
**violent** [28] - 7:7, 11:19, 15:1, 31:17, 33:7, 34:25, 35:4, 35:8, 36:2, 36:5, 36:16, 37:24, 40:13, 40:22, 42:24, 48:10, 71:5, 71:23, 72:2, 74:5, 74:8, 74:13, 84:11, 84:21, 85:15, 88:6, 89:6
**Viper** [10] - 8:2, 8:3, 8:12, 10:18, 10:22, 18:11, 18:20, 18:22, 73:21, 73:24
**vision** [1] - 34:6
**voice** [1] - 65:14
**voiced** [1] - 85:11
**void** [1] - 23:7
**volunteering** [1] - 19:1

**VS** [1] - 1:11

**W**

**wait** [1] - 66:22
**waiting** [1] - 66:18
**walked** [3] - 12:5, 12:8, 14:12
**wallet** [3] - 63:15, 64:3, 67:11
**walls** [1] - 12:24
**wanton** [1] - 74:13
**wants** [1] - 20:18
**warrant** [1] - 78:13
**warrants** [2] - 47:22, 48:21
**WAS** [2] - 33:20, 61:6
**watch** [2] - 7:12, 67:18, 75:10
**watched** [1] - 79:1
**waved** [1] - 26:16
**waving** [1] - 26:18
**ways** [2] - 24:25, 59:12
**Wayside** [1] - 15:22
**weapon** [1] - 52:18
**weapons** [2] - 48:3, 63:21, 64:4
**Wednesday** [5] - 4:4, 45:7, 45:8, 58:17
**Wednesdays** [2] - 47:22, 47:25
**week** [7] - 17:4, 17:5, 30:25, 37:11, 71:7, 71:15, 88:11
**weekly** [1] - 45:12
**weight** [1] - 31:13
**wellness** [1] - 11:1
**WESTERN** [1] - 1:1
**white** [1] - 40:7
**wide** [2] - 21:23, 59:17
**William** [2] - 4:11, 4:24
**WILLIAM** [4] - 1:17, 4:2, 4:18, 91:5
**willing** [1] - 14:21
**wind** [1] - 60:14
**window** [1] - 32:8
**Windows** [1] - 32:3
**wise** [2] - 21:21, 24:4
**witness** [5] - 4:3, 4:12, 4:14, 27:5, 91:9
**WITNESS** [2] - 2:2, 90:7
**women** [2] - 15:21, 59:11
**Women** [1] - 13:5
**word** [2] - 24:20, 75:13
**worded** [2] - 87:22,

87:25
**words** [1] - 89:25
**works** [1] - 33:10
**wrap** [1] - 89:11

## X

**Xavier** [1] - 5:2

## Y

**year** [17] - 8:16, 9:11, 14:9, 14:11, 31:9, 33:2, 36:17, 37:25, 42:10, 43:14, 88:9, 88:16, 88:17, 88:22, 89:4
**years** [22] - 5:23, 6:12, 7:16, 7:25, 8:23, 8:25, 9:2, 9:5, 9:7, 9:9, 9:25, 10:3, 16:23, 20:15, 27:6, 35:11, 42:2, 50:16, 76:22, 88:8, 89:20
**you-all** [2] - 48:12, 50:24
**young** [2] - 39:9, 59:11
**yourself** [1] - 61:23
**Yvette** [2] - 30:19, 40:4