To:  Susan Rivera, Assistant Jefferson County Attorney
From: Tammy Rinehart Kochel, Phd, Professor of Criminology and Criminal Justice, Southern Illinois University
Date: September 30, 2021

Dr. Tammy Rinehart Kochel, Professor, Southern Illinois University Carbondale Faner Hall 4329 MC4504 Carbondale, IL 62901. My expertise is in conducting applied policing research, including an emphasis on hot spots policing, and assessing the impacts of policing strategies on crime, communities, and perceptions about police, such as trust in police and police legitimacy. I have focused on policing in high crime areas and perceptions about police among residents of high crime areas, and comparing views by race. I have served as principal investigator on federal grants addressing a variety of policing topics over the past 20 years. Recent federally funded research has included evaluation of a Community Based Crime Reduction strategy focused on reducing gun violence and other problems in one neighborhood in St Louis County, MO ($1mil U.S. Department of Justice, Bureau of Justice Assistance); a focused deterrence gun violence evaluation in Springfield, IL (SIU subaward $270,146 via ICJIA, with BJA JAG funding), and a hot spots policing evaluation in St Louis County, MO ($395,481 U.S. Department of Justice National Institute of Justice). A complete list of my grants, presentations, and publications are provided in my curriculum vitae. A sample of recent publications are highlighted here:

Kochel, T.R. & Gau, G.M. (2021). Examining police presence, tactics, and engagement as facilitators of informal social control in high-crime areas. *Justice Quarterly, 38(2), 301-322.* DOI:10.1080/07418825.2019.1632917.

Kochel, T.R. & Weisburd, D. (2019).  The impact of hot spots policing on collective efficacy:  Findings from a randomized field trial. *Justice Quarterly, 36(5), 900-928*. DOI: 10.1080/07418825.2018.1465579

Kochel, T.R. (2018). Police legitimacy and resident cooperation in crime hotspots: Effects of victimization risk and collective efficacy. *Policing and Society, 28*(3), 251-270. DOI: 10.1080/10439463.2016.1174235

Sargeant, E. & Kochel, T.R. (2018). Re-examining the normative, expressive, and instrumental models: How do feelings of insecurity condition the willingness to cooperate with police in different contexts? *Policing and Society, 28(7), 823-840*. DOI:  10.1080/10439463.2016.1261139.

Kochel, T.R. (2018). Police legitimacy and resident cooperation in crime hotspots: Effects of victimization risk and collective efficacy. *Policing and Society, 28*(3), 251-270. DOI: 10.1080/10439463.2016.1174235

Kochel, T.R. (2018).  Applying police legitimacy, cooperation, and collective security hypotheses to explain collective efficacy and violence across neighborhoods. *International Journal of Comparative and Applied Criminal Justice, 42(4), 253-272*. DOI: 10.1080/01924036.2017.1310663

Kochel, T.R. & Weisburd, D.  (2017). Assessing community consequences of implementing hot spots policing in residential areas: Findings from a randomized field trial. *Journal of Experimental Criminology, 13*(2), 143-170. DOI:10.1007/s11292-017-9283-5

I have not previously served as an expert witness. I have been retained at an hourly rate of $250/hour to provide an expert opinion in the form of a report and testimony, as needed, about hot spots policing and its effectiveness against crime.

In preparing the report, I have reviewed:
- Available research about hot spots policing (please see the reference list at the end of the document)
- One Love Louisville Violence Reduction Strategy dated March 1, 2017, Office of Safe and Healthy Neighborhoods
- Office of Performance Improvement and Innovation Planning Template
- Hibbs Deposition Exhibit No. 1—LMPD Strategic Plan
- A sample of 9 Compstat slides (redacted) from April 2018-December 2018
- A sample of redacted, weekly hot spots maps dated from January 2, 2018 through December 26, 2018 emailed to the LMPD Ninth Division
- Video file of a special meeting of the government oversight and audit/public safety committee on April 16, 2019
- Video file of a Public Safety Committee Meeting held on June 5, 2019
- Body camara footage labeled Dixie, Dixie_Burwell, McNeil, and Holman
- Transcript labeled DEPO-Tae-Ahn Lea
- Plaintiff's FRCP 26(a)(2) Expert Disclosures
- Transcript of the videotaped deposition of Chief Steven Conrad
- Transcript of the videotaped deposition of Jeffrey Paul McCauley
- Transcript of videotaped deposition of Major William Arthur Hibbs
- Transcript of videotaped deposition of Gabriel Hellard
- 2020 LMPD UCR Report
- Kentucky State Data Center Louisville Neighborhood Profiles available at http://ksdc.louisville.edu/research/sponsored_projects/louisville-neighborhood-profiles/
- LMPD Division Maps available at Louisville-police.org/159/Division-Maps

The report contains

- A summary of relevant research
- A summary of observations from the files reviewed
- My informed opinions and conclusions

