1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF KENTUCKY
2                 AT LOUISVILLE

3

4

5  CIVIL ACTION NO. 3:19-CV-419-GNS-RSE

6

7

   TAE-AHN LEA                                    PLAINTIFF
8

9

10              VIDEOCONFERENCE/TELECONFERENCE
11  VS          DEPOSITION FOR THE PLAINTIFF

12

13

14  STEVE CONRAD, et al                          DEFENDANTS

15  * * *                    * * *                    * * *
16

17  DEPONENT:      JEFFREY PAUL McCAULEY
18                   (MARCH 9, 2021)

19

20

21

22

23              Nancy L. Nunnelley, RMR
           Kentucky Certification No. 20042B131
24              4413 Chenwood Lane
           Louisville, Kentucky 40299
25    Phone: (502) 594-1728  Fax: (502) 267-4156
      Email:  nunnelleycourtreporter@gmail.com

1 <u>APPEARANCES:</u>

2                    (ALL PARTIES AND THE WITNESS APPEARED
                     VIA VIDEOCONFERENCE/TELECONFERENCE)
3

    <u>For the Plaintiff</u>
4
        Josephine Buckner, Esquire
5       Sam Aguiar Injury Lawyers, PLLC
        1201 Story Avenue
6       Suite 301
        Louisville, Kentucky 40206
7       jbuckner@kylawoffice.com

8       ALSO PRESENT:  Tae-Ahn Lea
                       Tija Jackson
9


10
    <u>For the Defendants</u>
11
        Susan Rivera, Esquire
12      Jefferson County Attorney's Office
        200 South Fifth Street
13      Suite 300N
        Louisville, Kentucky 40202
14      susan.rivera@louisvilleky.gov

15


16
    <u>Videographer</u>
17
        Rich Ramey
18      richramey@bellsouth.net

19

20                      * * *

21

22

23

24

25

<u>INDEX</u>

<u>EXAMINATION:</u>

BY MS. JOSEPHINE BUCKNER                    4
BY MS. SUSAN RIVERA                         98

<u>EXHIBITS:</u>

NO EXHIBITS WERE MARKED                     102

* * *

1      The videoconference/teleconference

2 videotaped deposition of JEFFREY PAUL McCAULEY taken

3 with the witness being at his home, Louisville,

4 Kentucky, on Tuesday, March 9, 2021, at about the

5 hour of 1:20 P.M., said deposition being taken

6 pursuant to Notice for use in accordance with the

7 Federal Rules of Civil Procedure.

8 ***              ***              ***

9      VIDEOGRAPHER:  The date is March 9th,

10 2021.  The time is 1:19 -- or 1:20 P.M., rather.  We

11 are on the record for the deposition of Jeffrey

12 McCauley.  Would you please swear in the witness.

13      JEFFREY PAUL McCAULEY, after first being

14 duly sworn, deposed and said as follows:

15 EXAMINATION BY MS. JOSEPHINE BUCKNER

16      MS. BUCKNER:  Mr. McCauley, would you

17 state your full name for the record and spell your

18 last name.

19      DETECTIVE McCAULEY:  Jeffrey Paul

20 McCauley, M-C-C-A-U-L-E-Y.

21      Q.  Where are you currently employed?

22      A.  The Louisville Metro Police Department.

23      Q.  How long have you been with Louisville

24 Metro?

25      A.  Since June of 2012.

1      Q.   June.   What positions have you held since
2  that time?
3      A.   Police recruit, patrol officer, violent
4  crime detective, narcotics detective and K-9 handler.
5      Q.   And what's your current position?
6      A.   Narcotics detective and K-9 handler.
7          THE WITNESS:   Am I waiting long enough to
8  respond, not cutting you off?
9          THE REPORTER:   Yes.
10          MS. BUCKNER:   Yes.   He was asking if he
11  was waiting long enough to respond.
12          MS. RIVERA:   Oh, I thought he was asking
13  you that.
14          MS. BUCKNER:   Okay.
15          MS. RIVERA:   Yes, yes, you're doing fine.
16  When you're talking, though, you don't have to pause.
17  Just wait long enough for her to ask the question.
18  But you're doing fine.
19          THE WITNESS:   Okay.
20          MS. RIVERA:   This is fun.
21      Q.   How long have you been with the narcotics
22  unit as a detective and K-9 officer?
23      A.   With narcotics, since January of 2020, I
24  believe.   And a K-9 handler since May of 2018, I
25  believe.

1    Q.   You mentioned being a police recruit.  Did
2    you have to have a separate training for the K-9
3    officer, similar to that?
4        A.   I received specialized training for the K-9
5    position?
6        Q.   Yes.
7        A.   Yes.
8        Q.   How long was that training?
9        A.   It's continuous training.
10       Q.   You used the word continuous.  Can you
11   explain what that means?
12       A.   Yes.  I train with the dog weekly.
13       Q.   You use the same dog all the time?
14       A.   Yes, ma'am.
15       Q.   What kind of training have you had starting
16   with the academy?
17       A.   I've had nine years of training.  I mean, a
18   ton of training.  Can you be more specific?
19       Q.   I can.  You mentioned five positions.
20   Would it be safe to say that you had training for
21   each of those positions during the year that you were
22   in those positions?  Did you have training every year
23   or no?
24       A.   It depends.  We have annual training at
25   LMPD that cover various topics.  So I've -- yes, part

1  of that is I have received training every year.

2      Q.   Have you received training every year on

3  traffic stops?

4      A.   I do not recall if I've received training

5  every year.

6      Q.   Do you recall receiving training every year

7  on traffic stops as a narcotics detective?

8      A.   I have only been a narcotics detective for

9  approximately one year.  I don't believe I've

10  received traffic stop training in the last year.  I

11  would have to reference training records for that.

12     Q.   How long were you in violent crimes?

13     A.   I'm trying to think of the exact dates.

14  Off the top of my head I would say four years.

15     Q.   So from 2016 to 2020?

16     A.   I was -- I would say that that is very

17  accurate, give or take a few months on the possible

18  longer end.  Possibly four and a half years.  But I

19  would have to look at training records for that.

20     Q.   During that four years were you a member of

21  the Ninth Mobile unit?

22     A.   Yes, ma'am.

23     Q.   How many of those four years roughly?

24     A.   That is the Violent Crime Unit that I am

25  referring to.  So it would be that span.

1      Q.   So everybody in the Ninth Mobile unit is in

2  the Violent Crimes Unit?

3      A.   I refer to the Violent Crime Unit because

4  that is what it is referred to often.  To my

5  knowledge, there is no other Violent Crime Unit other

6  than Ninth Mobile through that time frame, from '16

7  to '20.  Does that answer your question?

8      Q.   Yes.

9      A.   Okay.

10      Q.   Did you get chosen to go to Ninth Mobile?

11      A.   I applied and was given the position.  So,

12  yes, I was chosen through an interview process.

13      Q.   Who did those interviews, do you recall?

14      A.   At the time it was Major Kevin Thompson.  I

15  know that he was in the interview.  Lieutenant

16  William Hibbs was the lieutenant at the time.  He was

17  in the interview.  There was a sergeant at the time,

18  but I do not remember exactly.  I believe it was

19  Sergeant Price, Wayne Price, but I'm not exactly sure

20  on the sergeant.

21      Q.   So after you went through that interview

22  process and after you were given the position, what

23  kind of training did they give you for Ninth Mobile?

24      A.   Can you be more specific?  Are you asking

25  if there was certain training for Ninth Mobile?

1       Q.   Let me ask you this way:  Did you commence

2   -- or I'll retract that question.  Let me ask this.

3       A.   Uh-huh.

4       Q.   Did you come into Ninth Mobile with a group

5   of people or just people came in one by one?

6       A.   So when I interviewed, several people were

7   selected to go to Ninth Mobile.  I believe four

8   people were selected, roughly.  At least I know for

9   sure three, maybe more.  Maybe four.

10       Q.   And did they take you-all through a

11   training process, three or four of you together, so

12   you could learn more about Ninth Mobile?

13       A.   No.  We did not receive any training.  I

14   think the question that you're asking, the three or

15   four of us that accepted the position came to Ninth

16   Mobile, did we receive training together about Ninth

17   Mobile?

18       Q.   (Nods head).

19       A.   No, not to my knowledge.

20       Q.   Did they give you a packet or assign you

21   each to a unit?  How did you start your work in the

22   Ninth Mobile?

23       A.   You kind of cut out on the first part.  You

24   asked if they gave us a packet?

25       Q.   Yes.  Any training materials, any packets,

1  anything to explain what Ninth Mobile is.

2      A.  There's a -- a policy in LMPD's standard

3  operating procedures that states the mission

4  statement of Ninth Mobile.  I was aware of that.  I'm

5  sure it was probably given to us.  I don't -- I don't

6  know if it was or not.  I knew that prior to the

7  interview.  So does that answer -- does that answer

8  your question?

9      Q.  I want to be more specific.

10     A.  Okay.

11     Q.  It seems like as a lawyer if I go from

12  doing one kind of work to another kind of work, I

13  will do a training about the new work I'm doing.  If

14  it's at the prosecutor's office moving from one unit

15  to another unit, sit with somebody, you watch what

16  they do, you learn the process.  And I was wondering

17  if they provided that for new members of Ninth

18  Mobile.

19     A.  Not that I recall.  But I wouldn't -- I

20  wouldn't have had any dealing with coming up with

21  that training or organizing that training.  I don't

22  recall getting that training.  But I can't tell you a

23  hundred percent that I didn't.  Once again, I'd

24  probably need to look at a training record to jog my

25  memory and say, oh, in 2016 you were -- you took this

1    class and this class and it was directly related to

2    what you would be doing.  Maybe -- I don't recall

3    that, but maybe it did happen.

4         Q.  How did you start your work as a new

5    recruit to Ninth Mobile?  How did you get assigned?

6         A.  I was told where to go to, to what squad to

7    work, what time to work.  I think that probably

8    answers your question.

9         Q.  Do you know how many squads there were?

10        A.  It was almost ever changing.  Five, I would

11   guess.  There was a fugitive unit and then several

12   just I would say street squad units that covered off

13   days, weekends, just enough to where there was

14   coverage throughout the week.  I think that there

15   were four street squads and a fugitive unit.

16        Q.  In 2016 -- and make sure I'm getting that

17   date right.  In 2016 you were assigned to a squad, is

18   that correct?

19        A.  I would think so, yes, ma'am.  I don't

20   remember exactly, but I was on a squad in Ninth

21   Mobile in 2016.

22        Q.  Do you remember if you knew anybody when

23   you started with that squad on the squad already?

24        A.  Yes.  Yeah.

25        Q.  Would it be safe to say that you knew

1   everybody on the squad at that point before you

2   started?

3        A.   I don't think I knew everyone on my squad.

4   And the squad I believe had five, maybe five people,

5   six people, something like that.  I met Detective

6   Donnie Shrout, who worked in Ninth Mobile at that

7   time, and I did not know him before that.

8        Q.   So our case at hand, the date of the

9   traffic stop was August 9th, 2018.  Do you

10  specifically remember this traffic stop?

11       A.   I do remember it.  I haven't spent much

12  time thinking about this stop.  It's been close to

13  three years.  I reviewed my body camera in

14  preparation for this to try and be prepared as

15  possible.  And I am familiar with the stop, yes.  But

16  it's almost three years old, is what I'm getting at.

17       Q.   Do you know how many stops you've made with

18  your squad during that time for the Ninth Mobile

19  unit?  Would you have numbers for that?

20       A.   I have no idea.

21       Q.   Do they share the data with you-all about

22  the number of stops you make in a week, a month or a

23  year?

24       A.   I have never heard -- first of all, I don't

25  know who "they" is.  But I've never heard, like,

```
 1   statistics about how many stops you've made.  But I'm
 2   not sure who you're referring to.
 3        Q.   Supervisors for LMPD for you and Ninth
 4   Mobile.
 5        A.   No.
 6        Q.   Who would have been considered the
 7   supervisor of your squad in August of 2018?
 8        A.   And that's when the traffic stop occurred,
 9   correct, 2018, August?
10        Q.   Correct.
11        A.   I believe it was Sergeant William Keeling.
12        Q.   And I want to make sure I'm using the
13   proper LMPD terminology.  As your supervisor of that
14   unit, what was his rank?
15        A.   Sergeant.
16        Q.   And you're considered detective at that
17   time?
18        A.   Yes, ma'am.
19        Q.   Okay.  Can you tell me, when you would
20   start a shift with your squad in August, did you-all
21   -- tell me how that would unfold at the time of your
22   shift in a day.  What did you-all do first, second
23   and third?
24        A.   Very rarely were days the same.  Some
25   people start working before work on their
```

1    investigations.  Some people go straight to the

2    office; some people don't.  We would oftentimes

3    attempt to have a formal roll call.  Sometimes that

4    would happen; sometimes it wouldn't.  We would try to

5    respond to any violent crime that would -- that may

6    occur on the way in to work or as work -- as our

7    shift was beginning.  So oftentimes, say we started

8    at 4 o'clock.  I might not see my sergeant or other

9    detectives until 5 or 6 o'clock if there's a shooting

10   or something that I responded to on the way in to

11   work.  Does that make sense?

12        Q.   Yes.  How do you find out what you're going

13   to do when your shift starts?

14        A.   So oftentimes we will be working at the

15   time -- thinking back, this is 2018 that we're

16   referring to, or are we referring to 2016 to 2020?

17        Q.   Did it change a lot between 2016 and 2020?

18        A.   What I asked -- or the reason I asked that

19   is, like I said, very rarely were days the same.  We

20   have a common goal in mind of preventing violent

21   crime and responding to shootings.  That was a daily

22   routine.  There were shootings through that time

23   sphere -- that time span we're talking, shootings

24   daily.  So you never know what's going to happen.

25   Then there would be times where people were working

1   investigations and cases that would -- you would

2   start working that at the beginning of shift.  And

3   then there would be times where maybe nothing has

4   happened.  Does that help with your question?

5       Q.  Concerning the four years, you're saying

6   that things changed and it might be different from

7   day-to-day.  But I guess my question is, did Sergeant

8   Keeling have a specific, you're doing X, Y or Z when

9   your shift starts, and then you get calls?  Was there

10  a written or understood protocol about what you-all

11  were supposed to do at the start of your shift that

12  he wanted?

13      A.  You keep referring to the -- you keep

14  referring to the start of the shift.  Like I'm

15  saying, we tried to have a formal roll call.

16  Sometimes it happened; sometimes it didn't.  We were

17  given statistics of where violent crime is maybe

18  occurring this week or where it occurred yesterday,

19  where we may be able to predict where it may occur

20  today or tomorrow.  And I think that's maybe what

21  you're asking me.  Did Sergeant Keeling say, X, Y and

22  Z at the beginning?  That was attempted, but you

23  never know if there's going to be a shooting that

24  happens.  And I can't emphasize that enough because

25  oftentimes we would be trying to have a roll call and

1    then have to run out of the office because there was

2    a shooting in Park Hill right next to our office and

3    people were calling for backup, and we had to assist

4    because we were so close.

5         Q.   Did you cover all the shootings in the

6    Jefferson County/Louisville Metro area as a unit?

7         A.   When I was working, if there was a shooting

8    anywhere in the city, we attempted to make it to it,

9    yes, ma'am.

10        Q.   Do you recall the names of the other

11   members of your squad in 2018 August?

12        A.   I'm just trying to think because there was

13   so much movement, and I've worked with so many people

14   through those, say, four years.  At that time I was

15   assigned, I believe, under Sergeant Keeling with

16   Detective McNeil, Detective Hellard.  I'm not sure if

17   Detective Crawford was on my squad or not.  I think

18   he was, but I'm not sure.  Detective Vidourek.  Maybe

19   Detective (Inaudible).  I'm not --

20             THE REPORTER:  Detective who?

21             THE WITNESS:  With all these -- what's

22   that?

23             MS. BUCKNER:  You're breaking up.

24             THE REPORTER:  You said detective

25   somebody, and I didn't hear who that was.

1          THE WITNESS:  The last one?

2          THE REPORTER:  Yes.

3          THE WITNESS:  Detective Doerr.

4          THE REPORTER:  Thank you.

5     A.   I think it's D-O-E-R-R.  I worked with him.

6  I'm not sure if it was at that time or not.

7     Q.   You used the term, there was so much

8  movement.  Do you know why there's so much movement?

9     A.   I do not.

10    Q.   When people would enter or leave a squad,

11 did you-all have any sort of meeting to discuss how

12 you handle the stops that you were working on or the

13 response to violent crimes that you were working on?

14    A.   Could you -- could you answer that question

15 again -- or, I'm sorry.  Could you ask that question

16 again?  When people would leave a squad?

17    Q.   Or somebody coming into your squad.  You

18 have a sergeant and one, two, three, four, five, six

19 or seven.  All detectives?  Is everybody a detective?

20 Or it's a mix of detectives and officers?

21    A.   Yeah.  Part of your question you asked, I

22 just thought of this, why -- why so many people --

23 why there's so much movement.  Throughout that time,

24 2016 to '20, LMPD would what they would call TY,

25 temporary assign officers with Ninth Mobile.  And

1    that's some of the reason there was movement.

2        So that question that you just asked, was

3    everyone a detective, all of those individuals that I

4    named were detectives.  But oftentimes we would have

5    people kind of do like a ridealong type, like, hey,

6    come -- come work with us for a couple weeks for

7    manpower issues or whatever it may be.  And

8    oftentimes there would be officers from, say, the

9    Sixth Division or the First Division that would come

10   ride with us.

11       Does that make sense and probably answer part

12   of your other question?

13       Q.  It does.  All very helpful.

14       It seems with having a job that's so important

15   and that's of such a serious nature that it would be

16   important for you guys to gather, discuss a plan and

17   implement that plan.  How -- I understand that you

18   have had training throughout the years up to that

19   point and beyond.  But how do you get together as a

20   group or a squad to know what the plan is for the

21   day, the week, the month?

22       A.  Like I told you, we attempt to have a -- we

23   attempt to have a roll call, a formal roll call.

24   That stuff is discussed there as far as shootings,

25   where they're happening, where violent crime is

1    occurring and what areas we need to be in to

2    hopefully be in a position to prevent violent crime.

3         Q.   As a group did you ever have a STOPS

4    training or a STOPS, S-T-O-P-S, meeting?

5         A.   I don't -- I don't recall.  Are you asking

6    at a roll call did we have a STOPS training?

7         Q.   (Nods head).

8         A.   We'd have to check training records.  I'm

9    not sure.

10        Q.   Do you recall with squad five, did you ever

11   stop and have a group discussion about how to handle

12   traffic stops?

13        A.   What is squad five?

14        Q.   I'm sorry.  Your squad, Sergeant Keeling,

15   McNeil, Hellard, Crawford, Vittmer and Doerr, did

16   you-all sit down and have a discussion -- and I'm

17   calling it a training; maybe it was less formal --

18   about traffic stops?

19        A.   I can't say that we did or didn't.  I don't

20   -- I'm not sure.  I don't know.  Yeah.

21        Q.   Okay.  Did you-all take a minute on any of

22   these days to just talk generally about the SOPs, to

23   make sure everybody was on the same page, knowing

24   their SOPs, the standard operating procedures?

25        A.   Again, that's probably -- that would be

1    talked about at roll call.  I can't tell you a

2    specific time, if it happened or not.  You know,

3    we're talking a five-year span, and we're referencing

4    back over a year ago.  I'm not sure.  I can't tell

5    you, yes, on this day we talked about a policy.  I

6    just can't tell you that.

7         Q.  I'm sure you can't tell me a day.  But it

8    just seems like I could tell you, I mean, the first

9    job I ever had was DPA, and every year we had DPA

10   training in Lexington or Louisville.  It rotated back

11   and forth.  And we would go through two days, if not

12   three days of everything that we needed.

13         Was there -- I would think you-all would have

14   some opportunity to discuss your jobs and what you do

15   to do those jobs, which to me is called a training.

16   You may call it something else.

17         A.  Is that a question?  Question there?

18         Q.  Yes.

19         A.  What's the question?

20         Q.  How do you describe your training?

21         A.  Continuously.  We -- I just went through

22   our mandated training last week, and we had a legal

23   update.

24         Q.  Okay.  Do you recall having a STOPS

25   training in 2018 at all?

1      A.   Having a Stops training in 2018.  And what

2  do you mean by a STOPS training?

3      Q.   Your strategic training.  That doesn't ring

4  a bell -- that doesn't ring a bell to you at all?

5      A.   If it's on my training record, yeah, I had

6  it.  I don't -- maybe we're just referring to some

7  STOPS training.  That sounds like something I had in

8  the academy.  I believe there's several weeks of

9  STOPS training, but I haven't heard it referred to

10  that way.  I don't ever remember hearing it referred

11  to that way, STOPS training in 2018.  If you have

12  some training saying I had it, I'm sure I had it.  I

13  just -- I'm sorry.  I can't tell you.

14      Q.   I think I'm assuming a lot.  My

15  understanding of the Ninth Mobile unit is that -- and

16  as you explained, you were looking for violent crime,

17  it was a Violent Crimes Unit.  Was part of your job

18  to stop vehicles and see if you could recover drugs

19  or guns?

20      A.   We made traffic stops and recovered a ton

21  of drugs and guns, yes.

22      Q.   And that was more than 50 percent of your

23  job?

24      A.   I -- there's no way I could put a number on

25  that.  Our job when -- I would say 100 percent of the

1   time is attempting to stop violent crime.

2          Q.   Other than stops, what would you do to stop

3   violent crime?

4          A.   Other than -- when you say stops, are you

5   saying --

6          Q.   Traffic stops.

7          A.   Other than traffic stops?  Yeah, we would

8   be visible in areas and neighborhoods.  We would

9   respond to any act of violent crime that happened

10  when we were working that we could, whether it was a

11  business robbery, a street robbery, a car jacking, a

12  shooting, a burglary.  We would do long-term

13  investigations, search warrants, build informants as

14  much as possible to keep in -- I'll say the term keep

15  an ear to the ground to get information on any

16  violent offenders that may be committing violent

17  crime, trying to keep tabs on violent offenders in

18  neighborhoods, especially that -- known violent

19  offenders that are released from prison that -- that

20  may be more likely to commit violent crime again.

21  Those are just some of the techniques.  I think that

22  was the first part of your question, what else did we

23  do besides stops.  Was that the question, ma'am?  I

24  think --

25         Q.   That was a fine answer.  Thank you.

1        A.    Okay.

2        Q.    Did you have training or a discussion with

3   your Sergeant Keeling about pat-downs?

4        A.    Did I have training with Sergeant Keeling

5   about pat-downs?

6        Q.    Uh-huh.

7        A.    Not directly, not that I recall.

8        Q.    How did you learn how to do a pat-down?

9        A.    In the police academy.

10       Q.    Which is also where you learned how to do a

11  traffic stop?

12       A.    Yes.

13       Q.    Okay.

14       A.    And that is the only time that I'm -- I'm

15  sitting here trying to think and answer a question,

16  STOPS training.  The only time I can remember

17  referencing that is the police academy.

18       Q.    And is there a training or how did you

19  learn how to get people out of a vehicle?

20       A.    In that STOPS training from what I recall.

21       Q.    And did -- is that when you also learned

22  when and how to use the K-9?

23       A.    I just called it STOPS training.  And I

24  think that that's what it's called because you keep

25  referring to it as that, but I'm not sure that they

1    call that in the academy, just to be clear.

2        Q.   Okay.  I'm not using stops as a trick

3    question or anything.  I --

4        A.   Yeah, and I'm not -- I want to be on the

5    same page with you with that, but I just have not

6    heard it referred to that in a long time, if that's

7    what it's referred to as.

8        Q.   How long was your academy?

9        A.   Hello.  Are you there?

10       Q.   How long was your academy?

11       A.   Roughly six months.  I started it in June,

12   and -- and I graduated the end of November around

13   Thanksgiving.

14       Q.   It sounds like you-all learned all of these

15   techniques at the academy.  And then you used them at

16   -- on patrol.  And then would you call it a promotion

17   to get to Violent Crimes, and used those techniques

18   there?  Is that a promotion to Violent Crimes?

19       A.   It's a -- there's no pay increase.  You

20   could call it a lateral position.  It has a fancier

21   name as detective instead of officer, but there's no

22   pay increase.  Call it a promotion if you'd like.

23       Q.   For the time you left the academy to the

24   time that you are an narcotics detective, did your

25   approach to these techniques change over time?

1        A.   I'm not sure.  We're kind of always

2   adapting.  But the staple of the traffic stop, the

3   technique, was that the question, did your technique

4   change?

5        Q.   To pat-downs, frisks, traffic stops, the

6   techniques, did that change for you over time after

7   you got out of the academy, your approach to those,

8   did that change over time?

9        A.   No, I don't believe so, no.

10       Q.   At the academy did you have the opportunity

11  to study the law on traffic stops, Fourth Amendment,

12  searches and seizures?

13       A.   Oh, yes.  Yes, we did.

14       Q.   And you mentioned that you more recently

15  had a training on legal?

16       A.   Every year, like you referred to your first

17  job you would do updates.  Yes, we have mandated

18  training.  I'm sure you're familiar with it.  We do a

19  block of mandated training is the legal update.  And

20  I just had that last week is what I was referring to.

21       Q.   Did you ever discuss the law in your squad

22  with Sergeant Keeling and the others?

23       A.   Say that -- you keep --

24       Q.   Did you ever discuss the law as it pertains

25  to searches and seizures with Sergeant Keeling and

1  the others?

2          A.   I'm sure that we did talk about legal

3  updates, and -- and I'm sure just refreshing people

4  with maybe who had questions.   I'm sure we did.

