**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

**TAE-AHN LEA,**

     **Plaintiff,**

**v.**                          **No. 3:19-CV-419-GNS-RSE**

**CONRAD, et al.,**

     **Defendants.**

_____/

**PRELIMINARY EXPERT REPORT OF LOU REITER**

1.    My name is Lou Reiter.  I have been actively involved in police practices and law enforcement since 1961.  I was an active police officer for 20 years.  Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.    Since 1983 I have been providing law enforcement consultation in police training and management.  I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures.
- Personnel practices.
- Supervisory techniques
- Crowd control procedures.
- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization.  Six of those have been as a consultant to the Special Litigation Section, Civil Rights Division, of the U.S. Department of Justice during their pattern and practice investigations.  My primary areas of focus during these audits are:

- · Citizen complaint procedures.
- · Discipline, internal affairs and early warning systems.
- · Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- · Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- · Organizational structure and command responsibilities.
- · Police department governance.
- · Policy and procedures development.
- · Use of force policy and procedures.
- · Investigation of critical incidents.

3.    Since 1983, I have been retained in over 1100 police related cases.  This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony.  I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- · Field procedures including tactics, arrest techniques and pursuits.
- · Standards of police misconduct investigations.
- · Use of force and deadly force.
- · Supervision.
- · Investigative procedures.
- · Jail intake procedures
- · Police management and personnel practices.
- · Investigation of citizen complaints and discipline.
- · Police policy and procedures development.
- · Police training.

4.    I am a former Deputy Chief of Police of the Los Angeles Police Department.  I served as a police officer in the Los Angeles Police Department for over twenty

years until I retired in 1981.  During that period, I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer.  I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals.  During my last two years with the LAPD, I implemented a Federal Consent Decree concerning hiring and training specifically oriented toward females and minorities.  In 1993 I published the manual/guide Law Enforcement Administrative Investigations; the Second Edition in 1998; Third Edition in 2006 and the Fourth Edition in 2019.

5.     My experience, training and background is more fully described in the attached resume.  A complete list of my testimony during the past four (4) years is attached.

6.     I have reviewed the following materials to date regarding this case:

- Complaints, pleadings, answers, interrogatories and responses, and court motions
- Videos of Lea traffic incident
- Lea Traffic citation and dismissal
- LMPD SOP Manual
- Metro Council Hearing transcript
- Media stories regarding the Lea traffic stop and policy changes
- 2017 Vehicle Stop Report, University of Louisville
- PSU file 19-016
- KP forms 2018 Officer McCauley
- LMPD Response to PERF 'Racially Biased Policing' Report
- Training bulletins
- Traffic Stop SOPs
- Traffic Stop Brochure

3

- Depositions with exhibits
  - o Major William Hibbs
  - o Chief of Police Steve Conrad
  - o Officer Jeffrey McCauley
  - o Officer Kevin Crawford
  - o Officer Gabriel Hellard

7.     These opinions are based upon the totality of my specialized knowledge in the field of police practices.  This experience is derived from my personal police experience, knowledge and training.    This expertise has been developed during my 60 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant.  This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices.  The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations.  These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal.  Many of these generally accepted

practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct.  These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds.  I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice.  My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination.  I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability.  These are products of my continuous review of case law that should guide a reasonable police agency in supervising its employees.  These terms have become common terms within law enforcement supervision, management and risk management; just as the terms

of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8. This expert report will cover two areas of police practices: (1) supervisory oversight of the Ninth Mobile Division, and (2) administrative investigations (PSU) of the Plaintiff Lea traffic incident.

