1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF KENTUCKY
2                      AT LOUISVILLE

3

4

5    CIVIL ACTION NO. 3:19-CV-419-GNS-RSE

6

7

     TAE-AHN LEA                                    PLAINTIFF
8

9

10                VIDEOCONFERENCE/TELECONFERENCE
11   VS          DEPOSITION FOR THE PLAINTIFF

12

13

14   STEVE CONRAD, et al                         DEFENDANTS

15   * * *                  * * *                      * * *
16

17   DEPONENT:         KEVIN CRAWFORD
                       (MARCH 24, 2021)
18

19

20

21

22

23              Nancy L. Nunnelley, RMR
          Kentucky Certification No. 20042B131
24              4413 Chenwood Lane
             Louisville, Kentucky 40299
25     Phone: (502) 594-1728  Fax: (502) 267-4156
        Email:  nunnelleycourtreporter@gmail.com

1    APPEARANCES:

2                        (ALL PARTIES AND THE WITNESS APPEARED
                         VIA VIDEOCONFERENCE/TELECONFERENCE)
3
     For the Plaintiff
4
         Sam Aguiar, Esquire
5        Lonita K. Baker, Esquire
         Josephine Buckner, Esquire
6        Sam Aguiar Injury Lawyers, PLLC
         1201 Story Avenue
7        Suite 301
         Louisville, Kentucky 40206
8        sam@kylawoffice.com
         jbuckner@kylawoffice.com
9        lonita@kylawoffice.com

10       ALSO PRESENT:   Tae-Ahn Lea
                         Tija Jackson
11

12
     For the Defendants
13
         Peter Ervin, Esquire
14       Jefferson County Attorney's Office
         200 South Fifth Street
15       Suite 300N
         Louisville, Kentucky 40202
16       Peter.ervin@louisvilleky.gov

17

18

19                         * * *

20

21

22

23

24

25

1                                INDEX

2    EXAMINATION:

3
      BY MR. SAM AGUIAR                              4
4     BY MR. PETER ERVIN                             68

5
     EXHIBITS:
6
      NO EXHIBITS WERE MARKED                        71
7

8

9
                            * * *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      The videoconference/teleconference

2  videotaped deposition of KEVIN CRAWFORD taken with

3  the witness being present via Zoom on Wednesday,

4  March 24, 2021, at about the hour of 12:59 P.M., said

5  deposition being taken pursuant to Notice for use in

6  accordance with the Federal Rules of Civil Procedure.

7  ***                    ***                    ***

8      THE REPORTER:  Okay.  We are on the record

9  for the deposition of Kevin Crawford, and the time is

10  12:59 P.M.

11      KEVIN CRAWFORD, after first being duly

12  sworn, deposed and said as follows:

13  <u>EXAMINATION BY MR. SAM AGUIAR</u>

14      MR. AGUIAR:  Sir, go ahead and tell us

15  your name, please.

16      OFFICER CRAWFORD:  Kevin Crawford.

17      Q.  And where do you work?

18      A.  I'm currently employed at Jeffersonville

19  Police Department.

20      Q.  How long have you been there?

21      A.  A little under two years.

22      Q.  And what is your -- what is your job title

23  there?

24      A.  Patrol officer.

25      Q.  Okay.  Have you held any other titles there

1   other than patrol officer?

2         A.   I'm not sure when you first get hired on if

3   it's recruit or what the name is, but other than

4   patrol officer I believe not.

5         Q.   All right.  Where did you go to school?

6         A.   High school or college, sir?

7         Q.   Both.

8         A.   I went to New Albany High School,

9   Jeffersonville High School, where I graduated, and

10  then Ivy Tech Community College in Sellersburg.

11        Q.   All right.  Did you get a degree from Ivy

12  Tech?

13        A.   Yes.

14        Q.   And what was that in?

15        A.   Criminal justice.

16        Q.   Was that a bachelor's or an associate's?

17        A.   Associate's.

18        Q.   Okay.  And when was that?

19        A.   I'm unsure of the exact dates.  The best of

20  my knowledge, I would say 2012 possibly, 2013, around

21  there.  I could be off by a couple years.

22        Q.   I'm not going to hold you to dates.  When

23  you left or after you got your associate's, what was

24  the first job you had after that?

25        A.   I was going to school -- or I was working

1    as a security officer at the Galt House hotel while I

2    was getting my degree.

3         Q.   All right.  And after the Galt House, where

4    did you go from there?

5         A.   Louisville Metro Police Department.

6         Q.   And what year did you start with LMPD?

7         A.   2013.  2013, I believe.

8         Q.   Okay.  And what -- what jobs did you have

9    at LMPD?

10        A.   As a patrol officer.  I'm not sure of the

11   exact title, if it was -- I worked patrol for I

12   believe about three years.  And then I was in Ninth

13   Mobile as a detective.  And then also I was in

14   narcotics.

15        Q.   Okay.  What divisions did you patrol?

16        A.   The Fourth Division is where I was assigned

17   to.  Prior to that I was in the First Division

18   training.

19        Q.   Who were your PTOs that you had?

20        A.   I don't recall at this time.

21        Q.   All right.  When were you in narcotics?

22        A.   Before I left, it would have been -- I

23   don't recall, sir.  I don't remember the times or the

24   dates.

25        Q.   Was it after -- was it after Ninth Mobile?

1      A.   Yes, sir.

2      Q.   Okay.  Are you -- do you take any

3 prescription medications?

4      A.   No.

5      Q.   Are you married?

6      A.   Yes.

7      Q.   Okay.  Do you have children?

8      A.   Yes.

9      Q.   How many?

10      A.   Just one.

11      Q.   Okay.  How old?

12      A.   Nine.

13      Q.   When you joined Jeffersonville Police

14 Department, did you have to do any sort of

15 psychological exam?

16      A.   Yes, sir.

17      Q.   And what made you leave LMPD?

18      A.   The benefits by far.  My family wanted me

19 to be in a safer area and closer to home, the biggest

20 ones.

21      Q.   All right.  Is the pay any better?

22      A.   I don't recall what the pay was over there.

23 It's similar.

24      Q.   What made you decide you wanted to become a

25 police officer?

```
 1         A.   It was an easy transition from going from
 2   the Marine Corps and serving my country to serving my
 3   community and, honestly, being able to help people
 4   out.
 5         Q.   What years did you serve in the Marine
 6   Corps?
 7         A.   2005 to 2009.
 8         Q.   All right.  And were you honorably
 9   discharged?
10         A.   Yes, sir.
11         Q.   And what did you do from 2009 to 2000 -- or
12   what did you do from 2009 from a work standpoint
13   until you joined or started working security at the
14   Galt House?
15         A.   There was only a few months gap between not
16   working and working with school.  I was going to
17   school at Ivy Tech.
18         Q.   Do you draw any sort of a military
19   disability?
20         A.   No.
21         Q.   And what made you decide to join the Ninth
22   Mobile?
23         A.   It just seemed like a huge -- it was -- it
24   was an opportunity to be in a great unit.
25         Q.   Okay.  And who did you interview with to
```

1  get that position?

2        A.   Who interviewed me or who also was

3  interviewing for the position?

4        Q.   Who interviewed you?

5        A.   I don't recall who it was, sir.

6        Q.   How many times did you apply to be in the

7  Ninth Mobile?

8        A.   I don't recall.

9        Q.   Was it more than one?

10       A.   I don't recall, sir.

11       Q.   All right.  When you began in the Ninth

12  Mobile, what was -- who was your commanding officer?

13       A.   Are you talking about the major, sir, or

14  like a first level supervisor such as sergeant?

15       Q.   Let's go the chain of command.  Who was

16  your direct sergeant?

17       A.   As far as the chain of command, sir, I

18  don't recall who it was.

19       Q.   You don't recall who your sergeant was when

20  you began?

21       A.   No, sir.

22       Q.   At the time of the incident that we're

23  going to talk about in August of 2018, who was your

24  sergeant?

25       A.   I don't recall, sir.

1      Q.   Do you recall who your lieutenant was when

2  you joined Ninth Mobile?

3      A.   No, sir.

4      Q.   Do you recall who your lieutenant was in

5  August of 2018?

6      A.   No, sir.

7      Q.   In August of 2018 who do you recall were

8  lieutenants in the division?

9      A.   Lieutenants within the division?

10 Lieutenant Huckleberry may have been there.  There

11 was another lieutenant that was older.  I can't -- I

12 don't recall, sir.

13     Q.   Okay.  In August of 2018 who was the major

14 of the division?

15     A.   There was two -- there were two different

16 majors.  I can see his face, but I can't remember his

17 name, sir.  I don't recall.

18     Q.   Do you remember the names of either of the

19 two?

20     A.   No, sir.

21     Q.   In terms of the organization of Ninth

22 Mobile in August of 2018, was it divided into squads?

23     A.   Yes, sir.

24     Q.   And were you on a street squad?

25     A.   I believe so.

1        Q.   Did you serve in any other types of squads

2  within Ninth Mobile?

3        A.   I don't recall, sir.

4        Q.   Is -- are the street squads, when you think

5  back to August of 2018, were they the lowest level

6  squads?

7        A.   Possibly, sir.  I don't recall.

8        Q.   Okay.  Did you ever try to go on to any

9  other squads in the Ninth Mobile?

10        A.   I don't recall, sir.

11        Q.   Who do you recall was on your squad in

12  August of 2018?

13        A.   Gabriel Hellard, I believe, Jeff McCauley.

14  It's been a long time, sir.  I don't recall.

15        Q.   When you think back to when you started

16  within the Ninth Mobile, what training was provided

17  to you to make sure that you knew how to do the job?

18        A.   We have mandatory -- we had mandatory

19  in-service training every year.  And then also we

20  would have training ever so often within Ninth

21  Mobile.

22        Q.   When you started in Ninth Mobile, did you

23  shadow with any other officers?

24        A.   I don't recall, sir.

25        Q.   Do you recall while you were within LMPD

1    what they called STOPS training?

2          A.   Yes, sir.

3          Q.   What do you remember about that?

4          A.   Can you ask a little more specific, sir?

5          Q.   Sure.

6          A.   Stops is very broad.

7          Q.   That's fine.  Do you remember, you know,

8    certain steps that you had to take during traffic

9    stops that were required under policy?

10          A.   Yes, sir.  I remember part of it, not

11    the --

12          Q.   Which steps do you remember?

13          A.   If it's the part that you're talking about,

14    you do an introduction, you say your name, the reason

15    for the stop.  I can't remember.  I don't recall

16    anything else, sir.

17          Q.   You had to ask the operator of the vehicle

18    if there was a legitimate reason for doing what he or

19    she did, right?  Do you remember that now?

20          A.   No, sir.

21          Q.   Okay.  You had to ask the -- you had to ask

22    for the driver's license, insurance and registration,

23    where they're located, right?

24          A.   I don't recall that, sir, no.

25          Q.   Fair to say, though, that's common sense.

1  When you pull somebody over for a traffic stop,

2  you're going to ask them for their license, insurance

3  and registration, right?

4       A.  Some officers would, yes, sir.

5       Q.  Okay.  Did you do that as routine?

6       A.  Are you talking about this incident, sir?

7       Q.  I'm talking about as a routine practice

8  while you were making traffic stops with LMPD.

9       A.  Would I always ask for registration,

10 insurance and driver's license, no, sir.

11      Q.  Okay.  Under which -- when you think about

12 the types of circumstances where you wouldn't, help

13 me understand that.

14      A.  If I had already ran the license plate,

15 there wouldn't be a need for a registration or other

16 things, sir.

17      Q.  Okay.  And did you have some sort of

18 routine practice that you went through as to when --

19 when you would run the registration on a vehicle?

20      A.  If time was afforded, I would, sir.

21      Q.  Okay.  One of the -- do you recall one of

22 the stops -- the steps of the stop policy being that

23 the officer will give instructions to the violator to

24 follow as he -- as you would review the documentation

25 and decide what to do?

1      A.   I'm sorry.  Can you restate the question,

2  please.

3      Q.   Sure.  Do you recall one of the steps of

4  the STOPS policy being that the officer will give

5  instructions to the violator to follow as the officer

6  reviews documentation and decides what action to

7  take?

8      A.   No, sir, I don't recall that.

9      Q.   Okay.  And do you recall that one of the

10  steps of the STOPS policy being that the officer will

11  issue the appropriate warning or citation and let the

12  violator know that the traffic stop is over?

13      A.   No, sir, I don't remember that.

14      Q.   Do you recall any training that was

15  provided to you on the circumstances that needed to

16  be present for a pat-down to occur?

17      A.   I'm sorry.  Can you restate the question?

18      Q.   Sure.  Do you recall any training provided

19  to you regarding the circumstances that needed to be

20  present for a pat-down to occur?

21      A.   In this incident or others, sir?

22      Q.   Training.

23      A.   Okay.  In training, yes, training was

24  provided, sir.

25      Q.   All right.  And what training were you

1    given on pat-downs?

2         A.   I don't recall what the training was, sir.

3    That was years and years ago.

4         Q.   Okay.  As you sit here now as a police

5    officer, what is your understanding of the

6    requirements that need to be present for a pat-down

7    to occur?

8         A.   It has to depend on the circumstances and

9    what's going on.

10        Q.   And let's unpackage that.  What

11   circumstances need to be present for you to be able

12   to do a lawful pat-down?

13        A.   Again, sir, it depends on what's going on,

14   what the situation is.

15        Q.   Okay.  Under what circumstances, at least

16   to the best of your knowledge, are you not permitted

17   to do a pat-down?

18        A.   I don't recall, sir.  It depends on what

19   the situation is, sir.

20        Q.   Have you been given any -- throughout LMPD

21   were you ever advised on the Fourth Amendment?

22        A.   Yes, sir.

23        Q.   Okay.  Are you familiar with what the

24   Fourth Amendment, at least in terms of its progeny,

25   has dictated as to when a pat-down may occur?

1        A.   Are you talking about the search and

2    seizure?  I don't know the exact -- give me one

3    second.  I don't know the exact -- what it exactly

4    says in the Fourth Amendment word for word.

5        Q.   Okay.  Have you been taught -- while you

6    were at LMPD were you ever taught any case law as it

7    related to pat-downs and the Fourth Amendment?

8        A.   Yes, sir.

9        Q.   Okay.  And what were you taught?

10       A.   Again, you're asking a very broad question.

11   Is this like a Terry stop?  Or I don't understand

12   what you're saying, sir.

13       Q.   Sure.  All I'm asking is, is basically what

14   training you were provided within LMPD as it related

15   to the Fourth Amendment and when pat-downs were

16   permitted.

17       A.   So as far as training all of LMPD, LMPD

18   will have the training records.  I don't have any of

19   the training records, sir.

20       Q.   Okay.  Do you specifically recall any

21   training that you were in where you were taught when

22   a pat-down was permitted?

23       A.   I believe so, sir.

24       Q.   Okay.  And when was that training?

25       A.   I don't recall.

1      Q.   Who -- who was it that put on the training?

2      A.   I don't recall, sir.  It would have been at

3   the LMPD training academy or in-service training.

4      Q.   And do you recall whether it was part of

5   the academy or whether it was part of in-service?

6      A.   I don't recall, sir.

7      Q.   Were you ever taught while at LMPD that

8   reasonable suspicion needed to exist for a pat-down

9   to be permitted?

10      A.   I don't recall, sir.

11      Q.   Do you know what I mean by reasonable

12   suspicion?

13      A.   That you reasonably suspicion -- or think a

14   crime was about to occur?  Is that what you're

15   getting at?

16      Q.   I'm asking you.

17      A.   Are you -- I don't understand this

18   question.  Can you repeat it, please.

19      Q.   Sure.  Were you ever given any training at

20   LMPD regarding reasonable suspicion as it relates to

21   pat-downs?

22      A.   I don't recall.  I'm sure I was, but I

23   don't recall when it was or any details about it.

24      Q.   What is your understanding of what -- what

25   role reasonable suspicion plays in whether or not you

1    may conduct a pat-down?

2         A.   I don't recall, sir.

3         Q.   What is your understanding right now as we

4    sit here today of what reasonable suspicion must

5    exist for a pat-down to be permitted?

6         A.   That you have to have -- reasonably suspect

7    that the person is armed, that a crime hasn't

8    occurred, they're possibly armed and dangerous, for

9    the safety of others.  If a party says, hey, they're

10   armed.  There's many different factors that could

11   play into that.

12        Q.   Okay.  While you're within the Ninth Mobile

13   did you engage in any sort of community service

14   projects?

15        A.   Yes, sir.

16        Q.   Okay.  Which ones do you recall?

17        A.   There were -- I know there was a few where

18   we did, like, a food outreach type things.  There

19   were several in the community, but I don't remember

20   specific ones, sir.

21        Q.   While you were within Ninth Mobile was it

22   ever indicated to you by command staff that traffic

23   stops were a mechanism for violent crime reduction?

24        A.   I don't recall, sir.

25        Q.   What's your understanding of what role

1  traffic stops played within the Ninth Mobile?