2

**Summary of Relevant Research Evidence on Hot Spots Policing**

**Gun Violence**

Nationally, the U.S. has begun to see a resurgence of gun violence (Wexler, 2007). To understand gun violence trends, a study by Braga et al., (2010) encourages analyzing gun violence trends at micro levels, such as street segments (the area between intersections) and intersections, rather than at the neighborhood or other larger geographic area. They assert that larger geographic units can obscure important trends and dynamics at smaller places. Most places in a jurisdiction experience no gun violence. A small number of places account for most of the violence. For example, a multiyear study in Boston found that 5% of street segments and intersections accounted for 74% of serious gun assault incidents (Braga et al., 2010). The researchers found that gun violence diffuses, that an intersection that suddenly spikes with gun violence drives up gun violence in the immediate blocks. The study concludes that gun violence prevention efforts must focus on micro-places, that gun violence rates will be significantly impacted by focusing on a small number of gun violence hot spots. They underscore prior research that has found crime prevention benefits when hot spots policing has been used to address violent gun crime hot spots (McGarrell et al., 2001).

**Hot Spots of Crime**

In the 1980s, available technology bolstered the understanding of the geographic distribution of crime. Police agencies began to use software to map crime and calls for police service. Systematic mapping of police data showed empirically what officers already perceived, which is that reported crime is not evenly nor randomly distributed geographically in a municipality. Rather, crime problems tend to cluster geographically, as well as concentrate among only a few victims and offenders (Spelman, 1995). For example, about 10% of victims account for 40% of crime incidents (Spelman, 1995). The rule of thumb is that about 20% of the population is responsible for 80% of crime.  Numerous studies show that about 50 to 60% of crime occurs in about 3 to 10% of places (Sherman et al., 1989) and that places with high crime tend to persistently have high crime. The degree of concentration can vary by crime type (e.g., all robberies concentrating at 2.2% of places, all rapes occurring at 1.2% of places, auto thefts occurring at 2.7% of places, domestic disturbances occurring at 8.6% of places, burglaries occurring at 10.6% of places (Sherman et al., 1989)).

In a national address to the American Society of Criminology, the leading hot spots scholar articulated a law of crime concentration, a rule of thumb that states that 5% of places typically experience 50% of crime in a jurisdiction (Weisburd, 2015). This ratio has been affirmed across a myriad of hot spots policing studies throughout the U.S. over the last three decades. Building on the knowledge of these patterns, Sherman (1995) described hot spots and high crime addresses as having "criminal careers," much like offenders do, with variation in the onset, duration, frequency, intermittency, and severity of the crime problems.

Scholars trying to explain the variation of crime, including its concentration at places, apply the Routine Activities Theory (RAT) (Cohen & Felson, 1979). RAT states that crime occurs when suitable targets/victims and motivated offenders come into contact within places with ineffective guardianship. This is called the crime triangle. Much like the fire triangle, RAT explains that removing any one of the three components (suitable targets/victims, motivated offenders, or ineffective guardianship) at a location will remove the opportunity for crime to occur in that space at that time. Understanding what facilitates more opportunities for crime in some places over others has led to a variety of crime prevention strategies,

including situational crime prevention, crime prevention through environmental design, and hot spots policing.

Hot spots can occur in residential, commercial, and other areas (Eck et al., 2007). Characteristics of places can attract both potential offenders and potential victims or help to influence the level of guardianship. For example, transportation centers such as bus terminals or subway stations and sporting events at large stadiums attract a high volume of people, both potential victims and offenders. Staffing only one or very few clerks in a convenience store or hotel; the physical design/layout/security measures of a business, park, or parking area; or service practices at restaurants or gas pumps can limit available guardianship. Recognizing the role that these qualities play in the crime triangle helps identify appropriate prevention strategies.

**Policing to Address Hot Spots of Crime**

Hot spots policing entails focusing police strategies in geographically small areas where crime clusters. The intent is to identify areas where crime has been high and to implement strategies to proactively prevent future crimes in that location. The approach triages limited police resources to high priority locations. A 2006 national survey of large law enforcement agencies with 100 or more sworn officers revealed that 83% of departments had been implementing hot spots policing at that time (Willis et al., 2010). It was and remains a common approach to crime prevention, particularly to address hot spots of violent crime, where 9 out of 10 departments apply hot spots policing (Braga et al., 2014). A survey by the Police Executive Research Forum finds that 43% of law enforcement agencies surveyed use directed patrol in hot spots frequently or routinely. Hot spots policing is the most commonly applied strategy to focus on gun crime hot spots (Koper, 2010).

The size of the geographic area of a hot spot is frequently only one or a few city street segments or blocks, sometimes even a single address or intersection, but hot spots policing has also been conducted in larger areas such as police beats (McGarrell et al., 2001; Sherman & Rogan, 1995). Typically, police agencies examine crime data such as police calls for service or incident reports, but also sometimes vehicle crash data or Emergency Medical Services data (Hibdon et al., 2021; Hibdon & Groff, 2014), to pinpoint the areas where crime concentrates. Sometimes the analysis examines crime in general and sometimes the analysis has been focused on a specific type of crime such as violent crime, property crime, burglary, gun violence, etc.