5          Q.   Did your squad, from your observation,

6  request vehicle occupants to exit on all stops?

7          A.   No.

8          Q.   How did you decide when to ask someone to

9  exit at a stop?

10         A.   That's a case-by-case basis.   I can't

11 broadly answer that.

12         Q.   Is there -- before you get to case-by-case

13 basis, is there a procedure that they wanted you to

14 follow in a general scenario of a traffic stop?

15         A.   Are you referring to the traffic stops?

16         Q.   Correct.

17         A.   So I guess I'd probably need you to ask

18 that question again, but you're asking if there's a

19 policy on traffic stops that's to be followed.   I

20 think that that's your question.

21         Q.   What's the answer to that question?

22         A.   Let's just ask the question again so we're

23 on the same page.

24         Q.   From your observations, did your squad

25 request occupants of vehicles to exit the vehicle on

```
 1    all traffic stops?
 2         A.   That's not the question I'm referring to.
 3    I already answered that one.  No.  You asked a
 4    question after that about a policy.
 5         Q.   Are you going to -- I'm asking -- you said
 6    that you used the case-by-case basis, and we
 7    understand that different things happen, different
 8    things apply.
 9         A.   Uh-huh.
10         Q.   But this goes back to my training
11    questions.  It would seem that in the academy as
12    these years are ticking by that you're an officer,
13    that you would learn, this is how Louisville Metro
14    Police does a traffic stop, and get occupants out of
15    a vehicle.  What did they tell you to do, is the
16    question?
17         A.   How did they tell us to get people out of a
18    vehicle?
19         Q.   During a traffic stop.
20         A.   So case-by-case basis, what --
21         Q.   What are the options?  You stop a person.
22    I'm going to use your word, there are techniques that
23    you need to use to survey the scene and make
24    determinations.  What were those?  Give us some
25    examples of those.
```

1       A.   You said use my words.  I don't know what

2  you're referring to.

3       Q.   Techniques.

4       A.   Yes.  When did I say that?

5       Q.   When we were trying to still get narrowed

6  down on ways in which you-all learn how to do your

7  jobs as officers ca keep Louisville Metro safe, you

8  were talking about seeing what was going on in a

9  situation, looking out for known violent criminals.

10 And I didn't write them all down, but, like, the

11 techniques that you use.  I'm trying to use your

12 words so I can better ask the questions.

13      A.   Okay.  So you're kind of confusing me.  So

14 ask me the question again, please.

15      Q.   How do you learn how to do a traffic stop?

16      A.   In the academy.

17      Q.   How?  What do they tell you to do?

18      A.   If you see a traffic infraction that's

19 enforceable by Kentucky state law, initiate your

20 lights and sirens and pull the vehicle over if the

21 vehicle will stop.

22      Q.   Then what are your choices of what to do?

23      A.   Are you asking me, to approach the vehicle,

24 is that what you're --

25      Q.   (Nods head).

1        A.   Okay.  So I would approach the vehicle.  I

2   would introduce myself as, hi, I'm Detective McCauley

3   with LMPD.  The reason that I initiated this traffic

4   stop is, say you ran a red light.  I'm just using

5   that to try and answer your question.  You follow me

6   so far?

7        Q.   Uh-huh.

8        A.   Okay.  Is there a reason that you ran the

9   red light?  And then I would wait for you to respond

10   saying yes or no.

11        Q.   Okay.  So in that scenario what would lead

12   you to remove someone from a vehicle?

13        A.   There could be several things.  That's --

14        Q.   Such as?

15        A.   Probable cause.  You want me -- are you

16   wanting me to just keep going?  I'm not sure here.

17   You said --

18        Q.   So you gave the scenario.

19        A.   Yes.

20        Q.   Asked, do you know you ran the stop sign.

21   Okay.  Now you're -- this is one of the cases in a

22   case-by-case basis.  What kinds of things are you

23   looking for or what kinds of things would trigger you

24   at this point, somebody says, oh, I ran the light,

25   officer.  Great.  How are you trained if you see

1    something going on with this scenario to remove

2    someone from the vehicle?

3        A.   So you're asking me if I was going to

4    remove someone for a vehicle -- from a vehicle, why?

5    Is that what you're saying?

6        Q.   Yeah.  What kinds of things would you see

7    to do that?

8        A.   Me personally, you're asking me that?

9        Q.   Yes.

10       A.   So if there was probable cause to arrest

11   someone, I was going to place someone under arrest, I

12   would remove them from the vehicle.  If there was a

13   visible threat, like if I needed to remove someone

14   because of a visible threat, I would do that.  If

15   there was a wanted person, say I recognized you as

16   having an active warrant, I could remove you from the

17   vehicle.  Is this answering your question?

18       Q.   You're doing great.

19       A.   Oh, thank you.  Those are several reasons

20   why I would remove someone from a vehicle.

21       Q.   For the Ninth Mobile unit, was there a

22   policy to have persons stopped by the Ninth Mobile

23   unit on a regular traffic stop, to remove them from

24   the vehicle?

25       A.   You just asked me if the Ninth Mobile

1 policy to remove people on a traffic stop?

2          Q.   Correct.

3          A.   No.  I'm kind of confused, but no.  There's

4 no policy to remove people because it's a traffic

5 stop.  That's how I interpret what you asked.

6          Q.   As a Ninth Mobile officer were you

7 instructed to do pat-downs on every stop?

8          A.   No.

9          Q.   Did you do sniffs on every stop?

10          A.   I believe you're referring to a K-9 sniff.

11          Q.   (Nods head).

12          A.   No.  I was not instructed to do anything on

13 every one stop by anything in Ninth Mobile, if that's

14 going to help with your -- seems like your series of

15 questions.

16          Q.   What was the mission of the Ninth Mobile

17 unit?

18          A.   To prevent violent crime, identify,

19 apprehend known violent offenders, address gang

20 violence if you come across it.

21          Q.   How did traffic stops help with reduction

22 of violent crime?

23          A.   People put guns, illegal guns in cars every

24 day.  People commit drive-by shootings in Louisville

25 every day.  Being visible, making traffic stops, I

1  know from experience from having people that I have

2  arrested tell me that, we pay attention when we see

3  unmarked vehicles in a neighborhood making traffic

4  stops.

5       I've heard on jail phone calls through

6  investigations of someone that I had arrested the day

7  before.  So picture this:  I arrest someone for

8  whatever it may be.  To further my investigation, the

9  next day or the day after, I may listen to jail phone

10  calls made by that individual to further my case.

11  I've heard on recorded jail calls individuals making

12  calls the night that they were arrested saying, hey,

13  don't be doing anything.  Ninth Mobile was in the

14  neighborhood tonight.  They are referring to whoever

15  they're calling not to do anything because Ninth

16  Mobile is in the area.

17       To me I interpret that as, I arrested someone

18  on a traffic stop.  I heard that person's words say

19  not to do anything because Ninth Mobile is here.  To

20  me that is preventing violent crime.  From what I

21  just heard on that call tells me that the traffic

22  stop that I made most likely prevented something

23  violent from happening.

24       That was a lot that I just said.  I don't know

25  if you kind of got that.

1     Q.   And you described techniques and procedures

2   that you and the other people in your division kind

3   of talked about and worked on and learned how to use

4   over the course of your years as a police officer?

5     A.   I don't know if I -- you just said a lot.

6   Was that in reference to what I just told you?

7     Q.   Uh-huh.

8     A.   Just from experience I know that I have

9   had.  You asked how traffic stops reduced violent

10  crime.  I just gave an exact example in my opinion.

11    Q.   It sounds like a strategy that you would

12  use to further your mission?

13    A.   You're saying strategy.  I just told you

14  how I know a traffic stop prevented violent crime.

15  That's what I'm saying.

16    Q.   Did you fill out stops forms for every

17  vehicle stop that you had in Ninth Mobile?

18    A.   No.

19    Q.   How did you decide when to fill out and

20  when not to fill out?

21    A.   I never decided when to fill them out or

22  when not to.

23    Q.   Who decides that?

24    A.   By policy you're supposed to do it.  When I

25  was on the -- a beat officer, I would do electronic

```
1   citations.  Like, if I arrest someone and write a
2   citation, the computer would automatically do the
3   stops form.  When I got to Ninth Mobile, I didn't
4   have a computer in my car.  I had to hand write
5   citations.  It's something that just got lost
6   somewhere along the way.  I didn't think to do it.
7        When I was working, we would go, go, go from
8   shooting to whatever, to assisting the homicide unit
9   looking for something.  I would work long hours, not
10  getting off till 3 o'clock in the morning sometimes.
11  Getting up for court at 7:00, 8:00 A.M.  I just
12  didn't think to do it.
13       To answer your question, no one told me not to,
14  I didn't choose not to.  I just simply didn't think
15  to do it.
16       Q.  Did you ever review the data that was
17  collected from stops forms, when able, collected by
18  the Ninth Mobile unit?  Were you ever able to review
19  that data?
20       A.  I don't know what data you're referring to
21  with stops forms.  We reviewed a lot of statistical
22  data as far as violent crime occurring.  But I don't
23  know what you're talking about with stops forms data.
24       Q.  Like, when you had the opportunity to fill
25  out one of these forms, maybe one in five times, one
```

1  in ten times, some days maybe a hundred out of a

2  hundred times that you got to do it, and as did the

3  other people on your unit, did you-all take a beat to

4  review what you -- what information was on the stops

5  forms?

6         A.   No, I never -- I never reviewed data on a

7  stops form.  I think that answers your question.  No,

8  I didn't.

9         Q.   Do you know what data is on a stops form,

10 what questions?

11        A.   I mean, yeah.

12        Q.   Can you tell me what's on a stops form?

13        A.   Yeah.  Date, time of location of incident,

14 where -- date, time, location; arrest, no arrest;

15 evidence seized; race of driver; age of driver;

16 gender of driver.  I believe there's some for

17 passenger as well.

18        Q.   Did you fill out the stops form on this

19 Tae-Ahn Lea stop?

20        A.   No.  Was not there when the stop was made,

21 as you know.

22        Q.   Unofficially did you and the Ninth Mobile

23 unit know how many stops you were making each day?

24        A.   I already know the answer to that is no.

25 But why did you say unofficially?

1        Q.   Because I didn't want you to get hung up on

2    a number.  I just didn't know if you-all discussed,

3    we had ten stops average.  We have 20 stops, stop for

4    a cold drink.  We've done five stops already.  We'll

5    probably have 15 more?

6        A.   Oh, no, no.  That was never talked about.

7    That was not a thing to do so many stops and spend --

8        Q.   No, not a plan to do stops.  But, like, I

9    know I may have ten phone calls in a day at work.

10    Did you know or, you know, have an expectation of how

11    many stops you might have in a day?

12        A.   No, not at all.

13        Q.   All right.  On August 9th, 2018, the day of

14    this stop, what area were you assigned to?

15        A.   So that day I can't remember that exact

16    roll call that we may have talked about where we need

17    to be working, but through reviewing my body camera,

18    I know that we were in the Algonquin neighborhood,

19    like the 18th Street corridor.  But I don't remember

20    -- other than reviewing this body camera, I don't

21    remember nothing from that day.  You could tell me I

22    wrote a search warrant and executed it on a house,

23    and I would not remember.  You could say I arrested

24    four people that day.  You could say I went home

25    throwing up.  I would not remember.  You say I

1  stepped in dog poop.  I'm not going to remember that

2  day other than this stop.

3       Q.   How did you get to the Algonquin

4  neighborhood?

5       A.   Through reviewing my body camera and my PSU

6  statement, I know that I was getting gas at

7  Thornton's.  Our office is almost in the Algonquin

8  neighborhood at Seventh and Industry.  So I would

9  have came out on Seventh Street and went to

10  Thornton's, assuming there was nothing else going on

11  that I don't remember that day.  I would have gotten

12  gas.  And then to get to the Algonquin neighborhood,

13  I would have drove west on Algonquin Avenue most

14  likely.  If that answers your question.

15       Q.   On this day did you -- are you saying that

16  you were at the Thornton's, the same Thornton's that

17  Tae-Ahn was at?

18       A.   Yes.  Through my PSU investigation,

19  reviewing that, I got gas at Thornton's.  I was asked

20  that question.  I got gas at Thornton's that day.

21       Q.   Did you see him at the Thornton's?

22       A.   Not that I recall.  To my knowledge, I had

23  never seen or had any interaction with Mr. Lea until

24  that traffic stop.

25       Q.   When you left the Thornton's, where were

 1   you headed?

 2         A.   That's what I just said.  I would have --

 3   from what I would recall I would have went west on

 4   Algonquin.

 5         Q.   What did you do next on this day?  Headed

 6   west and?

 7         A.   I don't -- like I said, I don't remember

 8   this day other than the traffic stop.  I'm assuming I

 9   went from the gas station to the stop giving, like,

10   the geographical location of where the two are.

11   They're very, very close.

12         Q.   From reviewing your body camera, when you

13   got to the scene, what did you see?

14         A.   A car and Detective Crawford and Hellard

15   and Mr. Lea.

16         Q.   Where were each of those people in the

17   relation to Mr. Lea's car?

18         A.   I would have to review the camera.  I don't

19   remember exactly.  They're outside of the vehicle,

20   but I don't know where they were.

21         Q.   What did you do next after you saw those

22   parties outside the vehicle?

23         A.   And I'm solely relying on my body camera

24   for this.  I don't remember if I tied my shoe as I

25   got out of the car or any of that.  I walked up to

1  Detective Crawford.  And I believe he said, "Hey,

2  will you do an exterior sniff of the vehicle."  I

3  believe that's what it is.

4      Q.  Did you do that sniff?

5      A.  My dog did that sniff.

6      Q.  How did you execute that?

7      A.  I gave the K-9 the command to sniff.

8      Q.  And what did the K-9 reveal?

9      A.  The K-9 gave a positive alert on the

10  vehicle.  I believe that's what you're asking, what

11  did the K-9 reveal.

12      Q.  Okay.  From your review how long were you

13  at the car before the K-9 alerted?

14      A.  It was the dog's first, I'll say, like, lap

15  around the vehicle.  It would have been -- how long

16  -- what was your question?  How long was I at the

17  scene or how long was the dog doing the sniff?

18  I'm --

19      Q.  Let's do dog doing -- how long was the dog

20  doing the sniff before it indicated?

21      A.  So the dog started the sniff at the front

22  driver's side headlight if you're looking at a

23  vehicle.  And the dog walked down the driver's side

24  of the vehicle towards the trunk, around the trunk to

25  the passenger side front door.  However long it takes

1    a dog to walk that distance is how long it took.

2         Your screen keeps freezing.  Does mine?

3         Q.   Yours does, but I feel like I'm getting the

4    rest of the answer.

5         A.   Okay.  I was -- I haven't said anything

6    else, but...

7         Q.   What does the dog do to indicate?

8         A.   So my dog sit, just picture a dog sitting.

9         Q.   Okay.  And when it sits, how do you know

10   what it found?

11        A.   I don't know what it found when it sits.

12        Q.   Okay.

13        A.   There could be several things that my dog

14   is trained to indicate on.  And I'll just go ahead

15   and answer those, because I'm sure it will be a

16   question:  Marijuana, cocaine, methamphetamine and

17   heroin.  It's not like the dog lays down for heroin

18   and sits for marijuana.  That's what I'm trying to --

19   to establish there when you said, what do you -- I

20   think your question was, how do you know what she

21   found.

22        Q.   Yes.

23        A.   Did I answer that correctly for you?

24        Q.   Yes.  I have a follow-up question.  Does

25   she indicate for money?

1       A.   Does she indicate for money?

2       Q.   (Nods head).

3       A.   No.

4       Q.   Now, I've got to go back just a little bit.

5  At this point in time you've been using a K-9 for

6  your position for how long?

7       A.   I'm not sure.  I'd have to look.  I would

8  think a couple months, given the stop was in August

9  of '18, and I believe I started the K-9 position in

10 May of '18.  A couple months.

11      Q.   Okay.  How long was your training to use a

12 K-9?

13      A.   So that's kind of like a double question.

14 Like, the initial training when I first get the dog,

15 I want to say it's like -- like 160 hours.  But the

16 reason I say it's like a double question is we

17 continue that training constantly.  And that's what I

18 -- what I stated earlier, is we're constantly

19 training with the dogs.

20      Q.   Did you have the same dog from the time you

21 started to the time of this stop?

22      A.   Yes, ma'am.

23      Q.   Okay.  And you -- I just want to make sure

24 I understand.  When the dog sits and indicates, you

25 don't know what it's -- what she's indicating for?

1       A.   She's indicating to the smell of a

2  narcotic, but I don't know specifically.  I think

3  that's what you're asking me.

4       Q.   That is what I'm asking.  And then how

5  reliable are the indications?

6       A.   Extremely reliable.

7       Q.   Can you explain extremely reliable to a

8  person who doesn't know anything about K-9 dogs and

9  the officers?

10      A.   Well, explain -- can you explain to me for

11 asking the question, what does reliable mean to you?

12      Q.   I'm going to say the dog indicates and

13 there's actually those four or five items in a car.

14      A.   Yeah.  All -- I mean, it's extremely

15 reliable.  I'm trying to explain to you.  I can't put

16 a, you know, a number on it and you say, hold me

17 accountable for saying 99 times out of 103.  But all

18 the time.  I mean, all the time.  When she indicates,

19 we have drugs in hand or an individual -- here's an

20 example for you.  I can think of a time where she

21 indicated and we didn't find drugs in hand like you

22 asked.  And when I had put the -- put the dog up, I

23 was speaking with the individual that was driving the

24 car and the individual was kind of laughing about it

25 and said, "That's a really good dog you have there."

1    And I said, "Yeah, I know she is.  But why do you say

2    that?"  And he said, "I had a pound of weed sitting

3    in the car yesterday, but it hadn't been in there

4    since yesterday and your dog smelled it."  That's a

5    time we didn't have drugs in hand but she was

6    reliable.  Does that make sense?

7         Q.    It would seem in this day and age, 2021,

8    that you-all would -- that K-9 officers,

9    detectives...

10         A.    You froze.

11         Q.    ... are for, you know --

12         A.    Can you start over?

13             THE REPORTER:  Josephine.

14             MS. RIVERA:  Josephine, you froze halfway

15    through that question.

16             THE REPORTER:  And I think you're frozen

17    again.  There you go.

18         Q.    So for a person who is an officer with a

19    K-9, it would seem in this day and age that we have

20    to have data for everything that we do, that you

21    would be taught or shown the reliability of a dog,

22    your dog, all the dogs in the department.

23         Were there -- did they offer percentages for

24    you-all to understand how good the dogs were?

25         A.    I see the dog every day work, and I see the

1  reliability every day.  Those numbers are available

2  I'm sure.  We -- we track our searches.  We track our

3  training.  I just can't calculate that number for you

4  sitting here right now.

5      But I'll tell you this for reliability:  In

6  2019 I went to the K-9 Olympics with my dog and two

7  other dogs with LMPD.  There were over 50 teams from

8  around the world.  And our team Ripley won first

9  place at the K-9 Olympics.  So we're talking about

10  reliability, we beat over 50 teams from around the

11  world in narcotics detection.  That's why I say very

12  reliable.

13      To tell you an exact -- I think you wanted me

14  to put a percentage on it and I'm sure that data can

15  come at some point.  I just don't have it right here,

16  but I'm telling you she's extremely reliable.  And I

17  hope that answers your question.  First place is

18  pretty good.

19      Q.  Do you fill out a K-9 report when you use a

20  dog?

21      A.  When I -- when the dog does a sniff, I

22  think that's what you're asking, is there a report

23  that is generated?

24      Q.  (Nods head).

25      A.  Yes.  Someone just rang my front doorbell.

1  One second.

2       Q.   I thought it was.

3       A.   Can I pause this for -- I answered that

4  question.  There's someone at my front door.  Can I

5  pause this?

6       Q.   Yes.

7       A.   Yes, I fill a report out.  Stand by.

8            VIDEOGRAPHER:  The time is 2:25.  We now

9  leave the video record.

10           (RECESS)

11           VIDEOGRAPHER:  The time is 2:28.  We now

12  return to the video record.

13           MS. BUCKNER:  We were at K-9 reports.  Can

14  you identify your reasonable suspicion for the use of

15  this K-9?

16       A.   There doesn't need to be reasonable

17  suspicion for an exterior sniff.

18       Q.   Did they tell you why they had pulled over

19  Tae-Ahn Lea's vehicle?

20       A.   Not that I recall.

21       Q.   So how do they ask you to do the sniff or

22  take the dog to do the sniff?

23       A.   Yeah.  This would be a case-by-case basis.

24  On this I don't recall.  I watched my body camera,

25  and when my body camera starts, I'm getting Ripley

1   out of the vehicle.  I don't recall.  If he said,

2   hey, do a sniff; hey, this is the reason why.  I want

3   you to know this; look for this.  I don't know.

4       Q.   And you don't have to write that on the K-9

5   report, or did you not have time to do a report this

6   time?

7       A.   Oh, no, I did the report.  And what do you

8   mean I didn't have time to write?  What are you

9   referring to?

10      Q.   The stop reports that you don't always have

11  time to do I was just --

12      A.   Oh, okay.  Yes.  Okay.  No.  So those are

13  two different things.  I'm not sure if we're on the

14  same page now.

15      Q.   Okay.  Tell me what's the difference.

16      A.   The stops form for the vehicle, that's what

17  you're talking about.  A K-9 sniff is a completely

18  different form.

19      Q.   What's on the K-9 form?

20      A.   Location, date, time, who I am, who the dog

21  is and what we did, and if anything was found, if you

22  seized anything, that would be on the form.

23      Q.   Would you ever say no if an officer asked

24  you to do a sniff?

25      A.   Oh, for sure, I would have if I -- if there

```
 1    was a reason to, if my dog was sick, if it wasn't
 2    safe.  Like, I do not like doing sniffs on the
 3    interstate, and I've told people, no, I'm not going
 4    to get out on the interstate with my dog because I
 5    don't think it's safe.
 6            Q.   Anything about a stop that would --
 7            A.   Can you -- your first part cut out.
 8            Q.   Are there any kinds of stops that you won't
 9    do a dog sniff on?
10            A.   What do you mean, are there any specific
11    stops?
12            Q.   Yeah.  If there's any traffic infractions
13    or running red lights, anything like that where
14    you're, like, I won't do a sniff on that?
15            A.   It doesn't matter.  That has no -- I'm not
16    there to judge that.  I'm a support system.  Does
17    that make sense?  Like, I'm not even there when the
18    stop is made.  But it's a -- I want to say it's a
19    case-by-case basis, but I can't ever remember asking
20    someone why -- I'm not going to do this because I
21    wasn't here.  Like, I don't understand really.  I
22    think I understand what you're asking.  I just --
23    I've never been in that position, I don't think.
24    Does that make sense?
25            Q.   Uh-huh.  If something might be too low
```

1    level for a sniff.

2         A.   That's why I have the tool, is to apply the

3    tool.  There's -- I don't understand what you're

4    asking with that, too low level of a sniff.

5         Q.   What are you referring to as a tool?

6         A.   The dog.

7         Q.   Okay.  That's what I thought.

8          When you watched your video, do you recall the

9    comments made about social media?

10        A.   I don't know the comment verbatim, but,

11   yes, about a vehicle -- or not a vehicle.  A video

12   being put on social media that's not true, that's not

13   -- that I don't agree with as lies being made, false

14   statements being made.

15        Q.   Why would you say that in this instance?

16        A.   Because the mother that I spoke with was

17   saying that I had said things that I did not say and

18   was putting them on social media.  That is not true.

19        Q.   Do you remember what you're referring to?

20        A.   Yes.  The statement that the mother said

21   that I -- that I said -- let me think about this for

22   a second because I watched the video.

23        Q.   Okay.

24        A.   Yes.  The mother said, "You could run

25   across the street too fast and you would say it's

1    violent."  She said I would make up a traffic

2    infraction.  That's not true.  I never said that.  I

3    would not do that.  And she's saying that on social

4    media, and it's not true.  That's what I'm referring

5    to.  There were several.

6         Q.  Go on.  What are -- what's another example

7    of that?

8         A.  "You said you took him out of the car

9    because you're doing violent trafficking."  I never

10   said that.  She said that I said that.

11        Q.  Did you make reference to video and the

12   Internet and the word disease?

13        A.  Yes, I did.

14        Q.  What did you mean by that?

15        A.  So, like, a disease goes unchecked and just

16   spreads, like say I have cancer and I don't know I

17   have cancer.  It's spreading throughout my body and I

18   don't know that I have it.  You follow me so far?

19        Q.  Okay.

20        A.  False statements like saying I said he's

21   doing violent trafficking and that's why he was taken

22   out of the car, I never said that.  That's false.

23   It's getting spread across the Internet and people

24   don't know, that listen to that, they don't know that

25   I didn't say that.  So it's unknowingly spreading.

1    That's what I meant by that.

2         Q.   Why would you think she would put a traffic

3    stop of her son online?

4         A.   Why do I think she would do that?

5         Q.   Why did you at the time think that was the

6    outcome?

7         A.   Because I could plainly see that's what she

8    was doing.

9         Q.   What did you see her doing?

10        A.   Filming it and talking on Facebook Live.

11        Q.   In the K-9 unit or -- I'm calling it the

12   wrong thing.  With your use of a K-9 in the mobile

13   unit, were you ever a person who initiated the

14   traffic stop?

15        A.   Have I ever initiated a traffic stop while

16   I have a K-9?

17        Q.   Uh-huh.

18        A.   I'm sure that I have.  I'm -- if I thought

19   hard enough, I'm sure I could, like, remember one.

20   But, yes, I have.

21        Q.   Do you agree that if you follow a vehicle

22   long enough, you'll likely see a traffic infraction?