9. **The lack of reasonable supervisory oversight for field officers assigned to the 9th Mobile Division enforcement unit of the Louisville Metro Police Department created an environment where field officers could operate contrary to LMPD policies and generally accepted police practices with a sense of impunity.  This was a foreseeable consequence as evidenced by the depositions of the Unit commander and Chief of Police.**

- The 'War on Drugs' in the 1980s changed the mission and operation of law enforcement agencies in the United States.  Agencies created specialized units for crime control and drug enforcement with names such as Gun Task Force, High Impact Teams, Street Crime Units, Street Narcotic Control, Gang Enforcement Teams, and other such terms.  The 'Broken Windows' concept spread throughout the country and targeted communities for minor nuisance crimes such as drinking in public, congregating on street corners, graffiti eradication, abandoned cars and trash, street sales of single cigarettes and other nontaxed goods.[1] These specialized units commonly were plainclothes officers or adopted the military style BDU uniforms.  With the creation of the 1033 program many of these units added military vehicles and weaponry to the operations.  It

---

[1] The 'Broken Windows' was laudatory in its concept.  However, the continuation of the program disclosed that it mainly targeted disadvantaged communities and principally African American populations.

was more common to see these types of units deployed to disadvantaged
sections of the community where there was a greater concentration of persons of
color.  The asset forfeiture program became a source of income for these types
of specialized units.  The COMPSTAT concept became an integral part of the
new mission for these types of units and agency command staff looked to the
creation of statistics such as traffic citations, field interview stops, search results,
guns recovered, money seized and arrests, rather than how these statistics were
achieved.

- In the past 20 years nearly every community that has fielded these types of
specialized enforcement units has also experienced repeated scandals of police
misconduct, theft, abuse, wrongful convictions and internal mismanagement.
Countless numbers of officers have gone to prison or have been terminated.
Many others have been placed on 'Brady Do Not Call' lists that prohibit them
from testifying in court as being unreliable.  Investigations of these failures have
demonstrated that there have been several common factors involved in each
one.  The overreliance of numbers without any evaluation of the quality or
Constitutionality of the seizures and arrests.  A failure to adopt reasonable
control and oversight systems that would flag officers or operations that targeted
persons of color more frequently. The lack of any reasonable system to identify
trends in vehicle stops and searches and search warrant services.  A failure of
the agency's Internal Affairs function to accept complaints or reasonably conduct
a fact-finding investigation particularly when the subject of the enforcement unit's
activity was a person of color or someone with reduced credibility due to an

arrest, association with undesirable elements in the community, or some believed affiliation with a gang.

- In 2014 the Ferguson incident highlighted many of these types of proactive police enforcement as an underlying issue of community unrest and police resentment. Many of these concerns were investigated by President Obama's 21st Century Policing Task Force in 2015.  Chief Conrad of the LMPD was an invited police executive following the final report.  Some of the issues highlighted were what appeared to be the movement of local police agencies away from a guardian concept to a more militaristic, warrior mode; the development of the 'cash register justice' in traffic citations, equipment violations and other nuisance control measures, failure to adopt systems that would identify problem officers and prohibit their jumping from agency to agency to avoid punishment; and bias policing or targeting persons of color.

- Chief Conrad returned to LMPD in 2012.  He stated that he created the Viper Unit in 2013 as an operation to address a violent crime increase.  These were primarily plainclothes officers.  In his deposition he stated that he got rid of it in 2014 as it was having some problems.  The actual media reports indicated that he lieutenant in charge was facing some sort of misconduct charge and the unit was disbanded in 2015.  The Ninth Mobile was created to take its place in September 2015.  Major Hibbs was put in command.  Apparently most of the former first level officers and detectives of the Viper Unit came over to the new unit. At least the street level teams were now wearing a uniform consisting of a

brown uniform shirt[2] with patches and name tags.  In 2021 the Ninth Mobile was disbanded.

- The depositions of Officers McCauley, Crawford and Hellard were consistent in that their violence prevention enforcement was primarily on traffic stops, they were not provided any specific training in this task, and they were not required to use 'stop forms' mandated by agency policy and State law.  In essence there was no method to determine whether the officers' use of discretion in traffic stops and person and vehicle searches were devoid of racial bias or lacked any reasonable degree of evidence from these types of stops and searches.