2      A.  I don't know as far as -- I would say to be

3  able to have contact with people and talk to them.

4      Q.  Okay.  Anything else?

5      A.  To be able to stop violent -- violent

6  felon -- felonies from occurring, if there was a

7  shooting if we got dispatched there.  But I don't

8  recall.

9      Q.  Okay.  And how would you personally, Kevin

10 Crawford as an LMPD Ninth Mobile detective, use

11 traffic stops to reduce violent crime?

12     A.  I don't recall, sir.

13     Q.  Talk to me about your job as a detective

14 within the Ninth Mobile.  What roles and

15 responsibilities did you have?

16     A.  We would assist other agencies, other

17 police departments, the DEA whenever we were advised

18 to or told to go somewhere.  We would respond to

19 shootings if they occurred while we were on duty.  We

20 would assist homicide, robbery, several different --

21 several different ways, sir.

22     Q.  And one of your roles and responsibilities

23 was to conduct traffic stops, correct?

24     A.  Yes, sir.

25     Q.  When you think back to your time within the

1   Ninth Mobile on a street squad, how often were you

2   conducting traffic stops on a daily basis?

3          A.   It just depends on the day and what our

4   goal essentially was.  If we were doing surveillance

5   or helping out one of the federal partners, it would

6   be likely that we wouldn't stop any at all.  Then

7   there would be -- go ahead.

8          Q.   Yeah.  What I was going to say is, let's

9   talk about a day and you don't have any surveillance

10  projects that you need to do.  You don't have any

11  sort of assistance that you need to provide to

12  another agency and it's just -- it's just a day, you

13  know, just a normal day without that going on.  What

14  frequency of -- what was your frequency of traffic

15  stops on those types of days?

16         A.   It just depends.  It just depends, sir.  It

17  could be one.  It could be five or six.  It's -- it

18  just depends on the -- on the day, sir.

19         Q.   Were there days that you can recall where

20  you had to go out -- or where you went out and

21  conducted more than ten traffic stops?

22         A.   I don't know an exact number, sir.  I don't

23  recall.

24         Q.   That's okay.  Can you remember any days

25  where you went out and conducted over eight traffic

1  stops?

2       A.   I don't -- I don't know, sir.  I don't

3  recall at this time.

4       Q.   Were you ever taught the distinction

5  between a safety stop versus investigative stop?

6       A.   No, sir.  I don't recall at this time.

7       Q.   Thinking back to your time within the Ninth

8  Mobile, what would you, Kevin Crawford, analyze in

9  terms of to determine whether or not a traffic stop

10 should be made?

11      A.   Can you resay the question, please.

12      Q.   Sure.  Throughout your time within the

13 Ninth Mobile, what would you personally analyze when

14 making the decision of whether or not to make a

15 traffic stop?

16      A.   If a traffic offense occurred in front of

17 me.

18      Q.   And as a matter of routine, would you stop

19 everybody that you identified as committing a traffic

20 violation?

21      A.   Not every person.  You couldn't stop every

22 person, sir.

23      Q.   So what other criteria would you use to

24 determine whether or not to make that stop?

25      A.   If I can safely make the stop.  If it was

 1   going the opposite direction, I couldn't safely pull

 2   into traffic, you can't stop that.

 3          Q.   What criteria would you use to determine

 4   whether or not to remove a driver of a person you'd

 5   stopped for a traffic violation from the vehicle, to

 6   remove them?

 7          A.   Depends on the criminal indicators that are

 8   present and how they're actually -- it depends on the

 9   criminal indicators that are present and then the

10   safety around us.

11          Q.   Okay.  What criminal indicators would you

12   look for?

13          A.   Extreme nervousness, weapons present, plain

14   view, narc -- I mean, there are several different

15   things, sir.

16          Q.   Let's work through them, the ones you can

17   remember.  So extreme nervousness, weapons present.

18   Things you identified in plain view.  What else?

19          A.   You can get them out just for officer

20   safety.  There's several different things.

21          Q.   And when you say that you could get them

22   out for officer safety, what do you mean by that?

23          A.   Case law that was established by the

24   supreme court.

25          Q.   When you think back to the traffic stops

1   that you made in the Ninth Mobile, would you request

2   as routine for everybody, every driver to exit the

3   vehicle?

4         A.   No, sir.

5         Q.   So let's think about the situations where

6   you wouldn't.   Under what situations can you recall

7   that you didn't ask the driver to exit the vehicle,

8   why didn't you?

9         A.   I don't recall.

10        Q.   Within the Ninth Mobile were you assigned

11  to different hot spots for patrolling?

12        A.   We would go to different hot spots, yes,

13  sir.

14        Q.   Okay.   And who would advise you which hot

15  spots to focus on?

16        A.   A supervisor.

17        Q.   While you were in the Ninth Mobile were you

18  required after traffic stops to fill out stops forms?

19        A.   I don't recall.

20        Q.   Were you ever shown what a stops form was?

21        A.   Yes, sir.

22        Q.   Okay.   And what was on the stops form?

23        A.   I don't recall, sir.

24        Q.   Under what situations were you advised that

25  you did not need to fill out a stops form after a

1    traffic stop?

2         A.   I don't recall, sir.

3         Q.   Do you remember situations where you didn't

4    fill out a stops form after a traffic stop?

5         A.   I don't recall.

6         Q.   You can't recall a single situation where

7    you did a traffic stop and afterwards didn't fill out

8    a stops form?

9         A.   I don't recall, sir.

10        Q.   What was on the stops form?  Do you recall

11   whether or not -- well, let's work through specific

12   things.  On the stops form do you recall whether or

13   not you had to identify if a pat-down was done?

14        A.   I don't recall.

15        Q.   Do you recall whether or not you had to

16   identify whether anyone within the vehicle was

17   removed from the vehicle?

18        A.   I don't recall, sir.

19        Q.   Within the form did you have to identify

20   whether or not a K-9 did a sniff on the vehicle?

21        A.   I don't recall, sir.

22        Q.   Within the form did you have to identify

23   the race of the driver?

24        A.   I don't recall.

25        Q.   Within the stops form did you have to

1   identify any reasonable suspicion you had for a

2   pat-down?

3          A.   I don't recall.

4          Q.   Within the stops form did you have to

5   identify whether a frisk was done?

6          A.   I don't recall.

7          Q.   Within the stops form did you have to

8   identify whether or not an arrest was made?

9          A.   I don't recall.

10          Q.   Within the stops form did you have to

11   identify whether or not a warning was given?

12          A.   I don't recall.

13          Q.   Do you recall any situations where within

14   the Ninth Mobile, command staff reviewed any data

15   with you as it related to information they got from

16   the stops forms?

17          A.   I don't recall, sir.

18          Q.   Do you recall a strategy within the Ninth

19   Mobile that was called or alluded to at least as

20   People, Places and Narcotics?

21          A.   I've heard of it on the news, but I don't

22   remember it while I was there, sir.

23          Q.   Okay.  While you were within Ninth Mobile,

24   did command staff ever advise you to -- to focus on

25   certain types of vehicles?

1      A.   I don't recall, sir.

2      Q.   While you were within the Ninth Mobile did
3  you ever -- did upper command ever advise you to
4  focus on certain age ranges for drivers?

5      A.   No, sir.

6      Q.   While you were in the Ninth Mobile did
7  command staff ever advise you to focus on certain
8  races?

9      A.   No, sir.

10      Q.   While you were within Ninth Mobile what's
11  your understanding of the requirements that needed to
12  be present for you to do a frisk?

13      A.   Can you resay the question, please.

14      Q.   Sure.   While you were within Ninth Mobile,
15  when you think back to that, what were the
16  requirements that were in place for you to be able to
17  do a frisk?

18      A.   A frisk of a person or a vehicle?   What do
19  you mean, sir?

20      Q.   Of a person.

21      A.   I don't recall, sir.

22      Q.   What is a frisk of a vehicle?

23      A.   I don't recall, sir.

24      Q.   Okay.   While you were within the Ninth
25  Mobile doing traffic stops, under what situations --

1    what situations had to be present for you to request

2    for K-9 to respond and do a sniff?

3            A.   I don't recall.

4            Q.   How often do you recall, you know, more

5    than 50 percent of the time when you made a traffic

6    stop would you request a vehicle sniff?

7            A.   I don't recall, sir.

8            Q.   While you were in the Ninth Mobile what --

9    what requirements were in place for you to handcuff a

10   suspect?

11           A.   I don't remember.  I don't recall.

12           Q.   Did you recall -- do you recall any sort of

13   training that you received as it relates to

14   prolonging traffic stops?

15           A.   When it comes to K-9?

16           Q.   Yes.

17           A.   You don't.  You don't prolong traffic

18   stops.  We were trained, yes, sir.

19           Q.   When you think back to traffic stops that

20   you made for traffic violations within the Ninth

21   Mobile, think about every ten that you did, how often

22   would you come up with illegal guns?

23           A.   I don't recall.

24           Q.   Out of those -- when you think about, you

25   know, every ten that you did, how often would you

1    recover dope?

2           A.   I don't recall, sir.

3           Q.   What training did you receive on pretext

4    traffic stops at LMPD?

5           A.   I don't recall.

6           Q.   Do you know what I mean by pretextual

7    traffic stops?

8           A.   No, sir.

9           Q.   Do you know what a pretextual traffic stop

10   is?

11          A.   Yes, sir.

12          Q.   Okay.  And what is it?

13          A.   I don't recall at this time.

14          Q.   Do you recall when, you know, what you were

15   advised at LMPD as to when a pretextual traffic stop

16   was permitted?

17          A.   I don't recall.

18               MR. ERVIN:  Sam.

19               MR. AGUIAR:  Yeah, yeah.

20               MR. ERVIN:  Excuse me.  Do you mind if we

21   take a break?

22               MR. AGUIAR:  Absolutely not.  That's

23   totally fine.  It's 1:27.  Can we come back at 1:35?

24               MR. ERVIN:  Yes, sir.

25               MR. AGUIAR:  Okay.  Thank you.

```
 1              MR. ERVIN:  Thanks.

 2              THE REPORTER:  Okay.  We will go off the

 3    record.

 4              (RECESS)

 5              THE REPORTER:  We are back on the record

 6    at 1:38.

 7              MR. AGUIAR:  Officer Crawford, while you

 8    were within LMPD, do you recall receiving any

 9    training on implicit bias?

10         A.   Yes, sir.

11         Q.   And what do you recall about that?

12         A.   We had -- we had implicit bias training

13    several times throughout the academy.  I don't recall

14    exact dates.  I know we had it in the academy and

15    then throughout -- a couple times throughout the --

16    my time there.

17         Q.   And what did you learn through that

18    training?

19         A.   That some people have implicit biases.

20         Q.   What is implicit bias?

21         A.   I don't know the exact definition.  In my

22    own words I guess I could say that it's bias that

23    certain people have against other people that --

24    biases that they grew up with, that they were taught

25    about other people.
```

1      Q.   Throughout your time while you were at LMPD
2  did you ever have any citizen complaints filed
3  against you?
4      A.   I don't recall.  If there were, there
5  weren't very many.  None that I recall at this time.
6      Q.   Did you receive any training while at LMPD
7  regarding racial profiling?
8      A.   Yes, sir.
9      Q.   Okay.  And what do you recall about the
10 training that you received regarding racial
11 profiling?
12     A.   That you don't profile people based on
13 their race, gender, other physical characteristics
14 about them.
15     Q.   And why is that important?  Why is it
16 important as an officer to make sure that you're not
17 engaging in racial profiling?
18     A.   Because you want to be -- you want to have
19 the -- be able to make the best judgment whatever the
20 issue is.
21     Q.   Would you agree as a police officer that
22 if -- you know, if you personally were to engage in
23 racial profiling, you may lose trust within the
24 community?
25     A.   Absolutely.

1        Q.   You were trained within LMPD, I'd imagine,

2    that you need to show respect for all people

3    regardless of race, gender, age, correct?

4        A.   Yes, sir.

5        Q.   While you were within LMPD do you recall

6    ever being shown a public information brochure for

7    citizens regarding what they should do when stopped

8    by police officers?

9        A.   I don't recall, sir.  I don't think I -- I

10   don't recall.

11       Q.   Do you recall undergoing a training called

12   honing interpersonal negotiating techniques?

13       A.   I don't remember that, sir.  I don't

14   recall.

15       Q.   All right.  Let's skip forward to the

16   incident that this case is about.  On that particular

17   day you were with Gabe -- you were with Hellard,

18   correct?

19       A.   Yes, sir.

20       Q.   Okay.  And was he your -- was he your -- I

21   guess what would you call him, your beat partner?

22       A.   Just another person in the squad.

23       Q.   Was there anybody else that -- or let's put

24   it this way.  Was Hellard the one that you routinely

25   were with when doing traffic stops?

1    A.   Me and him rode together quite frequently.

2    Q.   How was it determined who would ride

3  together?

4    A.   I don't recall.

5    Q.   Was it assigned or was it something that

6  you-all would just select?  Do you remember that?

7    A.   A lot of times you would just select it

8  yourself, I believe.

9    Q.   Did Hellard come into Ninth Mobile before

10  or after you did?

11    A.   From the best of my knowledge, we came in

12  together.

13    Q.   Before you came in together, did you know

14  him?

15    A.   Yes.

16    Q.   All right.  How long have you known Officer

17  Hellard?

18    A.   Ever since the academy in 2013.

19    Q.   Did you-all go through the academy

20  together?

21    A.   Yes, sir.

22    Q.   Would you consider him a personal friend?

23    A.   Yes, sir.

24    Q.   All right.  Are the two of you still

25  personal friends?

1       A.   We're decent friends.  We're not as good

2  friends as we used to be.

3       Q.   All right.  Do you recall, thinking back to

4  the day of the Tae-Ahn Lee traffic stop, going to

5  Thornton's beforehand?

6       A.   Yes, sir.

7            MR. AGUIAR:  Nancy, can you enable screen

8  sharing?

9            THE REPORTER:  Sure.  Is it not already?

10           MR. AGUIAR:  No.  It says disabled

11  participant screen sharing.  I remember we had this

12  last time.  Maybe there was something I was supposed

13  to do, but I'm just clicking -- there we go.  All

14  right.  Good.

15           THE REPORTER:  There you go.

16      Q.   Okay.  So, Officer Crawford, do you recall

17  why you-all went to Thornton's?

18      A.   We would often go there and gas up, get

19  something to drink.

20      Q.   Does Thornton's, do you-all -- do you-all

21  get free drinks there?

22      A.   Yes, sir.  We used to.  I'm not sure if

23  they still do it or not.

24      Q.   Did you -- did you see Tae-Ahn Lee while he

25  was at Thornton's?

1      A.   No, I didn't see him.  I don't believe I

2  did.

3      Q.   Do you recall whether or not Officer -- or

4  Detective Hellard indicated to you that he saw

5  Tae-Ahn Lee?

6      A.   I don't recall.

7      Q.   All right.  Can you see my screen?  Can you

8  see a screenshot?

9      A.   No, sir.  All I see is like a menu, like a

10  folder.

11      Q.   Okay.  I can't remember what I did here.  I

12  think I had to hit share, like, second screen or

13  something.  Nancy, do you remember?

14          THE REPORTER:  I think you need to maybe

15  put that on your laptop separately and then close

16  that screen.

17          MR. AGUIAR:  Oh, okay.  Well, that makes

18  sense.  All right.  Let me pull it up again.  How

19  about now?  We in business?  Can you see a screenshot

20  of you?

21          THE REPORTER:  Yes.

22      Q.   Officer Hellard, can you see -- can you see

23  that screenshot from Thornton's?

24          MR. ERVIN:  Officer Crawford.

25          MR. AGUIAR:  What's that?

1          MR. ERVIN:  Crawford.

2      A.  Crawford, sir.

3      Q.  Oh, did I call you Hellard?  That's

4  embarrassing.  I apologize.

5      A.  That's okay.

6      Q.  Officer Crawford, can you see on the screen

7  what's a screenshot from Thornton's?

8      A.  Yes, sir.

9      Q.  Have you -- in advance of this deposition,

10 have you seen any of the surveillance footage from

11 Thornton's from this day?

12     A.  No, sir.

13     Q.  Okay.  On this particular situation right

14 here, just out of curiosity, when you pulled up here,

15 why didn't you park in a designated parking spot?

16     A.  I'm not sure.  I've parked in that spot

17 before.  I'm sorry.  I'll go back and answer your

18 question.  Can you repeat your question for me?

19     Q.  Sure.  On this particular day do you recall

20 why you didn't park in a designated parking spot?

21     A.  I don't recall, sir.  I don't know if that

22 was -- it may have been a parking spot there, sir.

23     Q.  Okay.  All right.  Let's -- all right.  So

24 what we're going to do now is we're just going to

25 work our way through the video of your body camera on

1  that day, okay?

2       A.   Okay.

3       Q.   Have you ever had a chance to watch that

4  body camera?

5       A.   My body camera, yes, sir.

6       Q.   We'll get there, I promise.

7            (COMMENTS OFF THE RECORD)

8            THE REPORTER:  We are back on the record

9  at 1:55.