There is not a standardized timeframe that agencies use to analyze for hot spots (Wheeler & Reuter, 2021). Often analyses will use several months of data, a year, or even multiple years of data to not only determine where crime concentrates, but also whether the concentration of crime in an area is persistent rather than a temporary spike. Rarer crime events require longer data timeframes (e.g., rape tends to be rarer than assault, so identifying hot spots of rape would likely entail reviewing data over multiple years). Examining data over different time periods affects the nature of the crime patterns that can be observed. For example, reviewing several years of data can show the places with the highest levels of crime enduring over time, but can mask variation during that time. Cyclic problems with crime and persistently uniform problems would both show as hot spots over time, even though the nature of the problem is different. Examining shorter periods of time, such as a few weeks, shows temporary spikes in crime at a place, but the concentration may be isolated (e.g., impacted by an event such as a concert or fair or even a single prolific offender). Enduring hot spots may invoke a long-term solution such as changing the environment (e.g., traffic patterns, lighting, razing abandoned buildings). Short-term hot spots would necessitate a

temporary response such as working with event coordinators, closed-circuit cameras, intensive police presence, or an investigatory focus on the prolific offender (Johnson et al., 2008).

Hot spots policing takes many forms (e.g., problem-oriented policing, situational crime prevention, foot patrols, drug/drunk driving/other crackdowns, stop and frisk, misdemeanor arrests, directed patrols—targeted police presence at hot spots). A common approach is to saturate an area with police presence. In this way, hot spots policing attempts to increase guardianship in an area and capitalize on deterrence. Deterrence theory says that potential offenders weigh the benefits and consequences of committing a crime or delinquent act. When the perceived benefits outweigh the perceived consequences, the would-be offender will commit crime. Conversely, when the likely consequences overshadow the likely benefits, the would-be offender opts against committing the crime at that place at that time, thus preventing crime. Saturating an area with police presence is designed to convey that someone cares about what happens in that space and that the risk of offenders being caught is high—that being caught is a near certainty, rather than unlikely. The goal is to convey this message during the hot spots strategy implementation and for some amount of time even after police discontinue hot spots policing in an area (Sherman, 1990). Furthermore, when individuals are stopped and cited or arrested there is also a form of specific deterrence being practiced. In this case, not only is the message of police presence meant to inform the general public, including potential offenders, about the high risk of being caught in that area, but a specific offender who is held accountable for his/her actions experiences firsthand the certainty of punishment, and this experience will discourage him/her from future offending.

Most often, hot spots policing has taken the form of increasing police visibility in the hot spot. Available research has shown that spending additional time in the high crime location, notably, about an additional 9 to 15 minutes at a time is an effective deterrent, more effective, for example than more frequent but shorter bursts of police presence on any given day (Koper, 1995; Williams & Coupe, 2017). Available research has not provided direction on the duration of the hot spots policing efforts at a specific location. Hot spots policing strategies studied by researchers have often persisted for three months or more, but no concerted effort has been made to study whether a specific duration is more or less effective at reducing crime—whether spending a day or a week or a month or six months focused on a specific area produces different outcomes. However, Koper et al., (2021) found that calls for service for violence, property crime, and disorder declined in hot spots in Riley County, KS even when new hot spots were identified each week.

**Impact of Hot Spots Policing on Crime**

Hot spots policing has been one of the most successful policing strategies to reduce crime. It has a strong evidence-base documenting its ability to reduce crime in general as well as specific crime types (Braga et al., 2014, 2019; Braga & Weisburd, 2020). Assessments of hot spots studies have found the biggest effects against drug offenses and violent crimes, but hot spots policing is also effective against property crime and disorder offenses, without merely pushing crime to other locations (Braga et al., 2014). In fact, nearby places tend to experience crime reductions, in addition to the hot spot itself (Bowers et al., 2011). A recent empirical synthesis (meta-analysis) of 62 rigorous hot spots policing studies, nearly 80% of which were conducted in the U.S., reported favorable results. Across all the studies, the results showed that implementing hot spots policing significantly reduces crime. The studies addressed a variety of different crime problems (e.g., gun crimes, burglary robbery, drugs, auto theft, violent crime, property crime, all crime types at once) and used a range of hot spots policing methods. Problem oriented policing approaches and police saturation strategies showed significant reductions in crime (Braga et al., 2019). Their findings confirmed a series of meta-analyses of studies conducted in prior years (Braga et al., 2012;

5

Braga, 2001, 2005; Braga et al., 2014) that also showed the effectiveness of hot spots policing against crime. The most recent empirical synthesis found that prior meta-analyses underestimated the size of the impact of hot spots policing on crime (8.1% reduction in crime, on average, compared to standard policing approaches) and reported an even larger impact of hot spots policing on crime than previously estimated—a 16% reduction in crime, on average (Braga & Weisburd, 2020).