23        A.   It would be a case-by-case basis.  I can't

24   answer that.  I've never thought of it that way.

25        Q.   Can you tell me what a pretextual traffic

1  stop is?

2      A.   Actual definition, I would have to

3  reference an encyclopedia or something.

4      Q.   Could you explain to me what a pretextual

5  stop is?

6      A.   So the way that I understand, without

7  reviewing any material and not prepared for that, a

8  pretextual stop would be thinking that you're looking

9  for something in a vehicle before you stop it.  And I

10 used a vehicle because I know that's what we're

11 talking about.

12     Q.   Did you receive training on pretextual

13 stops?

14     A.   Not that I can remember.  Maybe that's in

15 -- if there -- if I have, I would guess it's in that

16 STOPS training that you've referred to.  But not that

17 I recall.

18     Q.   It seems that would be a good tool in your

19 violent crime, you know, prevention -- seems like

20 that would be a good tool in what you were doing as

21 an officer in the Ninth Mobile unit at the time.

22     A.   Is that a question?

23     Q.   Yes.

24     A.   You said it seemed like it would be a good

25 tool.

1        Q.   Would that be a tool that you could use in

2    your division?

3        A.   Or could it be a tool?

4        Q.   Yes.

5        A.   I'm sure it could.  Anything could be a

6    tool.  What do you think the definition?  Could you

7    enlighten me on a pretextual stop?

8        Q.   I've never had a training on it.

9        A.   Ah.

10        Q.   When are pretextual stops permitted?

11        A.   I haven't had training on it, either, that

12    I can refer to, so I couldn't answer that.

13        Q.   Were the majority of stops in your squad

14    pretextual stops?

15        A.   I'm not even sure I understand the

16    definition of a pretextual stop, so I can't answer

17    that.

18        Q.   Using your definition.

19        A.   Say the question again.

20        Q.   Using your definition.

21        A.   What is the question?

22        Q.   Were the majority of stops in your squad

23    pretextual stops according to your definition?

24        A.   No.  Not in my opinion.

25        Q.   Okay.  I'm going to go back to your dog.

1       A.   Okay.

2       Q.   If the dog was wrong, like in this stop,

3  how are you confident in the dog's ability to

4  accurately identify the presence of narcotics in the

5  next stop?

6       A.   That was a long question.  The first part,

7  I don't know if you can break the question down, but

8  the first part you said if the dog was wrong like it

9  was in this stop, was that -- was that the first --

10      Q.   Do you agree that the dog was wrong in this

11  stop?

12      A.   I do not agree that the dog was wrong.

13      Q.   Okay.  So I'll take that out.  So if a dog

14  is wrong on a stop, not the one we're here for, if a

15  dog is wrong on a stop, how are you confident in its

16  ability on the next stop?

17      A.   I never explored that.  I know my dog is

18  extremely reliable.  And the dog and I, we can't

19  obviously verbally speak.  So the dog only knows to

20  sit for those four odors that we spoke of earlier.

21      Q.   If your dog is -- I couldn't hear the end

22  of your question -- or end of your statement.

23      A.   Okay.  I don't think that I've been in that

24  situation.  I trust my dog.  I know she's an

25  extremely reliable dog like we spoke to earlier.

1    When she sits, I fully believe that she is sitting

2    because she smelled one of those four odors or all of

3    those odors that we spoke to earlier, the marijuana,

4    the methamphetamine, the cocaine, the heroin.  I've

5    never been in that position where I don't trust the

6    dog.

7         Q.   Even if you don't -- even if those items

8    are not found in a car?

9         A.   Like I spoke to earlier, the vehicle, we're

10   talking about a car, just because those items aren't

11   specifically found or in our hands, that doesn't mean

12   that the dog is wrong.  I've received training --

13   we've talked a lot about training.  This hasn't been

14   brought up.

15        I have taken a training course.  It's called

16   Desert Snow.  It's kind of a weird name, Desert Snow.

17   But what it is, is it's a week training course

18   completely geared towards finding hides in vehicles.

19   And what I mean by that is say smugglers, picture,

20   like, someone smuggling drugs or people across the

21   border from Mexico to United States and picture your

22   vehicle that you have, whatever, say it's a Ford

23   Taurus, we receive training on hides that people make

24   in those -- in a Ford Taurus to where they can turn

25   the radio up full blast, turn the air condition on

1    high and then hit the horn, and the seat will fold

2    open and there will be 10 kilos of cocaine sitting in

3    there.  I took a class that taught all of that and

4    showed us real life hides that have been seized.  And

5    before that training I had no idea of any of that.

6           And at that training they show us how dogs will

7    indicate, say, on the dashboard.  And then I try and

8    take the car apart to look and I don't find anything,

9    okay?  Well, then the person putting the class on

10   shows a way to manipulate, say, the dashboard and

11   take it off and there's ten pounds of marijuana

12   sitting right there under a quarter inch of plastic

13   that we just couldn't find.

14           Does that make sense?  You follow me with that

15   training?

16           Q.   Yes.

17           A.   Yes.  So when -- just because I don't find

18   it does not mean that the dog is wrong, okay?  And

19   like I referenced earlier, when an individual on a

20   stop told me, "Man, that's a good dog you got there."

21   And I asked, "Why do you say that?"  "Because I had a

22   pound of weed sitting in the car yesterday."  Because

23   we don't find it does not mean that the dog is wrong.

24   I have also -- hunh?

25           Q.   I have another dog question.

1        A.   Okay.  I wasn't done.  Can I continue?

2        Q.   Oh, sure.

3        A.   Yeah.  So there was recently a study that

4   was sent to me that a K-9 organization put on -- I

5   like your Monster -- that a K-9 organization had put

6   on, and what they did was they studied odor that was

7   staying in vehicles.  How long does odor stay in the

8   seat of a vehicle, just use that as an example,

9   because they do, they cut out part of a cloth of a

10  vehicle and they put drug odor on it.  Well, the dogs

11  were finding this drug odor long after the drugs had

12  been removed at upwards of 90 percent reliability

13  days after it had been removed.  The dog was not

14  wrong.  But no drugs were found in hand.  Does that

15  make sense?

16       Q.   Yeah.

17       A.   Thank you.

18       Q.   I have another question.  If a sniff is

19  done and nothing is detected, where do you report

20  that?

21       A.   Into our -- I fill that exact same report

22  out that I told you about and I enter it into a

23  system.

24       Q.   What what's that system?

25       A.   SharePoint.

1   Q.   Is that a -- an LMPD database?

2   A.   I am not a computer person.

3   Q.   Okay.  Okay.

4   A.   Definitely a database, but...

5   Q.   Okay.  Answer this if you know the answer.

6  If we pull forms from 2018, what percentage would you

7  estimate...

8        THE REPORTER:  Josephine, you're frozen.

9   Q.   If we pull forms for 2018, what percentage

10  would you estimate that the dog did not indicate?

11   A.   You want me to answer that if possible?  Is

12  that what you --

13   Q.   If you can.

14   A.   I can't answer that.  I have no idea.

15   Q.   Can I use the term hot spots for violent

16  crime?

17   A.   Oh, you absolutely can if you want.

18   Q.   I found it.  Okay.  So my question is:

19  What percentage -- let me ask it again.

20   A.   Uh-oh.  Okay.

21   Q.   What would the percentage be where a dog

22  did not indicate for stops you made in hot spots?

23   A.   I have no idea.  I'm not a percentage

24  person.  And you're -- just to be clear here, we're

25  talking, like, almost a three-year span of me having

1    my dog.  To ask me what I ate for lunch yesterday,

2    I'm going to have to think about it.  Yeah.  It's --

3    that's just a lot of data that there's no way I could

4    give you an accurate answer, and I wouldn't just

5    guess.

6         Q.  Can you tell me if it's more than

7    50 percent or less than 50 percent?

8         A.  I can't give you a percentage number on

9    that.

10         MS. BUCKNER:  Would you-all mind if we

11   took a quick break?

12         THE WITNESS:  Yeah, I'm fine.

13   Ms. Buckner --

14         VIDEOGRAPHER:  The time is 2:48.  We now

15   leave the video record.

16         (RECESS)

17         VIDEOGRAPHER:  The time is 3:02.  We now

18   return to the video record.

19         MS. BUCKNER:  Thank you.  Fair to say, you

20   don't know if Crawford had reasonable suspicion to

21   perform a pat-down or frisk?

22         A.  I was not there.

23         Q.  That's what I thought.

24          After review of this body camera, what made

25   this traffic stop different from other traffic stops?

1         A.   What body camera?  Are you --

2         Q.   Your body camera that you reviewed.

3         A.   My body camera?  What made it different

4  from other traffic stops?

5         Q.   (Nods head).

6         A.   All stops are different.  They're not the

7  same, so it was just a stop.

8         Q.   Was Tae-Ahn pulled over because he was a

9  young black male driving a nice vehicle in the hot

10  spot?

11         A.   I was not there for the stop.

12         Q.   Was Tae-Ahn frisked because he was a young

13  black male pulled over in a hot spot?

14          MS. RIVERA:  Objection to form.

15          MS. BUCKNER:  Can he answer?

16          MS. RIVERA:  Yes, he can answer.  But to

17  the best of his knowledge.

18         A.   Like I previously stated, I was not present

19  for the stop.

20         Q.   Was Tae-Ahn frisked because he was a young

21  black male pulled over in a hot spot?

22          MS. RIVERA:  Objection to form.  Go ahead.

23         A.   I was not present for the stop.

24         Q.   You'd agree that your dog's error in

25  indicating that there were narcotics in the vehicle

1  contributed to Tae-Ahn being handcuffed?

2          MS. RIVERA:  Objection to form.  Go ahead

3  and answer.

4      A.  Can you say the question again, please.

5      Q.  Would you agree that your dog's error in

6  indicating that there were narcotics in the vehicle

7  contributed to Tae-Ahn being handcuffed?

8      A.  I would not agree.  My dog did not make an

9  error.

10     Q.  Would you agree that your dog's indication

11  contributed to Tae-Ahn being handcuffed?

12     A.  I did not handcuff Tae-Ahn.  I couldn't

13  answer that.

14     Q.  Were you counseled over your dog's false

15  indication over this?

16     A.  My dog did not falsely indicate.  I was not

17  counseled for something that did not happen.

18     Q.  Have you ever been counseled on your dog's

19  false indication?

20     A.  My dog did not falsely indicate.  I have

21  not been canceled -- counseled on something that has

22  not happened.

23     Q.  Did you try to determine why your dog got

24  it wrong?

25     A.  Once again, my dog did not get it wrong.

1   And I did not try to determine something that did not

2   happen.

3        Q.   Did you try to determine if your dog got it

4   wrong?

5        A.   I'm confident that my dog was not wrong.

6        Q.   Does it concern you that your dog

7   indicating, we think getting it wrong, you saying

8   he's a hundred percent right, does it concern you

9   that that indication resulted in a man pulled over

10  for a wide turn, being handcuffed for several

11  minutes?  Does that concern you at all?

12           MS. RIVERA:  Objection to form.  But he

13  can answer.

14       A.   My dog's indication has nothing to do with

15  that.

16       Q.   Does it concern you that situations like

17  this could result in a young black teen developing

18  negative views of the police?

19           MS. RIVERA:  Objection to form.  He can

20  answer.

21       A.   I didn't hear the first part of your

22  question, but I don't want anyone to have negative

23  views towards the police.

24       Q.   Does it concern you that stops like this

25  could result in that?

1      A.   Yeah, I don't want anyone to have negative

2   views towards the police.

3      Q.   Does it concern you that a person being

4   involved in a traffic stop like this would become

5   scared of the police?

6      A.   I don't --

7           MS. RIVERA:   Objection.  Oh, sorry.

8   Objection to form.  He can go ahead and answer.

9      A.   Yeah, I don't want anyone to be scared of

10  the police.

11     Q.   Does it concern you that situations like

12  this make people question the intentions of the

13  police?

14          MS. RIVERA:   Objection to form.  But he

15  can go ahead and answer.

16     A.   What is "situations like this?"  What are

17  you -- what is "this?"

18     Q.   Tae-Ahn Lea's traffic stop.

19     A.   And the question is?

20     Q.   Does it concern you that a traffic stop

21  like Tae-Ahn's could make a young black male question

22  the intentions of the police?

23     A.   I don't want anyone -- any individual to

24  question -- say it again.  I'm just having a hard

25  time remembering what you're saying.  It's like a

1    longer question.

2        Q.   Does it concern you that situations like

3    Tae-Ahn Lea's traffic stop would cause a young black

4    male to question the intentions of the police?

5        A.   Yeah, I don't want anyone to question the

6    intentions being wrong.  It's just a weird question

7    the way it's worded in my opinion.  It's hard to --

8    it's like a tricky question.

9        Q.   Does it concern you that situations like

10   Tae-Ahn Lea's traffic stop would leave a young black

11   male feeling he was targeted by the police?  Does

12   that concern you, is the question?

13       A.   Yeah, I don't want anyone to feel that

14   they're targeted by the police.

15       Q.   Having reviewed your body cam, would you

16   want your child to be treated the way Tae-Ahn Lea was

17   treated by the police?

18            MS. RIVERA:  Objection to form.  Go ahead

19   and answer.

20       A.   It's -- the age of my children are in no

21   way related to Tae-Ahn Lea.  So that question is not

22   even answerable.

23       Q.   Would you want your wife to be treated the

24   way Tae-Ahn Lea was treated by the police?

25            MS. RIVERA:  Objection to form.  But go

1    ahead and answer.

2         A.   Would I want my wife to be treated the way

3    Tae-Ahn Lea was treated by the police, by watching my

4    body camera?

5         Q.   Correct.

6         A.   That's the question?

7         Q.   Correct.

8         A.   My wife, she would -- nothing was

9    disrespected by Tae-Ahn or to Tae-Ahn Lea.  It has

10   nothing to do with my wife.

11        Q.   If you were pulled over for an improper

12   turn, would you expect to be pulled out of your car?

13        A.   If I was pulled over for an improper turn,

14   would I be pulled out of my car?

15        Q.   Would you expect to be pulled out of your

16   car?

17        A.   If the officer asked me to, I would get out

18   of my car.

19        Q.   If you were pulled over for an improper

20   turn, would you expect to be patted down?

21        A.   If I was -- if the officer asked to pat me

22   down, I would oblige.

23        Q.   If you were pulled over for an improper

24   turn, would you expect to be frisked?

25        A.   If the officer asked to frisk me, I

1   wouldn't have a problem with it.

2        Q.   If you were pulled over for an improper

3   turn, would you expect your vehicle to be sniffed by

4   a narcotics dog?

5        A.   I wouldn't have a problem with it, yeah.

6        Q.   Would you expect to be handcuffed if you

7   were pulled over for an improper turn?

8        A.   If I was pulled over for an improper turn,

9   would I expect to be handcuffed?  If there was a

10  reason to handcuff me, I wouldn't have -- yeah.

11  That's fine.

12       Q.   If your wife's vehicle got a false

13  indication and she was handcuffed, would that upset

14  you?

15       A.   Say it again.  If my wife's vehicle had

16  what?

17       Q.   A false indication and she was --

18       A.   Of what?

19       Q.   -- handcuffed?

20       A.   A false indication?

21       Q.   By a drug dog.

22       A.   If my wife's vehicle got a false indication

23  from a drug dog, would I be upset?

24       Q.   And she was handcuffed, would that upset

25  you?

1    A.   If my wife was handcuffed because she was

2    driving her vehicle and a false indication occurred,

3    is that your question?

4    Q.   Yeah.  She's pulled over.  A dog sniffs her

5    car.  She's put in handcuffs.  Would that scenario

6    upset you?

7    A.   That's a hypothetical situation there.  I

8    can't really answer that.  I...

9    Q.   If a hypothetical situation like this

10   occurred with your wife, hypothetically would you

11   file a complaint against the officers who pulled her

12   over?

13   A.   I can't answer that.  It hasn't happened.

14   I don't know what I would do.

15   Q.   In the sequence of a traffic stop for a

16   traffic violation, were you trained to run a license,

17   registration and CourtNet before doing a dog sniff?

18   A.   I don't think that training related to

19   that.  You're kind of crossing fields with -- with

20   the dog sniff and running information.  Does that

21   make sense?

22   Q.   I could not hear any part of your answer

23   per the Internet.

24   A.   Okay.  Ask the question again, please.

25   Q.   When in the sequence of a traffic stop for

1    a traffic violation, were you trained to run a

2    license, a registration and CourtNet before doing a

3    dog sniff?

4         A.   I think that that would -- you're not -- I

5    didn't receive training.  Those two fields are two

6    separate fields that there's no -- there's no

7    established training for those to be paralleled

8    together.  Does that make sense?

9         Q.   What are you saying are the two different?

10        A.   So a dog handler handles the dog.  Someone

11   that does the traffic stop and the CourtNet that

12   you're referring to, they're -- they're not trained

13   on dog handling.  So I don't think that there's any

14   established, like, hierarchy of training for when you

15   call for the dog.  I don't think that that is

16   established anywhere.  So I can't -- it's not that

17   I'm not trying to answer that.  I don't think that

18   that is a thing.

19        Q.   So if I said as the dog trainer, were you

20   trained to run license, registration and CourtNet

21   before a dog sniff, that's a no, as the dog trainer?

22        A.   Yeah.

23        Q.   Handler.

24        A.   I'm not a dog -- dog trainer.

25        Q.   Handler.

1      A.  Yeah, as a handler, I just handle the dog.

2   I don't -- do I know how to do those things, yes,

3   absolutely.  But that's not my responsibility.  My

4   responsibility is the dog, to do that.

5      Q.  Do you ask if that's been done before you

6   take the dog to do the sniff?

7      A.  You're breaking up a little bit.  Can you

8   say it again?

9      Q.  Do you ask if that has been done, license,

10  registration and CourtNet, do you ask the other

11  officers before you do your sniff?

12     A.  That would be a case-by-case basis.  I'm

13  not concerned with their administrative work.  I am

14  concerned with observing my dog and being responsible

15  for the dog and the safety of the dog.

16     Q.  Would you agree that there is an importance

17  in running that information before a sniff?

18     A.  Would I agree that there's an importance of

19  running that information before the sniff?

20     Q.  Right.

21     A.  I don't -- I wouldn't agree that it --

22  before the sniff, that's -- I think that that's

23  neither here nor there, if it's done before the sniff

24  or during the sniff or...

25     Q.  It could help you identify whether the

1    person has a record for drugs, couldn't it?

2         A.   Are you asking me a question if running

3    their history?

4         Q.   (Nods head).

5         A.   Yes.  Like, so, if I run your history, I'll

6    know if you have a history of drugs, yes, that is

7    true.

8         Q.   You would know if a person had a history of

9    felonies by running that information?

10        A.   In -- in Kentucky you -- yes, you would

11   know a history.  And that goes for the previous

12   question, too, like the drug history.  Through

13   CourtNet it wouldn't show you what happened in

14   Indiana or what happened in Florida.  It would just

15   show you Kentucky.  But, yes, if you run their

16   history, you would have an idea of their criminal

17   history in Kentucky, whether it's felony, misdemeanor

18   violation.

19        Q.   It could also lower your concerns over the

20   safety of the stop if you had some of that

21   information?

22        A.   Are you -- is that a question?

23        Q.   Yes.

24        A.   What's the question?

25        Q.   Could it give you -- having run those

1    documents and taking a look, seeing what was -- what

2    a person's history in Kentucky might be like, could

3    help you with the concern over the safety of a stop;

4    you would better know who you were pulling over as

5    far as Kentucky is concerned?

6         A.   You may look at it that way, someone may

7    look at it that way.  But all these traffic stops are

8    different, and you don't know what someone's state of

9    mind is in any given day.  You don't know someone's

10   mental state.  So looking at someone's history, you

11   could have an idea of what has happened.  But that

12   doesn't mean that it's any safer on any traffic stop.

13        Q.   What is your understanding of why Crawford

14   called for a dog before pulling of that -- any of

15   that information?

16        A.   I have no idea about any of that.  I wasn't

17   there when the stop was made.  I don't know what

18   Crawford did before I got to the stop.  That's

19   nothing to do with me.  I have no knowledge of that.

20        Q.   At any time during the stop did you form a

21   belief that Tae-Ahn was armed?

22        A.   I wasn't concerned with Tae-Ahn the least

23   bit.  I was concerned with observing my dog and doing

24   as she did her function.

25        Q.   I asked that as a yes or no.  At any time

1  during the stop did you form a belief that Tae-Ahn

2  was armed?

3       A.  I don't think I can answer that yes or no.

4  For one, I don't remember -- I just remember through

5  watching my body camera observing the dog and doing

6  my aspect of that stop.  I never -- I can't answer

7  that yes or no.

8       Q.  This is going to be a yes or no.  At any

9  time during the stop did you form a belief that

10  Tae-Ahn was dangerous?

11       A.  Once again, that's -- that's not something

12  I can answer yes or no to.  I was not focused on

13  Mr. Lea.  I was focused on doing my part in that on

14  that traffic stop and that was with the dog.

15       Q.  At any time during the stop did you form a

16  belief that Tae-Ahn was a flight risk?

17       A.  Once again, I'm going to refer to my

18  previous two questions.  I was not -- I wasn't

19  looking at Tae-Ahn, I wasn't thinking about Tae-Ahn.

20  I was focused on my dog was doing that I am

21  responsible for.

22       Q.  At anytime did you express concerns to

23  Crawford or Hellard that a dog sniff would prolong

24  the stop?

25       A.  Did I -- say that again.  Did I ask

1    Crawford -- was I concerned that it would prolong the

2    stop?

3         Q.   That's the question.

4         A.   I didn't have any banter back and forth

5    about prolonging the stop with anyone.  And I do not

6    think that my actions with the dog prolonged the

7    stop.  I'm thinking I'm answering your question.

8         Q.   Is it part of your concern when you arrive

9    to do a sniff how long it would prolong a stop?

10        A.   I don't think that -- it's a case-by-case

11   basis.  But I do not believe that the sniff prolongs

12   the stop.

13        Q.   Have you ever been involved in a stop where

14   the sniff prolonged the stop?

15        A.   I do not believe so.

16        Q.   Okay.  Other than your dealings with

17   Tae-Ahn's mom, was the stop similar to other stops

18   you've engaged in at the time?

19        A.   That's a very broad question.  I'll need

20   you to be more specific.

21        Q.   Was this stop similar to other stops you

22   engaged at the time, taking out your interaction with

23   his mother?

24        A.   Was this stop similar?  It was daytime.  I

25   was working in Ninth Mobile.  A traffic stop was

1    done.  I used my K-9 and did an exterior sniff of the

2    vehicle.  So, yes, it would be similar.  I think that

3    answers your question.  You let me know if it

4    doesn't.

5           Q.  How did you feel about the changing of the

6    traffic stop policy?

7           A.  How did I feel about the changing of the

8    traffic stop policy?  Referring to what changes?

9           Q.  After August 9th of 2018 when this

10   happened, Chief Conrad made a change to the traffic

11   stop policy.  How did you feel about that change?

12          A.  My -- don't matter.  I have a job to do and

13   enforce the law and abide by our policies.

14          Q.  Who told you about the changes that Conrad

15   made to the policies?

16          A.  I'm trying to remember back.  I believe --

17   you know, this maybe would answer one of your

18   questions from earlier.  We've had so many.  I

19   believe that someone from the chief's office came to

20   our -- came to the Ninth Mobile office, I believe.

21          And you had asked me earlier about a STOPS

22   training.  And I wouldn't say that that's a STOPS

23   training, but I do believe that -- I'm trying to

24   think of his name.  I can picture his name.  He's no

25   longer -- he became a chief somewhere else, if I'm

1    remembering it correctly.  But I believe he came to

2    our office, and we had, like, a formal roll call and

3    he spoke about the policy.  I'll try and remember his

4    name.

5         Q.   Thank you.  Where is the Ninth Mobile unit

6    office?

7         A.   So the Ninth Mobile is no longer an

8    individual unit.  But it was at Seventh and Industry,

9    six -- I believe the actual address is 635 Industry.

10   It's the property room.  And it was on the second or

11   third floor.  You went up several flights of steps.

12        Q.   And when that person came to that office to

13   discuss the changes, do you recall about how long

14   that meeting was?

15        A.   No, I don't recall.

16        Q.   What was said at the meeting?

17        A.   That there was a traffic stop -- new

18   traffic stop policy.

19        Q.   What was new about it that you recall?

20        A.   There were several, I guess, elements of

21   the policy.  It was a new policy.  What is that guy's

22   name?  I think he's the chief in Baltimore or

23   something now.  You may know.  I'm serious, I don't

24   remember his name.

25        Q.   I don't, either, but if we need that later,

1  we'll get it.

2       A.   Yeah.

3       Q.   Were you-all given the opportunity to ask

4  questions about the new policy?

5       A.   Typically in a situation like that people

6  ask questions.  I don't recall.

7       Q.   Did you ask any questions that day?

8       A.   Not that I recall.  I don't even remember

9  what the day was.

10      Q.   Do you agree -- do you agree that all

11 people regardless of race, age, location or religious

12 beliefs are entitled to protections guaranteed by the

13 Fourth Amendment?

14      A.   Absolutely.

15      Q.   What are the protections that people are

16 guaranteed under the Fourth Amendment?

17      A.   Unlawful search and seizure.  That no one

18 should be searched or seized unlawfully.

19      Q.   As an officer assigned to fight violent

20 crime, how did you balance the need to identify

21 elements of violent crime on traffic stops versus a

22 person's constitutional protections under the Fourth

23 Amendment?

24      A.   It's a long question, but I think I can

25 answer it with, it's easy, as long as you abide by

1   the Fourth Amendment, you're not going to do anything

2   to violate it.