- The final report of the 21st Century Policing Task Force in its 'Practical Next Steps to Get Started,' stated under the subtitle 'What do we know? What Do the Data Say?' indicates "collect and analyze data demographic data on all stops, searches, and seizures."

- SOP 8.8 "Biased Law Enforcement Practices" in section 8.8.7 states "Officers are required to complete a Vehicle Stop Reporting form for every traffic stop, regardless of whether a citation is written, or an arrest is made."  Under Section 8.8.9 "Analysis…The Vehicle Stop Reporting form data shall be analyzed and compiled into a report on an annual basis.  This report shall include a summary of all stops by officers and also include recommendations for improvement."

---

[2] It is interesting that so many of these types of specialized police enforcement units have adopted colors of uniforms that are offensive to some members of the community for historical reasons (brown or black BDU).

- Major Hibbs in his deposition acknowledged the stop form requirement and he delegated the task of monitoring those to his lieutenants and sergeants. He did not receive any statistics on stops and the degree to which guns and narcotics were seized. Chief Conrad stated in his deposition that eventually narcotic trafficking became part of the mission of the Ninth Mobile Division, and it was known as the "People, Places, and Narcotics" strategy. He stated that traffic stops were never part of the Violent Crime Reduction Strategy. He never accessed the data base to determine traffic stop data of the Ninth Mobile Division. He didn't know whether the data would show the percentage of black persons stopped and didn't seek that type of analysis. He confirmed that he believed traffic stops were being overused.

- Chief Conrad published in 2018 the LMPD response to the PERF 'Racially Biased Policing' Report of 2016. A PERF recommendation states, "These policies represent an important effort to convey to both citizens and police that 'racial profiling' will not be tolerated. Unfortunately, the vast majority of these policies do little to clarify how officers can conduct their activities in racially neutral ways (albeit some agencies may address this in training). Of particular concern is the lack of guidance that we provide officers with regard to whether and how they can use race as one factor in a set of factors to establish reasonable suspicion or probable cause and to make other law enforcement decisions." Part of the Chief Conrad's LMPD response included, "LMPD requires the use of a "STOPS" form on every traffic stop. This documents the details of

the stop and occupants of the vehicle to include race and whether or not a search was conducted."

- The last report of which I'm aware on traffic stops produced by the LMPD was in 2017.  The information from all 8 divisions[3] showed increases of stops involving African American persons and a decrease in stops of Caucasian drivers. Searches of African American drivers were 8.3% while Caucasian drivers were searched in 4.8%.

- Notably, this data underreported the racial disparities of the stops and searches, as STOPS forms were not completed or reported by the vast majority of the Ninth Mobile Division, which was the Division in which Officers Crawford and Hellard squad worked. Citations produced by LMPD in this case reflect that nearly all the drivers cited by Crawford and Hellard during the subject time frame were African American.

- Even though both Major Hibbs and Chief Conrad had the ability to review the various videotapes of the Lea traffic stop, both were reticent to opine whether the actions of the officers were proper, legal or consistent with LMPD policies.[4] Major Hibbs in his deposition said that he viewed the videos but he couldn't be critical as he was not there.  He didn't interview either Crawford or Hellard because he didn't want to interfere with the PSU investigation.  Chief Conrad viewed the various videos of the Lea traffic stop and he stated that he would

---

[3] This data could not have included traffic stops by the Ninth Mobile Division as they apparently did not require their officers to complete these forms.

[4] This reluctance to evaluate and challenge actions of street officers is unfortunately common in law enforcement even when there is video evidence of the incident.  That would be like saying a football coach could not evaluate the play of his team from game day videos because he was not on the field engaging with the other team.

have to wait for the outcome of the PSU investigation to make any determination of the appropriateness of the officers' actions, even though he had some concerns about some of the actions.