10           MR. AGUIAR:  Officer Crawford, do you see

11 a video playing on the screen?

12      A.   Yes, sir, I do.

13      Q.   Okay.  Good.

14           (PLAYING VIDEO)

15      Q.   All right.  So stopping right there.  Up to

16 this point, Officer Crawford, would you agree that in

17 that video we don't hear you introduce yourself and

18 say who you are?

19      A.   Well --

20           MR. ERVIN:  Sam, I'm sorry.  Let me object

21 first, Officer Crawford.  And you may be factually

22 correct, Sam, but this video didn't show that.

23 Something's out of sync there.  I don't know why, but

24 it didn't appear that the video and the audio were in

25 sync, and one or both were intermittently

 1   interrupted.  And so I just -- I think it's difficult

 2   to answer that question based on that video.

 3          Q.   Officer Crawford, you said you reviewed

 4   this -- the video of your body camera previously,

 5   right?

 6          A.   Yes, sir.

 7          Q.   And within what you've reviewed do you

 8   recall -- do you recall seeing any situation where

 9   you identified yourself to Tae-Ahn Lea?

10          A.   I was in full uniform, sir.

11          Q.   I'm just asking, did you identify yourself?

12   Did you tell Tae-Ahn Lea who you were?

13          A.   Visually he could see me as a police

14   officer with Louisville Metro Police.

15          Q.   Did you give -- did you give Tae-Ahn Lea

16   your name?

17          A.   Verbally?  No, sir, I don't believe I did.

18          Q.   Okay.  Did you give Tae-Ahn Lea an

19   opportunity to explain what he did?

20          A.   I don't recall, sir.

21          Q.   At this point, at least we see when you

22   come up to the vehicle and at least right here as we

23   see in the video, Tae-Ahn Lea had his hands by the

24   steering wheel, correct?

25          A.   That's what it appears, yes.

1    Q.   Was there anything threatening about his

2    mannerisms up to this point?

3        A.   In what the video that you just showed did

4    not show, it's part of a bigger picture, when the

5    vehicle was slow to stop and didn't come to a

6    complete -- didn't stop when it should have.  It was

7    slow to stop.

8        Q.   Okay.  And what's -- and what's the

9    significance of that?

10       A.   It's just the beginning.  It's just the

11   beginning of a long series of steps that just

12   heightens the tension level of what could --

13   something criminal that could be occurring.

14       Q.   Do you recall during this stop, was there

15   anything -- were there any weapons or narcotics in

16   plain view?

17       A.   Yes.

18       Q.   Okay.  And what did -- what weapons and

19   narcotics were in plain view?

20       A.   A bat or a wooden rod, sir.

21       Q.   When did you first see the wooden rod?

22       A.   I was advised of it when we made contact.

23       Q.   And what do you mean when you made contact?

24       A.   When we first approached, Hellard said

25   "bat."

1      Q.   Did you ask --

2      A.   He said something about his right hand.

3      Q.   Did you ask Tae-Ahn Lea about the bat?

4      A.   No.

5      Q.   Fair to say at least at this point right

6   here when you approached Tae-Ahn Lea, the only

7   suspected offense that you had of him was a traffic

8   violation?

9      A.   There was additionals.  But as far as

10  criminal offense, yes, it was just the traffic

11  offense.

12     Q.   Okay.  Let's keep going.

13          (PLAYING VIDEO)

14     Q.   All right.  Officer Crawford, up to this

15  point did you believe that Tae-Ahn Lea was acting

16  nervous?

17     A.   Yes.

18     Q.   Okay.  And what made you believe that?

19     A.   His breathing pattern, the rise and fall of

20  his chest.  When his hands were initially on the

21  steering wheel, his fingertips were shaking.

22     Q.   He was courteous -- up to this point he was

23  courteous to you, correct?

24     A.   To a point, yes.

25     Q.   What do you mean "to a point?"

1          A.    This video's kind of choppy.  So precisely

2     he gets passive/aggressive.  His demeanor changes.

3          Q.    Up till this point, we're a minute and

4     51 seconds into the video, Tae-Ahn Lea has not gotten

5     passive/aggressive with you, correct?

6          A.    I don't recall as far as the time-wise.

7          Q.    Okay.  I don't know if you can't see it on

8     the screen what I'm referencing in terms of time

9     frame.  I'm looking at the bottom left.  I should

10    have a cursor where it says 1:51.  Do you see that?

11         A.    Yes, sir.

12         Q.    So just I'm asking at least up until what

13    we've seen at this point, would it be fair to say

14    that Tae-Ahn Lea has not gotten passive/aggressive

15    with you?

16         A.    I can't say, sir.  With the -- how choppy

17    the video is right now and not knowing the time with

18    the time stamp, I can't say.  I don't recall at this

19    time, sir.

20         Q.    Has Tae-Ahn Lea up to this point complied

21    with your requests?

22         A.    Aside from not pulling over whenever we

23    initially pulled him over, yes.

24         Q.    All right.  He's complied with your verbal

25    requests to this point, correct?

1      A.   Yes.

2      Q.   And when you advised him if he had any

3  guns, he said no, correct?

4      A.   Correct.

5      Q.   And you had no reason at this point to

6  believe that he had guns, correct?

7      A.   False.   No.

8      Q.   Okay.   Did you believe at this point that

9  he had guns?

10     A.   I believe he may have had other weapons

11 because he lied -- he didn't say anything about the

12 bat or the pole over on the other side.

13     Q.   Okay.   Up until this point did you identify

14 within his pockets or anything you observed on him

15 any sort of a bulge that you thought might have been

16 a gun?

17     A.   No, sir.

18          (PLAYING VIDEO)

19     Q.   All right.   Stop at that point.   Again,

20 you'd agree that when you asked Tae-Ahn Lea for his

21 insurance information, he was compliant, correct?

22     A.   Yes, sir.

23     Q.   And at this point is his breathing pattern

24 leading you to believe that he's nervous?

25     A.   Yes.

1      Q.   And what about it?

2      A.   How rapidly that his chest was rising and

3  falling.

4      Q.   You'd agree that being pulled over by the

5  police can be a nervous experience for anyone,

6  correct?

7      A.   Yes.  But there's different levels of

8  nervousness.

9      Q.   And how do you differentiate between those?

10      A.   Based on all the stops I've made previously

11  in my career and my training.

12      Q.   So what indicators are you looking for to

13  see if somebody is extremely nervous versus just a

14  little nervous?

15      A.   With their hands shaking a tiny bit, with

16  breathing pattern, legs shaking, eyes twitching, the

17  nonverbal communication.

18      Q.   All right.  So hands shaking, eyes

19  twitching.  What else did you say?

20      A.   Nonverbal communication, sir.

21      Q.   What kind of nonverbal communication?

22      A.   Any communication with their body that

23  isn't verbal.

24      Q.   And what -- what communication with their

25  body that isn't verbal are indicators to you of

1  nervousness?

2       A.   Was that a question, sir?

3       Q.   Yes, sir.

4       A.   Can you reask it, please.

5       Q.   Sure.   What nonverbal communication are you

6  looking for for signs of nervousness?

7       A.   Anything that's not -- anything that's not

8  normal.

9       Q.   When Tae-Ahn Lea's phone rang and he

10  answered it, did you have any problems with him

11  answering his phone?

12       A.   No, sir.

13            (PLAYING VIDEO)

14       Q.   Officer Crawford, why did you pull Tae-Ahn

15  out of the vehicle?

16       A.   Like I said before, it's all the little

17  things that led up to it.  The first thing was he was

18  slow to stop.  The vehicle didn't pull over right

19  when we stopped it despite having plenty -- that

20  entire lane to pull over.  It was a two-lane street

21  on that side.  After speaking to or on approach

22  talking to him, Officer Hellard noticed the weapon

23  that's partially concealed in the seat, the bat.

24  Speaking to him, his phone rang, he not only when he

25  answered it, he left it on speakerphone.  A lot of

1  people will just hang on the phone instead of putting

2  it on speakerphone.  This raised our suspicion that

3  was going -- could possibly happen, inviting more

4  people to the scene.

5       Q.  Why didn't you tell him all that?

6       A.  I gave him a simple command of, hey, move

7  these objects, and he refused to do it.  He wasn't

8  following the commands, sir.

9       Q.  He did ask you why he was being removed

10  from the vehicle, correct?

11      A.  Yes, sir.

12      Q.  And why didn't you tell him?

13      A.  Because he continued to not move the items

14  over in his belongings, so I helped him out of the

15  vehicle gently.

16      Q.  And why didn't you explain to him why you

17  were removing him out of the vehicle?

18      A.  I'm sorry.  Can you reask the question?

19      Q.  Why didn't you explain to him why you were

20  removing him from the vehicle?

21      A.  I don't recall, sir.

22          (PLAYING VIDEO)

23      Q.  Officer Crawford, why did you ask Tae-Ahn

24  Lea four different times whether or not he had any

25  weapons?

```
 1          A.   Because I kept getting interrupted.

 2          Q.   What do you mean by that?

 3          A.   I kept getting interrupted.

 4          Q.   When you had asked him originally whether

 5   or not he had any weapons when he had indicated to

 6   you he had to go into his pockets to grab his

 7   license, what interruption did you get there?

 8          A.   I don't recall, sir.

 9          Q.   When he told you at that point that he did

10   not have any weapons, you didn't have any reason to

11   believe that he had a gun on him, correct?

12          A.   I'm sorry.  Can you resay the question,

13   please?

14          Q.   Sure.  The first time that you asked him

15   whether or not he had any weapons and he indicated to

16   you that he did not --

17          A.   Yes.

18          Q.   -- you didn't have any reason to believe at

19   that point that he was armed with a gun, correct?

20          A.   He could have been.

21          Q.   Did you have any reason to believe that he

22   was at that point?

23          A.   I didn't have any reason to believe he

24   wasn't.  I mean, he could have had a gun on him.  I

25   didn't know.
```

1      Q.   If you thought that he would have had a gun

2  on him, is it fair to say that you would not have

3  permitted him to go into his pockets for his driver's

4  license?

5      A.   No.   I would have -- I mean, if I would

6  have known he had a gun in that pocket, no, I

7  wouldn't have had him go in and grab his ID.

8      Q.   And even if you thought he had a gun in

9  that pocket, you wouldn't have let him go grab his

10 ID, correct?

11     A.   I don't recall.

12     Q.   Did anything change between that initial

13 time that you asked him whether or not he had any

14 weapons and the time that you patted him down that

15 made you think that he had a gun?

16     A.   Just the interaction with him and seeing

17 him displaying the nervousness, sir.

18     Q.   At this point when you had him out of the

19 vehicle, did you see anything in terms of, like, a

20 bulge or a visual indicator from his pockets or his

21 clothing that led you to believe that he was armed?

22     A.   He had a small bulge.   I don't remember

23 where it was at.

24     Q.   Do you remember if it was in his lower body

25 or his upper body?

1    A.   It was around his waistline, I believe.   I
2  think it was just caused by the white shirt that he
3  was wearing.
4    Q.   That bulge that you saw in his waistline,
5  did you think that was a gun?
6    A.   No, sir.   It was just a small bulge.
7    Q.   After he was up against the vehicle, why
8  did you ask him two times in a row if he had any
9  weapons on him?
10    A.   I don't recall, sir.
11    Q.   At this point did you think he had any
12  weapons on him?
13    A.   I don't recall.   I believe he may have or
14  may not have.   I didn't know.   With his actions that
15  he had displayed so far to that point, it was
16  possible.
17    Q.   The Ninth Mobile is a violent crime unit,
18  correct?
19    A.   Yes, sir.
20    Q.   When you pulled over Tae-Ahn Lea, what did
21  you think you were doing in terms of accomplishing
22  solving violent crime?
23    A.   It was a simple traffic stop, sir.
24    Q.   Did you call -- did you ever advise that --
25  you know, what division was this in, do you recall?

1    A.   Possibly the Second Division, maybe the

2    Fourth.  I don't recall, sir.

3    Q.   Okay.  Again, you guys are violent crime.

4    And then you've got -- you had patrol over in Second

5    Division.  Any reason you just didn't tell Second

6    Division to handle this traffic stop?

7    A.   No, sir.  I initiated the traffic stop.

8    Q.   Okay.  Before you even approached Tae-Ahn's

9    vehicle or got out of your vehicle, you and Hellard

10   had reached out to McCauley, correct?

11   A.   I'm sorry.  Can you reask the question?

12   Q.   Sure.  So when you lit up Tae-Ahn Lea --

13   A.   Yes.

14   Q.   -- you and Hellard had reached out to

15   McCauley, correct?

16   A.   No.

17   Q.   Hellard had reached out to McCauley,

18   correct?

19   A.   I don't -- I don't know what his actions

20   were.  I know he called off that we're stopping a

21   vehicle on the radio, but I don't know what he said

22   or I don't recall any of that.

23   Q.   You-all requested for McCauley to respond

24   to the scene of this traffic stop, correct?

25   A.   No, I did not.

1   Q.   All right.  Hellard did, correct?

2   A.   I don't know what his actions were.

3   Q.   McCauley responded to the scene, correct?

4   A.   Yes.

5   Q.   All right.  So do you have any idea how or

6   how he got notice to respond to the scene?

7   A.   Because he was in our squad and we called

8   off on a traffic stop.

9   Q.   Okay.  And do you recall whether or not

10  you-all personally or specifically reached out to

11  McCauley and requested him?

12  A.   No.

13  Q.   In terms of your time in the Ninth Mobile

14  when were you -- or how were you trained in terms of

15  when to ask for a K-9 to come to the scene of a

16  traffic stop?

17  A.   Can you repeat the question, please.

18  Q.   Sure.  When you think back to your training

19  in the Ninth Mobile, under what circumstances were

20  you advised to have a K-9 come to the scene of a

21  traffic stop?

22  A.   I don't recall.

23  Q.   Under what circumstances were you advised

24  to request a K-9 sniff at the scene of a traffic

25  stop?

1      A.   I don't recall what they were, sir.

2      Q.   Do you recall whether or not you were told,

3   you know, under these situations do not ask for a K-9

4   sniff?

5      A.   No.  I don't recall, sir.

6      Q.   Do you recall under what situations you

7   were advised it was, you know, you were -- or do you

8   recall when you were advised that it was appropriate

9   to request a K-9 sniff?

10      A.   I don't recall, sir.

11      Q.   When you were go -- when you think back to

12   then, under what situations would you typically

13   request a K-9 sniff?

14      A.   If there was some type of criminal activity

15   present.

16      Q.   And what type of criminal activity present?

17   What do you mean by that?

18      A.   Narcotic possession, anything to do with

19   narcotics, sir.

20      Q.   What criminal activity was present with

21   Tae-Ahn Lea?

22      A.   Can you be more specific, please?

23      Q.   I'm just going with -- I'm using your

24   words.  You said if there's criminal activity

25   present, that's when you would request a K-9 sniff,

1  correct?

2       A.   I didn't request a K-9 sniff.  I believe

3  McCauley just came to back us up, and he just

4  happened to be a K-9 officer, sir.

5       Q.   That's okay.  We're jumping ahead of

6  ourselves here.  I just want to make sure I heard you

7  correctly.  If there was criminal activity present,

8  those are the situations where you would request a

9  K-9 sniff, correct?

10      A.   Yes.

11      Q.   What criminal activity was present with

12 Tae-Ahn Lea?

13      A.   There were indicators of criminal activity

14 with Tae-Ahn Lea.

15      Q.   And those indicators were what?

16      A.   His nervousness, him lying to us about the

17 weapon.

18      Q.   What else?

19      A.   That's all that I can recall at this time.

20      Q.   What led you to believe that, I guess what

21 you'd called it, like, a -- you know, a bat or a

22 stick, what led you to believe that that was a

23 weapon?

24      A.   Because it was a weapon.  It can be used to

25 harm something.  I'm not sure I fully understand your

1  question, sir.

2      Q.   That's okay.  I mean, not to be too smart

3  here, but, like, a fork is -- could be used to harm

4  somebody, correct?

5      A.   Yes, sir.

6      Q.   If he had a fork, you know, that was on

7  the -- in his floor board, would you have considered

8  that to be a weapon?

9      A.   No, sir.

10     Q.   And why not?

11     A.   It's a fork, sir.

12     Q.   Okay.

13          (PLAYING VIDEO)

14     Q.   Officer Crawford, in that sequence right

15 there, fair to say that you were doing -- you were

16 trying to identify whether or not there were any

17 criminal indicators in plain view in the vehicle,

18 correct?

19     A.   The main thing I was looking for, for

20 anything dangerous to the dog whenever he went in

21 there.

22     Q.   You didn't identify anything, correct?

23     A.   Other than the bat.  But the bat wouldn't

24 have hurt the dog just sitting there, no, sir.

25     Q.   You didn't see any indicators of narcotics,

1  correct?

2      A.  Not at this time.

3      Q.  And you didn't see any firearms, correct?

4      A.  No, sir.

5      Q.  That's correct, right, you didn't see any

6  firearms?