In 2014, Schaefer and colleagues (2021) conducted an evaluation of hot spots policing in metropolitan Louisville. The 47 treatment hot spots and 47 control hot spots were one linear street block each. During the 90-day intervention, treatment hot spots received about two to three police visits per day, for an average of 15 minutes each visit. There was no specific activity expected of police, other than to be visible (this is a common approach in hot spots policing studies). Comparing calls for police service during the 2014 intervention to the same time during 2013 showed a significant impact of hot spots policing on calls for service. However, in their study, the researchers also applied an atypical analysis approach that accounted for whether the hot spot was located in the city center or in a suburban area of Louisville. This regression analysis showed no significant effect of hot spots policing on calls for service or other crime outcomes. Due to the study design, however, the study had limited power to detect an effect, meaning the crime impact of hot spots policing had to be large for their analyses to be able to detect that effect. Smaller effects would be undetectable.

Some scholars recently have begun computing cost savings attributed to hot spots policing, including providing just the right amount of dosage of police (not too much, not too little) at the right times in a high crime area to reduce crime in that area. Crimes that are prevented save the police agency resources to investigate, arrest, write reports, attend court, etc. A recent hot spots study in the United Kingdom found that for a six-week window, by focusing police resources in hot spots during the weekend, when violence was highest, for 12-15 minutes every hour during a 4-hour hot time for crime, they reduced crime, with the greatest impact on violence, and saved about 40% of policing costs (Gibson et al., 2017).

**Hot Spots Policing to Address Gun Violence**

Hot spots policing has been applied to address gun violence problems (Corsaro et al., 2019; Sherman & Rogan, 1995) and has been effective. A systematic review of four rigorous evaluations of directed patrols (targeted police presence at hot spots) aimed to reduce gun crime in high crime places reported that gun crime declines by 29 to 71%. For example, in Pittsburgh, conducting evening gun patrols (8pm to midnight) in high gun violence patrol zones was associated with declines in shots fired (by 34%) and gunshot injuries (by 71%) in the hot spot relative to a comparison area (Koper & Mayo-Wilson, 2012). Corsaro and colleagues (2019) evaluated the impact of a 6-month period of daily saturation patrols totaling 1.5 to 2 hours daily at each of 22 hot spots in Las Vegas, with the officer(s) staying in the hot spot about 15 minutes at a time, either with police vehicle flashing lights on or patrolling on foot. The targeted hot spots, relative to 22 control hot spots, experienced a reduction in calls for service, violent crime, and property crime. In Indianapolis, they applied a targeted approach to stopping pedestrians and vehicles, focusing on suspicious people and vehicles, alongside an approach of maximizing the number of traffic stops to seize more guns. Only the targeted approach reduced gun crime (Koper & Mayo-Wilson, 2012). In Kansas City, Sherman and Rogan (1995) evaluated extra police patrols for 29 weeks, whereby officers seized guns found in plain sight, found in searches incident to arrest, and resulting from safety frisks during traffic stops. Officers seized 1 gun per 28 traffic stops and 1 gun per 84 hours of extra patrols. In the target area, gun crimes declined by 49% while the comparison beat showed a non-significant uptick of gun crimes. The average gun offenses per week dropped from 5.8 before the patrols to 3.2 during the patrols. Homicide also declined in the target area, but not in the comparison area. Surveys of residents showed that target

area residents felt less fearful and more satisfied with their neighborhood, relative to the comparison area residents. However, the gun violence reductions were temporary, until patrols resumed. The researchers cautioned that intensive gun patrols could harm police-community relations and detrimentally impact young males. However, Shaw (1995) examined public opinion in Kansas City and reported that the community was aware of and supported the enhanced policing and perceived an improvement in their neighborhood. However, the study did not examine the opinions of the specific individuals stopped by police.

**Using Traffic Stops in Hot Spots Policing**

A program called DDACTS (Data-Driven Approaches to Crime and Traffic Safety) uses information about crime hot spots to identify an efficient patrol route to maximize time inside and nearby hot spots of crime and vehicle crashes. Seven demonstration sites implemented the approach in 2008 (Baltimore County, MD; Lafourche Parish, LA; Nashville, TN; Oakland, CA; Rochester, NY; St Albans, VT; Washoe County Sheriff, NV). In Baltimore County, where officers conducted high visibility traffic enforcement in 2008-2009, traffic stops increased by 42.5%, and burglaries, robberies, motor vehicle theft declined significantly, by 17%, 33.5%, and 41% respectively (Hall & Puls, 2010). Rochester had focused on areas with gun crimes and speeding-related crashes and reported a 36% decline in homicide, alongside reductions in robberies, aggravated assaults, and motor vehicle theft (Delaney & Schneider, 2010). Nashville reported declines in Part 1 crimes, accidents, and fatalities (Wyatt, 2010). However, property crime increases were observed in Lafourche Parish, LA (Silverii, 2010).