3        Q.   Did it ever concern you that pretextual

4   traffic stops would violate the Fourth Amendment?

5        A.   No, as long as you're abiding by the Fourth

6   Amendment, you're not going to do anything to violate

7   it.

8        Q.   Can you repeat your question?  I was

9   frozen.

10        A.   Oh, it wasn't a question.  It was a

11   statement.  I said, no, as long as you abide by the

12   Fourth Amendment, you're not going to violate it.

13   So, no, I didn't have a -- I had no concerns that I

14   would violate the Fourth Amendment.

15        Q.   I'm going to -- did it ever concern you

16   that pretextual traffic stops would violate Fourth

17   Amendment protections?

18        A.   I was never concerned with violating the

19   Fourth Amendment, never.

20        Q.   How would you decide who to pull over for a

21   pretextual traffic...

22            THE REPORTER:  Josephine, you're frozen.

23   You froze.  We didn't get the question.

24        Q.   How would you decide --

25            THE REPORTER:  You're froze.

1        A.    Uh-oh.

2             THE REPORTER:  We didn't get the question.

3        Q.    How would you decide who to pull over for

4    pretextual traffic stops?

5        A.    I didn't decide on pretextual.  I didn't do

6    any of that.  If I made a traffic stop, it was for a

7    traffic infraction that occurred in front of me or

8    that I knew through investigation that who I was

9    stopping, from everything that I remember.  That --

10   that has nothing to do with me and traffic stops.

11       Q.    Given your position in a Violent Crime

12   Unit, Ninth Mobile unit, would you follow a vehicle

13   to identify a traffic violation later in the ride in

14   order to pull them over and obtain more information?

15       A.    Can you -- can you ask that again, please?

16       Q.    In your Ninth Mobile unit, to prevent

17   violent crimes, would you follow a person in a

18   vehicle, identify a traffic violation in order to

19   pull them over to obtain more information?

20       A.    I think it's a case-by-case basis.  I can't

21   just say, yes/no.  There's just so many moving parts

22   to policing and to working with violent crime.

23       Q.    Why was a Violent Crime Unit driving the

24   streets pulling people over for traffic violations

25   and performing K-9 sniffs when the only known

1    infraction was a traffic violation in this instance?

2         A.   That's not a question -- I know you're

3    asking me that question.  All I did with this was do

4    the exterior sniff with my dog.  I can't answer other

5    parts of why a vehicle was stopped.  I wasn't there

6    for that.

7         Q.   Did you only do sniffs for the Ninth Mobile

8    unit?

9         A.   No.  You know, so I've had the dog for

10   close to three years, and we've done sniffs for

11   several agencies, federal agencies, you know, other

12   -- definitely other parts of Louisville Metro Police.

13   No, not just Ninth Mobile.  I think that was your

14   question?

15        Q.   Uh-huh.  From the time you started with

16   your dog -- from the time you started with your dog

17   in the Ninth Mobile to August 9th of 2018 -- hold on.

18   Let me find my question.

19        Okay.  From the time you started in the

20   narcotics division with the dog, did you only sniff

21   for Ninth Mobile during that time period?

22        A.   Are you --

23        Q.   From the time you started to this incident

24   date.

25        A.   I think I understand your question.  But

1    you worded it incorrectly.  You said from the time

2    you started in narcotics did you only sniff for Ninth

3    Mobile.

4         Q.   With the dog.

5         A.   Yeah, I think you meant to say from the

6    time you started -- from the time you were in Ninth

7    Mobile did you only sniff for Ninth Mobile.  Is that

8    what you meant?  Because you said this stop occurred

9    when I was in Ninth Mobile.  I'm currently in

10   narcotics.  But I didn't go to narcotics for almost

11   two years after this incident.  And your question you

12   asked was, when you were in narcotics did you only

13   sniff for Ninth Mobile, unless I heard it wrong.

14        Q.   Let me make sure I understand something.

15   The entire time you were in Ninth Mobile did you have

16   the dog?

17        A.   No, ma'am.

18        Q.   So from the time you were in Ninth Mobile

19   with a dog --

20        A.   Yes.

21        Q.   -- until August 9th, 2018 --

22        A.   Okay.

23        Q.   -- did you sniff for anybody else other

24   than Ninth Mobile --

25        A.   I would have to --

1       Q.   -- for that short period of time?

2       A.   Yeah, I would have to look at documents.  I

3  really have no idea.  It been so long and we've done

4  so many sniffs, I couldn't tell you.

5       Q.   Do you know if a stop like this was common

6  in the Highlands during this period?

7       A.   I'm not sure what "a stop like this" is, a

8  traffic stop.  Traffic stops happen in the Highlands

9  every day.

10      Q.   When I say "a stop like this", I'm talking

11  traffic violation, dog, handcuffs, getting out of a

12  vehicle, kind of an escalation or progression from a

13  traffic stop.  That's what -- that's the example I

14  want to use or the hypothetical I want to use.

15      A.   Okay.

16      Q.   So hypothetically is a stop like this or

17  was a stop like this common in the Highlands at the

18  time?

19      A.   I have no idea.  I would have to study

20  traffic stop statistics to answer that question

21  accurately.

22      Q.   Was a stop like this common in the east end

23  neighborhoods within LMPD's jurisdictions?

24      A.   I would just have to answer or answer that

25  with, I only know what I have done.  I don't know

1   what all of LMPD has -- that question just as a

2   hypothetical, it's almost impossible to accurately

3   answer, I feel like.

4       Q.   ... Ninth Mobile to perform pretextual

5   traffic stop...

6            THE REPORTER:  Josephine, you're frozen

7   and we didn't get the question.  We didn't get the

8   question.

9            MS. BUCKNER:  I can repeat my question if

10  you-all can hear me now.

11           THE REPORTER:  Yes.

12      A.   Yes, ma'am.

13      Q.   Was it more common for your squad to

14  perform pretextual traffic stops on male drivers over

15  female drivers?

16      A.   I don't think that our squad singled out

17  anyone.  Your question is male, female, pretextual

18  stops.  I don't think that that happened.  I can't

19  answer for a group.  I can only answer of what I have

20  done.

21      Q.   Was it more common for your squad to

22  perform pretextual traffic stops on young drivers

23  over senior citizen drivers?

24      A.   Once again, I can't answer what a group has

25  done.  I can answer what I have done.

1    Q.   Was it more common for your squad to

2  perform pretextual traffic stops on black drivers

3  over white drivers?

4    A.   Once, again, I can't answer what a squad

5  has done.  Can only answer for what I have done.

6    Q.   Is this something that the stops data would

7  hopefully indicate?

8    A.   I'm not sure what the stops data will

9  indicate.  And the word "hopefully" I'm not sure what

10  that is in there.  Why that's -- what are you hoping

11  for?

12    Q.   Hoping that the forms have identified the

13  race of the drivers, the age, the location and the

14  gender, like you said you-all write down.

15    A.   The form will say whatever the form says.

16  I'm not sure.  I can't answer that.

17    Q.   Was it ever expressed to you by command

18  staff that your squad's stops were disproportionately

19  made on black drivers?

20    A.   No.

21    Q.   Was it ever expressed to you by command

22  staff that your squad's stops were disproportionately

23  made on male drivers?

24    A.   No.  No one ever -- no one ever told me

25  that.

1    Q.   Tae-Ahn believes there's less of a chance

2  he would have been pat down had he been white with no

3  criminal record.  Do you agree?

4    A.   I do not agree.

5    Q.   Why not?

6    A.   Because if Tae-Ahn was patted down, and I

7  wasn't there for this, but if he was patted down,

8  there would have been a reason for it.  And I do not

9  believe that race would have had anything to do with

10  that.

11    Q.   Tae-Ahn believes there's less a chance he

12  would have been pat-down had he been white and in a

13  wealthy neighborhood.  Do you agree?

14    A.   That's what Tae-Ahn thinks.  I don't --

15  that's what he thinks.

16    Q.   Are you concerned that he would think that?

17    A.   I hate that he thinks that, but that's what

18  he thinks.

19    Q.   Tae-Ahn believes there's less of a chance

20  he would have had the vehicle sniffed had he been a

21  white senior citizen in a wealthy neighborhood.  Do

22  you agree?

23    A.   I don't know what Tae-Ahn thinks.  That's

24  his opinion.

25    Q.   Tae-Ahn believes there's less of a chance

1   he would have been handcuffed had he been white in a

2   wealthy neighborhood.  Do you agree or disagree?

3        A.   That's what Tae-Ahn believes.  I can't tell

4   you what he -- that's him.  It's his opinion.

5        Q.   Tae-Ahn believes there's less of a chance

6   he would have been pulled from the vehicle had he

7   been white in a wealthy neighborhood.  Do you agree

8   or disagree?

9        A.   That's what Tae-Ahn believes.

10       Q.   Were you aware that Tae-Ahn has nightmares

11  over this incident?

12       A.   I have no way of knowing what Tae-Ahn

13  dreams of, no idea.

14       Q.   If I let you know that that was occurring,

15  how does that make you feel?

16       A.   I hate that anyone would have nightmares

17  about experiences with police.  It's very

18  unfortunate.

19       Q.   Were you aware that Tae-Ahn has less trust

20  in police because of this incident?

21       A.   Was I aware of that?

22       Q.   (Nods head).

23       A.   No.

24       Q.   Now knowing this to be true or being told,

25  how does that make you feel?

1    A.    It's definitely unfortunate.  I don't want

2  anyone to mistrust the police.  It's -- ultimately

3  that has a reflection on me, and I hate that

4  obviously.  I don't want people to not trust me.

5  I've never officially met Mr. Lea, and he doesn't --

6  it sounds like he doesn't trust me.

7    Q.    If you had a do-over on this incident,

8  would you do anything differently?

9    A.    I did nothing wrong.  I did my job like I

10  was supposed to on this.  So I cannot say I would do

11  anything differently.  This being publicized the way

12  it has been and blasted all over the news and showing

13  my picture for doing my job has really affected my

14  family and I, and I definitely wish that that did not

15  happen.  But I did nothing that I was not trained or

16  supposed to do with this.  So I can't say that I

17  would -- I think you said redo it or not do it or

18  something like that.

19    Q.    What training did you receive in

20  racially-biased policing?

21    A.    That's kind of been something that we have

22  -- that mandated that I referred to earlier, how we

23  get a legal update.  Racially-biased policing has

24  been a topic that we receive training on several --

25  for years off and on.  Does that make sense?

1        Q.   Uh-huh.  Do you have to have a certain

2  number of hours in racially-biased policing or?

3        A.   Oh, I have no idea, like, a number of

4  hours, no.  It's something I'm sure that would be on

5  a training record and could be available.  I just

6  don't have it.

7        Q.   How are you confident that Tae-Ahn's race

8  did not play a role in the traffic stop?

9        A.   You kind of cut out.  I think the question

10  was, how are you confident his race didn't have a

11  role in the stop?

12        Q.   (Nods head).

13        A.   I'm confident in that because I've never

14  been a part of that.  I've never seen that happen for

15  any reason, race playing a role in it.

16        Q.   How are you confident in the belief you

17  formed that his mother would post the incident

18  online?

19        A.   How am I confident it was posted online?

20        Q.   No.  You had a belief that it would be.

21  How are you confident at the time that his mother

22  would post the incident online?

23        A.   It was actively being posted online.  I

24  don't remember if I -- if someone said, I'm recording

25  on Facebook Live or whatever it was.  But it was

1   established during the stop that it was on social

2   media.  That's how.

3          Q.   How are you confident that his mother would

4   lie about the incident?

5          A.   How am I confident his mother would lie

6   about the incident?

7          Q.   You made a statement that she would lie

8   about the incident.

9          A.   Because it happened to my face.  She was

10  saying that I had said things or that we had said

11  things that were untrue and that we would just make

12  up a reason to stop them or to do a traffic stop.

13  That was not true.  It was being said to my face.

14  That's how I know.

15         Q.   Did you have any other evidence that his

16  mother lied about the incident?

17         A.   Do I have other evidence his mother lied

18  about the -- the traffic stop?

19         Q.   Correct.

20         A.   No.  She was -- she was making false

21  statements to my face as we were conversating.

22  That's -- that's why I said she would lie about it.

23  Because she was lying to my face as it was being

24  recorded.

25         Q.   What division of Louisville Metro Police

1  did this incident occur in?

2      A.   Did you say what division?

3      Q.   (Nods head).

4      A.   It's the Second Division.  It's very close

5  to Shively -- the outside of LMPD/Shively.  I believe

6  the border is Algonquin.  And I wasn't there for the

7  traffic stop.  But through reviewing the body camera,

8  it's on 18th Street close to I believe Burwell.  And

9  that should fall in the Second Division.

10     Q.   Would it have been possible to call a beat

11  patrol officer to do that stop instead of Ninth

12  Mobile?

13     A.   It's a hypothetical question.  You know, I

14  wasn't there for the stop.  I don't have any idea

15  what was going on in that beat.  But anything is

16  possible.  You know, I wasn't a part of it.  So it's

17  tough to answer that.

18     Q.   Does anyone else in that division have a

19  K-9?

20     A.   In the Ninth Mobile division?

21     Q.   No.  In the Second Division, you said.

22     A.   Oh, where the -- where I believe the stop

23  occurred?

24     Q.   (Nods head).

25     A.   No one in the Second Division has a K-9

1  assigned to them.  I don't know if there was a K-9

2  from the K-9 division in that area.  I have no idea.

3  But no one in that division has one assigned to them.

4      Q.  During your time in the Ninth Mobile before

5  the traffic stop policies changed, would you call

6  patrol officers to complete traffic stops on some of

7  the minor traffic violations?

8      A.  I would not call -- I think you said a

9  division car to do a traffic stop.  I would not do

10  that.  And I don't know when the traffic stop policy

11  changed or went into effect.  But, no, I would not

12  call someone else to do a traffic stop for me if

13  that's what you're asking.

14      Q.  Why not?

15      A.  Because I am -- if I'm witnessing the stop,

16  I would enforce the state law like it's written.  I

17  wouldn't ask someone else to stop what they're doing

18  to come do something for me if that makes sense.

19      Q.  Okay.  Did anyone in the Ninth Mobile do

20  that, kind of get a stop underway and if it was a

21  minor traffic violation --

22      A.  I don't know what others in the Ninth

23  Mobile have done.  I just know what I've done.

24      Q.  Did you ever recommend to anyone within

25  Ninth Mobile that they change the way traffic stops

1    were used to reduce violent crime?

2            A.    Can you say that again?

3            Q.    Uh-huh.  Did you ever recommend to anyone

4    within Ninth Mobile that Ninth Mobile should change

5    the way traffic stops were used to reduce violent

6    crime?

7            A.    No, I don't recall recommending anything to

8    Ninth Mobile.

9            Q.    Did any command staff discuss with you that

10   the division would be changing the way traffic stops

11   would be used as violent crime prevention tools?

12           A.    Not that I recall.  Change the way traffic

13   stops are used for violent crime prevention?

14           Q.    Uh-huh.

15           A.    It's a very broad question.  Are you

16   referring to the policy or -- because I know we just

17   talked about the policy change.  I don't recall that.

18           Q.    You don't recall that point being discussed

19   when the person came to Industry to talk to you-all?

20           A.    Yeah, that's what I'm trying to correlate

21   here because, you know, we've talked a lot, like,

22   over a five-year span, and a lot of things have

23   changed.  The traffic stop policy, obviously made

24   changes to the policy.  And your question is, was it

25   discussed of how the stops would be different?  Is

1  that -- is that the question?

2       Q.   Let me repeat the question.

3       A.   Okay.

4       Q.   Did any command staff discuss with you the

5  division would be changing the way traffic stops

6  would be used as a violent crime prevention tool?

7       A.   I don't recall.  I'm not saying that it

8  happened.  I just don't recall.  As you can see, I'm

9  kind of confused on the -- answering the question.

10  But I just don't recall that.

11       Q.   Would it be fair to say that other than

12  perhaps executing search warrants, your street squad

13  spent more time doing traffic stops as a crime

14  reduction tool than any other crime reduction tactic?

15       A.   No, I wouldn't say so.  Surveillance,

16  watching and speaking with informants and

17  conversating with RTCC and doing investigative

18  research made up a very large portion of our -- of

19  what we did to combat violent crime.

20       Q.   What's RTCC?

21       A.   It's the Real Time Crime Center.  They are,

22  like, analysts.  They watch all the city cameras

23  throughout the city, like, all the cameras downtown

24  and maybe, like, on 26th and Broadway there are city

25  cameras.  They watch those, and they relay

1   information about, you know, stolen vehicles in the

2   area, shooting suspects, stuff like that.  So we

3   conversate a lot with them in an effort -- well, we

4   used to when it was Ninth Mobile.  Now I'm in

5   narcotics, so not as -- not so much now.  But

6   speaking throughout the past, we would utilize them

7   daily.

8           Q.  Are you familiar with People, Places and

9   Narcotics, the initiative, People, Places and

10  Narcotics?

11          A.  I really couldn't tell you.  I mean, I've

12  heard that.  I don't -- I'm not familiar with it.  I

13  couldn't tell you what it is.  Is it an organization,

14  People, Places, Narcotics?  Is there an acronym that

15  I maybe would know it better by?

16          Q.  I don't think so.  I think Chief Conrad

17  referred to it as People, Places and Narcotics.

18          A.  Okay.  If you could tell me some more about

19  it, maybe it would jog my memory.  But, I mean, I

20  can't tell you yes, no.

21          Q.  I was going to ask you, who were the

22  people?

23          A.  Oh, I have no idea.

24          Q.  What were the places?

25          A.  I have no idea.

1      Q.   What were the narcotics?

2      A.   What were the narcotics?

3      Q.   What narcotics were you looking for?

4      A.   I don't even know what that is, so...

5      Q.   What made you think Tae-Ahn Lea fit the

6   profile of a violent criminal?

7      A.   I never said I thought that.

8      Q.   What made you think prior to the sniff that

9   Tae-Ahn had narcotics in the vehicle?

10      A.   I never said I thought that.

11      Q.   Would you agree that one of your squad's

12   goals is to build trust between the police and the

13   community?

14      A.   Yes.

15      Q.   How did you and your team accomplish this

16   goal with this interaction with Mr. Lea?

17      A.   Obviously it is not a -- you've already

18   told me several times Mr. Lea does not trust the

19   police.  Obviously this is not a good example of how

20   that happened.

21      Q.   Assume the following:  There are black

22   teens with no criminal records who are pulled over by

23   police for traffic violations and then subjected to

24   being pulled from their vehicles, patted down after

25   repeatedly saying they are unarmed, frisked after

1  repeatedly saying they are unarmed and subjected to a

2  K-9 sniff of their vehicles.  How are these actions

3  by police supposed to enhance trust between these

4  black teens, their families that they tell about it,

5  their friends they tell about it and the public who

6  sees it with the police videos?

7           MS. RIVERA:  Objection to form.  That's

8  just a really compound question.  But he can answer

9  as best as he can.

10      A.  I didn't hear the beginning of the

11  question, like, the very first sentence.  So I can't

12  -- I don't -- I thought you said choose from the

13  following.

14      Q.  Assume.

15      A.  Say it again.

16      Q.  I'll read it again.

17      A.  Okay.

18      Q.  The word I'm using is assume.

19      A.  Oh, assume.

20      Q.  So assume the following:  There are black

21  teens with no criminal records who are pulled over by

22  police for traffic violations and then subjected to

23  being pulled from their vehicles, patted down repeat

24  -- patted down after repeatedly saying they are

25  unarmed, frisked after repeatedly saying they are

1    unarmed and subjected to a K-9 sniff of their

2    vehicles.  How are these actions by the police

3    supposed to enhance trust between these black teens,

4    their families they tell about it, their friends they

5    tell about it and the public who sees it?

6         A.   So you want me to answer that.  You're

7    assuming so much.  I can't assume how that would make

8    anyone feel.  There's just -- it's too much to -- to

9    just assume.

10        Q.   Have you ever considered the thought that

11   this type of policing causes a further divide between

12   the black community and the police?

13        A.   You're -- it's a very vague question, "this

14   type of policing."

15        Q.   Ninth Mobile unit.

16        A.   Violent crime prevention, is that -- still

17   very vague.  Trying to prevent violent crime, this is

18   how I'm interpreting your question.  Trying to --

19   have I ever assumed trying to prevent violent crime

20   causes a rift in the community?  I think that's --

21   was that the question?

22        Q.   No.

23        A.   Okay.

24        Q.   But do you think that what you said, that

25   that -- the way that violent crime is prevented or

1    trying to be prevented in the community, does that

2    cause a divide between the black community and the

3    police?

4         A.   I can't speak for what causes a divide

5    between the black community and the police.

6              MS. BUCKNER:  Would you-all mind if we

7    took one more break?

8              THE WITNESS:  It's pretty close to my

9    family getting home.  I'm watching them on the map.

10   I'm really going to have to take a break.  They're

11   picking up some -- some things.  So I'm not sure

12   exactly when they will be here.  They're very close.

13   But they're just picking up some dry cleaning and

14   stuff.  So, I mean, I can -- I could probably push

15   through for a little bit longer and then take the

16   break or break now and then maybe have to break

17   again.

18             MS. BUCKNER:  I'd rather break now and

19   maybe break again because I may be done.

20             VIDEOGRAPHER:  The time is 3:55.  We now

21   leave the video record.

22             (RECESS)

23             VIDEOGRAPHER:  The time is 4:06.  We now

24   return to the video record.

25        Q.   Do you have a problem with the fact that

1  Tae-Ahn called his mom to the scene?

2        A.   Not at all.

3        Q.   From your experience is it a red flag if a

4  parent is called to a scene?

5        A.   Red flag, no.

6        Q.   If your child was 18 and called you having

7  been stopped for a traffic violation, would you feel

8  free to go to the scene?

9        A.   It's a hypothetical, but I'll answer that

10  because, yes, I -- if -- I would go to the scene if I

11  was able to and she asked or they asked me to.

12        Q.   Would you repeat your answer?

13        A.   Oh, I hope -- can you hear me?  I hope my

14  wifi is good in the basement.

15            THE REPORTER:  We can hear you.

16        A.   Okay.  I would feel free to go to the

17  scene.  That would be a long time from now, though.

18        Q.   Do you have...

19            THE REPORTER:  Josephine, you're frozen.

20  We did not get your question.

21        Q.   Have you had other parents come to the

22  scene of a traffic stop you're a part of?

23        A.   Yes.

24        Q.   Did that cause you concern?

25        A.   No.

```
1        Q.   I have no other questions.

2        A.   Oh, thank you.

3   EXAMINATION BY MS. SUSAN RIVERA

4            MS. RIVERA:  I do have a few follow-ups,

5   though.  Sorry.

6        I just wanted to clear up some stuff on the

7   People, Places and Narcotics questioning that

8   Josephine was asking you earlier.  You've never heard

9   the phrase People Places Narcotics, correct?

10           MR. McCAULEY:  If I have, I -- it was

11  out -- in one ear, out the other.  That's not what I

12  would refer to it as.

13       Q.   Okay.  But were you generally aware as the

14  Violent Crime Unit, were you-all focusing on certain

15  people who committed violent crimes?

16       A.   Yes.  Violent offenders.  Identifying and

17  apprehending violent offenders.

18       Q.   And were there specific people that you

19  knew to be violent offenders that you kind of focused

20  on, like that individual or that group, you know,

21  that hung around with that individual --

22       A.   Yes.

23       Q.   -- in terms of a focus on people --

24       A.   Yes.

25       Q.   -- certain people.
```

1    Okay.  And then places, were you-all -- you

2  know, I mean, you've talked about how you kind of as

3  a mobile unit, you went around to wherever violent

4  crime was occurring.  Is that your understanding

5  where you-all kind of focused on places where violent

6  claim was?

7    A.  Yes.  I didn't realize that's how you-all

8  -- I say you-all, as in that was relayed to you as

9  people and places.  That's just I knew that that's

10  what we did.  I didn't refer to it in that lingo.

11    Q.  How were you-all notified about places to

12  go?

13    A.  So we talked a lot about statistics in

14  this.  And we would try and stay a step ahead of the

15  violent crime and where it was occurring, where it

16  had occurred and where it may occur next.  So

17  oftentimes in our office there would be --

18  Ms. Buckner referred to hot spot earlier.  There

19  would be paperwork, maps generated that would show

20  statistically where shootings, homicides, robberies

21  were happening, and we would try and be available in

22  those areas to respond and also prevent.

23    If say there's a shooting that happened in

24  Portland and we know that the people that did the

25  shooting live at Seventh -- or the group responsible

1    is from the Seventh and Berry area, Taylor Boulevard,

2    if there's a shooting last night in Portland, we

3    would spend time in the Seventh and Berry/Taylor

4    Boulevard area in attempt to prevent a shooting that

5    next day or if there was a shooting, to apprehend the

6    individuals responsible for that shooting.

7         Q.   Okay.  And with respect to narcotics, I

8    mean, is it kind of commonly accepted within the

9    world of policing that there's a strong link between

10   narcotics and violent crime?

11        A.   Yes.

12        Q.   So were you somewhat focused then as a unit

13   on locating narcotics, people dealing in narcotics?

14        A.   Yes.

15             MS. RIVERA:  Could we take just a quick

16   break?

17             MS. BUCKNER:  Of course.

18             VIDEOGRAPHER:  The time is 4:10.  We now

19   leave the video record.

20             (RECESS)

21             VIDEOGRAPHER:  The time is 4:12.  We now

22   return to the video record.

23             MS. RIVERA:  I just have two questions

24   left.  One, first, is it your understanding that

25   pretextual stops are unlawful -- are pretextual stops

1    allowed?