- The earliest versions of supervisory early intervention programs occurred during the later 1960s with the Los Angeles Police Department and then in the early 1970s with the St. Louis County Police Department.  Both of those were soon abandoned.  The next advent of the Early Warning System (EWS) was the adoption of one by the Miami-Dade Police Department in 1982; that program is still in operation.  During the 1980s and early 1990s the concept began to be discussed in law enforcement journals, academic reports and police conferences. It was not until the mid 1990s when the first computerized EWS program was introduced to law enforcement.  Soon this supervisory oversight concept was advocated by the COPS unit of the U.S. Department of Justice and the terminology changed to Early Identification and Intervention System (EIIS).  In 2002 the Commission on Accreditation for Law Enforcement Agencies, Inc., mandated that an early intervention program be instituted for any agency seeking accreditation.

- From my work on a previous case, I am aware that the Louisville Metro Police Department has a history of not using its operational early warning system capabilities.  Former Chief Conrad, during his deposition[5], testified that the agency had a system "sort of" and "We don't have one that is operational." (48)

---

[5] This is from my expert report in the civil case *Cleveland v Louisville Meto Government,* No.: 3:16-cv-588, which I submitted to the court in August 2017.

He acknowledged that there is one mentioned in the agency's policy, but it has "never been operational." (48) Chief Conrad[6] realized this after he returned from the 2014 meeting of President Obama's Task Force formed after the Ferguson incident and he came back to Louisville to discover that it had not been implemented. (49) He found that the agency couldn't agree on the thresholds or what to do if an officer was found to have exceeded these and he formed a group that is working on this specific policy implementation (49).  "I think it would be very beneficial to the department to have a functional early warning system." (50) Chief Conrad, in my opinion, had plenty of time to put a system in place before the traffic stops at issue if he had made this a priority.

- Despite the foregoing, in his October 2018 response to the PERF 'Racially Based Policiing' report, Chief Conrad wrote: "The LMPD utilizes an early warning system software program (IAPro) for the purpose of identifying work-related problematic behavioral patterns among members…The LMPD is looking to enhance the tracking capabilities of IAPro…LMPD has developed a new employee intervention system (EIS) to identify potential issues with employees before they get to an unacceptable level of performance."

- It is my understanding, however, that the LMPD did not have an operational early intervention/tracking system in place at the time of the subject traffic stops, as the implementation of this system was a component of the settlement agreement in September 2020 for the Breonna Taylor fatal shooting.

---

[6] Chief Conrad was the Chief of Police for Glendale Arizona during the years 2005-2012.  The Glendale Police Department had initially been accredited by the Commission for Accreditation of Law Enforcement Agencies since 2000 and reaccredited every 3 years after that and during Chief Conrad's tenure.  This accreditation requires the agency to have an operational early warning system.

- Officer Crawford had three PSU initiated complaints including the one for the Lea traffic stop.  He had two (2) in 2018 (18-243 and 18-277) and then the Lea case 19-016.  One of the earlier cases included an allegation of racial bias.  All of these cases were 'cleared by exception.'  There is no indication that he was ever evaluated by any supervisory intervention.  There was no explanation given for the Chief of Police's notation of 'no rehire' when he resigned from the LMPD.

- The LMPD is accredited by both the national (CALEA) and state level (KACP) groups.  Its written policies are acceptable.  But these written policies become meaningless if they are not implemented in the field.  When officers are allowed to ignore written policies and training guidelines, they develop their own version of what street policing should be.  This lack of supervisory oversight and accountability frequently creates a street implementation where unconstitutional policing can thrive.

- The deposition of Officer Crawford reveals deficiencies in his training and/or oversight. He was unfamiliar with the required steps of a traffic stop. He doesn't recall being trained to ask if there was a legitimate reason why the person committed the violation or ask for their license, registration, and insurance. He would not routinely ask for these items. He doesn't recall the required step of giving the driver instructions to follow. He doesn't recall when he is not permitted to do a pat-down, only saying it depends on the situation. He doesn't recall specifics on Fourth Amendment training, and doesn't recall ever being trained at LMPD that reasonable suspicion needed to exist for a pat-down to be performed. He doesn't recall the requirements which needed to be present for an individual

to be frisked. He doesn't recall what the prerequisites were for requesting a K9 sniff of a vehicle. He doesn't recall the prerequisites for handcuffing a suspect or prolonging a detention of a suspect.