7      A.  Yes.  That's correct.  I did not see any

8  firearms.

9      Q.  At this point you hadn't run the license or

10  registration, correct?

11      A.  I don't recall, sir.

12      Q.  Did you -- when would -- when you think

13  back to your traffic stops, when would you typically

14  run the registration on the vehicle?

15      A.  Back then, after the stop, sir.

16      Q.  And was it part of a certain sequence, you

17  know, would you do certain things, then run the

18  registration and then do more things, or how did that

19  work?

20      A.  It just depend -- depended on the

21  situation.

22      Q.  In this particular situation, you had

23  certain resources that you could do to search Tae-Ahn

24  Lea, such as CourtNet, license and registration,

25  correct?

1      A.   Yes, sir.

2      Q.   And why is it important to -- why is it

3 important to run a registration?

4      A.   Make sure the vehicle's not stolen, to make

5 sure the registration is up to date, not expired and

6 also to see who it's registered to.

7      Q.   All right.  And why is it important to run

8 the license?

9      A.   Making -- to make sure that they're not a

10 wanted person and also a registered driver.

11      Q.   And why is it important to run CourtNet?

12      A.   I'm sorry?

13      Q.   Why is it important to run the CourtNet?

14      A.   To see if there are any warrants that are

15 on there, it will pop up.

16      Q.   It's also important to see their criminal

17 history to see if they've got a history of violent

18 crime, correct?

19      A.   I wouldn't say that's the important, no,

20 sir.

21      Q.   You'd want to know as an officer if you're

22 dealing with a suspect who's got a history of, you

23 know, violence with a gun, homicide, things along

24 those lines, right?

25      A.   I mean, that would be nice information to

1    have, yes, sir.

2         Q.   And it's information that you're able to

3    get through CourtNet, correct?

4         A.   I don't recall.  I don't recall what was on

5    CourtNet, sir.  I remember we had access to it, but

6    it's been awhile.

7         Q.   How come to this point you hadn't run any

8    of that on Tae-Ahn Lea?

9         A.   I don't recall, sir.

10             (PLAYING VIDEO)

11        Q.   Officer Crawford, at this point there's a

12   sniff being done of the vehicle, correct?

13        A.   I don't know what that terminology is

14   called, but, yes, sir.

15        Q.   Okay.  To the best of your knowledge, who

16   requested for Detective McCauley to have that sniff

17   done?

18        A.   I did.

19        Q.   And why did you?

20        A.   Because I believed something criminal was

21   inside the vehicle, criminal in nature.

22        Q.   And just so I understand correctly, that's

23   because of sign -- or indicators of nervousness, of

24   Tae-Ahn not telling you that there was a bat in the

25   vehicle?  Those --

1        A.   Yes, sir.

2        Q.   Were those the two indicators?

3        A.   Yes, sir.

4             MR. ERVIN:   Objection to the form.

5        Q.   Why didn't you run Tae-Ahn's background

6   before requesting the sniff?

7        A.   He got there so quickly.

8        Q.   Why didn't you have him wait until you ran

9   the background before having the sniff done?

10       A.   To try to get Tae-Ahn Lea out of there as

11  soon as I could, not delay it at all.

12       Q.   Did you ever undergo any K-9 training?

13       A.   I've gone to K-9 training a few times, but

14  I've never gone to handler class or anything like

15  that.

16       Q.   Why did you go to K-9 training?

17       A.   I thought K-9s are awesome.  They're pretty

18  fun to have.

19       Q.   Who put on that training?

20       A.   I don't recall who it was.

21       Q.   Did you learn within that -- did you learn

22  within that training how at least to identify a dog

23  indicating on a vehicle?

24       A.   No, sir.  I think that's between the K-9

25  and its handler.  I'm not a K-9 expert or anything

1    like that.

2         Q.   This particular dog of McCauley's, do you

3    know whether or not it was trained to hit on money?

4         A.   I don't recall.  I don't know, sir.

5         Q.   Can you recall any situations where you

6    were with the dog and it was indicated to you that

7    the dog hit on money?

8         A.   No, sir, I don't recall.

9         Q.   Within Ninth Mobile, marijuana possession,

10   was that a priority, identifying people that had

11   marijuana?

12        A.   Are you talking about -- I'm sorry.  Can

13   you reask the question, please?

14        Q.   Sure.  So would it be fair to say that

15   within Ninth Mobile, you know, you-all were

16   definitely looking for illegal guns, correct?

17        A.   Yes.

18        Q.   You-all were looking for narcotics,

19   correct?

20        A.   Yes, sir.

21        Q.   Were you-all advised that marijuana should

22   be a priority?

23        A.   Marijuana's an illegal narcotic in the

24   State of Kentucky.  Illegal narcotics go hand in hand

25   with firearms and also violent felonies, sir.

1      Q.   So given that marijuana's illegal in

2   Kentucky, is that something that you were advised by

3   command within Ninth Mobile that you needed to, you

4   know, identify and confiscate?

5      A.   If it's illegal.  It wasn't -- I don't --

6   from the best of my knowledge, I don't think Ninth

7   Mobile ever gave any type of orders like that.  I

8   mean, when you're sworn in as a police officer,

9   you're sworn to uphold the law.  So you're not going

10   to not seize the marijuana or, yeah.

11      Q.   In this particular situation why didn't you

12   just write Tae-Ahn a ticket and let him go?

13      A.   I don't know, sir.  I don't recall.

14      Q.   In this particular situation the dog ends

15   up hitting on the vehicle, correct?

16      A.   I'm not sure.  I believe there was a

17   positive indication by the K-9.  You'll have to speak

18   to officer or Detective McCauley about that.

19      Q.   Fair to say, though, that at least

20   throughout the duration of this traffic stop, there

21   was never any firearms or narcotics discovered within

22   the vehicle, right?

23      A.   No, sir.

24      Q.   And there never any narcotics or

25   illegal firearms discovered on Tae-Ahn's person,

1    correct?

2          A.   No, sir.  You're correct.

3          Q.   Did you ever go and, you know, talk to

4    McCauley about, you know, situations where the dog

5    gives an indication but there's no narcotics actually

6    recovered?  Did you ever ask him about that?

7          A.   I don't recall, sir.

8          Q.   Did you ever -- you know, did McCauley ever

9    give you an explanation as to why dogs can -- you

10   know, his dog could hit on a vehicle for narcotics

11   but there was no narcotics in the vehicle?

12         A.   I don't recall, sir.

13         Q.   Did you-all ever, you know, try to

14   understand why the dogs can get it wrong, you know,

15   what circumstances could be present?

16         A.   I'm sure the K-9 handlers go through that

17   type of training, sir.

18         Q.   Did you -- within the training you went to,

19   did it ever -- was it ever identified within that

20   training as to, you know, how these dogs can get it

21   wrong?

22         A.   It may have, but I don't recall at this

23   time.  Is there a way we can do a short break,

24   please?

25         Q.   Of course.  And I don't have much more for

1   you, so let's come back at 2:35, and I'm going to

2   have you done by -- done by 3:00, okay?

3          A.   Thank you.

4          Q.   You bet.

5               THE REPORTER:  Okay.  We are off the

6   record at 2:28.

7               (RECESS)

8               THE REPORTER:  We are back on the record

9   at 2:36.

10              MR. AGUIAR:  Officer Hellard, were you

11  aware that Tae-Ahn Lea as a result of this incident

12  had to go to counseling?

13         A.   I'm sorry.  Can -- you say Officer

14  Hellard's gone to counseling?

15         Q.   Oh, shit.  Excuse my language.  I say

16  Hellard again?

17          Officer Crawford, do you realize as a result of

18  this incident, Tae-Ahn Lea went to counseling?

19         A.   No, sir.

20         Q.   How does that make you feel as an officer

21  that following an interaction with Tae-Ahn, that he

22  went to counseling because he was so concerned about

23  it?

24         A.   That's unfortunate.

25         Q.   When you watch -- when you watch, you know,

1   the interaction with Tae-Ahn and, you know, over

2   20 minutes of the traffic stop, do you feel like that

3   was an excessive amount of time?

4        A.  No, sir.

5        Q.  How would you feel if you got a phone call

6   from your wife that she'd been pulled over from

7   turning into the wrong lane and was being pulled out

8   of the vehicle by the officer?

9        MR. ERVIN:  Objection.  Don't -- that's --

10   that's not a fair question.  I'm going to instruct

11   him not to answer that question.

12        Q.  Tae-Ahn feels like had he committed the

13   same offense in the east end in a white neighborhood,

14   that this -- this wouldn't have happened.  Do you

15   agree with that?

16        A.  No.  That's incorrect.

17        Q.  Okay.  And what makes you disagree with

18   that?

19        A.  Because we've done -- we've assisted

20   St. Matthews and J-town in stopping vehicles.  And we

21   did similar, the exact same things.

22        Q.  Are you concerned that traffic stops the

23   way -- that were handled the way Tae-Ahn's were can

24   cause citizens like Tae-Ahn to lose trust in the

25   police?

1        A.   No.

2        Q.   Are you concerned that traffic stops like

3    the ones that were done on Tae-Ahn could cause black

4    young male especially to have a negative view towards

5    the police?

6        A.   No.

7        Q.   When you think about when you were doing

8    the hot spot street squad work over in Ninth Mobile

9    and doing traffic stops, what -- if you had to

10   estimate, what percentage of the stops were done on

11   black citizens?

12       A.   I don't know, sir.

13       Q.   You think it was more than half?

14       A.   I don't know, sir.

15       Q.   Were you ever advised while within Ninth

16   Mobile by upper command to -- to take an extra look

17   at drivers that were driving a nicer-looking vehicle?

18       A.   No, sir.

19       Q.   Were you ever advised to, you know,

20   prioritize certain demographics when conducting

21   traffic stops?

22       A.   No.

23       Q.   If you had a chance to go back and redo

24   this, you know, traffic stop, would you have done

25   anything differently?

1      A.   No, sir.

2           MR. ERVIN:   Objection to form.

3      Q.   Did anybody within LMPD come to discuss

4  this incident with you?

5      A.   I'm sorry.  Can you reask the question?

6      Q.   Sure.  Did anybody within LMPD come to

7  discuss this incident with you?

8      A.   No.

9      Q.   Upper command never said, hey, I want to

10  talk to you about this Tae-Ahn Lea incident that's

11  going viral?

12      A.   I believe PSU attempted, but I was no

13  longer employed with them.

14      Q.   Did you apply to Jeffersonville Police

15  Department before or after this incident?

16      A.   2018, it would have been after.

17      Q.   Do you recall who it was you interviewed

18  with within narcotics to get the position there?

19      A.   No, sir, I don't -- I don't recall.

20      Q.   Do you recall if you had gone in and put in

21  for a narcotics position before or after this

22  incident with Tae-Ahn Lea?

23      A.   It would have been after.

24      Q.   Throughout your interactions with Tae-Ahn

25  Lea was there anything that, you know, anything that

1    suggested to you that he was a member of a gang?

2         A.   I don't recall, sir.

3         Q.   Was there anything within the interaction

4    with Tae-Ahn Lea that suggested to you that he was a

5    violent criminal?

6         A.   No, sir, I don't recall.

7         Q.   Was there anything within the interactions

8    that you had with Tae-Ahn Lea that suggested to you

9    that he was armed and dangerous?

10        A.   Aside from his demeanor, no, sir.

11        Q.   And was there anything within your

12   interactions with Tae-Ahn Lea that led you to believe

13   he was a drug dealer?

14        A.   I don't recall, sir.

15        Q.   I don't know if you were still with LMPD or

16   not, so I'll preface it with -- this question with

17   that.  Was it -- while you were with LMPD after this

18   incident with Tae-Ahn Lea, did you learn that they

19   were changing the traffic stop policy?

20        A.   Yes, sir.

21        Q.   And what was your reaction to that?

22        A.   I didn't have any of the training.  I don't

23   know what they changed about it, sir.

24        Q.   When you heard, hey, we're training our

25   traffic -- or changing our traffic stop policies, how

1  did that make you feel?

2       A.   It sounded like they were just changing it,

3  sir.  I didn't -- I didn't have any feelings towards

4  it.

5       Q.   Did you ever recommend to anyone within

6  Ninth Mobile that they change the way traffic stops

7  were used?

8       A.   No, sir, I don't believe I did.

9       Q.   What other types of squads were in Ninth

10  Mobile?  Like, there's fugitive, right, there's a

11  fugitive squad?

12       A.   That sounds right, yes, sir.

13       Q.   What other ones were there?

14       A.   A fugitive.  And then I don't know.  There

15  was another one, but I don't really know much about

16  it.  I don't know anything about it.  I didn't know

17  anything about it, sir.

18       Q.   Did you ever try to get on the fugitive

19  squad?

20       A.   No, sir.

21       Q.   Did you ever try to get on any of the other

22  squads?

23       A.   No, sir.  I don't believe.  I don't recall,

24  sir.  It's been a long time.

25       Q.   When -- when new detectives would join on

1  to the Ninth Mobile, would they do ridealongs with

2  you?

3         A.   I don't recall.

4         Q.   Do you recall if you took -- if you, you

5  know, mentored any detectives when they came into the

6  Ninth Mobile, you know, try to show them how to do

7  their job?

8         A.   No, sir.  I don't recall mentoring anyone.

9         Q.   The Ninth Mobile street squad, would you

10 ever call patrol officers to come complete the

11 traffic stops?

12        A.   I'm sorry.  Can you repeat that?  You

13 broke -- I don't know if it's my Internet, but I only

14 got part of the question.

15        Q.   It's probably my Internet.  So while you

16 were in the Ninth Mobile were there times when you

17 would call patrol -- call, you know, call out to

18 patrol divisions to do a traffic stop?

19        A.   To do a traffic stop?

20        Q.   Yes.

21        A.   I don't recall, sir.

22        Q.   Traffic stops like -- like the one that

23 were done on Tae-Ahn Lea, do you believe that they

24 were effective?

25        A.   You're frozen again.  Can you say it again?

 1  You were frozen.

 2      Q.  Sure.  Traffic stops like the one that you

 3  did on Tae-Ahn Lea, do you believe that they were

 4  effective in reducing violent crime?

 5      A.  I don't -- I don't know, sir.  I don't -- I

 6  don't know anything about the -- as far as the hot

 7  spots or anything like that.  I was never trained on

 8  any of that mapping stuff, the violent crime.

 9      Q.  Traffic stops like the one that you did on

10  Tae-Ahn Lea, do you believe they were effective in

11  enhancing trust between the community and the police?

12      A.  I don't know, sir.

13      Q.  Officer Crawford, that's all I've got for

14  you.  So I appreciate your time.  And obviously your

15  attorney can ask anything he wants.

16          MR. ERVIN:  I may, Sam.  Give us a couple

17  minutes.

18          MR. AGUIAR:  You bet.

19          MR. ERVIN:  Thank you.

20          THE REPORTER:  We are going off the record

21  at 2:46.

22          (RECESS)

23          THE REPORTER:  It is 2:54, and we're back

24  on the record.

25

1  EXAMINATION BY MR. PETER ERVIN

2          MR. ERVIN:  Officer Crawford, just going

3  back through some of the questions that were asked

4  and answers that were given, I want to be sure that

5  the record is clear in what my understanding to this

6  point at least of the facts have been, and including

7  what your -- most of your testimony has been today.

8          But at one point near the end of

9  Mr. Aguiar's examination of you he asked the

10 question, why not just write a ticket and let him go.

11 And your answer was, I don't know.  Do you recall

12 that?

13         OFFICER CRAWFORD:  Yes.  Yes, sir.

14     Q.  Do you -- is that the fact or were there

15 reasons why you didn't just write him a ticket and

16 let him go?

17     A.  No.  There were reasons, sir.  All this

18 stuff that was presented in front of me and Officer

19 Hellard says otherwise, that there was criminal

20 activity afoot, that he was hiding something.  When

21 we initially stopped him, the vehicle was slow to

22 stop.  He was -- he was very nervous.  His breathing,

23 his hands shaking, him clenching his fists whenever

24 he was talking to Officer Hellard, him calling -- or

25 him receiving a phone call and leaving it on

speakerphone.  Me having him exit the vehicle or giving him instructions to move the stuff out of his lap before he exited the vehicle.  And then the dog ending up indicated on the vehicle.  That the reason why I didn't just write him a ticket is I believed he was hiding something.  If it wasn't weapons, then it could have been narcotics, sir.

Q.  Another question more toward the end of Mr. Aguiar's examination of you was, he asked whether you are concerned about whether the stop of Mr. Lea has resulted in a negative image for police.  And your answer was no.  Is that true?

A.  No, I misunderstood the question.

MR. AGUIAR:  Hold on.  Sorry.  Mine froze up.  I don't know if anybody else's did.  So I apologize.  I didn't get a chance to hear the question.  Sorry.

MR. ERVIN:  That's okay.

Q.  Near the end of Mr. Aguiar's examination you were asked the question of whether you were concerned about or whether you were concerned that the stop of Tae-Ahn Lea had left a negative image or a negative impression of police officers.  And I believe your answer was no.  And my question to you is, is that correct?