Applying stop, question, and frisk approaches to hot spots policing, whereby investigatory stops are used to search for guns and drugs in the hot spot, even when effective at reducing crime, have been criticized because of concerns about the impact on young minority suspects (Weisburd et al., 2014). For example, in New York City, blacks were six times more likely to be stopped by police than whites, all while seizure and arrest rates from the stops were typically (less than 10%) (Gelman et al., 2007). A study of traffic stops and investigatory stops in Kansas City, MO found that implementing investigatory stops prompted officers to act on implicit biases about who appears suspicious, and thus investigatory stops were the driving force behind racial disparities in police stops, rather than stops for traffic violations such as speeding. The researchers concluded that the long-term consequences for race-relations was not adequately balanced against the short term crime control benefits of investigatory stops (Epp et al., 2014). For these reasons, present-day academic sentiments sway against the use of investigatory stops in hot spots policing.

**Impact of Hot Spots Policing on Community Relationships and Police Legitimacy**

The effect on crime is only one important outcome to consider when examining the benefits and consequences of implementing hot spots policing. Kochel (2011) pointed out the importance of examining the impact on the public's perception of police and trust in police. Focusing police resources in a small geographic area, especially without first engaging the community and explaining the intentions, has the potential to harm public opinion and even cooperation with the police, and it is important, even for crime control, to protect against feelings of marginalization or estrangement from police (Bell, 2017). However, available evidence does not support that hot spots policing generates long-term harm against trust, legitimacy, or public support for police (Kochel & Weisburd, 2017; Ratcliffe et al., 2015; Weisburd et al., 2011).

**Public Opinions about Hot Spots Policing**

In a recent nationwide public opinion poll, 61% of Americans supported using hot spots policing—focusing police resources in places where crime concentrates. Levels of support were somewhat lower among Black Americans (46%) and Hispanic Americans (40%). The type of hot spots policing approach with the most support is situational interventions that change the environment such as lighting, video cameras, and tearing down buildings, followed by increased police presence and patrol, while misdemeanor arrests (e.g. for public drinking) had the least public support (Metcalfe & Pickett, 2018).

**Summary of Observations from the Files Reviewed and Basis of my Impressions/Conclusions**

**Crime Prevention Strategies**

The Louisville Violence Reduction Strategy outlines a multifaceted evidence-based approach to their goal of reducing violence, outlining elements for prevention, intervention, enforcement, re-entry, community mobilization, and organizational change/development. The strategy examined 2016 crime problems and identified homicides and shootings as major problems. The strategy specifies that Louisville had 118 homicides in 2016; 85% involved gunshots. They recorded 504 shootings (the planning template specifies 515). Three-quarters of the shootings and homicides occurred in the 1st, 2nd, and 4th police divisions. The goal of the violence reduction strategy includes reducing homicides and shootings by 25% by focusing on six targeted areas that account for 50% of the 2016 homicides. The areas include: Park Hill (2nd Division), Russell (1st Division), Shawnee (2nd Division), Shelby Park (4th Division), Smoketown (4th Division), Victory Park (2nd Division). The strategy employed seven pillars. One pillar of the strategy is enforcement, including hot spots policing.

The Louisville Metro Police Department (LMPD) Strategic Plan outlines a role for the police department to further the goals of the Violence Reduction Strategy. The plan specified an intention to reduce crime by "concentrating on people, places, and narcotics," and to "use a data-driven approach to determine where crime occurs the most and deploy resources to the areas of Louisville-Jefferson County with the highest crime rates," and to use technology to assist with deterrence of criminal activity. The violence reduction goals stand alongside other goals outlined by LMPD such as improving traffic safety, community interaction, ethical and equitable treatment, transparency, legitimacy, accountability, and employee wellness and safety.

**LMPD Approach to Hot Spots Policing**

The weekly hot spots maps depict violent crime hots spots using 1 week of data by division (1st, 2nd, 4th, and 6th). As would be expected with data representing a very short duration, the location of the hottest areas shows different hot spots each week.

At the Oversight and Audit/Public Safety Committee meeting on April 16, 2019, former LMPD Chief Steven Conrad described the LMPD focus on people, places, and narcotics as an effort to "stop violence," with its basis in the 2016 homicides and other crime problems, and funding for $1.2 million in overtime allocation to focus on places disproportionately impacted by crime and violence. He described traffic stops as one strategy used, which lead to an increase in seized guns. Note though that my understanding of the meeting remarks conflicts with the transcript of Chief Conrad's deposition where he states that, "Traffic stops were never a violent crime strategy." I believe he was underscoring that hot

spots policing was the strategy and there was not a specific plan to apply traffic stops as the hot spots strategy.

At the meeting, Chief Conrad described that one in ten cars stopped resulted in the discovery of guns, drugs, or both. He stated that the ninth mobile division had seized 1400 guns during their 2.5 years of operation, 205 in the first 3.5 months of 2019, many from vehicles. The chief attributed the reduction in UCR crimes in Louisville to the focused efforts of the people, places, and narcotics strategy.