2         A.   Yes.

3         Q.   As far as you're aware?

4         A.   Yes.

5         Q.   And in terms of doing -- having the dog

6    sniff a vehicle, do you need probable cause to sniff

7    a vehicle?

8         A.   No, you do not.

9         Q.   Do you need reasonable suspicion to search

10   a vehicle -- or to sniff a vehicle?  Not search.

11   Sorry.  Just to do the sniff?

12        A.   No, you do not.

13        Q.   What's your -- what's your understanding of

14   what -- when you can do just the sniff around the

15   vehicle?

16        A.   As long as the sniff does not prolong a

17   traffic stop, if we're talking about traffic stops,

18   you're in a public road -- you're in a public area

19   roadway, there's a traffic infraction committed in

20   the presence of law enforcement.

21             MS. RIVERA:  That's all the questions I

22   have.

23             MS. BUCKNER:  No follow-up questions to

24   that.

25             VIDEOGRAPHER:  The time is 4:13.  This

1    completes the video record.

2

3              (NO EXHIBITS WERE MARKED)

4

5              (WITNESS EXCUSED AT 4:13 P.M.)

6

7    * * *                    * * *                    * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF KENTUCKY

2  COUNTY OF JEFFERSON

3        I, NANCY L. NUNNELLEY, RMR, Notary Public,

4  State of Kentucky at Large, do hereby certify that

5  the foregoing deposition of JEFFREY PAUL McCAULEY was

6  taken at the time and place stated in the caption;

7  that the appearances were as set forth in the

8  caption; that prior to giving their testimony the

9  witness was first duly sworn by me, that said

10  testimony was taken down by me in stenographic notes

11  and thereafter reduced under my supervision to the

12  foregoing 102 typewritten pages and that said

13  typewritten transcript is a true, accurate and

14  complete record of my stenographic notes so taken.

15        I further certify that I am not related by

16  blood or marriage to any of the parties hereto and

17  that I have no interest in the outcome of captioned

18  case.

19        My commission as Notary Public expires July 10,

20  2023.

21        Given under my hand this the 22nd day of

22  March 2021 at Louisville, Kentucky.

23

24                    _____

25                    NOTARY PUBLIC   No. 625762

**'**

**'16** [1] - 8:6
**'18** [2] - 41:9, 41:10
**'20** [2] - 8:7, 17:24

**1**

**10** [2] - 55:2, 103:19
**100** [1] - 21:25
**102** [2] - 3:6, 103:10
**103** [1] - 42:17
**1201** [1] - 2:1
**15** [1] - 36:5
**160** [1] - 41:15
**18** [1] - 97:6
**18th** [2] - 36:19, 88:8
**1:19** [1] - 4:10
**1:20** [2] - 4:5, 4:10

**2**

**20** [1] - 36:3
**200** [1] - 2:12
**20042B131** [1] - 1:23
**2012** [1] - 4:25
**2016** [8] - 7:15, 10:25, 11:16, 11:17, 11:21, 14:16, 14:17, 17:24
**2018** [15] - 5:24, 12:9, 13:7, 13:9, 14:15, 16:11, 20:25, 21:1, 21:11, 36:13, 57:6, 57:9, 73:9, 78:17, 79:21
**2019** [1] - 44:6
**2020** [4] - 5:23, 7:15, 14:16, 14:17
**2021** [5] - 1:17, 4:4, 4:10, 43:7, 103:22
**2023** [1] - 103:20
**22nd** [1] - 103:21
**267-4156** [1] - 1:25
**26th** [1] - 91:24
**2:25** [1] - 45:8
**2:28** [1] - 45:11
**2:48** [1] - 58:14

**3**

**3** [1] - 34:10
**300N** [1] - 2:13
**301** [1] - 2:6
**3:02** [1] - 58:17
**3:19-CV-419-GNS-RSE** [1] - 1:5
**3:55** [1] - 96:20

**4**

**4** [2] - 3:3, 14:8
**40202** [1] - 2:13
**40206** [1] - 2:6
**40299** [1] - 1:24
**4413** [1] - 1:24
**4:06** [1] - 96:23
**4:10** [1] - 100:18
**4:12** [1] - 100:21
**4:13** [2] - 101:25, 102:5

**5**

**5** [1] - 14:9
**50** [5] - 21:22, 44:7, 44:10, 58:7
**502** [2] - 1:25
**594-1728** [1] - 1:25

**6**

**6** [1] - 14:9
**625762** [1] - 103:25
**635** [1] - 74:9

**7**

**7:00** [1] - 34:11

**8**

**8:00** [1] - 34:11

**9**

**9** [2] - 1:17, 4:4
**90** [1] - 56:12
**98** [1] - 3:3
**99** [1] - 42:17
**9th** [6] - 4:9, 12:9, 36:13, 73:9, 78:17, 79:21

**A**

**A.M** [1] - 34:11
**abide** [3] - 73:13, 75:25, 76:11
**abiding** [1] - 76:5
**ability** [2] - 53:3, 53:16
**able** [4] - 15:19, 34:17, 34:18, 97:11
**absolutely** [3] - 57:17, 68:3, 75:14
**academy** [13] - 6:16, 21:8, 23:9, 23:17, 24:1, 24:8, 24:10, 24:15, 24:23, 25:7,

25:10, 27:11, 28:16
**accepted** [2] - 9:15, 100:8
**accomplish** [1] - 93:15
**accordance** [1] - 4:6
**according** [1] - 52:23
**accountable** [1] - 42:17
**accurate** [3] - 7:17, 58:4, 103:13
**accurately** [3] - 53:4, 80:21, 81:2
**acronym** [1] - 92:14
**act** [1] - 22:9
**ACTION** [1] - 1:5
**actions** [3] - 72:6, 94:2, 95:2
**active** [1] - 30:16
**actively** [1] - 86:23
**actual** [2] - 51:2, 74:9
**adapting** [1] - 25:2
**address** [2] - 31:19, 74:9
**administrative** [1] - 68:13
**affected** [1] - 85:13
**age** [6] - 35:15, 43:7, 43:19, 63:20, 75:11, 82:13
**agencies** [2] - 78:11
**ago** [1] - 20:4
**agree** [20] - 48:13, 50:21, 53:10, 53:12, 59:24, 60:5, 60:8, 60:10, 68:16, 68:18, 68:21, 75:10, 83:3, 83:4, 83:13, 83:22, 84:2, 84:7, 93:11
**Aguiar** [1] - 2:5
**ahead** [8] - 40:14, 59:22, 60:2, 62:8, 62:15, 63:18, 64:1, 99:14
**AHN** [1] - 1:7
**Ahn** [43] - 2:8, 35:19, 37:17, 45:19, 59:8, 59:12, 59:20, 60:1, 60:7, 60:11, 60:12, 62:18, 63:3, 63:10, 63:16, 63:21, 63:24, 64:3, 64:9, 70:21, 70:22, 71:1, 71:10, 71:16, 71:19, 83:1, 83:6, 83:11, 83:14, 83:19, 83:23, 83:25, 84:3, 84:5, 84:9, 84:10, 84:12, 84:19, 93:5, 93:9, 97:1
**Ahn's** [3] - 62:21,

72:17, 86:7
**air** [1] - 54:25
**al** [1] - 1:14
**alert** [1] - 39:9
**alerted** [1] - 39:13
**Algonquin** [7] - 36:18, 37:3, 37:7, 37:12, 37:13, 38:4, 88:6
**ALL** [1] - 2:2
**allowed** [1] - 101:1
**almost** [6] - 11:10, 12:16, 37:7, 57:25, 79:10, 81:2
**ALSO** [1] - 2:8
**Amendment** [11] - 25:11, 75:13, 75:16, 75:23, 76:1, 76:4, 76:6, 76:12, 76:14, 76:17, 76:19
**analysts** [1] - 91:22
**AND** [1] - 2:2
**annual** [1] - 6:24
**answer** [59] - 8:7, 10:7, 17:14, 18:11, 22:25, 23:15, 26:11, 26:21, 29:5, 34:13, 35:24, 40:4, 40:15, 40:23, 50:24, 52:12, 52:16, 57:5, 57:11, 57:14, 58:4, 59:15, 59:16, 60:3, 60:13, 61:13, 61:20, 62:8, 62:15, 63:19, 64:1, 66:8, 66:13, 66:22, 67:17, 71:3, 71:6, 71:12, 73:17, 75:25, 78:4, 80:20, 80:24, 81:3, 81:19, 81:24, 81:25, 82:4, 82:5, 82:16, 88:17, 94:8, 95:6, 97:9, 97:12
**answerable** [1] - 63:22
**answered** [2] - 27:3, 45:3
**answering** [3] - 30:17, 72:7, 91:9
**answers** [5] - 11:8, 35:7, 37:14, 44:17, 73:3
**anytime** [1] - 71:22
**apart** [1] - 55:8
**appearances** [1] - 103:7
**APPEARANCES** [1] - 2:1
**APPEARED** [1] - 2:2
**applied** [1] - 8:11
**apply** [2] - 27:8, 48:2
**apprehend** [2] - 31:19,

100:5
**apprehending** [1] - 98:17
**approach** [4] - 24:25, 25:7, 28:23, 29:1
**area** [8] - 16:6, 32:16, 36:14, 89:2, 92:2, 100:1, 100:4, 101:18
**areas** [3] - 19:1, 22:8, 99:22
**armed** [2] - 70:21, 71:2
**arrest** [6] - 30:10, 30:11, 32:7, 34:1, 35:14
**arrested** [5] - 32:2, 32:6, 32:12, 32:17, 36:23
**arrive** [1] - 72:8
**aspect** [1] - 71:6
**assign** [2] - 9:20, 17:25
**assigned** [7] - 11:5, 11:17, 16:15, 36:14, 75:19, 89:1, 89:3
**assist** [1] - 16:3
**assisting** [1] - 34:8
**assume** [7] - 93:21, 94:14, 94:18, 94:19, 94:20, 95:7, 95:9
**assumed** [1] - 95:19
**assuming** [4] - 21:14, 37:10, 38:8, 95:7
**AT** [2] - 1:2, 102:5
**ate** [1] - 58:1
**attempt** [4] - 14:3, 18:22, 18:23, 100:4
**attempted** [2] - 15:22, 16:8
**attempting** [1] - 22:1
**attention** [1] - 32:2
**Attorney's** [1] - 2:12
**August** [10] - 12:9, 13:7, 13:9, 13:20, 16:11, 36:13, 41:8, 73:9, 78:17, 79:21
**automatically** [1] - 34:2
**available** [3] - 44:1, 86:5, 99:21
**Avenue** [2] - 2:5, 37:13
**average** [1] - 36:3
**aware** [6] - 10:4, 84:10, 84:19, 84:21, 98:13, 101:3

**B**

**backup** [1] - 16:3

**balance** [1] - 75:20
**Baltimore** [1] - 74:22
**banter** [1] - 72:4
**basement** [1] - 97:14
**basis** [11] - 26:10, 26:13, 27:6, 27:20, 29:22, 45:23, 47:19, 50:23, 68:12, 72:11, 77:20
**beat** [5] - 33:25, 35:3, 44:10, 88:10, 88:15
**became** [1] - 73:25
**become** [1] - 62:4
**beginning** [4] - 14:7, 15:2, 15:22, 94:10
**belief** [6] - 70:21, 71:1, 71:9, 71:16, 86:16, 86:20
**beliefs** [1] - 75:12
**believes** [7] - 83:1, 83:11, 83:19, 83:25, 84:3, 84:5, 84:9
**bell** [2] - 21:4
**Berry** [1] - 100:1
**Berry/Taylor** [1] - 100:3
**best** [2] - 59:17, 94:9
**better** [3] - 28:12, 70:4, 92:15
**between** [8] - 14:17, 93:12, 94:3, 95:3, 95:11, 96:2, 96:5, 100:9
**beyond** [1] - 18:19
**biased** [3] - 85:20, 85:23, 86:2
**bit** [4] - 41:4, 68:7, 70:23, 96:15
**black** [16] - 59:9, 59:13, 59:21, 61:17, 62:21, 63:3, 63:10, 82:2, 82:19, 93:21, 94:4, 94:20, 95:3, 95:12, 96:2, 96:5
**blast** [1] - 54:25
**blasted** [1] - 85:12
**block** [1] - 25:19
**blood** [1] - 103:16
**body** [17] - 12:13, 36:17, 36:20, 37:5, 38:12, 38:23, 45:24, 45:25, 49:17, 58:24, 59:1, 59:2, 59:3, 63:15, 64:4, 71:5, 88:7
**border** [2] - 54:21, 88:6
**Boulevard** [2] - 100:1, 100:4
**break** [10] - 53:7,

58:11, 96:7, 96:10, 96:16, 96:18, 96:19, 100:16
**breaking** [2] - 16:23, 68:7
**broad** [2] - 72:19, 90:15
**broadly** [1] - 26:11
**Broadway** [1] - 91:24
**brought** [1] - 54:14
**Buckner** [2] - 2:4, 99:18
**BUCKNER** [15] - 3:3, 4:15, 4:16, 5:10, 5:14, 16:23, 45:13, 58:10, 58:19, 59:15, 81:9, 96:6, 96:18, 100:17, 101:23
**buckner** [1] - 58:13
**build** [2] - 22:13, 93:12
**burglary** [1] - 22:12
**Burwell** [1] - 88:8
**business** [1] - 22:11
**but..** [2] - 40:6, 57:4
**BY** [4] - 3:3, 3:3, 4:15, 98:3

---

## C

**calculate** [1] - 44:3
**cam** [1] - 63:15
**camera** [16] - 12:13, 36:17, 36:20, 37:5, 38:12, 38:18, 38:23, 45:24, 45:25, 58:24, 59:1, 59:2, 59:3, 64:4, 71:5, 88:7
**cameras** [3] - 91:22, 91:23, 91:25
**canceled** [1] - 60:21
**cancer** [2] - 49:16, 49:17
**cannot** [1] - 85:10
**caption** [2] - 103:6, 103:8
**captioned** [1] - 103:17
**car** [21] - 22:11, 34:4, 38:14, 38:17, 38:25, 39:13, 42:13, 42:24, 43:3, 49:8, 49:22, 54:8, 54:10, 55:8, 55:22, 64:12, 64:14, 64:16, 64:18, 66:5, 89:9
**cars** [1] - 31:23
**case** [25] - 12:8, 26:10, 26:12, 27:6, 27:20, 29:22, 32:10, 45:23, 47:19, 50:23, 68:12,

72:10, 77:20, 103:18
**case-by-case** [11] - 26:10, 26:12, 27:6, 27:20, 29:22, 45:23, 47:19, 50:23, 68:12, 72:10, 77:20
**cases** [2] - 15:1, 29:21
**causes** [3] - 95:11, 95:20, 96:4
**Center** [1] - 91:21
**certain** [4] - 8:25, 86:1, 98:14, 98:25
**Certification** [1] - 1:23
**certify** [2] - 103:4, 103:15
**chance** [5] - 83:1, 83:11, 83:19, 83:25, 84:5
**change** [11] - 14:17, 24:25, 25:4, 25:6, 25:8, 73:10, 73:11, 89:25, 90:4, 90:12, 90:17
**changed** [4] - 15:6, 89:5, 89:11, 90:23
**changes** [4] - 73:8, 73:14, 74:13, 90:24
**changing** [5] - 11:10, 73:5, 73:7, 90:10, 91:5
**check** [1] - 19:8
**Chenwood** [1] - 1:24
**Chief** [2] - 73:10, 92:16
**chief** [2] - 73:25, 74:22
**chief's** [1] - 73:19
**child** [2] - 63:16, 97:6
**children** [1] - 63:20
**choices** [1] - 28:22
**choose** [2] - 34:14, 94:12
**chosen** [2] - 8:10, 8:12
**citation** [1] - 34:2
**citations** [2] - 34:1, 34:5
**citizen** [2] - 81:23, 83:21
**city** [4] - 16:8, 91:22, 91:23, 91:24
**CIVIL** [1] - 1:5
**Civil** [1] - 4:7
**claim** [1] - 99:6
**class** [4] - 11:1, 55:3, 55:9
**cleaning** [1] - 96:13
**clear** [3] - 24:1, 57:24, 98:6
**close** [8] - 12:12, 16:4, 38:11, 78:10, 88:4,

88:8, 96:8, 96:12
**cloth** [1] - 56:9
**cocaine** [3] - 40:16, 54:4, 55:2
**cold** [1] - 36:4
**collected** [2] - 34:17
**combat** [1] - 91:19
**coming** [2] - 10:20, 17:17
**command** [5] - 39:7, 82:17, 82:21, 90:9, 91:4
**commence** [1] - 9:1
**comment** [1] - 48:10
**comments** [1] - 48:9
**commission** [1] - 103:19
**commit** [2] - 22:20, 31:24
**committed** [2] - 98:15, 101:19
**committing** [1] - 22:16
**common** [7] - 14:20, 80:5, 80:17, 80:22, 81:13, 81:21, 82:1
**commonly** [1] - 100:8
**community** [6] - 93:13, 95:12, 95:20, 96:1, 96:2, 96:5
**complaint** [1] - 66:11
**complete** [2] - 89:6, 103:14
**completely** [2] - 46:17, 54:18
**completes** [1] - 102:1
**compound** [1] - 94:8
**computer** [3] - 34:2, 34:4, 57:2
**concern** [16] - 61:6, 61:8, 61:11, 61:16, 61:24, 62:3, 62:11, 62:20, 63:2, 63:9, 63:12, 70:3, 72:8, 76:3, 76:15, 97:24
**concerned** [8] - 68:13, 68:14, 70:5, 70:22, 70:23, 72:1, 76:18, 83:16
**concerning** [1] - 15:5
**concerns** [3] - 69:19, 71:22, 76:13
**condition** [1] - 54:25
**confident** [11] - 53:3, 53:15, 61:5, 86:7, 86:10, 86:13, 86:16, 86:19, 86:21, 87:3, 87:5
**confused** [2] - 31:3, 91:9
**confusing** [1] - 28:13

**Conrad** [3] - 73:10, 73:14, 92:16
**CONRAD** [1] - 1:14
**considered** [3] - 13:6, 13:16, 95:10
**constantly** [2] - 41:17, 41:18
**constitutional** [1] - 75:22
**continue** [2] - 41:17, 56:1
**continuous** [2] - 6:9, 6:10
**continuously** [1] - 20:21
**contributed** [3] - 60:1, 60:7, 60:11
**conversate** [1] - 92:3
**conversating** [2] - 87:21, 91:17
**correct** [7] - 11:18, 13:9, 13:10, 26:16, 31:2, 64:5, 64:7, 87:19, 98:9
**correctly** [2] - 40:23, 74:1
**correlate** [1] - 90:20
**corridor** [1] - 36:19
**counseled** [4] - 60:14, 60:17, 60:18, 60:21
**COUNTY** [1] - 103:2
**County** [1] - 2:12
**County/Louisville** [1] - 16:6
**couple** [3] - 18:6, 41:8, 41:10
**course** [4] - 33:4, 54:15, 54:17, 100:17
**COURT** [1] - 1:1
**court** [1] - 34:11
**CourtNet** [6] - 66:17, 67:2, 67:11, 67:20, 68:10, 69:13
**cover** [2] - 6:25, 16:5
**coverage** [1] - 11:14
**covered** [1] - 11:12
**Crawford** [9] - 16:17, 19:15, 38:14, 39:1, 58:20, 70:13, 70:18, 71:23, 72:1
**crime** [38] - 5:4, 14:5, 14:21, 15:17, 18:25, 19:2, 21:16, 22:1, 22:3, 22:9, 22:17, 22:20, 31:18, 31:22, 32:20, 33:10, 33:14, 34:22, 51:19, 57:16, 75:20, 75:21, 77:22, 90:1, 90:6, 90:11, 90:13, 91:6, 91:13,

91:14, 91:19, 95:16, 95:17, 95:19, 95:25, 99:4, 99:15, 100:10
**Crime** [7] - 7:24, 8:3, 8:5, 77:11, 77:23, 91:21, 98:14
**crimes** [4] - 7:12, 17:13, 77:17, 98:15
**Crimes** [4] - 8:2, 21:17, 24:17, 24:18
**criminal** [5] - 69:16, 83:3, 93:6, 93:22, 94:21
**criminals** [1] - 28:9
**crossing** [1] - 66:19
**current** [1] - 5:5
**cut** [4] - 9:23, 47:7, 56:9, 86:9
**cutting** [1] - 5:8

**D**

**D-O-E-R-R** [1] - 17:5
**daily** [3] - 14:21, 14:24, 92:7
**dangerous** [1] - 71:10
**dashboard** [2] - 55:7, 55:10
**data** [13] - 12:21, 34:16, 34:19, 34:20, 34:22, 34:23, 35:6, 35:9, 43:20, 44:14, 58:3, 82:6, 82:8
**database** [2] - 57:1, 57:4
**date** [4] - 4:9, 11:17, 12:8, 35:13, 35:14, 46:20, 78:24
**dates** [1] - 7:13
**day-to-day** [1] - 15:7
**days** [8] - 11:13, 13:24, 14:19, 19:22, 20:11, 20:12, 35:1, 56:13
**daytime** [1] - 72:24
**dealing** [2] - 10:20, 100:13
**dealings** [1] - 72:16
**decide** [6] - 26:8, 33:19, 76:20, 76:24, 77:3, 77:5
**decided** [1] - 33:21
**decides** [1] - 33:23
**Defendants** [1] - 2:10
**DEFENDANTS** [1] - 1:14
**definitely** [4] - 57:4, 78:12, 85:1, 85:14
**definition** [6] - 51:2, 52:6, 52:16, 52:18,

52:20, 52:23
**department** [1] - 43:22
**Department** [1] - 4:22
**DEPONENT** [1] - 1:17
**deposed** [1] - 4:14
**DEPOSITION** [1] - 1:11
**deposition** [4] - 4:2, 4:5, 4:11, 103:5
**describe** [1] - 20:20
**described** [1] - 33:1
**Desert** [2] - 54:16
**detected** [1] - 56:19
**detection** [1] - 44:11
**DETECTIVE** [1] - 4:19
**Detective** [8] - 12:5, 16:16, 16:17, 16:19, 29:2, 38:14, 39:1
**detective** [15] - 5:4, 5:6, 5:22, 7:7, 7:8, 13:16, 16:18, 16:20, 16:24, 17:3, 17:19, 18:3, 24:21, 24:24
**detectives** [4] - 14:9, 17:19, 17:20, 18:4
**detectives..** [1] - 43:9
**determinations** [1] - 27:24
**determine** [3] - 60:23, 61:1, 61:3
**developing** [1] - 61:17
**difference** [1] - 46:15
**different** [11] - 15:6, 27:7, 46:13, 46:18, 58:25, 59:3, 59:6, 67:9, 70:8, 90:25
**differently** [2] - 85:8, 85:11
**directly** [2] - 11:1, 23:7
**disagree** [2] - 84:2, 84:8
**discuss** [8] - 17:11, 18:16, 20:14, 25:21, 25:24, 74:13, 90:9, 91:4
**discussed** [4] - 18:24, 36:2, 90:18, 90:25
**discussion** [3] - 19:11, 19:16, 23:2
**disease** [2] - 49:12, 49:15
**disproportionately** [2] - 82:18, 82:22
**disrespected** [1] - 64:9
**distance** [1] - 40:1
**DISTRICT** [2] - 1:1, 1:1
**divide** [3] - 95:11, 96:2, 96:4

**Division** [6] - 18:9, 88:4, 88:9, 88:21, 88:25
**division** [12] - 33:2, 52:2, 78:20, 87:25, 88:2, 88:18, 88:20, 89:2, 89:3, 89:9, 90:10, 91:5
**do-over** [1] - 85:7
**documents** [2] - 70:1, 80:2
**Doerr** [2] - 17:3, 19:15
**dog** [104] - 6:12, 6:13, 37:1, 39:5, 39:17, 39:19, 39:21, 39:23, 40:1, 40:7, 40:8, 40:13, 40:17, 41:14, 41:20, 41:24, 42:12, 42:22, 42:25, 43:4, 43:21, 43:22, 43:25, 44:6, 44:20, 44:21, 45:22, 46:20, 47:1, 47:4, 47:9, 48:6, 52:25, 53:2, 53:8, 53:10, 53:12, 53:13, 53:15, 53:17, 53:18, 53:19, 53:21, 53:24, 53:25, 54:6, 54:12, 55:18, 55:20, 55:23, 55:25, 56:13, 57:10, 57:21, 58:1, 60:8, 60:16, 60:20, 60:23, 60:25, 61:3, 61:5, 61:6, 65:4, 65:21, 65:23, 66:4, 66:17, 66:20, 67:3, 67:10, 67:13, 67:15, 67:19, 67:21, 67:24, 68:1, 68:4, 68:6, 68:14, 68:15, 70:14, 70:23, 71:5, 71:14, 71:20, 71:23, 72:6, 78:4, 78:9, 78:16, 78:20, 79:4, 79:16, 79:19, 80:11, 101:5
**dog's** [8] - 39:14, 53:3, 59:24, 60:5, 60:10, 60:14, 60:18, 61:14
**dogs** [7] - 41:19, 42:8, 43:22, 43:24, 44:7, 55:6, 56:10
**done** [18] - 36:4, 56:1, 56:19, 68:5, 68:9, 68:23, 73:1, 78:10, 80:3, 80:25, 81:20, 81:25, 82:5, 89:23, 96:19
**Donnie** [1] - 12:6
**door** [2] - 39:25, 45:4
**doorbell** [1] - 44:25