- The deposition of Officer Hellard confirms that Hellard completed STOPS forms before joining the Ninth Mobile Division, but that he did not do them within the Ninth Mobile Division. Within the Ninth Mobile, the STOPS form requirement was not enforced. He did not receive any specific training when he joined the Ninth Mobile. Hellard stated that he was not targeting black citizens but could not explain why the 25 citations showed to him in his deposition of vehicle occupants were all Black citizens and that none of the those pulled over were white.

- The Metro Council hearing testimony of Chief Conrad, as confirmed within his deposition, identified that 9 in 10 of the Ninth Mobile Traffic Stops resulted in no guns or drugs whatsoever, leading those 9 in 10 to be "very upset with that interaction with us." Chief Conrad himself conceded that the traffic stop "tactic that we used in my opinion was overused as opposed to more focus on people that we suspected of being involved in criminal activity, a more focused, ordered approach." Conrad then goes on to state to the Council that the traffic stop tactic "in and of itself, just stopping people that have committed a traffic violation and then getting out of the car, searching the car, without a reason to believe that particular person was involved in a crime is over the top and a waste of police time, effort and resources."

- Chief Conrad also confirms in his deposition that when an internal investigation was closed by exception due to investigated officer's departure from the agency,

15

the Chief would close the file and would not read the interviews given in the investigation.

- The frequency of the traffic stops was confirmed in a deposition I was provided, which estimated that certain squads were doing 3-4 an hour on average.

10. **The administrative investigation of the Lea incident by the Louisville Metro Police PSU was perfunctory, unreasonably delayed, and contrary to reasonable and generally accepted police practices. The investigative efforts and final disposition demonstrated a conscious choice to avoid finding the truth of the police encounter, illuminate the serious police enforcement flaws, and hold the officers accountable for their serious abuse of authority.**

- Administrative investigations, commonly referred to as Internal Affairs or Professional Standards, are vital to maintaining reasonable parameters of field performance by officers. These investigations can originate from a myriad of sources. A common police practice is to investigate allegations of police misconduct which come to the attention of the police agency from any source if the allegation, if later proven true, would amount to misconduct. This type of system protects the concerns and rights of the four (4) essential elements to such a system - the aggrieved person, the accused officer, the involved police agency, and the community served by the police agency. These systems of administrative investigations establish the environment within the involved agency for field officers to know that they will be held accountable for their actions in the field.

- These practices are not new in the police field.  They have been delineated in frequent national studies on police practices including the 1931 Wickershim Commission, 1967 President Johnson's Commission, 1968 Kerner Commission Report, 1974 Police Task Force Report of the National Advisory Commission on Criminal Standards and Goals, and other similar studies since that time.  These practices are embodied in model policies of nationally recognized police professional groups such as the International Association of Chiefs of Police and the Police Executive Research Forum.  They have been continuously referenced in authoritative texts such as the O.W. Wilson <u>Police Administration</u>, a former Chicago Police Superintendent, and its many successors and the International City Management Association's texts on municipal police practices.  It is extensively covered in specific training for administrative investigations by national training entities including the Institute for Police Technology and Management (FL), International Association of Chiefs of Police (VA), Americans for Effective Law Enforcement (IL), Northwestern University Police Traffic Institute (IL), Southern Police Institute (KY), Public Agency Training Council (IN), and the Legal and Liability Risk Management Institute (IN).

- I regularly train on this subject to police practitioners and use my publication, <u>Law Enforcement Administrative Investigations</u>, as a training tool.  I frequently conduct internal audits of police agencies in the practice of administrative investigations.  I have personally been an investigator of police misconduct allegations and have adjudicated other cases of police misconduct for 11 years as a police command officer with the Los Angeles Police Department.  I am

familiar with the effect these practices have within police agencies and the field conduct of police officers.