1        A.   No, sir.   I misunderstood the question.

2   It's absolutely -- I think it has.   And honestly, it

3   is concerning.   What I thought he might have meant

4   was it unlawful in that aspect.   But, yes, in general

5   it is concern -- I am concerned by it.

6        Q.   And how is that?

7        A.   As viewed -- I'm sorry.   As far as views on

8   police in general?

9        Q.   Yes, sir.

10       A.   I mean, it did -- just looking at it, it

11  does appear to have a negative look or impact on

12  police, especially with everything that's going --

13  everything that's going on in today's world and in

14  the police world.

15       Q.   All right.   And -- but in terms of the

16  lawfulness of the stop, was it your understanding

17  that the stop was conducted in a lawful manner?

18       A.   Yes, sir, it was.

19            MR. ERVIN:   That's all I have.   Thank you.

20            MR. AGUIAR:   Peter, I don't like to play

21  Ping-Pong.   We're done.   So I'm not going to -- I

22  don't have anymore questions.

23            THE REPORTER:   Okay.   We will --

24            THE WITNESS:   Can I say something real

25  quick?

1          MR. AGUIAR:  Do you want it on the record

2     or off the record?

3          MR. ERVIN:  Yeah --

4          THE WITNESS:  On the record.

5          MR. AGUIAR:  Peter, I'm a little, you

6     know --

7          MR. ERVIN:  Yeah, I don't --

8          MR. AGUIAR:  There wasn't a question

9     asked.

10         MR. ERVIN:  -- I don't -- let's go off the

11    record first.

12         THE REPORTER:  Okay.  We will go off the

13    record at 2:58 P.M.

14

15         (NO EXHIBITS WERE MARKED)

16

17         (WITNESS EXCUSED AT 2:58 P.M.)

18

19    * * *               * * *                  * * *

20

21

22

23

24

25

STATE OF KENTUCKY

COUNTY OF JEFFERSON

    I, NANCY L. NUNNELLEY, RMR, Notary Public, State of Kentucky at Large, do hereby certify that the foregoing deposition of KEVIN CRAWFORD was taken at the time and place stated in the caption; that the appearances were as set forth in the caption; that prior to giving their testimony the witness was first duly sworn by me, that said testimony was taken down by me in stenographic notes and thereafter reduced under my supervision to the foregoing 71 typewritten pages and that said typewritten transcript is a true, accurate and complete record of my stenographic notes so taken.

    I further certify that I am not related by blood or marriage to any of the parties hereto and that I have no interest in the outcome of captioned case.

    My commission as Notary Public expires July 10, 2023.

    Given under my hand this the 1st day of April 2021 at Louisville, Kentucky.

                     NOTARY PUBLIC  No. 625762

**1**

**10** [1] - 72:19
**1201** [1] - 2:6
**12:59** [2] - 4:4, 4:10
**1:27** [1] - 28:23
**1:35** [1] - 28:23
**1:38** [1] - 29:6
**1:51** [1] - 40:10
**1:55** [1] - 36:9
**1st** [1] - 72:21

**2**

**20** [1] - 61:2
**200** [1] - 2:14
**2000** [1] - 8:11
**20042B131** [1] - 1:23
**2005** [1] - 8:7
**2009** [3] - 8:7, 8:11, 8:12
**2012** [1] - 5:20
**2013** [4] - 5:20, 6:7, 32:18
**2018** [8] - 9:23, 10:5, 10:7, 10:13, 10:22, 11:5, 11:12, 63:16
**2021** [3] - 1:17, 4:4, 72:22
**2023** [1] - 72:20
**24** [2] - 1:17, 4:4
**267-4156** [1] - 1:25
**2:28** [1] - 60:6
**2:35** [1] - 60:1
**2:36** [1] - 60:9
**2:46** [1] - 67:21
**2:54** [1] - 67:23
**2:58** [2] - 71:13, 71:17

**3**

**300N** [1] - 2:15
**301** [1] - 2:7
**3:00** [1] - 60:2
**3:19-CV-419-GNS-RSE** [1] - 1:5

**4**

**4** [1] - 3:3
**40202** [1] - 2:15
**40206** [1] - 2:7
**40299** [1] - 1:24
**4413** [1] - 1:24

**5**

**50** [1] - 27:5
**502** [2] - 1:25
**51** [1] - 40:4

**594-1728** [1] - 1:25

**6**

**625762** [1] - 72:25
**68** [1] - 3:4

**7**

**71** [2] - 3:6, 72:11

**A**

**able** [7] - 8:3, 15:11, 19:3, 19:5, 26:16, 30:19, 55:2
**absolutely** [3] - 28:22, 30:25, 70:2
**academy** [6] - 17:3, 17:5, 29:13, 29:14, 32:18, 32:19
**access** [1] - 55:5
**accomplishing** [1] - 47:21
**accordance** [1] - 4:6
**accurate** [1] - 72:13
**acting** [1] - 39:15
**ACTION** [1] - 1:5
**action** [1] - 14:6
**actions** [3] - 47:14, 48:19, 49:2
**activity** [8] - 50:14, 50:16, 50:20, 50:24, 51:7, 51:11, 51:13, 68:20
**additionals** [1] - 39:9
**advance** [1] - 35:9
**advise** [5] - 23:14, 25:24, 26:3, 26:7, 47:24
**advised** [14] - 15:21, 19:17, 23:24, 28:15, 38:22, 41:2, 49:20, 49:23, 50:7, 50:8, 57:21, 58:2, 62:15, 62:19
**afforded** [1] - 13:20
**afoot** [1] - 68:20
**afterwards** [1] - 24:7
**age** [2] - 26:4, 31:3
**agencies** [1] - 19:16
**agency** [1] - 20:12
**ago** [1] - 15:3
**agree** [3] - 30:21, 36:16, 41:20, 42:4, 61:15
**Aguiar** [2] - 2:4, 2:6
**AGUIAR** [19] - 3:3, 4:13, 4:14, 28:19, 28:22, 28:25, 29:7,
33:7, 33:10, 34:17, 34:25, 36:10, 60:10, 67:18, 69:14, 70:20, 71:1, 71:5, 71:8
**Aguiar's** [3] - 68:9, 69:9, 69:19
**ahead** [3] - 4:14, 20:7, 51:5
**AHN** [1] - 1:7
**Ahn** [47] - 2:10, 33:4, 33:24, 34:5, 37:9, 37:12, 37:15, 37:18, 37:23, 39:3, 39:6, 39:15, 40:4, 40:14, 40:20, 41:20, 43:9, 43:14, 44:23, 47:20, 48:12, 50:21, 51:12, 51:14, 53:23, 55:8, 55:24, 56:10, 58:12, 60:11, 60:18, 60:21, 61:1, 61:12, 61:24, 62:3, 63:10, 63:22, 63:24, 64:4, 64:8, 64:12, 64:18, 66:23, 67:3, 67:10, 69:22
**Ahn's** [4] - 48:8, 56:5, 58:25, 61:23
**al** [1] - 1:14
**Albany** [1] - 5:8
**ALL** [1] - 2:2
**alluded** [1] - 25:19
**ALSO** [1] - 2:10
**Amendment** [5] - 15:21, 15:24, 16:4, 16:7, 16:15
**amount** [1] - 61:3
**analyze** [2] - 21:8, 21:13
**AND** [1] - 2:2
**answer** [5] - 35:17, 37:2, 61:11, 68:11, 69:12, 69:24
**answered** [2] - 43:10, 43:25
**answering** [1] - 43:11
**answers** [1] - 68:4
**apologize** [2] - 35:4, 69:16
**appear** [2] - 36:24, 70:11
**appearances** [1] - 72:7
**APPEARANCES** [1] - 2:1
**APPEARED** [1] - 2:2
**apply** [2] - 9:6, 63:14
**appreciate** [1] - 67:14
**approach** [1] - 43:21
**approached** [3] - 38:24, 39:6, 48:8

**appropriate** [2] - 14:11, 50:8
**April** [1] - 72:22
**area** [1] - 7:19
**armed** [6] - 18:7, 18:8, 18:10, 45:19, 46:21, 64:9
**arrest** [1] - 25:8
**aside** [2] - 40:22, 64:10
**aspect** [1] - 70:4
**assigned** [3] - 6:16, 23:10, 32:5
**assist** [2] - 19:16, 19:20
**assistance** [1] - 20:11
**assisted** [1] - 61:19
**associate's** [3] - 5:16, 5:17, 5:23
**AT** [2] - 1:2, 71:17
**attempted** [1] - 63:12
**attorney** [1] - 67:15
**Attorney's** [1] - 2:14
**audio** [1] - 36:24
**August** [7] - 9:23, 10:5, 10:7, 10:13, 10:22, 11:5, 11:12
**Avenue** [1] - 2:6
**aware** [1] - 60:11
**awesome** [1] - 56:17
**awhile** [1] - 55:6

**B**

**bachelor's** [1] - 5:16
**background** [2] - 56:5, 56:9
**Baker** [1] - 7:24
**based** [3] - 30:12, 37:2, 42:10
**basis** [1] - 20:2
**bat** [9] - 38:20, 38:25, 39:3, 41:12, 43:23, 51:21, 52:23, 55:24
**beat** [1] - 31:21
**become** [1] - 7:24
**beforehand** [1] - 33:5
**began** [2] - 9:11, 9:20
**beginning** [2] - 38:10, 38:11
**belongings** [1] - 44:14
**benefits** [1] - 7:18
**best** [6] - 5:19, 15:16, 30:19, 32:11, 55:15, 58:6
**bet** [2] - 60:4, 67:18
**better** [1] - 7:21
**between** [6] - 8:15, 21:5, 42:9, 46:12, 56:24, 67:11

**bias** [4] - 29:9, 29:12, 29:20, 29:22
**biases** [2] - 29:19, 29:24
**bigger** [1] - 38:4
**biggest** [1] - 7:19
**bit** [1] - 42:15
**black** [2] - 62:3, 62:11
**blood** [1] - 72:16
**board** [1] - 52:7
**body** [8] - 35:25, 36:4, 36:5, 37:4, 42:22, 42:25, 46:24, 46:25
**bottom** [1] - 40:9
**break** [2] - 28:21, 59:23
**breathing** [4] - 39:19, 41:23, 42:16, 68:22
**broad** [2] - 12:6, 16:10
**brochure** [1] - 31:6
**broke** [1] - 66:13
**Buckner** [1] - 2:5
**bulge** [5] - 41:15, 46:20, 46:22, 47:4, 47:6
**business** [1] - 34:19
**BY** [4] - 3:3, 3:4, 4:13, 68:1

**C**

**camera** [4] - 35:25, 36:4, 36:5, 37:4
**caption** [2] - 72:6, 72:7
**captioned** [1] - 72:17
**career** [1] - 42:11
**case** [4] - 16:6, 22:23, 31:16, 72:18
**caused** [1] - 47:2
**certain** [9] - 12:8, 25:25, 26:4, 26:7, 29:23, 53:16, 53:17, 53:23, 62:20
**Certification** [1] - 1:23
**certify** [2] - 72:4, 72:15
**chain** [2] - 9:15, 9:17
**chance** [3] - 36:3, 62:23, 69:16
**change** [2] - 46:12, 65:6
**changed** [1] - 64:23
**changes** [1] - 40:2
**changing** [3] - 64:19, 64:25, 65:2
**characteristics** [1] - 30:13
**Chenwood** [1] - 1:24
**chest** [2] - 39:20, 42:2

children [1] - 7:7
choppy [2] - 40:1, 40:16
circumstances [9] - 13:12, 14:15, 14:19, 15:8, 15:11, 15:15, 49:19, 49:23, 59:15
citation [1] - 14:11
citizen [1] - 30:2
citizens [3] - 31:7, 61:24, 62:11
CIVIL [1] - 1:5
Civil [1] - 4:6
class [1] - 56:14
clear [1] - 68:5
clenching [1] - 68:23
clicking [1] - 33:13
close [1] - 34:15
closer [1] - 7:19
clothing [1] - 46:21
college [1] - 5:6
College [1] - 5:10
command [11] - 9:15, 9:17, 18:22, 25:14, 25:24, 26:3, 26:7, 44:6, 58:3, 62:16, 63:9
commanding [1] - 9:12
commands [1] - 44:8
COMMENTS [1] - 36:7
commission [1] - 72:19
committed [1] - 61:12
committing [1] - 21:19
common [1] - 12:25
communication [6] - 42:17, 42:20, 42:21, 42:22, 42:24, 43:5
Community [1] - 5:10
community [5] - 8:3, 18:13, 18:19, 30:24, 67:11
complaints [1] - 30:2
complete [3] - 38:6, 66:10, 72:13
compliant [1] - 41:21
complied [2] - 40:20, 40:24
concealed [1] - 43:23
concern [1] - 70:5
concerned [7] - 60:22, 61:22, 62:2, 69:10, 69:21, 70:5
concerning [1] - 70:3
conduct [2] - 18:1, 19:23
conducted [3] - 20:21, 20:25, 70:17
conducting [2] - 20:2,

62:20
confiscate [1] - 58:4
CONRAD [1] - 1:14
consider [1] - 32:22
considered [1] - 52:7
contact [3] - 19:3, 38:22, 38:23
continued [1] - 44:13
Corps [2] - 8:2, 8:6
correct [44] - 19:23, 31:3, 31:18, 36:22, 37:24, 39:23, 40:5, 40:25, 41:3, 41:4, 41:6, 41:21, 42:6, 44:10, 45:11, 45:19, 46:10, 47:18, 48:10, 48:15, 48:18, 48:24, 49:1, 49:3, 51:1, 51:9, 52:4, 52:18, 52:22, 53:1, 53:3, 53:5, 53:7, 53:10, 53:25, 54:18, 55:3, 55:12, 57:16, 57:19, 58:15, 59:1, 59:2, 69:25
correctly [2] - 51:7, 55:22
counseling [4] - 60:12, 60:14, 60:18, 60:22
country [1] - 8:2
County [1] - 2:14
COUNTY [1] - 72:2
couple [3] - 5:21, 29:15, 67:16
course [1] - 59:25
court [1] - 22:24
COURT [1] - 1:1
courteous [1] - 39:22, 39:23
CourtNet [5] - 53:24, 54:11, 54:13, 55:3, 55:5
crawford [1] - 35:2
Crawford [21] - 4:9, 4:16, 19:10, 21:8, 29:7, 33:16, 34:24, 35:1, 35:6, 36:10, 36:16, 36:21, 37:3, 39:14, 43:14, 44:23, 52:14, 55:11, 60:17, 67:13, 68:2
CRAWFORD [6] - 1:17, 4:2, 4:11, 4:16, 68:13, 72:5
crime [10] - 17:14, 18:7, 18:23, 19:11, 47:17, 47:22, 48:3, 54:18, 67:4, 67:8
criminal [19] - 5:15,

22:7, 22:9, 22:11, 38:13, 39:10, 50:14, 50:16, 50:20, 50:24, 51:7, 51:11, 51:13, 52:17, 54:16, 55:20, 55:21, 64:5, 68:19
criteria [1] - 21:23, 22:3
curiosity [1] - 35:14
cursor [1] - 40:10

**D**

daily [1] - 20:2
dangerous [3] - 18:8, 52:20, 64:9
data [1] - 25:14
date [1] - 54:5
dates [4] - 5:19, 5:22, 6:24, 29:14
days [3] - 20:15, 20:19, 20:24
DEA [1] - 19:17
dealer [1] - 64:13
dealing [1] - 54:22
decent [1] - 33:1
decide [3] - 7:24, 8:21, 13:25
decides [1] - 14:6
decision [1] - 21:14
DEFENDANTS [1] - 1:14
Defendants [1] - 2:12
definitely [1] - 57:16
definition [1] - 29:21
degree [2] - 5:11, 6:2
delay [1] - 56:11
demeanor [2] - 40:2, 64:10
demographics [1] - 62:20
Department [4] - 4:19, 6:5, 7:14, 63:15
departments [1] - 19:17
depended [1] - 53:20
DEPONENT [1] - 1:17
deposed [1] - 4:12
DEPOSITION [1] - 1:11
deposition [5] - 4:2, 4:5, 4:9, 35:9, 72:5
designated [2] - 35:15, 35:20
despite [1] - 43:19
details [1] - 17:23
detective [3] - 6:13, 19:10, 19:13
Detective [3] - 34:4, 55:16, 58:18

detectives [2] - 65:25, 66:5
determine [3] - 21:9, 21:24, 22:3
determined [1] - 32:2
dictated [1] - 15:25
different [10] - 10:15, 18:10, 19:20, 19:21, 22:14, 22:20, 23:11, 23:12, 42:7, 44:24
differentiate [1] - 42:9
differently [1] - 62:25
difficult [1] - 37:1
direct [1] - 9:16
direction [1] - 22:1
disability [1] - 8:19
disabled [1] - 33:10
disagree [1] - 61:17
discharged [1] - 8:9
discovered [2] - 58:21, 58:25
discuss [2] - 63:3, 63:7
dispatched [1] - 19:7
displayed [1] - 47:15
displaying [1] - 46:17
distinction [1] - 21:4
DISTRICT [2] - 1:1, 1:1
divided [1] - 10:22
Division [5] - 6:16, 6:17, 48:1, 48:5, 48:6
division [4] - 10:8, 10:9, 10:14, 47:25
divisions [2] - 6:15, 66:18
documentation [2] - 13:24, 14:6
dog [10] - 52:20, 52:24, 56:22, 57:2, 57:6, 57:7, 58:14, 59:4, 59:10, 69:3
dogs [3] - 59:9, 59:14, 59:20
done [13] - 24:13, 25:5, 55:12, 55:17, 56:9, 60:2, 61:19, 62:3, 62:10, 62:24, 66:23, 70:21
dope [1] - 28:1
down [14] - 14:16, 14:20, 15:6, 15:12, 15:17, 15:25, 16:22, 17:8, 18:1, 18:5, 24:13, 25:2, 46:14, 72:9
downs [4] - 15:1, 16:7, 16:15, 17:21
draw [1] - 8:18
drink [1] - 33:19

drinks [1] - 33:21
driver [5] - 22:4, 23:2, 23:7, 24:23, 54:10
driver's [3] - 12:22, 13:10, 46:3
drivers [2] - 26:4, 62:17
driving [1] - 62:17
drug [1] - 64:13
duly [2] - 4:11, 72:9
duration [1] - 58:20
during [2] - 12:8, 38:14
duty [1] - 19:19