However, during the meeting, Chief Conrad said that he recognized the need to give the community a voice and described an initiative with Spalding University to engage the community in strategic planning. Chief Conrad stated that "we need to make changes" and made a commitment to making the Louisville metro community cohesive by race and treating all people with respect and fairness. Many of Chief Conrad's remarks circled back to the idea of officers applying procedural justice during traffic stops, notably by police explaining their actions to the stopped party and also giving the stopped person a voice. The chief also described conducting an external annual review of traffic stops via the University of Louisville. At the meeting, two councilpersons requested that the chief find another way to reduce crime, alternative policing approaches to using traffic stops focused in West Louisville.

**Traffic Stop Policy Shift**

On June 5, 2019, former Chief Steven Conrad testified during the Public Safety Committee meeting. The dialogue was similar to the April 2019 meeting. The chief restated the departmental focus on homicides and violence, along with narcotics and the geographic focus in six neighborhoods where the problems had been concentrating: "putting officers in the places where we have seen a disproportionate amount of crime occurring." He described the use of traffic stops in these areas, confiscating guns, drugs, or guns and drugs from 5.5% of people stopped, with the largest number of seizures in the 1st, 2nd, and 4th divisions, but especially the 2nd division. He then described a reduction in violent crime and property crime as evidence of the effectiveness of the strategy.

However, Chief Conrad described that LMPD has since changed their approach to traffic stops in hot spots, because the strategy "made everyone mad." He described that 1 in 10 stopped went to jail, but the other 9 "went away mad" for having been stopped. He stated that increasing community trust is important and so the department was at that time adopting a new progressive traffic stop policy that favored stops for the purpose of safety (e.g., speeding), but not investigatory stops (e.g., wide left turns, cracked windshields). Officers were at that time being trained not to use investigatory stops as a matter of routine, and starting August 1, 2019, officers were going to be obligated to write in their reports the reasons for the stop and any justification for requiring a driver/passenger to get out of the car, sit on the ground, or for handcuffing or searching the suspect. Furthermore, the policy now required that a lieutenant review video of any traffic stops involving a K-9. He described the new traffic stop policy as a sea change for LMPD and different from the practices of other police agencies. In response to a question, Chief Conrad specified that in the month (May-June 3, 2019) since the traffic stop policy training had been conducted, vehicle stops had declined 44% from the prior month.

**Impact on Crime in Louisville**

Crime data show violent crime declined in Louisville between 2016 and 2017 and between 2017 and 2018, according to the LMPD UCR report. This includes large reductions in the murder rate, by 7.55%

9

between 2016-2017 and by 24.49% between 2017 and 2018. Violent crime rates, including homicide rates in Louisville have increased in 2019 and 2020.

**Informed Opinions and Conclusions**

1. Hot spots policing was a core component of the LMPD's multipronged efforts to reduce violence, including gun violence and homicide. The application of hot spots policing to geographic concentrations of gun violence, homicide, and other violent crime problems is well-supported in available research on the crime effectiveness of the approach. Many different approaches to hot spots policing reduce crime, including increased police presence and enforcement activities.

2. Hot spots policing is a commonly used strategy by U.S. law enforcement and the public tends to support police concentrating their resources in places where the crimes are occurring.

3. Gun arrests, gun seizures, and narcotics seizures featured prominently in the Compstat materials for Ninth Mobile Division. In the first three years of operation, the Ninth Mobile Unit seized an average of 578 guns per year and arrested an average of 665 people per year. Using traffic stops and gun seizures in high crime areas has shown effectiveness in prior research at reducing gun violence.

4. Consistent with the strategic plan to reduce violence, the analyses of hot spots focused primarily on the police divisions (1st, 2nd, 4th) in which the six targeted neighborhoods with the highest levels of violence, including homicide and gun violence, were located. The weekly data on assaults, homicides, gun crimes, and robbery identify emergent clusters of violence in small geographic areas (e.g., just a few blocks) best suited for short term strategies (e.g. directed patrols rather than situational crime prevention). Although almost no studies have looked at the ideal duration of hot spots initiatives, an evaluation in Kansas supports the use of weekly hot spots to reduce violent crime problems (Koper et al., 2021).

5. The departmental operating procedures, as described in former Chief Conrad's deposition and during his testimony to the Council, placed an emphasis on procedural justice, on treating people fairly and respectfully during traffic stops. Research strongly supports that procedurally just treatment of individuals can promote satisfaction with police and police legitimacy, even when the outcome of a police-citizen encounter is negative in the eyes of the suspect (e.g., ticket, arrest).

6. Encounters initiated by investigatory stops can facilitate officers inadvertently or intentionally applying naturally occurring implicit biases to determine whether a person is suspicious and thus should be stopped and investigated. Investigatory stops, more so than traffic stops, tend to result in disproportionate consequences for minorities (Epp et al., 2014). The rationale for changing the LMPD stop policy in 2019 and the actual changes made to the policy appear to recognize and try to address this problem, aiming to balance crime control goals against police-community relations and fairness. Requiring officers to justify their stops (when they are not "safety"/traffic stops) and to justify treatment during stops, as well as ongoing annual assessments by the University of Louisville to examine the

potential disproportionalities of stops by race are important elements to preventing discriminatory practices.