**double** [2] - 41:13, 41:16
**down** [19] - 19:16, 23:8, 28:6, 28:10, 39:23, 40:17, 53:7, 58:21, 64:20, 64:22, 82:14, 83:2, 83:6, 83:7, 83:12, 93:24, 94:23, 94:24, 103:10
**downs** [4] - 23:3, 23:5, 25:5, 31:7
**downtown** [1] - 91:23
**DPA** [2] - 20:9
**dreams** [1] - 84:13
**drink** [1] - 36:4
**drive** [1] - 31:24
**drive-by** [1] - 31:24
**driver** [2] - 35:15, 35:16
**driver's** [2] - 39:22, 39:23
**drivers** [9] - 81:14, 81:15, 81:22, 81:23, 82:2, 82:3, 82:13, 82:19, 82:23
**driving** [4] - 42:23, 59:9, 66:2, 77:23
**drove** [1] - 37:13
**drug** [5] - 56:10, 56:11, 65:21, 65:23, 69:12
**drugs** [10] - 21:18, 21:21, 42:19, 42:21, 43:5, 54:20, 56:11, 56:14, 69:1, 69:6
**dry** [1] - 96:13
**duly** [2] - 4:14, 103:9
**during** [13] - 6:21, 7:20, 12:18, 27:19, 68:24, 70:20, 71:1, 71:9, 71:15, 78:21, 80:6, 87:1, 89:4

**E**

**ear** [2] - 22:15, 98:11
**east** [1] - 80:22
**easy** [1] - 75:25
**effect** [1] - 89:11
**effort** [1] - 92:3
**either** [2] - 52:11, 74:25
**electronic** [1] - 33:25
**elements** [2] - 74:20, 75:21
**Email** [1] - 1:25
**emphasize** [1] - 15:24
**employed** [1] - 4:21
**encyclopedia** [1] - 51:3

**end** [5] - 7:18, 24:12, 53:21, 53:22, 80:22
**enforce** [2] - 73:13, 89:16
**enforceable** [1] - 28:19
**enforcement** [1] - 101:20
**engaged** [2] - 72:18, 72:22
**enhance** [2] - 94:3, 95:3
**enlighten** [1] - 52:7
**enter** [2] - 17:10, 56:22
**entire** [1] - 79:15
**entitled** [1] - 75:12
**error** [3] - 59:24, 60:5, 60:9
**escalation** [1] - 80:12
**especially** [2] - 22:18
**Esquire** [2] - 2:4, 2:11
**establish** [1] - 40:19
**established** [4] - 67:7, 67:14, 67:16, 87:1
**estimate** [1] - 57:10
**estimate..** [1] - 57:7
**et** [1] - 1:14
**evidence** [3] - 35:15, 87:15, 87:17
**exact** [5] - 7:13, 33:10, 36:15, 44:13, 56:21
**exactly** [5] - 8:18, 8:19, 11:20, 38:19, 96:12
**EXAMINATION** [3] - 3:2, 4:15, 98:3
**example** [6] - 33:10, 42:20, 49:6, 56:8, 80:13, 93:19
**examples** [1] - 27:25
**EXCUSED** [1] - 102:5
**execute** [1] - 39:6
**executed** [1] - 36:22
**executing** [1] - 91:12
**EXHIBITS** [3] - 3:5, 3:6, 102:3
**exit** [3] - 26:6, 26:9, 26:25
**expect** [7] - 64:12, 64:15, 64:20, 64:24, 65:3, 65:6, 65:9
**expectation** [1] - 36:10
**experience** [3] - 32:1, 33:8, 97:3
**experiences** [1] - 84:17
**expires** [1] - 103:19
**explain** [7] - 6:11,

10:1, 42:7, 42:10, 42:15, 51:4
**explained** [1] - 21:16
**explored** [1] - 53:17
**express** [1] - 71:22
**expressed** [2] - 82:17, 82:21
**exterior** [4] - 39:2, 45:17, 73:1, 78:4
**extremely** [6] - 42:6, 42:7, 42:14, 44:16, 53:18, 53:25

### F

**face** [4] - 87:9, 87:13, 87:21, 87:23
**Facebook** [2] - 50:10, 86:25
**fact** [1] - 96:25
**fair** [2] - 58:19, 91:11
**fall** [1] - 88:9
**false** [11] - 48:13, 49:20, 49:22, 60:14, 60:19, 65:12, 65:17, 65:20, 65:22, 66:2, 87:20
**falsely** [2] - 60:16, 60:20
**familiar** [4] - 12:15, 25:18, 92:8, 92:12
**families** [2] - 94:4, 95:4
**family** [2] - 85:14, 96:9
**fancier** [1] - 24:20
**far** [6] - 18:24, 29:6, 34:22, 49:18, 70:5, 101:3
**fast** [1] - 48:25
**Fax** [1] - 1:25
**federal** [1] - 78:11
**Federal** [1] - 4:7
**felonies** [1] - 69:9
**felony** [1] - 69:17
**female** [2] - 81:15, 81:17
**few** [2] - 7:17, 98:4
**fields** [3] - 66:19, 67:5, 67:6
**Fifth** [1] - 2:12
**fight** [1] - 75:19
**file** [1] - 66:11
**fill** [9] - 33:16, 33:19, 33:20, 33:21, 34:24, 35:18, 44:19, 45:7, 56:21
**filming** [1] - 50:10
**fine** [5] - 5:15, 5:18, 22:25, 58:12, 65:11
**First** [1] - 18:9

**first** [19] - 4:13, 9:23, 12:24, 13:22, 20:8, 22:22, 25:16, 39:14, 41:14, 44:8, 44:17, 47:7, 53:6, 53:8, 53:9, 61:21, 94:11, 100:24, 103:9
**fit** [1] - 93:5
**five** [12] - 6:19, 11:10, 12:4, 17:18, 19:10, 19:13, 20:3, 34:25, 36:4, 42:13, 90:22
**five-year** [2] - 20:3, 90:22
**flag** [2] - 97:3, 97:5
**flight** [1] - 71:16
**flights** [1] - 74:11
**floor** [1] - 74:11
**focus** [1] - 98:23
**focused** [4] - 71:12, 71:13, 71:20, 98:19, 99:5, 100:12
**focusing** [1] - 98:14
**fold** [1] - 55:1
**follow** [10] - 26:14, 29:5, 40:24, 49:18, 50:21, 55:14, 77:12, 77:17, 98:4, 101:23
**follow-up** [2] - 40:24, 101:23
**follow-ups** [1] - 98:4
**followed** [1] - 26:19
**following** [3] - 93:21, 94:13, 94:20
**follows** [1] - 4:14
**FOR** [1] - 1:11
**Ford** [2] - 54:22, 54:24
**foregoing** [2] - 103:5, 103:12
**form** [25] - 34:3, 35:7, 35:9, 35:12, 35:18, 46:16, 46:18, 46:19, 46:22, 59:14, 59:22, 60:2, 61:12, 61:19, 62:8, 62:14, 63:18, 63:25, 70:20, 71:1, 71:9, 71:15, 82:15, 94:7
**formal** [5] - 14:3, 15:15, 18:23, 19:17, 74:2
**formed** [1] - 86:17
**forms** [9] - 33:16, 34:17, 34:21, 34:23, 34:25, 35:5, 57:6, 57:9, 82:12
**forth** [3] - 20:11, 72:4, 103:7
**four** [16] - 7:14, 7:18,

7:20, 7:23, 9:7, 9:9, 9:11, 9:15, 11:15, 15:5, 16:14, 17:18, 36:24, 42:13, 53:20, 54:2
**Fourth** [11] - 25:11, 75:13, 75:16, 75:22, 76:1, 76:4, 76:5, 76:12, 76:14, 76:16, 76:19
**frame** [1] - 8:6
**free** [2] - 97:8, 97:16
**freezing** [1] - 40:2
**friends** [2] - 94:5, 95:4
**frisk** [2] - 58:21, 64:25
**frisked** [5] - 59:12, 59:20, 64:24, 93:25, 94:25
**frisks** [1] - 25:5
**front** [5] - 39:21, 39:25, 44:25, 45:4, 77:7
**froze** [4] - 43:10, 43:14, 76:23, 76:25
**frozen** [6] - 43:16, 57:8, 76:9, 76:22, 81:6, 97:19
**fugitive** [2] - 11:11, 11:15
**full** [2] - 4:17, 54:25
**fully** [1] - 54:1
**fun** [1] - 5:20
**function** [1] - 70:24

### G

**gang** [1] - 31:19
**gas** [5] - 37:6, 37:12, 37:19, 37:20, 38:9
**gather** [1] - 18:16
**geared** [1] - 54:18
**gender** [2] - 35:16, 82:14
**general** [1] - 26:14
**generally** [2] - 19:22, 98:13
**generated** [2] - 44:23, 99:19
**geographical** [1] - 38:10
**given** [8] - 8:11, 8:22, 10:5, 15:17, 41:8, 70:9, 75:3, 77:11
**Given** [1] - 103:21
**goal** [2] - 14:20, 93:16
**goals** [1] - 93:12
**graduated** [1] - 24:12
**great** [2] - 29:25, 30:18
**ground** [1] - 22:15

**group** [8] - 9:4, 18:20, 19:3, 19:11, 81:19, 81:24, 98:20, 99:25
**guaranteed** [2] - 75:12, 75:16
**guess** [6] - 11:11, 15:7, 26:17, 51:15, 58:5, 74:20
**guns** [4] - 21:19, 21:21, 31:23
**guys** [1] - 18:16

### H

**half** [1] - 7:18
**halfway** [1] - 43:14
**hand** [7] - 12:8, 34:4, 42:19, 42:21, 43:5, 56:14, 103:21
**handcuff** [2] - 60:12, 65:10
**handcuffed** [11] - 60:1, 60:7, 60:11, 61:10, 65:6, 65:9, 65:13, 65:19, 65:24, 66:1, 84:1
**handcuffs** [2] - 66:5, 80:11
**handle** [3] - 17:12, 19:11, 68:1
**handler** [7] - 5:4, 5:6, 5:24, 67:10, 67:23, 67:25, 68:1
**handles** [1] - 67:10
**handling** [1] - 67:13
**hands** [1] - 54:11
**hard** [3] - 50:19, 62:24, 63:7
**hate** [3] - 83:17, 84:16, 85:3
**have..** [1] - 97:18
**head** [1] - 7:14
**head)** [12] - 9:18, 19:7, 28:25, 31:11, 41:2, 44:24, 59:5, 69:4, 84:22, 86:12, 88:3, 88:24
**headed** [2] - 38:1, 38:5
**headlight** [1] - 39:22
**hear** [8] - 16:25, 53:21, 61:21, 66:22, 81:10, 94:10, 97:13, 97:15
**heard** [11] - 12:24, 12:25, 21:9, 24:6, 32:5, 32:11, 32:18, 32:21, 79:13, 92:12, 98:8
**hearing** [1] - 21:10

**held** [1] - 5:1
**Hellard** [4] - 16:16, 19:15, 38:14, 71:23
**hello** [1] - 24:9
**help** [5] - 15:4, 31:14, 31:21, 68:25, 70:3
**helpful** [1] - 18:13
**hereby** [1] - 103:4
**hereto** [1] - 103:16
**heroin** [3] - 40:17, 54:4
**hi** [1] - 29:2
**Hibbs** [1] - 8:16
**hides** [3] - 54:18, 54:23, 55:4
**hierarchy** [1] - 67:14
**high** [1] - 55:1
**Highlands** [3] - 80:6, 80:8, 80:17
**Hill** [1] - 16:2
**history** [10] - 69:3, 69:5, 69:6, 69:8, 69:11, 69:12, 69:16, 69:17, 70:2, 70:10
**hit** [1] - 55:1
**hold** [2] - 42:16, 78:17
**home** [3] - 4:3, 36:24, 96:9
**homicide** [1] - 34:8
**homicides** [1] - 99:20
**hope** [3] - 44:17, 97:13
**hopefully** [1] - 19:2, 82:7, 82:9
**hoping** [2] - 82:10, 82:12
**horn** [1] - 55:1
**hot** [6] - 57:15, 57:22, 59:9, 59:13, 59:21, 99:18
**hour** [1] - 4:5
**hours** [4] - 34:9, 41:15, 86:2, 86:4
**house** [1] - 36:22
**hundred** [4] - 10:23, 35:1, 35:2, 61:8
**hung** [2] - 36:1, 98:21
**hunh** [1] - 55:24
**hypothetical** [6] - 66:7, 66:9, 80:14, 81:2, 88:13, 97:9
**hypothetically** [2] - 66:10, 80:16

### I

**I..** [1] - 66:8
**idea** [15] - 12:20, 55:5, 57:14, 57:23, 69:16, 70:11, 70:16, 80:3,

80:19, 84:13, 86:3, 88:14, 89:2, 92:23, 92:25
**identified** [1] - 82:12
**identify** [7] - 31:18, 45:14, 53:4, 68:25, 75:20, 77:13, 77:18
**identifying** [1] - 98:16
**illegal** [1] - 31:23
**implement** [1] - 18:17
**importance** [2] - 68:16, 68:18
**important** [2] - 18:14, 18:16
**impossible** [1] - 81:2
**improper** [7] - 64:11, 64:13, 64:19, 64:23, 65:2, 65:7, 65:8
**Inaudible)** [1] - 16:19
**inch** [1] - 55:12
**incident** [13] - 35:13, 78:23, 79:11, 84:11, 84:20, 85:7, 86:17, 86:22, 87:4, 87:6, 87:8, 87:16, 88:1
**incorrectly** [1] - 79:1
**increase** [2] - 24:19, 24:22
**INDEX** [1] - 3:1
**Indiana** [1] - 69:14
**indicate** [11] - 40:7, 40:14, 40:25, 41:1, 55:7, 57:10, 57:22, 60:16, 60:20, 82:7, 82:9
**indicated** [2] - 39:20, 42:21
**indicates** [3] - 41:24, 42:12, 42:18
**indicating** [5] - 41:25, 42:1, 59:25, 60:6, 61:7
**indication** [10] - 60:10, 60:15, 60:19, 61:9, 61:14, 65:13, 65:17, 65:20, 65:22, 66:2
**indications** [1] - 42:5
**individual** [9] - 32:10, 42:19, 42:23, 42:24, 55:19, 62:23, 74:8, 98:20, 98:21
**individuals** [3] - 18:3, 32:11, 100:6
**Industry** [4] - 37:8, 74:8, 74:9, 90:19
**informants** [2] - 22:13, 91:16
**information** [11] - 22:15, 35:4, 66:20,

68:17, 68:19, 69:9, 69:21, 70:15, 77:14, 77:19, 92:1
**infraction** [6] - 28:18, 49:2, 50:22, 77:7, 78:1, 101:19
**infractions** [1] - 47:12
**initial** [1] - 41:14
**initiate** [1] - 28:19
**initiated** [3] - 29:3, 50:13, 50:15
**initiative** [1] - 92:9
**Injury** [1] - 2:5
**instance** [2] - 48:15, 78:1
**instead** [2] - 24:21, 88:11
**instructed** [2] - 31:7, 31:12
**intentions** [4] - 62:12, 62:22, 63:4, 63:6
**interaction** [3] - 37:23, 72:22, 93:16
**interest** [1] - 103:17
**Internet** [3] - 49:12, 49:23, 66:23
**interpret** [2] - 31:5, 32:17
**interpreting** [1] - 95:18
**interstate** [2] - 47:3, 47:4
**interview** [5] - 8:12, 8:15, 8:17, 8:21, 10:7
**interviewed** [1] - 9:6
**interviews** [1] - 8:13
**introduce** [1] - 29:2
**investigation** [3] - 32:8, 37:18, 77:8
**investigations** [4] - 14:1, 15:1, 22:13, 32:6
**investigative** [1] - 91:17
**involved** [2] - 62:4, 72:13
**issues** [1] - 18:7
**items** [3] - 42:13, 54:7, 54:10

## J

**jacking** [1] - 22:11
**Jackson** [1] - 2:8
**jail** [2] - 32:5, 32:9, 32:11
**January** [1] - 5:23
**jbuckner@ kylawoffice.com** [1]

- 2:7
**JEFFERSON** [1] - 103:2
**Jefferson** [2] - 2:12, 16:6
**JEFFREY** [4] - 1:17, 4:2, 4:13, 103:5
**Jeffrey** [2] - 4:11, 4:19
**job** [9] - 18:14, 20:9, 21:17, 21:23, 21:25, 25:17, 73:12, 85:9, 85:13
**jobs** [3] - 20:14, 20:15, 28:7
**jog** [2] - 10:24, 92:19
**JOSEPHINE** [2] - 3:3, 4:15
**Josephine** [8] - 2:4, 43:13, 43:14, 57:8, 76:22, 81:6, 97:19, 98:8
**judge** [1] - 47:16
**July** [1] - 103:19
**June** [3] - 4:25, 5:1, 24:11
**jurisdictions** [1] - 80:23

## K

**K-9** [40] - 5:4, 5:6, 5:22, 5:24, 6:2, 6:4, 23:22, 31:10, 39:7, 39:8, 39:9, 39:11, 39:13, 41:5, 41:9, 41:12, 42:8, 43:8, 43:19, 44:6, 44:9, 44:19, 45:13, 45:15, 46:4, 46:17, 46:19, 50:11, 50:12, 50:16, 56:4, 56:5, 73:1, 77:25, 88:19, 88:25, 89:1, 89:2, 94:2, 95:1
**Keeling** [9] - 13:11, 15:8, 15:21, 16:15, 19:14, 23:3, 23:4, 25:22, 25:25
**keep** [9] - 15:13, 22:14, 22:17, 23:24, 25:23, 28:7, 29:16
**keeps** [1] - 40:2
**KENTUCKY** [2] - 1:1, 103:1
**Kentucky** [13] - 1:23, 1:24, 2:6, 2:13, 4:4, 28:19, 69:10, 69:15, 69:17, 70:2, 70:5, 103:4, 103:22
**Kevin** [1] - 8:14

**kilos** [1] - 55:2
**kind** [24] - 6:15, 8:23, 9:23, 10:12, 18:5, 25:1, 28:13, 31:3, 32:25, 33:2, 41:13, 42:24, 54:16, 66:19, 80:12, 85:21, 86:9, 89:20, 91:9, 98:19, 99:2, 99:5, 100:8
**kinds** [4] - 29:22, 29:23, 30:6, 47:8
**knowing** [3] - 19:23, 84:12, 84:24
**knowledge** [5] - 8:5, 9:19, 37:22, 59:17, 70:19
**known** [4] - 22:18, 28:9, 31:19, 77:25
**knows** [1] - 53:19

## L

**Lane** [1] - 1:24
**lap** [1] - 39:14
**large** [1] - 91:18
**Large** [1] - 103:4
**last** [6] - 4:18, 7:10, 17:1, 20:22, 25:20, 100:2
**lateral** [1] - 24:20
**laughing** [1] - 42:24
**law** [7] - 25:11, 25:21, 25:24, 28:19, 73:13, 89:16, 101:20
**lawyer** [1] - 10:11
**Lawyers** [1] - 2:5
**lays** [1] - 40:17
**LEA** [1] - 1:7
**Lea** [14] - 2:8, 35:19, 37:23, 38:15, 63:16, 63:21, 63:24, 64:3, 64:9, 71:13, 85:5, 93:5, 93:16, 93:18
**Lea's** [5] - 38:17, 45:19, 62:18, 63:3, 63:10
**lead** [1] - 29:11
**learn** [7] - 9:12, 10:16, 23:8, 23:19, 27:13, 28:6, 28:15
**learned** [4] - 23:10, 23:21, 24:14, 33:3
**least** [2] - 9:8, 70:22
**leave** [7] - 17:10, 17:16, 45:9, 58:15, 63:10, 96:21, 100:19
**left** [3] - 24:23, 37:25, 100:24
**legal** [5] - 20:22, 25:15, 25:19, 26:2,

85:23
**less** [8] - 19:17, 58:7, 83:1, 83:11, 83:19, 83:25, 84:5, 84:19
**level** [2] - 48:1, 48:4
**Lexington** [1] - 20:10
**license** [4] - 66:16, 67:2, 67:20, 68:9
**lie** [4] - 87:4, 87:5, 87:7, 87:22
**lied** [2] - 87:16, 87:17
**lies** [1] - 48:13
**lieutenant** [2] - 8:15, 8:16
**life** [1] - 55:4
**light** [3] - 29:4, 29:9, 29:24
**lights** [2] - 28:20, 47:13
**likely** [4] - 22:20, 32:22, 37:14, 50:22
**lingo** [1] - 99:10
**link** [1] - 100:9
**listen** [2] - 32:9, 49:24
**Live** [2] - 50:10, 86:25
**live** [1] - 99:25
**LMPD** [8] - 6:25, 13:3, 13:13, 17:24, 29:3, 44:7, 57:1, 81:1
**LMPD's** [2] - 10:2, 80:23
**LMPD/Shively** [1] - 88:5
**locating** [1] - 100:13
**location** [6] - 35:13, 35:14, 38:10, 46:20, 75:11, 82:13
**long-term** [1] - 22:12
**look** [9] - 7:19, 10:24, 41:7, 46:3, 55:8, 70:1, 70:6, 70:7, 80:2
**looking** [9] - 21:16, 28:9, 29:23, 34:9, 39:22, 51:8, 70:10, 71:19, 93:3
**lost** [1] - 34:5
**LOUISVILLE** [1] - 1:2
**Louisville** [13] - 1:24, 2:6, 2:13, 4:3, 4:22, 4:23, 20:10, 27:13, 28:7, 31:24, 78:12, 87:25, 103:22
**low** [2] - 47:25, 48:4
**lower** [1] - 69:19
**lunch** [1] - 58:1
**lying** [1] - 87:23

## M

**M-C-C-A-U-L-E-Y** [1] - 4:20
**ma'am** [9] - 6:14, 7:22, 11:19, 13:18, 16:9, 22:23, 41:22, 79:17, 81:12
**Major** [1] - 8:14
**majority** [2] - 52:13, 52:22
**male** [9] - 59:9, 59:13, 59:21, 62:21, 63:4, 63:11, 81:14, 81:17, 82:23
**Man** [1] - 55:20
**man** [1] - 61:9
**mandated** [4] - 20:22, 25:17, 25:19, 85:22
**manipulate** [1] - 55:10
**manpower** [1] - 18:7
**map** [1] - 96:9
**maps** [1] - 99:19
**March** [3] - 4:4, 4:9, 103:22
**MARCH** [1] - 1:17
**marijuana** [4] - 40:16, 40:18, 54:3, 55:11
**MARKED** [2] - 3:6, 102:3
**marriage** [1] - 103:16
**material** [1] - 51:7
**materials** [1] - 9:25
**matter** [2] - 47:15, 73:12
**McCauley** [10] - 1:17, 4:2, 4:12, 4:13, 4:16, 4:19, 4:20, 29:2, 98:10, 103:5
**McNeil** [2] - 16:16, 19:15
**mean** [20] - 6:17, 20:8, 21:2, 35:11, 42:11, 42:14, 42:18, 46:8, 47:10, 49:14, 54:11, 54:19, 55:18, 55:23, 70:12, 92:11, 92:19, 96:14, 99:2, 100:8
**means** [1] - 6:11
**meant** [3] - 50:1, 79:5, 79:8
**media** [5] - 48:9, 48:12, 48:18, 49:4, 87:2
**meeting** [4] - 17:11, 19:4, 74:14, 74:16
**member** [1] - 7:20
**members** [2] - 10:17, 16:11
**memory** [1] - 10:25,

92:19
**mental** [1] - 70:10
**mentioned** [3] - 6:1, 6:19, 25:14
**met** [2] - 12:5, 85:5
**methamphetamine** [2] - 40:16, 54:4
**Metro** [7] - 4:22, 4:24, 16:6, 27:13, 28:7, 78:12, 87:25
**Mexico** [1] - 54:21
**might** [5] - 14:8, 15:6, 36:11, 47:25, 70:2
**mind** [4] - 14:20, 58:10, 70:9, 96:6
**mine** [1] - 40:2
**minor** [2] - 89:7, 89:21
**minute** [1] - 19:21
**minutes** [1] - 61:11
**misdemeanor** [1] - 69:17
**mission** [3] - 10:3, 31:16, 33:12
**mistrust** [1] - 85:2
**mix** [1] - 17:20
**mobile** [2] - 50:12, 99:3
**Mobile** [66] - 7:21, 8:1, 8:6, 8:10, 8:23, 8:25, 9:4, 9:7, 9:12, 9:16, 9:17, 9:22, 10:1, 10:4, 10:18, 11:5, 11:21, 12:6, 12:18, 13:4, 17:25, 21:15, 30:21, 30:22, 30:25, 31:6, 31:13, 31:16, 32:13, 32:16, 32:19, 33:17, 34:3, 34:18, 35:22, 51:21, 72:25, 73:20, 74:5, 74:7, 77:12, 77:16, 78:7, 78:13, 78:17, 78:21, 79:3, 79:7, 79:9, 79:13, 79:15, 79:18, 79:24, 81:4, 88:12, 88:20, 89:4, 89:19, 89:23, 89:25, 90:4, 90:8, 92:4, 95:15
**mom** [2] - 72:17, 97:1
**money** [2] - 40:25, 41:1
**Monster** [1] - 56:5
**month** [2] - 12:22, 18:21
**months** [4] - 7:17, 24:11, 41:8, 41:10
**morning** [1] - 34:10
**most** [2] - 32:22, 37:13
**mother** [10] - 48:16,