- In the past 40 years I have primarily been involved in the essential police task of conducting administrative investigations; whether they are called Internal Affairs, Office of Professional Standards, Public Integrity or some similar term.  Yearly I instruct approximately 1000 police practitioners in this task.  I have written extensively on this topic and during the past 4 years conducted numerous webinars on these essential tasks.  In 1974 the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals was published including the chapter on 'Internal Affairs' that I researched and authored.  In 2019 I published the fourth edition of my training manual "Law Enforcement Administrative Investigations."  In conjunction with Public Agency Training Council, Indianapolis, IN, we created in 2007 the only certification program for this police task: National Certification for IA/OPS Investigators and Supervisors; over 1000 have been certified and several hundred have been recertified.  This has continued under the new organization, Legal and Liability Risk Management Institute and its Public Safety Internal Affairs Institute. I have presented numerous topics at the conventions of the National Internal Affairs Investigators Association and IAPro Users on the essentials of reasonable and professional police administrative investigations.

- I reviewed the 284 page PSU #19-016 report in its entirety.  From the procedural forms and interview admonishments it is apparent that the PSU process of the LMPD appears to understand the basic principles of a reasonable administrative

investigation.  However, the substance of the investigation as evidenced by the investigative report, in my opinion, shows that the investigators and review chain up to and including the Chief of Police did not conduct an impartial, objective, fair, timely and reasonable fact-finding investigation.

- The traffic stop incident involving Mr. Lea occurred on August 9, 2018.  It was widely broadcast by the media and social media both locally and nationally.

- Chief Conrad initiated the PSU investigation on February 18, 2019.[7]

- The investigation initiation and internal review process took 20 months.  Four (4) officers were interviewed twice for a **total** of 51 minutes for all eight (8) interviews.  PSU attempted to interview Mr. Lea, but this did not occur.  Lea did, however, speak with the Louisville Metro Council at a meeting in which Chief Conrad was present.  The  PSU also included Officer body camera videos, one Thornton surveillance video, four (4) case laws, and the training records of the K9 officer.

- What is more important, however, is what the investigation and review process did not do.

- The principal officer, Crawford, who was the driver of the police vehicle that initially stopped Mr. Lea, was never interviewed.  The official PSU notice ordering him to be interviewed was sent to him on February 21, 2019.  He was formally served and signed the service of interview giving him 48 hours' notice on March 7, 2019.  Officer Crawford submitted his letter of resignation on May 17, 2019,

---

[7] Chief Conrad said during the Governmental Oversight Meeting on May 16, 2019, "I had an opportunity to see that video and…it concerns after watching that video which is what prompted to order a professional standards investigation…I could certainly see it for watching that why Mr. Lea and his mother were upset…I was concerned enough that I felt like an investigation was warranted."

making his departure effective on June 3, 2019.  During that period of over two (2) months PSU did not interview Officer Crawford and there is explanation what, if any, attempt was made to interview him.

- Officer Hellard was the partner officer of Officer Crawford.  Officer Hellard goes through a long recitation of what he perceived occurred during this stop.  His rendition does not comport with the videos of the stop.  He is never challenged on what he says or what he indicates he perceived.  He indicates that Mr. Lea's answers to questions are 'vague' and that Mr. Lea had an 'attitude' yet there is no follow up questioning.  His rationale for his decision to handcuff Mr. Lea is refuted by the video and not questioned by Sgt. Tatum during this interview.  He stated that this traffic stop was approximately 24 minutes in length and most of their traffic stops are 30 minutes.  There was no follow up on the appropriateness of this considering the case law included with this investigation and the various SOP of the LMPD.  Officer Hellard stated that one of the reasons he chose to handcuff Mr. Lea was that "him not giving consent on the car, uh, being super nervous, he had – I remember saying that he had a really hard breathing through his shirt.  I could see his chest pounding as he was breathing."  The investigator included in his investigation a case law from Commonwealth of Kentucky v. John E. Smith, Jr. 542 S.W.3d 276 which concluded, "We simply conclude, as did the trial court and the Court of Appeals, that nothing happened before Eaton launched the dog sniff search that transformed the situation from a routing stop for a traffic infraction into a drug trafficking case.  The only additional faction cited is Appellee's apparent nervousness.  While that is certainly part of the totality of