**E**

east [1] - 61:13
easy [1] - 8:1
effective [3] - 66:24, 67:4, 67:10
eight [1] - 20:25
either [1] - 10:18
Email [1] - 1:25
embarrassing [1] - 35:4
employed [2] - 4:18, 63:13
enable [1] - 33:7
end [4] - 61:13, 68:8, 69:8, 69:19
ending [1] - 69:4
ends [1] - 58:14
engage [2] - 18:13, 30:22
engaging [1] - 30:17
enhancing [1] - 67:11
entire [1] - 43:20
Ervin [1] - 2:13
ERVIN [20] - 3:4, 28:18, 28:20, 28:24, 29:1, 34:24, 35:1, 36:20, 56:4, 61:9, 63:2, 67:16, 67:19, 68:1, 68:2, 69:18, 70:19, 71:3, 71:7, 71:10
especially [2] - 62:4, 70:12
Esquire [4] - 2:4, 2:5, 2:5, 2:13
essentially [1] - 20:4
established [1] - 22:23
estimate [1] - 62:10
et [1] - 1:14
exact [8] - 5:19, 6:11, 16:2, 16:3, 20:22, 29:14, 29:21, 61:21
exactly [1] - 16:3

exam [1] - 7:15
examination [3] - 68:9, 69:9, 69:19
EXAMINATION [3] - 3:2, 4:13, 68:1
excessive [1] - 61:3
excuse [2] - 28:20, 60:15
EXCUSED [1] - 71:17
EXHIBITS [3] - 3:5, 3:6, 71:15
exist [2] - 17:8, 18:5
exit [3] - 23:2, 23:7, 69:1
exited [1] - 69:3
experience [1] - 42:5
expert [1] - 56:25
expired [1] - 54:5
expires [1] - 72:19
explain [3] - 37:19, 44:16, 44:19
explanation [1] - 59:9
extra [1] - 62:16
extreme [2] - 22:13, 22:17
extremely [1] - 42:13
eyes [2] - 42:16, 42:18

F

face [1] - 10:16
fact [1] - 68:14
factors [1] - 18:10
facts [1] - 68:6
factually [1] - 36:21
fair [8] - 12:25, 39:5, 40:13, 46:2, 52:15, 57:14, 58:19, 61:10
fall [1] - 39:19
falling [1] - 42:3
false [1] - 41:7
familiar [1] - 15:23
family [1] - 7:18
far [9] - 7:18, 9:17, 16:17, 19:2, 39:9, 40:6, 47:15, 67:6, 70:7
Fax [1] - 1:25
Federal [1] - 4:6
federal [1] - 20:5
feelings [1] - 65:3
felon [1] - 19:6
felonies [2] - 19:6, 57:25
few [3] - 8:15, 18:17, 56:13
Fifth [1] - 2:14
filed [1] - 30:2
fill [4] - 23:18, 23:25, 24:4, 24:7

fine [2] - 12:7, 28:23
fingertips [1] - 39:21
firearms [6] - 53:3, 53:6, 53:8, 57:25, 58:21, 58:25
First [1] - 6:17
first [11] - 4:11, 5:2, 5:24, 9:14, 36:21, 38:21, 38:24, 43:17, 45:14, 71:11, 72:8
fists [1] - 68:23
five [1] - 20:17
floor [1] - 52:7
focus [4] - 23:15, 25:24, 26:4, 26:7
folder [1] - 34:10
follow [2] - 13:24, 14:5
following [2] - 44:8, 60:21
follows [1] - 4:12
food [1] - 18:18
footage [1] - 35:10
FOR [1] - 1:11
foregoing [2] - 72:5, 72:11
fork [3] - 52:3, 52:6, 52:11
form [15] - 23:20, 23:22, 23:25, 24:4, 24:8, 24:10, 24:12, 24:19, 24:22, 24:25, 25:4, 25:7, 25:10, 56:4, 63:2
forms [2] - 23:18, 25:16
forth [1] - 72:7
forward [1] - 31:15
four [1] - 44:24
Fourth [2] - 6:16, 15:21, 15:24, 16:4, 16:7, 16:15, 48:2
frame [1] - 40:9
free [1] - 33:21
frequency [2] - 20:14
frequently [1] - 32:1
friend [1] - 32:22
friends [3] - 32:25, 33:1, 33:2
frisk [5] - 25:5, 26:12, 26:17, 26:18, 26:22
front [2] - 21:16, 68:18
froze [1] - 69:14
frozen [2] - 66:25, 67:1
fugitive [4] - 65:10, 65:11, 65:14, 65:18
full [1] - 37:10
fully [1] - 51:25
fun [1] - 56:18

G

Gabe [1] - 31:17
Gabriel [1] - 11:13
Galt [3] - 6:1, 6:3, 8:14
gang [1] - 64:1
gap [1] - 8:15
gas [1] - 33:18
gender [2] - 30:13, 31:3
general [2] - 70:4, 70:8
gently [1] - 44:15
Given [1] - 72:21
given [6] - 15:1, 15:20, 17:19, 25:11, 58:1, 68:4
goal [1] - 20:4
grab [3] - 45:6, 46:7, 46:9
graduated [1] - 5:9
great [1] - 8:24
grew [1] - 29:24
guess [3] - 29:22, 31:21, 51:20
gun [10] - 41:16, 45:11, 45:19, 45:24, 46:1, 46:6, 46:8, 46:15, 47:5, 54:23
guns [5] - 27:22, 41:3, 41:6, 41:9, 57:16
guys [1] - 48:3

H

half [1] - 62:13
hand [4] - 39:2, 57:24, 72:21
handcuff [1] - 27:9
handle [1] - 48:6
handled [1] - 61:23
handler [2] - 56:14, 56:25
handlers [1] - 59:16
hands [5] - 37:23, 39:20, 42:15, 42:18, 68:23
hang [1] - 44:1
harm [2] - 51:25, 52:3
hear [2] - 36:17, 69:16
heard [3] - 25:21, 51:6, 64:24
heightens [1] - 38:12
held [1] - 4:25
Hellard [18] - 11:13, 31:17, 31:24, 32:9, 32:17, 34:4, 34:22, 35:3, 38:24, 43:22, 48:9, 48:14, 48:17, 49:1, 60:10, 60:16,

68:19, 68:24
Hellard's [1] - 60:14
help [2] - 8:3, 13:12
helped [1] - 44:14
helping [1] - 20:5
hereby [1] - 72:4
hereto [1] - 72:16
hiding [2] - 68:20, 69:6
high [1] - 5:6
High [2] - 5:8, 5:9
hired [1] - 5:2
history [3] - 54:17, 54:22
hit [4] - 34:12, 57:3, 57:7, 59:10
hitting [1] - 58:15
hold [2] - 5:22, 69:14
home [1] - 7:19
homicide [2] - 19:20, 54:23
honestly [2] - 8:3, 70:2
honing [1] - 31:12
honorably [1] - 8:8
hot [5] - 23:11, 23:12, 23:14, 62:8, 67:6
hotel [1] - 6:1
hour [1] - 4:4
House [3] - 6:1, 6:3, 8:14
Huckleberry [1] - 10:10
huge [1] - 8:23
hurt [1] - 52:24

I

ID [2] - 46:7, 46:10
idea [1] - 49:5
identified [4] - 21:19, 22:18, 37:9, 59:19
identify [14] - 24:13, 24:16, 24:19, 24:22, 25:1, 25:5, 25:8, 25:11, 37:11, 41:13, 52:16, 52:22, 56:22, 58:4
identifying [1] - 57:10
illegal [7] - 27:22, 57:16, 57:23, 57:24, 58:1, 58:5, 58:25
image [2] - 69:11, 69:22
imagine [1] - 31:1
impact [1] - 70:11
implicit [4] - 29:9, 29:12, 29:19, 29:20
important [9] - 30:15, 30:16, 54:2, 54:3,

54:7, 54:11, 54:13, 54:16, 54:19
impression [1] - 69:23
in-service [3] - 11:19, 17:3, 17:5
incident [12] - 9:22, 13:6, 14:21, 31:16, 60:11, 60:18, 63:4, 63:7, 63:10, 63:15, 63:22, 64:18
including [1] - 68:6
incorrect [1] - 61:16
INDEX [1] - 3:1
indicated [6] - 18:22, 34:4, 45:5, 45:15, 57:6, 69:4
indicating [1] - 56:23
indication [2] - 58:17, 59:5
indicator [1] - 46:20
indicators [11] - 22:7, 22:9, 22:11, 42:12, 42:25, 51:13, 51:15, 52:17, 52:25, 55:23, 56:2
information [5] - 25:15, 31:6, 41:21, 54:25, 55:2
initial [1] - 46:12
initiated [1] - 48:7
Injury [1] - 2:6
inside [1] - 55:21
instead [1] - 44:1
instruct [1] - 61:10
instructions [3] - 13:23, 14:5, 69:2
insurance [4] - 12:22, 13:2, 13:10, 41:21
interaction [4] - 46:16, 60:21, 61:1, 64:3
interactions [2] - 63:24, 64:7, 64:12
interest [1] - 72:17
intermittently [1] - 36:25
Internet [2] - 66:13, 66:15
interpersonal [1] - 31:12
interrupted [3] - 37:1, 45:1, 45:3
interruption [1] - 45:7
interview [1] - 8:25
interviewed [3] - 9:2, 9:4, 63:17
interviewing [1] - 9:3
introduce [1] - 36:17
introduction [1] - 12:14
investigative [1] -

21:5
**inviting** [1] - 44:3
**issue** [2] - 14:11, 30:20
**items** [1] - 44:13
**Ivy** [3] - 5:10, 5:11, 8:17

## J

**J-town** [1] - 61:20
**Jackson** [1] - 2:10
**jbuckner@ kylawoffice.com** [1] - 2:8
**Jeff** [1] - 11:13
**Jefferson** [1] - 2:14
**JEFFERSON** [1] - 72:2
**Jeffersonville** [4] - 4:18, 5:9, 7:13, 63:14
**job** [5] - 4:22, 5:24, 11:17, 19:13, 66:7
**jobs** [1] - 6:8
**join** [2] - 8:21, 65:25
**joined** [3] - 7:13, 8:13, 10:2
**Josephine** [2] - 2:5
**judgment** [1] - 30:19
**July** [1] - 72:19
**jumping** [1] - 51:5
**justice** [1] - 5:15

## K

**K-9** [20] - 24:20, 27:2, 27:15, 49:15, 49:20, 49:24, 50:3, 50:9, 50:13, 50:25, 51:2, 51:4, 51:9, 56:12, 56:13, 56:16, 56:24, 56:25, 58:17, 59:16
**K-9s** [1] - 56:17
**keep** [1] - 39:12
**KENTUCKY** [2] - 1:1, 72:1
**Kentucky** [8] - 1:23, 1:24, 2:7, 2:15, 57:24, 58:2, 72:4, 72:22
**kept** [2] - 45:1, 45:3
**Kevin** [4] - 4:9, 4:16, 19:9, 21:8
**KEVIN** [4] - 1:17, 4:2, 4:11, 72:5
**kind** [2] - 40:1, 42:21
**knowing** [1] - 40:17
**knowledge** [5] - 5:20, 15:16, 32:11, 55:15,

58:6
**known** [2] - 32:16, 46:6

## L

**lane** [3] - 43:20, 61:7
**Lane** [1] - 1:24
**language** [1] - 60:15
**lap** [1] - 69:3
**laptop** [1] - 34:15
**Large** [1] - 72:4
**last** [1] - 33:12
**law** [3] - 16:6, 22:23, 58:9
**lawful** [2] - 15:12, 70:17
**lawfulness** [1] - 70:16
**Lawyers** [1] - 2:6
**LEA** [1] - 1:7
**Lea** [36] - 2:10, 37:9, 37:12, 37:15, 37:18, 37:23, 39:3, 39:6, 39:15, 40:4, 40:14, 40:20, 41:20, 44:24, 47:20, 48:12, 50:21, 51:12, 51:14, 53:24, 55:8, 56:10, 60:11, 60:18, 63:10, 63:22, 63:25, 64:4, 64:8, 64:12, 64:18, 66:23, 67:3, 67:10, 69:10, 69:22
**Lea's** [1] - 43:9
**leading** [1] - 41:24
**learn** [4] - 29:17, 56:21, 64:18
**least** [10] - 15:15, 15:24, 25:19, 37:21, 37:22, 39:5, 40:12, 56:22, 58:19, 68:6
**leave** [1] - 7:17
**leaving** [1] - 68:25
**led** [5] - 43:17, 46:21, 51:20, 51:22, 64:12
**Lee** [3] - 33:4, 33:24, 34:5
**left** [5] - 5:23, 6:22, 40:9, 43:25, 69:22
**legitimate** [1] - 12:18
**legs** [1] - 42:16
**level** [3] - 9:14, 11:5, 38:12
**levels** [1] - 42:7
**license** [9] - 12:22, 13:2, 13:10, 13:14, 45:7, 46:4, 53:9, 53:24, 54:8
**lied** [1] - 41:11
**lieutenant** [4] - 10:1,

10:4, 10:10, 10:11
**lieutenants** [2] - 10:8, 10:9
**likely** [1] - 20:6
**lines** [1] - 54:24
**lit** [1] - 48:12
**LMPD** [25] - 6:6, 6:9, 7:17, 11:25, 13:8, 15:20, 16:6, 16:14, 16:17, 17:3, 17:7, 17:20, 19:10, 28:4, 28:15, 29:8, 30:1, 30:6, 31:1, 31:5, 63:3, 63:6, 64:15, 64:17
**located** [1] - 12:23
**Lonita** [1] - 2:5
**lonita@kylawoffice. com** [1] - 2:9
**look** [3] - 22:12, 62:16, 70:11
**looking** [8] - 40:9, 42:12, 43:6, 52:19, 57:16, 57:18, 62:17, 70:10
**lose** [2] - 30:23, 61:24
**LOUISVILLE** [1] - 1:2
**Louisville** [6] - 1:24, 2:7, 2:15, 6:5, 37:14, 72:22
**lower** [1] - 46:24
**lowest** [1] - 11:5
**lying** [1] - 51:16

## M

**main** [1] - 52:19
**major** [2] - 9:13, 10:13
**majors** [1] - 10:16
**male** [1] - 62:4
**mandatory** [2] - 11:18
**manner** [1] - 70:17
**mannerisms** [1] - 38:2
**mapping** [1] - 67:8
**MARCH** [1] - 1:17
**March** [1] - 4:4
**marijuana** [4] - 57:9, 57:11, 57:21, 58:10
**marijuana's** [2] - 57:23, 58:1
**Marine** [2] - 8:2, 8:5
**MARKED** [2] - 3:6, 71:15
**marriage** [1] - 72:16
**married** [1] - 7:5
**matter** [1] - 21:18
**Matthews** [1] - 61:20
**McCauley** [12] - 11:13, 48:10, 48:15, 48:17, 48:23, 49:3, 49:11,