## References

Bell, M. C. (2017). Police reform and the dismantling of legal estrangement. *The Yale Law Journal*, 2054–2150.

Bowers, K. J., Johnson, S. D., Guerette, R. T., Summers, L., & Poynton, S. (2011). Spatial displacement and diffusion of benefits among geographically focused policing initiatives: A meta-analytical review. *Journal of Experimental Criminology*, *7*(4), 347–374.

Braga, A. A. (2001). The effects of hot spots policing on crime. *The ANNALS of the American Academy of Political and Social Science*, *578*(1), 104–125.

Braga, A. A. (2005). Hot spots policing and crime prevention: A systematic review of randomized controlled trials. *Journal of Experimental Criminology*, *1*(3), 317–342.

Braga, A. A., Papachristos, A. V., & Hureau, D. M. (2010). The concentration and stability of gun violence at micro places in Boston, 1980–2008. *Journal of Quantitative Criminology*, *26*(1), 33–53.

Braga, A. A., Papachristos, A. V., & Hureau, D. M. (2014). The effects of hot spots policing on crime: An updated systematic review and meta-Analysis. *Justice Quarterly*, *31*(4), 633–663. https://doi.org/10.1080/07418825.2012.673632

Braga, A. A., Turchan, B. S., Papachristos, A. V., & Hureau, D. M. (2019). Hot spots policing and crime reduction: An update of an ongoing systematic review and meta-analysis. *Journal of Experimental Criminology*, *15*(3), 289–311. https://doi.org/10.1007/s11292-019-09372-3

Braga, A. A., & Weisburd, D. L. (2020). Does hot spots policing have meaningful impacts on crime? Findings from an alternative approach to estimating effect sizes from place-based program evaluations. *Journal of Quantitative Criminology*, 1–22. https://doi.org/10.1007/s10940-020-09481-7

Braga, A., Papachristos, A., & Hureau, D. (2012). Hot spots policing effects on crime. *Campbell Systematic Reviews*, *8*(8), 1–96.

Cohen, L. E., & Felson, M. (1979). Social change and crime rate trends: A routine activity approach. *American Sociological Review*, *44*(4), 588. https://doi.org/10.2307/2094589

Corsaro, N., Engel, R. S., Herold, T. D., & Yildirim, M. (2019). *Implementing Gang & Gun Violence Reduction Strategies in Las Vegas, Nevada: Hot Spots Evaluation Results*. IACP/UC Center for Police Research and Policy. Alexandria, VA.

Delaney, C., & Schneider, K. A. (2010). DDACTS Operations in Rochester. *Geography Public Safety: A Quarterly Bulletin of Applied Geography for the Study of Crime & Public Safety*, *2*(4), 11–15. https://doi.org/10.1037/e506742011-002

Eck, J. E., Clarke, R. V., & Guerette, R. T. (2007). Risky facilities: Crime concentration in homogeneous sets of establishments and facilities. *Crime Prevention Studies*, *21*, 225.

Epp, C. R., Maynard-Moody, S., & Haider-Markel, D. P. (2014). *Pulled Over: How Police Stops Define Race and Citizenship*. University of Chicago Press.

Gelman, A., Fagan, J., & Kiss, A. (2007). An analysis of the New York City Police Department's "Stop-and-Frisk" policy in the context of claims of racial bias. *Journal of the American Statistical Association*, *102*(479), 813–823.

Gibson, C., Slothower, M., & Sherman, L. W. (2017). Sweet spots for hot spots? A cost-effectiveness comparison of two patrol strategies. *Cambridge Journal of Evidence-Based Policing*, *1*(4), 225–243.

Hall, H., & Puls, E. N. (2010). Implementing DDACTS in Baltimore County: Using geographic incident patterns to deploy enforcement. *Geography Public Safety: A Quarterly Bulletin of Applied Geography for the Study of Crime & Public Safety*, *2*(4), 5–7. https://doi.org/10.1037/e506742011-002

Hibdon, J., & Groff, E. R. (2014). What you find depends on where you look: Using emergency medical services call data to target illicit drug use hot spots. *Journal of Contemporary Criminal Justice*, *30*(2), 169–185.

Hibdon, J., Telep, C. W., & Huff, J. (2021). Going beyond the blue: The utility of emergency medical services data in understanding violent crime. *Criminal Justice Review*, *46*(2), 190–211. https://doi.org/10.1177/0734016821999700

Johnson, S. D., Lab, S. P., & Bowers, K. J. (2008). Stable and fluid hotspots of crime: Differentiation and identification. *Built Environment (1978-)*, 32–45.