48:20, 48:24, 72:23, 86:17, 86:21, 87:3, 87:5, 87:16, 87:17
**movement** [5] - 16:13, 17:8, 17:23, 18:1
**moving** [2] - 10:14, 77:21
**MR** [1] - 98:10
**MS** [36] - 3:3, 3:3, 4:15, 4:16, 5:10, 5:12, 5:14, 5:15, 5:20, 16:23, 43:14, 45:13, 58:10, 58:19, 59:14, 59:15, 59:16, 59:22, 60:2, 61:12, 61:19, 62:7, 62:14, 63:18, 63:25, 81:9, 94:7, 96:6, 96:18, 98:3, 98:4, 100:15, 100:17, 100:23, 101:21, 101:23

## N

**name** [9] - 4:17, 4:18, 24:21, 54:16, 73:24, 74:4, 74:22, 74:24
**named** [1] - 18:4
**names** [1] - 16:10
**NANCY** [1] - 103:3
**Nancy** [1] - 1:23
**narcotic** [1] - 42:2
**Narcotics** [6] - 92:9, 92:10, 92:14, 92:17, 98:7, 98:9
**narcotics** [26] - 5:4, 5:6, 5:21, 5:23, 7:7, 7:8, 24:24, 44:11, 53:4, 59:25, 60:6, 65:4, 78:20, 79:2, 79:10, 79:12, 92:5, 93:1, 93:2, 93:3, 93:9, 100:7, 100:10, 100:13
**narrowed** [1] - 28:5
**nature** [1] - 18:15
**need** [11] - 10:24, 19:1, 26:17, 27:23, 36:16, 45:16, 72:19, 74:25, 75:20, 101:6, 101:9
**needed** [2] - 20:12, 30:13
**negative** [3] - 61:18, 61:22, 62:1
**neighborhood** [10] - 32:3, 32:14, 36:18, 37:4, 37:8, 37:12, 83:13, 83:21, 84:2, 84:7

**neighborhoods** [3] - 22:8, 22:18, 80:23
**never** [26] - 12:24, 12:25, 14:24, 15:23, 33:21, 35:6, 36:6, 37:23, 47:23, 49:2, 49:9, 49:22, 50:24, 52:8, 53:17, 54:5, 71:6, 76:18, 76:19, 85:5, 86:13, 86:14, 93:7, 93:10, 98:8
**new** [7] - 10:13, 10:17, 11:4, 74:17, 74:19, 74:21, 75:4
**news** [1] - 85:12
**next** [8] - 16:2, 32:9, 38:5, 38:21, 53:5, 53:16, 99:16, 100:5
**nice** [1] - 59:9
**night** [2] - 32:12, 100:2
**nightmares** [2] - 84:10, 84:16
**nine** [1] - 6:17
**Ninth** [66] - 7:21, 8:1, 8:6, 8:10, 8:23, 8:25, 9:4, 9:7, 9:12, 9:15, 9:16, 9:22, 10:1, 10:4, 10:17, 11:5, 11:20, 12:6, 12:18, 13:3, 17:25, 21:15, 30:21, 30:22, 30:25, 31:6, 31:13, 31:16, 32:13, 32:15, 32:19, 33:17, 34:3, 34:18, 35:22, 51:21, 72:25, 73:20, 74:5, 74:7, 77:12, 77:16, 78:7, 78:13, 78:17, 78:21, 79:2, 79:6, 79:7, 79:9, 79:13, 79:15, 79:18, 79:24, 81:4, 88:11, 88:20, 89:4, 89:19, 89:22, 89:25, 90:4, 90:8, 92:4, 95:15
**NO** [3] - 1:5, 3:6, 102:3
**Notary** [2] - 103:3, 103:19
**NOTARY** [1] - 103:25
**notes** [2] - 103:10, 103:14
**nothing** [11] - 15:3, 36:21, 37:10, 56:19, 61:14, 64:8, 64:10, 70:19, 77:10, 85:9, 85:15
**Notice** [1] - 4:6
**notified** [1] - 99:11
**November** [1] - 24:12

**number** [8] - 12:22, 21:24, 36:2, 42:16, 44:3, 58:8, 86:2, 86:3
**numbers** [2] - 12:19, 44:1
**Nunnelley** [1] - 1:23
**NUNNELLEY** [1] - 103:3
**nunnelleycourtreporter@gmail.com** [1] - 1:25

## O

**o'clock** [3] - 14:8, 14:9, 34:10
**objection** [1] - 59:14, 59:22, 60:2, 61:12, 61:19, 62:7, 62:8, 62:14, 63:18, 63:25, 94:7
**oblige** [1] - 64:22
**observation** [1] - 26:5
**observations** [1] - 26:24
**observing** [3] - 68:14, 70:23, 71:5
**obtain** [2] - 77:14, 77:19
**obviously** [5] - 53:19, 85:4, 90:23, 93:17, 93:19
**occupants** [3] - 26:6, 26:25, 27:14
**occur** [4] - 14:6, 15:19, 88:1, 99:16
**occurred** [8] - 13:8, 15:18, 66:2, 66:10, 77:7, 79:8, 88:23, 99:16
**occurring** [6] - 15:18, 19:1, 34:22, 84:14, 99:4, 99:15
**odor** [4] - 56:6, 56:7, 56:10, 56:11
**odors** [3] - 53:20, 54:2, 54:3
**OF** [3] - 1:1, 103:1, 103:2
**offenders** [7] - 22:16, 22:17, 22:19, 31:19, 98:16, 98:17, 98:19
**offer** [1] - 43:23
**office** [11] - 10:14, 14:2, 16:1, 16:2, 37:7, 73:19, 73:20, 74:2, 74:6, 74:12, 99:17
**Office** [1] - 2:12

**officer** [17] - 5:3, 5:22, 6:3, 24:21, 27:12, 29:25, 31:6, 33:4, 33:25, 43:18, 46:23, 51:21, 64:17, 64:21, 64:25, 75:19, 88:11
**officers** [9] - 17:20, 17:25, 18:8, 28:7, 42:9, 43:8, 66:11, 68:11, 89:6
**officially** [1] - 85:5
**often** [1] - 8:4
**oftentimes** [7] - 14:2, 14:7, 14:14, 15:25, 18:4, 18:8, 99:17
**old** [1] - 12:16
**Olympics** [2] - 44:6, 44:9
**once** [6] - 10:23, 60:25, 71:11, 71:17, 81:24, 82:4
**one** [30] - 7:9, 9:5, 10:12, 10:14, 17:1, 17:18, 27:3, 29:21, 31:13, 34:13, 34:25, 45:1, 50:19, 53:14, 54:2, 71:4, 73:17, 75:17, 82:24, 88:25, 89:3, 93:11, 96:7, 98:11, 100:24
**online** [5] - 50:3, 86:18, 86:19, 86:22, 86:23
**open** [1] - 55:2
**operating** [2] - 10:3, 19:24
**opinion** [5] - 33:10, 52:24, 63:7, 83:24, 84:4
**opportunity** [4] - 20:14, 25:10, 34:24, 75:3
**options** [1] - 27:21
**or..** [1] - 68:24
**order** [2] - 77:14, 77:18
**organization** [3] - 56:4, 56:5, 92:13
**organizing** [1] - 10:21
**outcome** [2] - 50:6, 103:17
**outside** [3] - 38:19, 38:22, 88:5

# P

**P.M** [3] - 4:5, 4:10, 102:5
**packet** [2] - 9:20, 9:24
**packets** [1] - 9:25

**page** [4] - 19:23, 24:5, 26:23, 46:14
**pages** [1] - 103:12
**paperwork** [1] - 99:19
**paralleled** [1] - 67:7
**parent** [1] - 97:4
**parents** [1] - 97:21
**Park** [1] - 16:2
**part** [17] - 6:25, 9:23, 17:21, 18:11, 21:17, 22:22, 47:7, 53:6, 53:8, 56:9, 61:21, 66:22, 71:13, 72:8, 86:14, 88:16, 97:22
**parties** [2] - 38:22, 103:16
**PARTIES** [1] - 2:2
**parts** [3] - 77:21, 78:5, 78:12
**passenger** [2] - 35:17, 39:25
**past** [1] - 92:6
**pat** [9] - 23:3, 23:5, 23:8, 25:5, 31:7, 58:21, 64:21, 83:2, 83:12
**pat-down** [3] - 23:8, 58:21, 83:12
**pat-downs** [3] - 23:3, 23:5, 25:5, 31:7
**patrol** [4] - 5:3, 24:16, 88:11, 89:6
**patted** [6] - 64:20, 83:6, 83:7, 93:24, 94:23, 94:24
**Paul** [1] - 4:19
**PAUL** [4] - 1:17, 4:2, 4:13, 103:5
**pause** [3] - 5:16, 45:3, 45:5
**pay** [3] - 24:19, 24:22, 32:2
**People** [6] - 92:8, 92:9, 92:14, 92:17, 98:7, 98:9
**people** [46] - 9:5, 9:6, 9:8, 12:4, 12:5, 13:25, 14:1, 14:2, 14:25, 16:3, 16:13, 17:10, 17:16, 17:22, 18:5, 23:19, 26:3, 27:17, 31:1, 31:4, 31:23, 31:24, 32:1, 33:2, 35:3, 36:24, 38:16, 47:3, 49:23, 54:20, 54:23, 62:12, 75:5, 75:11, 75:15, 77:24, 85:4, 92:22, 98:15, 98:18, 98:23, 98:25, 99:9, 99:24,

100:13
**per** [1] - 66:23
**percent** [7] - 10:23, 21:22, 21:25, 56:12, 58:7, 61:8
**percentage** [7] - 44:14, 57:6, 57:9, 57:19, 57:21, 57:23, 58:8
**percentages** [1] - 43:23
**perform** [5] - 58:21, 81:4, 81:14, 81:22, 82:2
**performing** [1] - 77:25
**perhaps** [1] - 91:12
**period** [3] - 78:21, 80:1, 80:6
**permitted** [1] - 52:10
**person** [14] - 27:21, 30:15, 42:8, 43:18, 50:13, 55:9, 57:2, 57:24, 62:3, 69:1, 69:8, 74:12, 77:17, 90:19
**person's** [3] - 32:18, 70:2, 75:22
**personally** [1] - 30:8
**persons** [1] - 30:22
**pertains** [1] - 25:24
**phone** [3] - 32:5, 32:9, 36:9
**Phone** [1] - 1:25
**phrase** [1] - 98:9
**picking** [2] - 96:11, 96:13
**picture** [6] - 32:7, 40:8, 54:19, 54:21, 73:24, 85:13
**place** [4] - 30:11, 44:9, 44:17, 103:6
**Places** [6] - 92:8, 92:9, 92:14, 92:17, 98:7, 98:9
**places** [5] - 92:24, 99:1, 99:5, 99:9, 99:11
**plainly** [1] - 50:7
**PLAINTIFF** [2] - 1:7, 1:11
**Plaintiff** [1] - 2:3
**plan** [4] - 18:16, 18:17, 18:20, 36:8
**plastic** [1] - 55:12
**play** [1] - 86:8
**playing** [1] - 86:15
**PLLC** [1] - 2:5
**point** [6] - 12:1, 18:19, 29:24, 41:5, 44:15, 90:18

**Police** [4] - 4:22, 27:14, 78:12, 87:25
**police** [31] - 5:3, 6:1, 23:9, 23:17, 33:4, 61:18, 61:23, 62:2, 62:5, 62:10, 62:13, 62:22, 63:4, 63:11, 63:14, 63:17, 63:24, 64:3, 84:17, 84:20, 85:2, 93:12, 93:19, 93:23, 94:3, 94:6, 94:22, 95:2, 95:12, 96:3, 96:5
**policies** [3] - 73:13, 73:15, 89:5
**policing** [7] - 77:22, 85:20, 85:23, 86:2, 95:11, 95:14, 100:9
**policy** [21] - 10:2, 20:5, 26:19, 27:4, 30:22, 31:1, 31:4, 33:24, 73:6, 73:8, 73:11, 74:3, 74:18, 74:21, 75:4, 89:10, 90:16, 90:17, 90:23, 90:24
**poop** [1] - 37:1
**portion** [1] - 91:18
**Portland** [2] - 99:24, 100:2
**position** [12] - 5:5, 6:5, 8:11, 8:22, 9:15, 19:2, 24:20, 41:6, 41:9, 47:23, 54:5, 77:11
**positions** [4] - 5:1, 6:19, 6:21, 6:22
**positive** [1] - 39:9
**possible** [6] - 7:17, 12:15, 22:14, 57:11, 88:10, 88:16
**possibly** [1] - 7:18
**post** [2] - 86:17, 86:22
**posted** [2] - 86:19, 86:23
**pound** [2] - 43:2, 55:22
**pounds** [1] - 55:11
**predict** [1] - 15:19
**preparation** [1] - 12:14
**prepared** [2] - 12:14, 51:7
**presence** [2] - 53:4, 101:20
**present** [2] - 59:18, 59:23
**PRESENT** [1] - 2:8
**pretextual** [21] - 50:25, 51:4, 51:8,

51:12, 52:7, 52:10, 52:14, 52:16, 52:23, 76:3, 76:16, 76:21, 77:4, 77:5, 81:4, 81:14, 81:17, 81:22, 82:2, 100:25
**pretty** [2] - 44:18, 96:8
**prevent** [7] - 19:2, 31:18, 77:16, 95:17, 95:19, 99:22, 100:4
**prevented** [2] - 32:22, 33:14, 95:25, 96:1
**preventing** [2] - 14:20, 32:20
**prevention** [5] - 51:19, 90:11, 90:13, 91:6, 95:16
**previous** [2] - 69:11, 71:18
**previously** [1] - 59:18
**Price** [2] - 8:19
**prison** [1] - 22:19
**probable** [3] - 29:15, 30:10, 101:6
**problem** [3] - 65:1, 65:5, 96:25
**Procedure** [1] - 4:7
**procedure** [1] - 26:13
**procedures** [3] - 10:3, 19:24, 33:1
**process** [4] - 8:12, 8:22, 9:11, 10:16
**profile** [1] - 93:6
**progression** [1] - 80:12
**prolong** [4] - 71:23, 72:1, 72:9, 101:16
**prolonged** [2] - 72:6, 72:14
**prolonging** [1] - 72:5
**prolongs** [1] - 72:11
**promotion** [3] - 24:16, 24:18, 24:22
**proper** [1] - 13:13
**property** [1] - 74:10
**prosecutor's** [1] - 10:14
**protections** [4] - 75:12, 75:15, 75:22, 76:17
**protocol** [1] - 15:10
**provided** [1] - 10:17
**PSU** [2] - 37:5, 37:18
**Public** [2] - 103:3, 103:19
**public** [4] - 94:5, 95:5, 101:18
**PUBLIC** [1] - 103:25
**publicized** [1] - 85:11
**pull** [7] - 28:20, 57:6,

57:9, 76:20, 77:3, 77:14, 77:19
**pulled** [22] - 45:18, 59:8, 59:13, 59:21, 61:9, 64:11, 64:12, 64:13, 64:14, 64:15, 64:19, 64:23, 65:2, 65:7, 65:8, 66:4, 66:11, 84:6, 93:22, 93:24, 94:21, 94:23
**pulling** [3] - 70:4, 70:14, 77:24
**pursuant** [1] - 4:6
**push** [1] - 96:14
**put** [12] - 21:24, 31:23, 42:15, 42:22, 44:14, 48:12, 50:2, 56:4, 56:5, 56:10, 66:5
**putting** [2] - 48:18, 55:9

**Q**

**quarter** [1] - 55:12
**questioning** [1] - 98:7
**questions** [14] - 26:4, 27:11, 28:12, 31:15, 35:10, 71:18, 73:18, 75:4, 75:6, 75:7, 98:1, 100:23, 101:21, 101:23
**quick** [2] - 58:11, 100:15

**R**

**race** [7] - 35:15, 75:11, 82:13, 83:9, 86:7, 86:10, 86:15
**racially** [3] - 85:20, 85:23, 86:2
**racially-biased** [3] - 85:20, 85:23, 86:2
**radio** [1] - 54:25
**Ramey** [1] - 2:17
**ran** [4] - 29:4, 29:8, 29:20, 29:24
**rang** [1] - 44:25
**rank** [1] - 13:14
**rarely** [2] - 13:24, 14:19
**rather** [2] - 4:10, 96:18
**read** [1] - 94:16
**Real** [1] - 91:21
**real** [1] - 55:4
**realize** [1] - 99:7
**really** [8] - 42:25, 47:21, 66:8, 80:3, 85:13, 92:11, 94:8, 96:10

**reason** [11] - 14:18, 18:1, 29:3, 29:8, 41:16, 46:2, 47:1, 65:10, 83:8, 86:15, 87:12
**reasonable** [4] - 45:14, 45:16, 58:20, 101:9
**reasons** [1] - 30:19
**receive** [7] - 9:13, 9:16, 51:12, 54:23, 67:5, 85:19, 85:24
**received** [6] - 6:4, 7:1, 7:2, 7:4, 7:10, 54:12
**receiving** [1] - 7:6
**recently** [2] - 25:14, 56:3
**RECESS** [4] - 45:10, 58:16, 96:22, 100:20
**recognized** [1] - 30:15
**recommend** [2] - 89:24, 90:3
**recommending** [1] - 90:7
**record** [17] - 4:11, 4:17, 10:24, 21:5, 45:9, 45:12, 58:15, 58:18, 69:1, 83:3, 86:5, 96:21, 96:24, 100:19, 100:22, 102:1, 103:14
**recorded** [2] - 32:11, 87:24
**recording** [1] - 86:24
**records** [5] - 7:11, 7:19, 19:8, 93:22, 94:21
**recover** [1] - 21:18
**recovered** [1] - 21:20
**recruit** [3] - 5:3, 6:1, 11:5
**red** [5] - 29:4, 29:9, 47:13, 97:3, 97:5
**redo** [1] - 85:17
**reduce** [2] - 90:1, 90:5
**reduced** [2] - 33:9, 103:11
**reduction** [3] - 31:21, 91:14
**refer** [5] - 8:3, 52:12, 71:17, 98:12, 99:10
**reference** [4] - 7:11, 33:6, 49:11, 51:3
**referenced** [1] - 55:19
**referencing** [2] - 20:3, 23:17
**referred** [10] - 8:4, 21:9, 21:10, 24:6, 24:7, 25:16, 51:16, 85:22, 92:17, 99:18

**referring** [22] - 7:25, 13:2, 14:16, 15:13, 15:14, 21:6, 23:25, 25:20, 26:15, 27:2, 28:2, 31:10, 32:14, 34:20, 46:9, 48:5, 48:19, 49:4, 67:12, 73:8, 90:16
**reflection** [1] - 85:3
**refreshing** [1] - 26:3
**regardless** [1] - 75:11
**registration** [4] - 66:17, 67:2, 67:20, 68:10
**regular** [1] - 30:23
**related** [4] - 11:1, 63:21, 66:18, 103:15
**relation** [1] - 38:17
**relay** [1] - 91:25
**relayed** [1] - 99:8
**released** [1] - 22:19
**reliability** [5] - 43:21, 44:1, 44:5, 44:10, 56:12
**reliable** [10] - 42:5, 42:6, 42:7, 42:11, 42:15, 43:6, 44:12, 44:16, 53:18, 53:25
**religious** [1] - 75:11
**relying** [1] - 38:23
**remember** [29] - 8:18, 11:20, 11:22, 12:10, 12:11, 21:10, 23:16, 36:15, 36:19, 36:21, 36:23, 36:25, 37:1, 37:11, 38:7, 38:19, 38:24, 47:19, 48:19, 50:19, 51:14, 71:4, 73:16, 74:3, 74:24, 75:8, 77:9, 86:24
**remembering** [2] - 62:25, 74:1
**remove** [10] - 29:12, 30:1, 30:4, 30:12, 30:13, 30:16, 30:20, 30:23, 31:1, 31:4
**removed** [2] - 56:12, 56:13
**repeat** [5] - 76:8, 81:9, 91:2, 94:23, 97:12
**repeatedly** [4] - 93:25, 94:1, 94:24, 94:25
**report** [8] - 44:19, 44:22, 45:7, 46:5, 46:7, 56:19, 56:21
**REPORTER** [15] - 5:9, 16:20, 16:24, 17:2, 17:4, 43:13, 43:16, 57:8, 76:22, 76:25, 77:2, 81:6, 81:11,

97:15, 97:19
**reports** [2] - 45:13, 46:10
**request** [2] - 26:6, 26:25
**research** [1] - 91:18
**respect** [1] - 100:7
**respond** [6] - 5:8, 5:11, 14:5, 22:9, 29:9, 99:22
**responded** [1] - 14:10
**responding** [1] - 14:21
**response** [1] - 17:13
**responsibility** [2] - 68:3, 68:4
**responsible** [4] - 68:14, 71:21, 99:25, 100:6
**rest** [1] - 40:4
**result** [2] - 61:17, 61:25
**resulted** [1] - 61:9
**retract** [1] - 9:2
**return** [4] - 45:12, 58:18, 96:24, 100:22
**reveal** [2] - 39:8, 39:11
**review** [6] - 34:16, 34:18, 35:4, 38:18, 39:12, 58:24
**reviewed** [5] - 12:13, 34:21, 35:6, 59:2, 63:15
**reviewing** [7] - 36:17, 36:20, 37:5, 37:19, 38:12, 51:7, 88:7
**Rich** [1] - 2:17
**richramey@ bellsouth.net** [1] - 2:18
**ride** [2] - 18:10, 77:13
**ridealong** [1] - 18:5
**rift** [1] - 95:20
**ring** [2] - 21:3, 21:4
**Ripley** [2] - 44:8, 45:25
**risk** [1] - 71:16
**Rivera** [1] - 2:11
**RIVERA** [21] - 3:3, 5:12, 5:15, 5:20, 43:14, 59:14, 59:16, 59:22, 60:2, 61:12, 61:19, 62:7, 62:14, 63:18, 63:25, 94:7, 98:3, 98:4, 100:15, 100:23, 101:21
**RMR** [2] - 1:23, 103:3
**road** [1] - 101:18
**roadway** [1] - 101:19
**robberies** [1] - 99:20

**robbery** [2] - 22:11
**role** [3] - 86:8, 86:11, 86:15
**roll** [9] - 14:3, 15:15, 15:25, 18:23, 19:6, 20:1, 36:16, 74:2
**room** [1] - 74:10
**rotated** [1] - 20:10
**roughly** [3] - 7:23, 9:8, 24:11
**routine** [1] - 14:22
**RTCC** [2] - 91:17, 91:20
**Rules** [1] - 4:7
**run** [8] - 16:1, 48:24, 66:16, 67:1, 67:20, 69:5, 69:15, 69:25
**running** [4] - 47:13, 66:20, 68:17, 68:19, 69:2, 69:9

**S**

**safe** [5] - 6:20, 11:25, 28:7, 47:2, 47:5
**safer** [1] - 70:12
**safety** [3] - 68:15, 69:20, 70:3
**Sam** [1] - 2:5
**saw** [1] - 38:21
**scared** [2] - 62:5, 62:9
**scenario** [5] - 26:14, 29:11, 29:18, 30:1, 66:5
**scene** [9] - 27:23, 38:13, 39:17, 97:1, 97:4, 97:8, 97:10, 97:17, 97:22
**screen** [1] - 40:2
**search** [6] - 22:13, 36:22, 75:17, 91:12, 101:9, 101:10
**searched** [1] - 75:18
**searches** [3] - 25:12, 25:25, 44:2
**seat** [2] - 55:1, 56:8
**Second** [4] - 88:4, 88:9, 88:21, 88:25
**second** [4] - 13:22, 45:1, 48:22, 74:10
**see** [14] - 14:8, 21:18, 28:18, 29:25, 30:6, 32:2, 37:21, 38:13, 43:25, 50:7, 50:9, 50:22, 91:8
**seeing** [2] - 28:8, 70:1
**seem** [3] - 27:11, 43:7, 43:19
**sees** [2] - 94:6, 95:5
**seized** [4] - 35:15,

46:22, 55:4, 75:18
**seizure** [1] - 75:17
**seizures** [2] - 25:12, 25:25
**selected** [2] - 9:7, 9:8
**senior** [2] - 81:23, 83:21
**sense** [11] - 14:11, 18:11, 43:6, 47:17, 47:24, 55:14, 56:15, 66:21, 67:8, 85:25, 89:18
**sent** [1] - 56:4
**sentence** [1] - 94:11
**separate** [2] - 6:2, 67:6
**sequence** [2] - 66:15, 66:25
**sergeant** [5] - 8:17, 8:20, 13:15, 14:8, 17:18
**Sergeant** [10] - 8:19, 13:11, 15:7, 15:21, 16:15, 19:14, 23:3, 23:4, 25:22, 25:25
**series** [1] - 31:14
**serious** [2] - 18:15, 74:23
**set** [1] - 103:7
**seven** [1] - 17:19
**Seventh** [6] - 37:8, 37:9, 74:8, 99:25, 100:1, 100:3
**several** [13] - 9:6, 11:11, 21:8, 29:13, 30:19, 40:13, 49:5, 61:10, 74:11, 74:20, 78:11, 85:24, 93:18
**share** [1] - 12:21
**SharePoint** [1] - 56:25
**shift** [8] - 13:20, 13:22, 14:7, 14:13, 15:2, 15:9, 15:11, 15:14
**Shively** [1] - 88:5
**shoe** [1] - 38:24
**shooting** [13] - 14:9, 15:23, 16:2, 16:7, 22:12, 34:8, 92:2, 99:23, 99:25, 100:2, 100:4, 100:5, 100:6
**shootings** [7] - 14:21, 14:22, 14:23, 16:5, 18:24, 31:24, 99:20
**short** [1] - 80:1
**show** [4] - 55:6, 69:13, 69:15, 99:19
**showed** [1] - 55:4
**showing** [1] - 85:12
**shown** [1] - 43:21