circumstances to be examined, *Adkins v Commonwealth,* 96 S.W.3d779, 788 (Ky 2003), it is, nevertheless, not uncommon during a traffic stop and will not create a reasonable suspicion when paired with other fats which do not constitute a reasonable suspicion to search for drugs.  As the facts here did not support a reasonable that the vehicle contained drugs.  Appellee's nervousness after being stopped does not change the analysis."  If an investigator includes a case law within the investigation it should be used and addressed during the interview. Another issue not challenged by Sgt. Tatum is that no "Stop report" was completed as required by the LMPD.  Officer Hellard, being the partner officer usually makes him the report officer as well.

- Officer McCauley's two (2) interviews lasted a total of 11 minutes.  There were no questions asked regarding what he knew to be any factors that would support a reasonable suspicion to conduct a drug sniff by his K9 partner.  He stated that "I believe he (Crawford) asked if I could do an exterior stiff" but acknowledged that wasn't captured on either body worn camera.  Officer McCauley stated that his dog alerted and then he conducted a full interior search finding no drugs.  There was no questioning about his reporting this negative search, however.  Again, the investigator includes three case law sections about drug dog searches.  These related not only to the dog's training, but the documentation of reliability.  This investigation fails to even address that issue.[8]

- The final disposition of this administrative investigation occurred on October 16 and November 6, 2020.  Chief Yvette Gentry determined the investigation, as did

---

[8] The K9 report form used by Officer McCauley does not provide any disclosure of when his K9 might have alerted, but no contraband was then found.

the chain of command, should be 'Closed by Exception' due to Officer Crawford's resignation.  She further noted that a finding would have been 'Not Sustained.' On her earlier disposition on October 16 she wrote, "Officer did not submit to an interview.  He quit in 2019. Please advise if we should close and notify State as well as check no-rehire alone or if this is to be retroactive as a ref__" This would indicate that there was much more consideration given to Officer Crawford's actions or history that is not documented in this investigation.

- This administrative investigation did not meet, in any manner, the generally accepted police practices considering the totality of what was known and available by video and audio.  The LMPD did not need Officer Crawford's rationalization, minimization, or explanation why he failed to follow the procedures embodied in the numerous SOP and other directives on traffic stops. This investigation failed to delve into the actions of the other involved officers that contributed to Mr. Lea's unreasonable treatment.  This investigation, in my opinion, was purposefully narrowed to ensure that the LMPD did not have consider and be responsive to the position and rights of Mr. Lea.  This investigation gave the LMPD no information or insight into what would be necessary to correct these types of pretextual and unreasonable traffic stops of persons of color at the whims of field officers.  This investigation is a prime example of the organizational acceptance of field officers' erroneous implementation of agency written directives, training, and guidelines.

- In my opinion based upon my specialized skills, knowledge, and experience including that as a traffic enforcement officer, the video of the Lea encounter, as

best, would indicate a questionable traffic infraction.  But no reasonable police officer would believe that there was any degree of reasonable suspicion to take this minor traffic stop to the intrusive degree that it did.

11.   It is my understanding that additional materials may be in process of being produced. Therefore, I would request that this report be considered a preliminary report.  Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

12.   At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

13..   My fee for this professional service is a flat Case Development Fee of $9500, a fee of $2500 for deposition in the Atlanta area and $2500 per day plus expenses for deposition or trial appearances outside the Atlanta area.


This report is signed under penalty of perjury on this _____ day of July, 2021, in Jasper, GA.

_____

Lou Reiter