51:3, 55:16, 58:18, 59:4, 59:8
**McCauley's** [1] - 57:2
**mean** [15] - 17:11, 22:14, 22:22, 26:19, 28:6, 38:23, 39:25, 45:2, 45:24, 46:5, 50:17, 52:2, 54:25, 58:8, 70:10
**meant** [1] - 70:3
**mechanism** [1] - 18:23
**medications** [1] - 7:3
**member** [1] - 64:1
**mentored** [1] - 66:5
**mentoring** [1] - 66:8
**menu** [1] - 34:9
**Metro** [2] - 6:5, 37:14
**might** [2] - 41:15, 70:3
**military** [1] - 8:18
**mind** [1] - 28:20
**mine** [1] - 69:14
**minute** [1] - 40:3
**minutes** [2] - 61:2, 67:17
**misunderstood** [2] - 69:13, 70:1
**Mobile** [49] - 6:13, 6:25, 8:22, 9:7, 9:12, 10:2, 10:22, 11:2, 11:9, 11:16, 11:21, 11:22, 18:12, 18:21, 19:1, 19:10, 19:14, 20:1, 21:8, 21:13, 23:1, 23:10, 23:17, 25:14, 25:19, 25:23, 26:2, 26:6, 26:10, 26:14, 26:25, 27:8, 27:21, 32:9, 47:17, 49:13, 49:19, 57:9, 57:15, 58:3, 58:7, 62:8, 62:16, 65:6, 65:10, 66:1, 66:6, 66:9, 66:16
**money** [2] - 57:3, 57:7
**months** [1] - 8:15
**most** [1] - 68:7
**move** [3] - 44:6, 44:13, 69:2
**MR** [39] - 3:3, 3:4, 4:13, 4:14, 28:18, 28:19, 28:20, 28:22, 28:24, 28:25, 29:1, 29:7, 33:7, 33:10, 34:17, 34:24, 34:25, 35:1, 36:10, 36:20, 56:4, 60:10, 61:9, 63:2, 67:16, 67:18, 67:19, 68:1, 68:2, 69:14, 69:18, 70:19,

70:20, 71:1, 71:3, 71:5, 71:7, 71:8, 71:10
**must** [1] - 18:4

## N

**name** [5] - 4:15, 5:3, 10:17, 12:14, 37:16
**names** [1] - 10:18
**NANCY** [1] - 72:3
**nancy** [1] - 33:7
**Nancy** [2] - 1:23, 34:13
**narc** [1] - 22:14
**narcotic** [2] - 50:18, 57:23
**narcotics** [16] - 6:14, 6:21, 38:15, 38:19, 50:19, 52:25, 57:18, 57:24, 58:21, 58:24, 59:5, 59:10, 59:11, 63:18, 63:21, 69:7
**Narcotics** [1] - 25:20
**nature** [1] - 55:21
**near** [2] - 68:8, 69:19
**need** [8] - 13:15, 15:6, 15:11, 20:10, 20:11, 23:25, 31:2, 34:14
**needed** [5] - 14:15, 14:19, 17:8, 26:11, 58:3
**negative** [5] - 62:4, 69:11, 69:22, 69:23, 70:11
**negotiating** [1] - 31:12
**neighborhood** [1] - 61:13
**nervous** [6] - 39:16, 41:24, 42:5, 42:13, 42:14, 68:22
**nervousness** [8] - 22:13, 22:17, 42:8, 43:1, 43:6, 46:17, 51:16, 55:23
**never** [5] - 56:14, 58:21, 58:24, 63:9, 67:7
**New** [1] - 5:8
**new** [1] - 65:25
**news** [1] - 25:21
**nice** [1] - 54:25
**nicer** [1] - 62:17
**nicer-looking** [1] - 62:17
**nine** [1] - 7:12
**Ninth** [49] - 6:12, 6:25, 8:21, 9:7, 9:11, 10:2, 10:21, 11:2, 11:9, 11:16, 11:20, 11:22,

18:12, 18:21, 19:1, 19:10, 19:14, 20:1, 21:7, 21:13, 23:1, 23:10, 23:17, 25:14, 25:18, 25:23, 26:2, 26:6, 26:10, 26:14, 26:24, 27:8, 27:20, 32:9, 47:17, 49:13, 49:19, 57:9, 57:15, 58:3, 58:6, 62:8, 62:15, 65:6, 65:9, 66:1, 66:6, 66:9, 66:16
**NO** [3] - 1:5, 3:6, 71:15
**none** [1] - 30:5
**nonverbal** [4] - 42:17, 42:20, 42:21, 43:5
**normal** [2] - 20:13, 43:8
**Notary** [2] - 72:3, 72:19
**NOTARY** [1] - 72:25
**notes** [2] - 72:10, 72:13
**notice** [1] - 49:6
**Notice** [1] - 4:5
**noticed** [1] - 43:22
**number** [1] - 20:22
**NUNNELLEY** [1] - 72:3
**Nunnelley** [1] - 1:23
**nunnelleycourtreporter@gmail.com** [1] - 1:25

## O

**object** [1] - 36:20
**objection** [3] - 56:4, 61:9, 63:2
**objects** [1] - 44:7
**observed** [1] - 41:14
**obviously** [1] - 67:14
**occur** [5] - 14:16, 14:20, 15:7, 15:25, 17:14
**occurred** [3] - 18:8, 19:19, 21:16
**occurring** [2] - 19:6, 38:13
**OF** [3] - 1:1, 72:1, 72:2
**OFF** [1] - 36:7
**offense** [5] - 21:16, 39:7, 39:10, 39:11, 61:13
**Office** [1] - 2:14
**Officer** [10] - 32:16, 33:16, 34:3, 36:16, 36:21, 43:22, 60:13, 60:17, 68:18, 68:24

**OFFICER** [2] - 4:16, 68:13
**officer** [37] - 4:24, 5:1, 5:4, 6:1, 6:10, 7:25, 9:12, 13:23, 14:4, 14:5, 14:10, 15:5, 22:19, 22:22, 29:7, 30:16, 30:21, 34:22, 34:24, 35:6, 36:10, 37:3, 37:14, 39:14, 43:14, 44:23, 51:4, 52:14, 54:21, 55:11, 58:8, 58:18, 60:10, 60:20, 61:8, 67:13, 68:2
**officers** [5] - 11:23, 13:4, 31:8, 66:10, 69:23
**often** [6] - 11:20, 20:1, 27:4, 27:21, 27:25, 33:18
**old** [1] - 7:11
**older** [1] - 10:11
**one** [17] - 7:10, 9:9, 13:21, 14:3, 14:9, 16:2, 19:22, 20:5, 20:17, 31:24, 36:25, 65:15, 66:22, 67:2, 67:9, 68:8
**ones** [6] - 7:20, 18:16, 18:20, 22:16, 62:3, 65:13
**operator** [1] - 12:17
**opportunity** [2] - 8:24, 37:19
**opposite** [1] - 22:1
**orders** [1] - 58:7
**organization** [1] - 10:21
**originally** [1] - 45:4
**otherwise** [1] - 68:19
**ourselves** [1] - 51:6
**outcome** [1] - 72:17
**outreach** [1] - 18:18
**own** [1] - 29:22

## P

**P.M** [4] - 4:4, 4:10, 71:13, 71:17
**pages** [1] - 72:12
**park** [2] - 35:15, 35:20
**parked** [1] - 35:16
**parking** [3] - 35:15, 35:20, 35:22
**part** [7] - 12:10, 12:13, 17:4, 17:5, 38:4, 53:16, 66:14
**partially** [1] - 43:23
**participant** [1] - 33:11

**particular** [7] - 31:16, 35:13, 35:19, 53:22, 57:2, 58:11, 58:14
**parties** [1] - 72:16
**PARTIES** [1] - 2:2
**partner** [1] - 31:21
**partners** [1] - 20:5
**party** [1] - 18:9
**passive/aggressive** [3] - 40:2, 40:5, 40:14
**pat** [16] - 14:16, 14:20, 15:1, 15:6, 15:12, 15:17, 15:25, 16:7, 16:15, 16:22, 17:8, 17:21, 18:1, 18:5, 24:13, 25:2
**pat-down** [12] - 14:16, 14:20, 15:6, 15:12, 15:17, 15:25, 16:22, 17:8, 18:1, 18:5, 24:13, 25:2
**pat-downs** [4] - 15:1, 16:7, 16:15, 17:21
**patrol** [10] - 4:24, 5:1, 5:4, 6:10, 6:11, 6:15, 48:4, 66:10, 66:17, 66:18
**patrolling** [1] - 23:11
**patted** [1] - 46:14
**pattern** [3] - 39:19, 41:23, 42:16
**pay** [2] - 7:21, 7:22
**People** [1] - 25:20
**people** [11] - 8:3, 19:3, 29:19, 29:23, 29:25, 30:12, 31:2, 44:1, 44:4, 57:10
**percent** [1] - 27:5
**percentage** [1] - 62:10
**permitted** [7] - 15:16, 16:16, 16:22, 17:9, 18:5, 28:16, 46:3
**person** [9] - 18:7, 21:21, 21:22, 22:4, 26:18, 26:20, 31:22, 54:10, 58:25
**personal** [2] - 32:22, 32:25
**personally** [4] - 19:9, 21:13, 30:22, 49:10
**Peter** [3] - 2:13, 70:20, 71:5
**PETER** [2] - 3:4, 68:1
**peter.ervin@louisvilleky.gov** [1] - 2:16
**Phone** [1] - 1:25
**phone** [6] - 43:9, 43:11, 43:24, 44:1, 61:5, 68:25

**physical** [1] - 30:13
**picture** [1] - 38:4
**Ping** [1] - 70:21
**Ping-Pong** [1] - 70:21
**place** [3] - 26:16, 27:9, 72:6
**Places** [1] - 25:20
**plain** [5] - 22:13, 22:18, 38:16, 38:19, 52:17
**PLAINTIFF** [2] - 1:7, 1:11
**Plaintiff** [1] - 2:3
**plate** [1] - 13:14
**play** [2] - 18:11, 70:20
**played** [1] - 19:1
**playing** [1] - 36:11
**PLAYING** [7] - 36:14, 39:13, 41:18, 43:13, 44:22, 52:13, 55:10
**plays** [1] - 17:25
**plenty** [1] - 43:19
**PLLC** [1] - 2:6
**pocket** [2] - 46:6, 46:9
**pockets** [4] - 41:14, 45:6, 46:3, 46:20
**point** [28] - 36:16, 37:21, 38:2, 39:5, 39:15, 39:22, 39:24, 39:25, 40:3, 40:13, 40:20, 40:25, 41:5, 41:8, 41:13, 41:19, 41:23, 45:9, 45:19, 45:22, 46:18, 47:11, 47:15, 53:9, 55:7, 55:11, 68:6, 68:8
**pole** [1] - 41:12
**Police** [5] - 4:19, 6:5, 7:13, 37:14, 63:14
**police** [16] - 7:25, 15:4, 19:17, 30:21, 31:8, 37:13, 42:5, 58:8, 61:25, 62:5, 67:11, 69:11, 69:23, 70:8, 70:12, 70:14
**policies** [1] - 64:25
**policy** [5] - 12:9, 13:22, 14:4, 14:10, 64:19
**Pong** [1] - 70:21
**pop** [1] - 54:15
**position** [4] - 9:1, 9:3, 63:18, 63:21
**positive** [1] - 58:17
**possession** [2] - 50:18, 57:9
**possible** [1] - 47:16
**possibly** [5] - 5:20, 11:7, 18:8, 44:3, 48:1

**practice** [2] - 13:7, 13:18
**precisely** [1] - 40:1
**preface** [1] - 64:16
**prescription** [1] - 7:3
**PRESENT** [1] - 2:10
**present** [18] - 4:3, 14:16, 14:20, 15:6, 15:11, 22:8, 22:9, 22:13, 22:17, 26:12, 27:1, 50:15, 50:16, 50:20, 50:25, 51:7, 51:11, 59:15
**presented** [1] - 68:18
**pretext** [1] - 28:3
**pretextual** [3] - 28:6, 28:9, 28:15
**pretty** [1] - 56:17
**previously** [2] - 37:4, 42:10
**prioritize** [1] - 62:20
**priority** [2] - 57:10, 57:22
**problems** [1] - 43:10
**Procedure** [1] - 4:6
**profile** [1] - 30:12
**profiling** [4] - 30:7, 30:11, 30:17, 30:23
**progeny** [1] - 15:24
**projects** [2] - 18:14, 20:10
**prolong** [1] - 27:17
**prolonging** [1] - 27:14
**promise** [1] - 36:6
**provide** [1] - 20:11
**provided** [5] - 11:16, 14:15, 14:18, 14:24, 16:14
**PSU** [1] - 63:12
**psychological** [1] - 7:15
**PTOs** [1] - 6:19
**Public** [2] - 72:3, 72:19
**public** [1] - 31:6
**PUBLIC** [1] - 72:25
**pull** [6] - 13:1, 22:1, 34:18, 43:14, 43:18, 43:20
**pulled** [6] - 35:14, 40:23, 42:4, 47:20, 61:6, 61:7
**pulling** [1] - 40:22
**pursuant** [1] - 4:5
**put** [5] - 17:1, 31:23, 34:15, 56:19, 63:20
**putting** [1] - 44:1

**Q**

questions [2] - 68:3, 70:22
quick [1] - 70:25
quickly [1] - 56:7
quite [1] - 32:1

**R**

race [3] - 24:23, 30:13, 31:3
races [1] - 26:8
racial [4] - 30:7, 30:10, 30:17, 30:23
radio [1] - 48:21
raised [1] - 44:2
ran [2] - 13:14, 56:8
rang [2] - 43:9, 43:24
ranges [1] - 26:4
rapidly [1] - 42:2
reached [4] - 48:10, 48:14, 48:17, 49:10
reaction [1] - 64:21
real [1] - 70:24
realize [1] - 60:17
really [1] - 65:15
reask [5] - 43:4, 44:18, 48:11, 57:13, 63:5
reason [9] - 12:14, 12:18, 41:5, 45:10, 45:18, 45:21, 45:23, 48:5, 69:4
reasonable [6] - 17:8, 17:11, 17:20, 17:25, 18:4, 25:1
reasonably [2] - 17:13, 18:6
reasons [2] - 68:15, 68:17
receive [2] - 28:3, 30:6
received [2] - 27:13, 30:10
receiving [2] - 29:8, 68:25
RECESS [3] - 29:4, 60:7, 67:22
recommend [1] - 65:5
RECORD [1] - 36:7
record [15] - 4:8, 29:3, 29:5, 36:8, 60:6, 60:8, 67:20, 67:24, 68:5, 71:1, 71:2, 71:4, 71:11, 71:13, 72:13
records [2] - 16:18, 16:19
recover [1] - 28:1
recovered [1] - 59:6
recruit [1] - 5:3

redo [1] - 62:23
reduce [1] - 19:11
reduced [1] - 72:10
reducing [1] - 67:4
reduction [1] - 18:23
referencing [1] - 40:8
refused [1] - 44:7
regarding [5] - 14:19, 17:20, 30:7, 30:10, 31:7
regardless [1] - 31:3
registered [1] - 54:6, 54:10
registration [11] - 12:22, 13:3, 13:9, 13:15, 13:19, 53:10, 53:14, 53:18, 53:24, 54:3, 54:5
related [4] - 16:7, 16:14, 25:15, 72:15
relates [2] - 17:20, 27:13
remember [24] - 6:23, 10:16, 10:18, 12:3, 12:7, 12:10, 12:12, 12:15, 12:19, 14:13, 18:19, 20:24, 22:17, 24:3, 25:22, 27:11, 31:13, 32:6, 33:11, 34:11, 34:13, 46:22, 46:24, 55:5
remove [2] - 22:4, 22:6
removed [2] - 24:17, 44:9
removing [2] - 44:17, 44:20
repeat [4] - 17:18, 35:18, 49:17, 66:12
REPORTER [14] - 4:8, 29:2, 29:5, 33:9, 33:15, 34:14, 34:21, 36:8, 60:5, 60:8, 67:20, 67:23, 70:23, 71:12
request [9] - 23:1, 27:1, 27:6, 49:24, 50:9, 50:13, 50:25, 51:2, 51:8
requested [3] - 48:23, 49:11, 55:16
requesting [1] - 56:6
requests [2] - 40:21, 40:25
required [2] - 12:9, 23:18
requirements [4] - 15:6, 26:11, 26:16, 27:9
resay [3] - 21:11,

26:13, 45:12
resources [1] - 53:23
respect [1] - 31:2
respond [4] - 19:18, 27:2, 48:23, 49:6
responded [1] - 49:3
responsibilities [2] - 19:15, 19:22
restate [2] - 14:1, 14:17
result [2] - 60:11, 60:17
resulted [1] - 69:11
review [1] - 13:24
reviewed [3] - 25:14, 37:3, 37:7
reviews [1] - 14:6
ride [1] - 32:2
ridealongs [1] - 66:1
rise [1] - 39:19
rising [1] - 42:2
RMR [2] - 1:23, 72:3
robbery [1] - 19:20
rod [2] - 38:20, 38:21
rode [1] - 32:1
role [2] - 17:25, 18:25
roles [2] - 19:14, 19:22
routine [5] - 13:5, 13:7, 13:18, 21:18, 23:2
routinely [1] - 31:24
row [1] - 47:8
Rules [1] - 4:6
run [10] - 13:19, 53:9, 53:14, 53:17, 54:3, 54:7, 54:11, 54:13, 55:7, 56:5