Kochel, T. R. (2011). Constructing hot spots policing: Unexamined consequences for disadvantaged populations and for police legitimacy. *Criminal Justice Policy Review*, *22*(3), 350–374. https://doi.org/10.1177/0887403410376233

Kochel, T. R., & Weisburd, D. (2017). Assessing community consequences of implementing hot spots policing in residential areas: Findings from a randomized field trial. *Journal of Experimental Criminology*, *13*(2), 143–170. https://doi.org/10.1007/s11292-017-9283-5

Koper, C. S. (1995). Just enough police presence: Reducing crime and disorderly behavior by optimizing patrol time in crime hot spots. *Justice Quarterly*, *12*(4), 649–672.

Koper, C. S. (2010). *Gun Enforcement and Gun Violence Prevention Practices among Local Law Enforcement Agencies: A Research and Policy Brief* (p. 29). Washington DC: Police Executive Research Forum.

Koper, C. S., Lum, C., Wu, X., & Hegarty, T. (2021). The long-term and system-level impacts of institutionalizing hot spot policing in a small city. *Policing: A Journal of Policy and Practice*.

Koper, C. S., & Mayo-Wilson, E. (2012). Police strategies to reduce illegal possession and carrying of firearms: Effects on gun crime. *Campbell Systematic Reviews*, *8*(1), 1–53. https://doi.org/10.4073/csr.2012.11

McGarrell, E. F., Chermak, S., Weiss, A., & Wilson, J. (2001). Reducing firearms violence through directed police patrol. *Criminology & Public Policy*, *1*(1), 119–148.

Metcalfe, C., & Pickett, J. T. (2018). The extent and correlates of public support for deterrence reforms and hot spots policing. *Law & Society Review*, *52*(2), 471–502.

Ratcliffe, J. H., Groff, E. R., Sorg, E. T., & Haberman, C. P. (2015). Citizens' reactions to hot spots policing: Impacts on perceptions of crime, disorder, safety and police. *Journal of Experimental Criminology*, *11*, 393–417.

Schaefer, B. P., Hughes, T., & Stelzip, W. C. (2021). Hot spots across the metropolis: Evaluating hot spots directed patrol at city and suburban locations. *Justice Quarterly*, *38*(1), 101–123. https://doi.org/0.1080/07418825.2019.1616804

Shaw, J. W. (1995). Community policing against guns: Public opinion of the Kansas City gun experiment. *Justice Quarterly*, *12*(4), 695–710.

Sherman, L. W. (1990). Police crackdowns: Initial and residual deterrence. *Crime and Justice*, 1–48.

Sherman, L. W. (1995). Hot spots of crime and criminal careers of places. *Crime and Place*, *4*, 35–52.

Sherman, L. W., Gartin, P. R., & Buerger, M. E. (1989). Hot spots of predatory crime: Routine activities and the criminology of place. *Criminology*, *27*(1), 27–56.

Sherman, L. W., & Rogan, D. P. (1995). Effects of gun seizures on gun violence: Hot spots patrol in Kansas City. *Justice Quarterly*, *12*(4), 673–693.

Silverii, S. (2010). Traffic safety initiative modernizes resource deployment in Lafourche Parish. *Geography Public Safety: A Quarterly Bulletin of Applied Geography for the Study of Crime & Public Safety*, *2*(4), 7–9. https://doi.org/10.1037/e506742011-002

Spelman, W. (1995). Once bitten, then what—Cross-sectional and time-course explanations of repeat victimization. *British Journal of Criminology*, *35*(3), 366–383.

Weisburd, D. (2015). The law of crime concentration and the criminology of place. *Criminology*, *53*(2), 133–157.

Weisburd, D., Hinkle, J. C., Famega, C., & Ready, J. (2011). The possible "backfire" effects of hot spots policing: An experimental assessment of impacts on legitimacy, fear and collective efficacy. *Journal of Experimental Criminology*, *7*(4), 297–320.

Weisburd, D., Telep, C. W., & Lawton, B. A. (2014). Could innovations in policing have contributed to the New York City crime drop even in a period of declining police strength?: The case of stop, question and frisk as a hot spots policing strategy. *Justice Quarterly*, *31*(1), 129–153. https://doi.org/10.1080/07418825.2012.754920

Wexler, C. (2007). *Violent Crime in America: 24 Months of Alarming Trends* (pp. 1–20). Washington, DC: Police Executive Research Forum.

Wheeler, A. P., & Reuter, S. (2021). Redrawing hot spots of crime in Dallas, Texas. *Police Quarterly*, *24*(2), 159–184.

Williams, S., & Coupe, T. (2017). Frequency vs. length of hot spots patrols: A randomised controlled trial. *Cambridge Journal of Evidence-Based Policing*, *1*(1), 5–21.

Willis, J. J., Kochel, T. R., & Mastrofski, S. D. (2010). *The co-implementation of CompStat and community policing: A national assessment* (pp. 1–90). Washington, DC: Office of Community Oriented Policing Services.

Wyatt, J. (2010). Integrating crime and traffic crash data in Nashville. *Geography Public Safety: A Quarterly Bulletin of Applied Geography for the Study of Crime & Public Safety*, *2*(4), 9–10. https://doi.org/10.1037/e506742011-002