**shows** [1] - 55:10
**Shrout** [1] - 12:6
**sick** [1] - 47:1
**side** [3] - 39:22, 39:23, 39:25
**sign** [1] - 29:20
**similar** [5] - 6:3, 72:17, 72:21, 72:24, 73:2
**simply** [1] - 34:14
**singled** [1] - 81:16
**sirens** [1] - 28:20
**sit** [4] - 10:15, 19:16, 40:8, 53:20
**sits** [5] - 40:9, 40:11, 40:18, 41:24, 54:1
**sitting** [8] - 23:15, 40:8, 43:2, 44:4, 54:1, 55:2, 55:12, 55:22
**situation** [5] - 28:9, 53:24, 66:7, 66:9, 75:5
**situations** [5] - 61:16, 62:11, 62:16, 63:2, 63:9
**six** [4] - 12:5, 17:18, 24:11, 74:9
**Sixth** [1] - 18:9
**smell** [1] - 42:1
**smelled** [2] - 43:4, 54:2
**smugglers** [1] - 54:19
**smuggling** [1] - 54:20
**sniff** [51] - 31:10, 39:2, 39:4, 39:5, 39:7, 39:17, 39:20, 39:21, 44:21, 45:17, 45:21, 45:22, 46:2, 46:17, 46:24, 47:9, 47:14, 48:1, 48:4, 56:18, 66:17, 66:20, 67:3, 67:21, 68:6, 68:11, 68:17, 68:19, 68:22, 68:23, 68:24, 71:23, 72:9, 72:11, 72:14, 73:1, 78:4, 78:20, 79:2, 79:7, 79:13, 79:23, 93:8, 94:2, 95:1, 101:6, 101:10, 101:11, 101:14, 101:16
**sniffed** [2] - 65:3, 83:20
**sniffs** [7] - 31:9, 47:2, 66:4, 77:25, 78:7, 78:10, 80:4
**Snow** [2] - 54:16
**so..** [1] - 93:4
**social** [5] - 48:9,

48:12, 48:18, 49:3, 87:1
**solely** [1] - 38:23
**someone** [22] - 26:8, 29:12, 30:2, 30:4, 30:11, 30:13, 30:20, 32:6, 32:7, 32:17, 34:1, 44:25, 45:4, 47:20, 54:20, 67:10, 70:6, 73:19, 86:24, 89:12, 89:17
**sometimes** [5] - 14:3, 14:4, 15:16, 34:10
**somewhat** [1] - 100:12
**somewhere** [2] - 34:6, 73:25
**son** [1] - 50:3
**SOPs** [2] - 19:22, 19:24
**sorry** [6] - 17:15, 19:14, 21:13, 62:7, 98:5, 101:11
**sort** [1] - 17:11
**sounds** [4] - 21:7, 24:14, 33:11, 85:6
**South** [1] - 2:12
**span** [5] - 7:25, 14:23, 20:3, 57:25, 90:22
**speaking** [3] - 42:23, 91:16, 92:6
**specialized** [1] - 6:4
**specific** [8] - 6:18, 8:24, 10:9, 15:8, 20:2, 47:10, 72:20, 98:18
**specifically** [3] - 12:10, 42:2, 54:11
**spell** [1] - 4:17
**spend** [2] - 36:7, 100:3
**spent** [2] - 12:11, 91:13
**sphere** [1] - 14:23
**spot** [4] - 59:10, 59:13, 59:21, 99:18
**spots** [2] - 57:15, 57:22
**spread** [1] - 49:23
**spreading** [2] - 49:17, 49:25
**spreads** [1] - 49:16
**squad** [32] - 11:6, 11:12, 11:17, 11:20, 11:23, 12:1, 12:3, 12:4, 12:18, 13:7, 13:20, 16:11, 16:17, 17:10, 17:16, 17:17, 18:20, 19:10, 19:13, 19:14, 25:21, 26:5,

26:24, 52:13, 52:22, 81:13, 81:16, 81:21, 82:1, 82:4, 91:12
**squad's** [3] - 82:18, 82:22, 93:11
**squads** [2] - 11:9, 11:15
**staff** [4] - 82:18, 82:22, 90:9, 91:4
**stand** [1] - 45:7
**standard** [2] - 10:2, 19:24
**staple** [1] - 25:2
**start** [8] - 9:21, 11:4, 13:20, 13:25, 15:2, 15:11, 15:14, 43:12
**started** [13] - 11:23, 12:2, 14:7, 24:11, 39:21, 41:9, 41:21, 78:15, 78:16, 78:19, 78:23, 79:2, 79:6
**starting** [1] - 6:15
**starts** [3] - 14:13, 15:9, 45:25
**STATE** [1] - 103:1
**state** [5] - 4:17, 28:19, 70:8, 70:10, 89:16
**State** [1] - 103:4
**statement** [6] - 10:4, 37:6, 48:20, 53:22, 76:11, 87:7
**statements** [3] - 48:14, 49:20, 87:21
**STATES** [1] - 1:1
**states** [1] - 10:3
**States** [1] - 54:21
**station** [1] - 38:9
**statistical** [1] - 34:21
**statistically** [1] - 99:20
**statistics** [4] - 13:1, 15:17, 80:20, 99:13
**stay** [2] - 56:7, 99:14
**staying** [1] - 56:7
**stenographic** [2] - 103:10, 103:14
**step** [1] - 99:14
**stepped** [1] - 37:1
**steps** [1] - 74:11
**STEVE** [1] - 1:14
**still** [2] - 28:5, 95:16
**stolen** [1] - 92:1
**stop** [133] - 7:10, 12:9, 12:10, 12:12, 12:15, 13:8, 19:11, 21:18, 22:1, 22:2, 23:11, 25:2, 26:9, 26:14, 27:14, 27:19, 27:21, 28:15, 28:21, 29:4, 29:20, 30:23, 31:1, 31:5, 31:7, 31:9,

31:13, 32:18, 32:22, 33:14, 33:17, 35:19, 35:20, 36:3, 36:14, 37:2, 37:24, 38:8, 38:9, 41:8, 41:21, 46:10, 47:6, 47:18, 50:3, 50:14, 50:15, 51:1, 51:5, 51:8, 51:9, 52:7, 52:16, 53:2, 53:5, 53:9, 53:11, 53:14, 53:15, 53:16, 55:20, 58:25, 59:7, 59:11, 59:19, 59:23, 62:4, 62:18, 62:20, 63:3, 63:10, 66:15, 66:25, 67:11, 69:20, 70:3, 70:12, 70:17, 70:18, 70:20, 71:1, 71:6, 71:9, 71:14, 71:15, 71:24, 72:2, 72:5, 72:7, 72:9, 72:12, 72:13, 72:14, 72:17, 72:21, 72:24, 72:25, 73:6, 73:8, 73:11, 74:17, 74:18, 77:6, 79:8, 80:5, 80:7, 80:8, 80:10, 80:13, 80:16, 80:17, 80:20, 80:22, 86:8, 86:11, 87:1, 87:12, 87:18, 88:7, 88:11, 88:14, 88:22, 89:5, 89:9, 89:10, 89:12, 89:15, 89:17, 89:20, 90:23, 97:22, 101:17
**stop..** [1] - 81:5
**stopped** [3] - 30:22, 78:5, 97:7
**stopping** [1] - 77:9
**Stops** [1] - 21:1
**STOPS** [15] - 19:3, 19:4, 19:6, 20:24, 21:2, 21:7, 21:9, 21:11, 23:16, 23:20, 23:23, 51:16, 73:21, 73:22
**stops** [84] - 7:3, 7:7, 12:17, 12:22, 13:1, 17:12, 19:12, 19:18, 21:20, 22:2, 22:4, 22:6, 22:7, 22:23, 24:2, 25:5, 25:11, 26:6, 26:15, 26:19, 27:1, 31:21, 31:25, 32:4, 33:9, 33:16, 34:3, 34:17, 34:21, 34:23, 35:4, 35:7, 35:9, 35:12, 35:18, 35:23, 36:3, 36:4,

36:7, 36:8, 36:11, 46:16, 47:8, 47:11, 51:13, 52:10, 52:13, 52:14, 52:22, 52:23, 57:22, 58:25, 59:4, 59:6, 61:24, 70:7, 72:17, 72:21, 75:21, 76:4, 76:16, 77:4, 77:10, 80:8, 81:14, 81:18, 81:22, 82:2, 82:6, 82:8, 82:18, 82:22, 89:6, 89:25, 90:5, 90:10, 90:13, 90:25, 91:5, 91:13, 100:25, 101:17

**Story** [1] - 2:5
**straight** [1] - 14:1
**strategic** [1] - 21:3
**strategy** [2] - 33:11, 33:13
**street** [5] - 11:12, 11:15, 22:11, 48:25, 91:12
**Street** [4] - 2:12, 36:19, 37:9, 88:8
**streets** [1] - 77:24
**strong** [1] - 100:9
**studied** [1] - 56:6
**study** [3] - 25:11, 56:3, 80:19
**stuff** [4] - 18:24, 92:2, 96:14, 98:6
**subjected** [4] - 93:23, 94:1, 94:22, 95:1
**Suite** [2] - 2:6, 2:13
**supervision** [1] - 103:11
**supervisor** [2] - 13:7, 13:13
**supervisors** [1] - 13:3
**support** [1] - 47:16
**supposed** [6] - 15:11, 33:24, 85:10, 85:16, 94:3, 95:3
**surveillance** [1] - 91:15
**survey** [1] - 27:23
**Susan** [1] - 2:11
**SUSAN** [2] - 3:3, 98:3
**susan.rivera@ louisvilleky.gov** [1] - 2:14
**suspects** [1] - 92:2
**suspicion** [4] - 45:14, 45:17, 58:20, 101:9
**swear** [1] - 4:12
**sworn** [2] - 4:14, 103:9
**system** [3] - 47:16, 56:23, 56:24

# T

**tabs** [1] - 22:17
**tactic** [1] - 91:14
**TAE** [1] - 1:7
**Tae** [46] - 2:8, 35:19, 37:17, 45:19, 59:8, 59:12, 59:20, 60:1, 60:7, 60:11, 60:12, 62:18, 62:21, 63:3, 63:10, 63:16, 63:21, 63:24, 64:3, 64:9, 70:21, 70:22, 71:1, 71:10, 71:16, 71:19, 72:17, 83:1, 83:6, 83:11, 83:14, 83:19, 83:23, 83:25, 84:3, 84:5, 84:9, 84:10, 84:12, 84:19, 86:7, 93:5, 93:9, 97:1
**TAE-AHN** [1] - 1:7
**Tae-Ahn** [43] - 2:8, 35:19, 37:17, 45:19, 59:8, 59:12, 59:20, 60:1, 60:7, 60:11, 60:12, 62:18, 63:3, 63:10, 63:16, 63:21, 63:24, 64:3, 64:9, 70:21, 70:22, 71:1, 71:10, 71:16, 71:19, 83:1, 83:6, 83:11, 83:14, 83:19, 83:23, 83:25, 84:3, 84:5, 84:9, 84:10, 84:12, 84:19, 93:5, 93:9, 97:1
**Tae-Ahn's** [3] - 62:21, 72:17, 86:7
**targeted** [2] - 63:11, 63:14
**taught** [2] - 43:21, 55:3
**Taurus** [2] - 54:23, 54:24
**Taylor** [1] - 100:1
**team** [2] - 44:8, 93:15
**teams** [2] - 44:7, 44:10
**technique** [2] - 25:3
**techniques** [9] - 22:21, 24:15, 24:17, 24:25, 25:6, 27:22, 28:3, 28:11, 33:1
**teen** [1] - 61:17
**teens** [4] - 93:22, 94:4, 94:21, 95:3
**temporary** [1] - 17:25
**ten** [4] - 35:1, 36:3, 36:9, 55:11
**term** [4] - 17:7, 22:12, 22:14, 57:15

**terminology** [1] - 13:13
**terms** [2] - 98:23, 101:5
**testimony** [2] - 103:8, 103:10
**Thanksgiving** [1] - 24:13
**THE** [24] - 1:11, 2:2, 5:7, 5:9, 5:19, 16:20, 16:21, 16:24, 17:1, 17:2, 17:3, 17:4, 43:13, 43:16, 57:8, 58:12, 76:22, 76:25, 77:2, 81:6, 81:11, 96:8, 97:15, 97:19
**thereafter** [1] - 103:11
**thinking** [5] - 12:12, 14:15, 51:8, 71:19, 72:7
**thinks** [5] - 83:14, 83:15, 83:17, 83:18, 83:23
**third** [2] - 13:23, 74:11
**Thompson** [1] - 8:14
**Thornton's** [8] - 37:7, 37:10, 37:16, 37:19, 37:20, 37:21, 37:25
**threat** [2] - 30:13, 30:14
**three** [9] - 9:9, 9:11, 9:14, 12:13, 12:16, 17:18, 20:12, 57:25, 78:10
**three-year** [1] - 57:25
**throughout** [6] - 11:14, 17:23, 18:18, 49:17, 91:23, 92:6
**throwing** [1] - 36:25
**ticking** [1] - 27:12
**tied** [1] - 38:24
**Tija** [1] - 2:8
**today** [1] - 15:20
**together** [4] - 9:11, 9:16, 18:19, 67:8
**tomorrow** [1] - 15:20
**ton** [2] - 6:18, 21:20
**tonight** [1] - 32:14
**took** [6] - 10:25, 40:1, 49:8, 55:3, 58:11, 96:7
**tool** [10] - 48:2, 48:3, 48:5, 51:18, 51:20, 51:25, 52:1, 52:3, 52:6, 91:6, 91:14
**tools** [1] - 90:11
**top** [1] - 7:14
**topic** [1] - 85:24
**topics** [1] - 6:25
**tough** [1] - 88:17

**towards** [4] - 39:24, 54:18, 61:23, 62:2
**track** [2] - 44:2
**traffic** [110] - 7:3, 7:7, 7:10, 12:9, 12:10, 13:8, 19:12, 19:18, 21:20, 22:6, 22:7, 23:11, 25:2, 25:5, 25:11, 26:14, 26:15, 26:19, 27:1, 27:14, 27:19, 28:15, 28:18, 29:3, 30:23, 31:1, 31:4, 31:21, 31:25, 32:3, 32:18, 32:21, 33:9, 33:14, 37:24, 38:8, 47:12, 49:1, 50:2, 50:14, 50:15, 50:22, 50:25, 58:25, 59:4, 62:4, 62:18, 62:20, 63:3, 63:10, 66:15, 66:16, 66:25, 67:1, 67:11, 70:7, 70:12, 71:14, 72:25, 73:6, 73:8, 73:10, 74:17, 74:18, 75:21, 76:4, 76:16, 77:4, 77:6, 77:7, 77:10, 77:13, 77:18, 77:24, 78:1, 80:8, 80:11, 80:13, 80:20, 81:5, 81:14, 81:22, 82:2, 86:8, 87:12, 87:18, 88:7, 89:5, 89:6, 89:7, 89:9, 89:10, 89:12, 89:21, 89:25, 90:5, 90:10, 90:12, 90:23, 91:5, 91:13, 93:23, 94:22, 97:7, 97:22, 101:17, 101:19
**traffic..** [1] - 76:21
**trafficking** [2] - 49:9, 49:21
**train** [1] - 6:12
**trained** [7] - 29:25, 40:14, 66:16, 67:1, 67:12, 67:20, 85:15
**trainer** [2] - 67:19, 67:21, 67:24
**training** [82] - 6:2, 6:4, 6:8, 6:9, 6:15, 6:17, 6:18, 6:20, 6:22, 6:24, 7:1, 7:2, 7:4, 7:6, 7:10, 7:11, 7:19, 8:23, 8:25, 9:11, 9:13, 9:16, 9:25, 10:13, 10:21, 10:22, 10:24, 18:18, 19:4, 19:6, 19:8, 19:17, 20:10, 20:15, 20:20,

20:22, 20:25, 21:1, 21:2, 21:3, 21:5, 21:7, 21:9, 21:11, 21:12, 23:2, 23:4, 23:16, 23:18, 23:20, 23:23, 25:15, 25:18, 25:19, 27:10, 41:11, 41:14, 41:17, 41:19, 44:3, 51:12, 51:16, 52:8, 52:11, 54:12, 54:13, 54:15, 54:17, 54:23, 55:5, 55:6, 55:15, 66:18, 67:5, 67:7, 67:14, 73:22, 73:23, 85:19, 85:24, 86:5
**transcript** [1] - 103:13
**treated** [6] - 63:16, 63:17, 63:23, 63:24, 64:2, 64:3
**trick** [1] - 24:2
**tricky** [1] - 63:8
**tried** [1] - 15:15
**trigger** [1] - 29:23
**true** [8] - 48:12, 48:18, 49:2, 49:4, 69:7, 84:24, 87:13, 103:13
**trunk** [2] - 39:24
**trust** [9] - 53:24, 54:5, 84:19, 85:4, 85:6, 93:12, 93:18, 94:3, 95:3
**try** [10] - 12:14, 14:4, 29:5, 55:7, 60:23, 61:1, 61:3, 74:3, 99:14, 99:21
**trying** [17] - 7:13, 15:25, 16:12, 22:17, 23:15, 28:5, 28:11, 40:18, 42:15, 67:17, 73:16, 73:23, 90:20, 95:17, 95:18, 95:19, 96:1
**Tuesday** [1] - 4:4
**turn** [10] - 54:24, 54:25, 61:10, 64:12, 64:13, 64:20, 64:24, 65:3, 65:7, 65:8
**two** [11] - 17:18, 20:11, 38:10, 44:6, 46:13, 67:5, 67:9, 71:18, 79:11, 100:23
**TY** [1] - 17:24
**type** [3] - 18:5, 95:11, 95:14
**typewritten** [2] - 103:12, 103:13
**typically** [1] - 75:5

## U

**uh-oh** [2] - 57:20, 77:1
**ultimately** [1] - 85:2
**unarmed** [4] - 93:25, 94:1, 94:25, 95:1
**unchecked** [1] - 49:15
**under** [7] - 16:15, 30:11, 55:12, 75:16, 75:22, 103:11, 103:21
**understood** [1] - 15:10
**underway** [1] - 89:20
**unfold** [1] - 13:21
**unfortunate** [2] - 84:18, 85:1
**unit** [30] - 5:22, 7:21, 8:1, 9:21, 10:14, 10:15, 11:11, 11:15, 12:19, 13:14, 16:6, 21:15, 30:21, 30:23, 31:17, 34:8, 34:18, 35:3, 35:23, 50:11, 50:13, 51:21, 74:5, 74:8, 77:12, 77:16, 78:8, 95:15, 99:3, 100:12
**Unit** [8] - 7:24, 8:2, 8:3, 8:5, 21:17, 77:12, 77:23, 98:14
**United** [1] - 54:21
**UNITED** [1] - 1:1
**units** [1] - 11:12
**unknowingly** [1] - 49:25
**unlawful** [2] - 75:17, 100:25
**unlawfully** [1] - 75:18
**unless** [1] - 79:13
**unmarked** [1] - 32:3
**unofficially** [2] - 35:22, 35:25
**untrue** [1] - 87:11
**up** [20] - 10:20, 16:23, 18:18, 34:11, 36:1, 36:25, 38:25, 40:24, 42:22, 49:1, 54:14, 54:25, 68:7, 74:11, 87:12, 91:18, 96:11, 96:13, 98:6, 101:23
**update** [3] - 20:23, 25:19, 85:23
**updates** [2] - 25:17, 26:3
**ups** [1] - 98:4
**upset** [4] - 65:13, 65:23, 65:24, 66:6
**upwards** [1] - 56:12
**utilize** [1] - 92:6

## V

**vague** [2] - 95:13, 95:17
**various** [1] - 6:25
**vehicle** [58] - 23:19, 26:6, 26:25, 27:15, 27:18, 28:20, 28:21, 28:23, 29:1, 29:12, 30:2, 30:4, 30:12, 30:17, 30:20, 30:24, 33:17, 38:19, 38:22, 39:2, 39:10, 39:15, 39:23, 39:24, 45:19, 46:1, 46:16, 48:11, 50:21, 51:9, 51:10, 54:9, 54:22, 56:8, 56:10, 59:9, 59:25, 60:6, 65:3, 65:12, 65:15, 65:22, 66:2, 73:2, 77:12, 77:18, 78:5, 80:12, 83:20, 84:6, 93:9, 101:6, 101:7, 101:10, 101:15
**vehicles** [10] - 21:18, 26:25, 32:3, 54:18, 56:7, 92:1, 93:24, 94:2, 94:23, 95:2
**verbally** [1] - 53:19
**verbatim** [1] - 48:10
**versus** [1] - 75:21
**VIA** [1] - 2:2
**video** [13] - 45:9, 45:12, 48:8, 48:11, 48:22, 49:11, 58:15, 58:18, 96:21, 96:24, 100:19, 100:22, 102:1
**VIDEOCONFERENCE/ TELECONFERENCE** [2] - 1:10, 2:2
**videoconference/ teleconference** [1] - 4:1
**VIDEOGRAPHER** [10] - 4:9, 45:8, 45:11, 58:14, 58:17, 96:20, 96:23, 100:18, 100:21, 101:25
**Videographer** [1] - 2:16
**videos** [1] - 94:6
**videotaped** [1] - 4:2
**Vidourek** [1] - 16:18
**views** [3] - 61:18, 61:23, 62:2
**violate** [6] - 76:2, 76:4, 76:6, 76:12, 76:14,
76:16
**violating** [1] - 76:18
**violation** [9] - 66:16, 67:1, 69:18, 77:13, 77:18, 78:1, 80:11, 89:21, 97:7
**violations** [4] - 77:24, 89:7, 93:23, 94:22
**violence** [1] - 31:20
**Violent** [10] - 7:24, 8:2, 8:3, 8:5, 21:17, 24:17, 24:18, 77:11, 77:23, 98:14
**violent** [54] - 5:3, 7:12, 14:5, 14:20, 15:17, 17:13, 18:25, 19:2, 21:16, 22:1, 22:3, 22:9, 22:16, 22:17, 22:18, 22:20, 28:9, 31:18, 31:19, 31:22, 32:20, 32:23, 33:9, 33:14, 34:22, 49:1, 49:9, 49:21, 51:19, 57:15, 75:19, 75:21, 77:17, 77:22, 90:1, 90:5, 90:11, 90:13, 91:6, 91:19, 93:6, 95:16, 95:17, 95:19, 95:25, 98:15, 98:16, 98:17, 98:19, 99:3, 99:5, 99:15, 100:10
**visible** [4] - 22:8, 30:13, 30:14, 31:25
**Vittmer** [1] - 19:15
**VS** [1] - 1:11

## W

**wait** [2] - 5:17, 29:9
**waiting** [2] - 5:7, 5:11
**walk** [1] - 40:1
**walked** [2] - 38:25, 39:23
**warrant** [2] - 30:16, 36:22
**warrants** [2] - 22:13, 91:12
**watch** [3] - 10:15, 91:22, 91:25
**watched** [3] - 45:24, 48:8, 48:22
**watching** [4] - 64:3, 71:5, 91:16, 96:9
**Wayne** [1] - 8:19
**ways** [1] - 28:6
**wealthy** [4] - 83:13, 83:21, 84:2, 84:7
**weed** [2] - 43:2, 55:22
**week** [7] - 11:14, 12:22, 15:18, 18:21,
20:22, 25:20, 54:17
**weekends** [1] - 11:13
**weekly** [1] - 6:12
**weeks** [2] - 18:6, 21:8
**weird** [2] - 54:16, 63:6
**WERE** [2] - 3:6, 102:3
**west** [3] - 37:13, 38:3, 38:6
**WESTERN** [1] - 1:1
**white** [6] - 82:3, 83:2, 83:12, 83:21, 84:1, 84:7
**wide** [1] - 61:10
**wife** [6] - 63:23, 64:2, 64:8, 64:10, 66:1, 66:10
**wife's** [3] - 65:12, 65:15, 65:22
**wifi** [1] - 97:14
**William** [2] - 8:16, 13:11
**wish** [1] - 85:14
**witness** [3] - 4:3, 4:12, 103:9
**WITNESS** [9] - 2:2, 5:7, 5:19, 16:21, 17:1, 17:3, 58:12, 96:8, 102:5
**witnessing** [1] - 89:15
**won** [1] - 44:8
**wondering** [1] - 10:16
**word** [5] - 6:10, 27:22, 49:12, 82:9, 94:18
**worded** [2] - 63:7, 79:1
**words** [3] - 28:1, 28:12, 32:18
**world** [3] - 44:8, 44:11, 100:9
**write** [6] - 28:10, 34:1, 34:4, 46:4, 46:8, 82:14
**written** [2] - 15:10, 89:16
**wrote** [1] - 36:22

## Y

**year** [15] - 6:21, 6:22, 7:1, 7:2, 7:5, 7:6, 7:9, 7:10, 12:23, 20:3, 20:4, 20:9, 25:16, 57:25, 90:22
**years** [15] - 6:17, 7:14, 7:18, 7:20, 7:23, 12:13, 12:16, 15:5, 16:14, 18:18, 27:12, 33:4, 78:10, 79:11, 85:25
**yes/no** [1] - 77:21
**yesterday** [5] - 15:18, 43:3, 43:4, 55:22, 58:1
**you-all** [27] - 9:10, 12:21, 13:20, 13:22, 15:10, 17:11, 19:16, 19:21, 20:13, 24:14, 28:6, 35:3, 36:2, 43:8, 43:24, 58:10, 75:3, 81:10, 82:14, 90:19, 96:6, 98:14, 99:1, 99:5, 99:7, 99:8, 99:11
**young** [8] - 59:9, 59:12, 59:20, 61:17, 62:21, 63:3, 63:10, 81:22