**S**

safely [2] - 21:25, 22:1
safer [1] - 7:19
safety [5] - 18:9, 21:5, 22:10, 22:20, 22:22
SAM [2] - 3:3, 4:13
Sam [4] - 2:4, 2:6, 28:18, 36:20, 36:22, 67:16
sam@kylawoffice.com [1] - 2:8
saw [2] - 34:4, 47:4
scene [7] - 44:4, 48:24, 49:3, 49:6, 49:15, 49:20, 49:24
school [5] - 5:5, 5:6, 5:25, 8:16, 8:17
School [2] - 5:8, 5:9
screen [8] - 33:7, 33:11, 34:7, 34:12,

34:16, 35:6, 36:11, 40:8
screenshot [4] - 34:8, 34:19, 34:23, 35:7
search [2] - 16:1, 53:23
seat [1] - 43:23
Second [2] - 48:1, 48:4, 48:5
second [2] - 16:3, 34:12
seconds [1] - 40:4
security [2] - 6:1, 8:13
see [27] - 10:16, 33:24, 34:1, 34:7, 34:8, 34:9, 34:19, 34:22, 35:6, 36:10, 37:13, 37:21, 37:23, 38:21, 40:7, 40:10, 42:13, 46:19, 52:25, 53:3, 53:5, 53:7, 54:6, 54:14, 54:16, 54:17
seeing [2] - 37:8, 46:16
seize [1] - 58:10
seizure [1] - 16:2
select [2] - 32:6, 32:7
Sellersburg [1] - 5:10
sense [2] - 12:25, 34:18
separately [1] - 34:15
sequence [2] - 52:14, 53:16
sergeant [4] - 9:14, 9:16, 9:19, 9:24
series [1] - 38:11
serve [2] - 8:5, 11:1
service [4] - 11:19, 17:3, 17:5, 18:13
serving [2] - 8:2
set [1] - 72:7
several [6] - 18:19, 19:20, 19:21, 22:14, 22:20, 29:13
shadow [1] - 11:23
shaking [2] - 39:21, 42:15, 42:16, 42:18, 68:23
share [1] - 34:12
sharing [2] - 33:8, 33:11
shirt [1] - 47:2
shit [1] - 60:15
shooting [1] - 19:7
shootings [1] - 19:19
short [1] - 59:23
show [4] - 31:2, 36:22, 38:4, 66:6
showed [1] - 38:3
shown [2] - 23:20,

31:6
side [2] - 41:12, 43:21
sign [1] - 55:23
significance [1] - 38:9
signs [1] - 43:6
similar [2] - 7:23, 61:21
simple [2] - 44:6, 47:23
single [1] - 24:6
sit [2] - 15:4, 18:4
sitting [1] - 52:24
situation [9] - 15:14, 15:19, 24:6, 35:13, 37:8, 53:21, 53:22, 58:11, 58:14
situations [13] - 23:5, 23:6, 23:24, 24:3, 25:13, 26:25, 27:1, 50:3, 50:6, 50:12, 51:8, 57:5, 59:4
six [1] - 20:17
skip [1] - 31:15
slow [4] - 38:5, 38:7, 43:18, 68:21
small [2] - 46:22, 47:6
smart [1] - 52:2
sniff [14] - 24:20, 27:2, 27:6, 49:24, 50:4, 50:9, 50:13, 50:25, 51:2, 51:9, 55:12, 55:16, 56:6, 56:9
solving [1] - 47:22
something's [1] - 36:23
somewhere [1] - 19:18
soon [1] - 56:11
sorry [15] - 14:1, 14:17, 35:17, 36:20, 44:18, 45:12, 48:11, 54:12, 57:12, 60:13, 63:5, 66:12, 69:14, 69:17, 70:7
sort [7] - 7:14, 8:18, 13:17, 18:13, 20:11, 27:12, 41:15
sounded [1] - 65:2
sounds [1] - 65:12
South [1] - 2:14
speakerphone [2] - 43:25, 44:2, 69:1
speaking [2] - 43:21, 43:24
specific [4] - 12:4, 18:20, 24:11, 50:22
specifically [2] - 16:20, 49:10
spot [5] - 35:15, 35:16, 35:20, 35:22,

62:8
**spots** [4] - 23:11, 23:12, 23:15, 67:7
**squad** [9] - 10:24, 11:11, 20:1, 31:22, 49:7, 62:8, 65:11, 65:19, 66:9
**squads** [7] - 10:22, 11:1, 11:4, 11:6, 11:9, 65:9, 65:22
**St** [1] - 61:20
**staff** [4] - 18:22, 25:14, 25:24, 26:7
**stamp** [1] - 40:18
**standpoint** [1] - 8:12
**start** [1] - 6:6
**started** [3] - 8:13, 11:15, 11:22
**STATE** [1] - 72:1
**State** [2] - 57:24, 72:4
**STATES** [1] - 1:1
**steering** [2] - 37:24, 39:21
**stenographic** [2] - 72:10, 72:13
**steps** [6] - 12:8, 12:12, 13:22, 14:3, 14:10, 38:11
**STEVE** [1] - 1:14
**stick** [1] - 51:22
**still** [3] - 32:24, 33:23, 64:15
**stolen** [1] - 54:4
**stop** [50] - 12:15, 13:1, 13:22, 14:12, 16:11, 19:5, 20:6, 21:5, 21:9, 21:15, 21:18, 21:21, 21:24, 21:25, 22:2, 24:1, 24:4, 24:7, 27:6, 28:9, 28:15, 33:4, 38:5, 38:6, 38:7, 38:14, 41:19, 43:18, 47:23, 48:6, 48:7, 48:24, 49:8, 49:16, 49:21, 49:25, 53:15, 58:20, 61:2, 62:24, 64:19, 64:25, 66:18, 66:19, 68:22, 69:10, 69:22, 70:16, 70:17
**stopped** [4] - 22:5, 31:7, 43:19, 68:21
**stopping** [3] - 36:15, 48:20, 61:20
**STOPS** [3] - 12:1, 14:4, 14:10
**stops** [46] - 12:6, 12:9, 13:8, 13:22, 18:23, 19:1, 19:11, 19:23, 20:2, 20:15, 20:21,

21:1, 22:25, 23:18, 23:20, 23:22, 23:25, 24:4, 24:8, 24:10, 24:12, 24:25, 25:4, 25:7, 25:10, 25:16, 26:25, 27:14, 27:18, 27:19, 28:4, 28:7, 31:25, 42:10, 53:13, 61:22, 62:2, 62:9, 62:10, 62:21, 65:6, 66:11, 66:22, 67:2, 67:9
**Story** [1] - 2:6
**strategy** [1] - 25:18
**street** [6] - 10:24, 11:4, 20:1, 43:20, 62:8, 66:9
**Street** [1] - 2:14
**stuff** [3] - 67:8, 68:18, 69:2
**suggested** [3] - 64:1, 64:4, 64:8
**Suite** [2] - 2:7, 2:15
**supervision** [1] - 72:11
**supervisor** [2] - 9:14, 23:16
**supposed** [1] - 33:12
**supreme** [1] - 22:24
**surveillance** [3] - 20:4, 20:9, 35:10
**suspect** [3] - 18:6, 27:10, 54:22
**suspected** [1] - 39:7
**suspicion** [8] - 17:8, 17:12, 17:13, 17:20, 17:25, 18:4, 25:1, 44:2
**sworn** [4] - 4:12, 58:8, 58:9, 72:9
**sync** [2] - 36:23, 36:25

## T

**Tae** [51] - 2:10, 33:4, 33:24, 34:5, 37:9, 37:12, 37:15, 37:18, 37:23, 39:3, 39:6, 39:15, 40:4, 40:14, 40:20, 41:20, 43:9, 43:14, 44:23, 47:20, 48:8, 48:12, 50:21, 51:12, 51:14, 53:23, 55:8, 55:24, 56:5, 56:10, 58:12, 58:25, 60:11, 60:18, 60:21, 61:1, 61:12, 61:23, 61:24, 62:3, 63:10, 63:22, 63:24, 64:4, 64:8, 64:12, 64:18,

66:23, 67:3, 67:10, 69:22
**TAE** [1] - 1:7
**Tae-Ahn** [47] - 2:10, 33:4, 33:24, 34:5, 37:9, 37:12, 37:15, 37:18, 37:23, 39:3, 39:6, 39:15, 40:4, 40:14, 40:20, 41:20, 43:9, 43:14, 44:23, 47:20, 48:12, 50:21, 51:12, 51:14, 53:23, 55:8, 55:24, 56:10, 58:12, 60:11, 60:18, 60:21, 61:1, 61:12, 61:24, 62:3, 63:10, 63:22, 63:24, 64:4, 64:8, 64:12, 64:18, 66:23, 67:3, 67:10, 69:22
**TAE-AHN** [1] - 1:7
**Tae-Ahn's** [4] - 48:8, 58:25, 61:23
**taught** [7] - 16:5, 16:6, 16:9, 16:21, 17:7, 21:4, 29:24
**Tech** [3] - 5:10, 5:12, 8:17
**techniques** [1] - 31:12
**ten** [3] - 20:21, 27:21, 27:25
**tension** [1] - 38:12
**terminology** [1] - 55:13
**terms** [9] - 10:21, 15:24, 21:9, 40:8, 46:19, 47:21, 49:13, 49:14, 70:15
**Terry** [1] - 16:11
**testimony** [3] - 68:7, 72:8, 72:9
**THE** [19] - 1:11, 2:2, 4:8, 29:2, 29:5, 33:9, 33:15, 34:14, 34:21, 36:7, 36:8, 60:5, 60:8, 67:20, 67:23, 70:23, 70:24, 71:4, 71:12
**thereafter** [1] - 72:10
**they've** [1] - 54:17
**thinking** [2] - 21:7, 33:3
**Thornton's** [7] - 33:5, 33:17, 33:20, 33:25, 34:23, 35:7, 35:11
**threatening** [1] - 38:1
**three** [1] - 6:12
**throughout** [8] - 15:20, 21:12, 29:13, 29:15, 30:1, 58:20,

63:24
**ticket** [4] - 58:12, 68:10, 68:15, 69:5
**Tija** [1] - 2:10
**time-wise** [1] - 40:6
**tiny** [1] - 42:15
**title** [2] - 4:22, 6:11
**titles** [1] - 4:25
**today** [2] - 18:4, 68:7
**today's** [1] - 70:13
**together** [5] - 32:1, 32:3, 32:12, 32:13, 32:20
**took** [1] - 66:4
**totally** [1] - 28:23
**toward** [1] - 69:8
**towards** [2] - 62:4, 65:3
**town** [1] - 61:20
**traffic** [63] - 12:8, 13:1, 13:8, 14:12, 18:22, 19:1, 19:11, 19:23, 20:2, 20:14, 20:21, 20:25, 21:9, 21:15, 21:16, 21:19, 22:2, 22:5, 22:25, 23:18, 24:1, 24:4, 24:7, 26:25, 27:5, 27:14, 27:17, 27:19, 27:20, 28:4, 28:7, 28:9, 28:15, 31:25, 33:4, 39:7, 39:10, 47:23, 48:6, 48:7, 48:24, 49:8, 49:16, 49:21, 49:24, 53:13, 58:20, 61:2, 61:22, 62:2, 62:9, 62:21, 62:24, 64:19, 64:25, 65:6, 66:11, 66:18, 66:19, 66:22, 67:2, 67:9
**trained** [5] - 27:18, 31:1, 49:14, 57:3, 67:7
**training** [42] - 6:18, 11:16, 11:19, 11:20, 12:1, 14:14, 14:18, 14:22, 14:23, 14:25, 15:2, 16:14, 16:17, 16:18, 16:19, 16:21, 16:24, 17:1, 17:3, 17:19, 27:13, 28:3, 28:9, 29:12, 29:18, 30:6, 30:10, 31:11, 42:11, 49:18, 56:12, 56:13, 56:16, 56:19, 56:22, 59:17, 59:18, 59:20, 64:22, 64:24
**transcript** [1] - 72:12
**transition** [1] - 8:1
**true** [2] - 69:12, 72:12

**trust** [3] - 30:23, 61:24, 67:11
**try** [6] - 11:8, 56:10, 59:13, 65:18, 65:21, 66:6
**trying** [1] - 52:16
**turning** [1] - 61:7
**twitching** [2] - 42:16, 42:19
**two** [8] - 4:21, 10:15, 10:19, 32:24, 43:20, 47:8, 56:2
**two-lane** [1] - 43:20
**type** [5] - 18:18, 50:14, 50:16, 58:7, 59:17
**types** [5] - 11:1, 13:12, 20:15, 25:25, 65:9
**typewritten** [2] - 72:11, 72:12
**typically** [2] - 50:12, 53:13

## U

**under** [14] - 4:21, 12:9, 13:11, 15:15, 23:6, 23:24, 26:25, 49:19, 49:23, 50:3, 50:6, 50:12, 72:11, 72:21
**undergo** [1] - 56:12
**undergoing** [1] - 31:11
**unfortunate** [1] - 60:24
**uniform** [1] - 37:10
**unit** [2] - 8:24, 47:17
**UNITED** [1] - 1:1
**unlawful** [1] - 70:4
**unpackage** [1] - 15:10
**unsure** [1] - 5:19
**up** [23] - 27:22, 29:24, 33:18, 34:18, 35:14, 36:15, 37:22, 38:2, 39:14, 39:22, 40:3, 40:12, 40:20, 41:13, 43:17, 47:7, 48:12, 51:3, 54:5, 54:15, 58:15, 69:4, 69:15
**uphold** [1] - 58:9
**upper** [4] - 26:3, 46:25, 62:16, 63:9

## V

**vehicle** [40] - 12:17, 13:19, 22:5, 23:3, 23:7, 24:16, 24:17, 24:20, 26:18, 26:22, 27:6, 37:22, 38:5, 43:15, 43:18, 44:10,

44:15, 44:17, 44:20, 46:19, 47:7, 48:9, 48:21, 52:17, 53:14, 55:12, 55:21, 55:25, 56:23, 58:15, 58:22, 59:10, 59:11, 61:8, 62:17, 68:21, 69:1, 69:3, 69:4

**vehicle's** [1] - 54:4
**vehicles** [2] - 25:25, 61:20
**verbal** [3] - 40:24, 42:23, 42:25
**verbally** [1] - 37:17
**versus** [2] - 21:5, 42:13
**via** [1] - 4:3
**VIA** [1] - 2:2
**video** [11] - 35:25, 36:11, 36:17, 36:22, 36:24, 37:2, 37:4, 37:23, 38:3, 40:4, 40:17
**VIDEO** [7] - 36:14, 39:13, 41:18, 43:13, 44:22, 52:13, 55:10
**video's** [1] - 40:1
**videoconference/ teleconference** [1] - 4:1
**VIDEOCONFERENC E/ TELECONFERENCE** [2] - 1:10, 2:2
**videotaped** [1] - 4:2
**view** [6] - 22:14, 22:18, 38:16, 38:19, 52:17, 62:4
**viewed** [1] - 70:7
**views** [1] - 70:7
**violation** [3] - 21:20, 22:5, 39:8
**violations** [1] - 27:20
**violator** [3] - 13:23, 14:5, 14:12
**violence** [1] - 54:23
**violent** [12] - 18:23, 19:5, 19:11, 47:17, 47:22, 48:3, 54:17, 57:25, 64:5, 67:4, 67:8
**viral** [1] - 63:11
**visual** [1] - 46:20
**visually** [1] - 37:13
**VS** [1] - 1:11

**W**

**waistline** [2] - 47:1, 47:4

**wait** [1] - 56:8
**wants** [1] - 67:15
**warning** [2] - 14:11, 25:11
**warrants** [1] - 54:14
**watch** [3] - 36:3, 60:25
**ways** [1] - 19:21
**weapon** [5] - 43:22, 51:17, 51:23, 51:24, 52:8
**weapons** [13] - 22:13, 22:17, 38:15, 38:18, 41:10, 44:25, 45:5, 45:10, 45:15, 46:14, 47:9, 47:12, 69:6
**wearing** [1] - 47:3
**Wednesday** [1] - 4:3
**WERE** [2] - 3:6, 71:15
**WESTERN** [1] - 1:1
**wheel** [2] - 37:24, 39:21
**white** [2] - 47:2, 61:13
**wife** [1] - 61:6
**wise** [1] - 40:6
**witness** [2] - 4:3, 72:8
**WITNESS** [4] - 2:2, 70:24, 71:4, 71:17
**wooden** [2] - 38:20, 38:21
**word** [2] - 16:4
**words** [2] - 29:22, 50:24
**world** [2] - 70:13, 70:14
**write** [4] - 58:12, 68:10, 68:15, 69:5

**Y**

**year** [2] - 6:6, 11:19
**years** [6] - 4:21, 5:21, 6:12, 8:5, 15:3
**you-all** [11] - 32:6, 32:19, 33:17, 33:20, 48:23, 49:10, 57:15, 57:18, 57:21, 59:13
**young** [1] - 62:4
**yourself** [4] - 32:8, 36:17, 37:9, 37:11

**Z**

**Zoom** [1] - 4:3