UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00419-GNS-RSE

TAE-AHN LEA                                                                                           PLAINTIFF

v.

STEVE CONRAD, et al.                                                                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Partial Motion for Summary Judgment (DN 54) and Defendants' Motion for Summary Judgment (DN 65). This matter is ripe for adjudication. For the reasons stated below, Plaintiff's motion is **GRANTED**, and Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

I.      **BACKGROUND**

On August 9, 2018, Plaintiff Tae-Ah Lea ("Lea"), an eighteen-year-old African American male, was operating a vehicle in Louisville, Kentucky, when he was pulled over by Kevin Crawford ("Crawford") and Gabriel Hellard ("Hellard"), officers of the Louisville Metro Police Department ("LMPD"), in particular the LMPD Ninth Mobile Division ("Ninth Mobile"). (Compl. ¶¶ 1-2, DN 1). Crawford approached the vehicle and explained to Lea that he had made an improper wide turn. (Crawford Video 1:10-1:20, Aug. 9, 2018, DN 71-1). During the stop, Crawford repeatedly asked Lea if he had any weapons or drugs, which Lea denied. (Crawford Video 1:20, 2:47, 2:52-3:01). When asked for identification, Lea requested permission to retrieve the card from his pants pocket, to which Crawford replied: "[i]f you ain't got any guns." (Crawford Video 1:20-1:28). While Lea reached into his pockets, Hellard, who was standing by

1

the front passenger window, pointed to a souvenir baseball bat between the passenger seat and the console of Lea's car and asked "what's that, like a baseball bat or something right there?", to which Lea answered affirmatively. (Hellard Video 1:25-1:29, Aug. 9, 2018, DN 71-1). As he handed Crawford his identification, Lea received a cell phone call from his mother and told Crawford "my mom is on speaker." (Crawford Video 1:20-2:26). Crawford responded "that's cool, man." (Crawford Video 2:28). Crawford opened the car door and instructed Lea to move his phone and wallet from his lap and led Lea by the wrists out of the car. (Crawford Video 2:30-2:44). After twice again asking Lea if he had a weapon or drugs and being told "no," Crawford frisked Lea over his objection. (Crawford Video 2:53-2:54, 3:05-3:06). At no point after the initial inquiry did any of the officers mention to one another, or to Lea, anything else about the souvenir baseball bat.

Crawford requested to search the car and Lea denied consent, at which point Crawford spoke with his K9 officer, Jeffrey McCauley ("McCauley"), who had arrived on the scene. (Crawford Video 3:25-3:40). Crawford told McCauley that Lea acted nervous, but Crawford had not checked for any outstanding warrants. (Crawford Video 3:43-3:48). Crawford then returned to the vehicle and shined a flashlight into the car. (Crawford Video 3:50-4:30). At approximately five and a half minutes into the stop, Crawford began to review Lea's identification, while McCauley took his dog around the outside of the vehicle. (Crawford Video 5:45-6:38; McCauley Video 1:05-2:04, Aug. 9, 2018, DN 71-1). McCauley stated that the K9 was interested in Lea's wallet, and Crawford then began to search the vehicle in its entirety.[1] (Crawford Video 10:31-

---

[1] While Crawford was performing the search, Hellard stated: "we're allowed to pat you down for weapons, we're allowed to do that." (Hellard Video 3:07-3:08). During the majority of the stop, Hellard was standing next to Lea dond once the vehicle search began, Hellard handcuffed Lea. (Hellard Video 3:15-3:24).

14:45). After the search was completed and no contraband found, Crawford gave Lea a citation. (Crawford Video 15:42-24:30).

On June 10, 2019, Lea filed this action alleging violations of his civil rights under 42 U.S.C. § 1983, and various state law claims. (Compl. ¶¶ 95-133). In the Complaint, Lea asserts claims against Chief Steve Conrad ("Conrad"), Major William Hibbs ("Hibbs"), Crawford, Hellard, McCauley, Jason McNeil ("McNeil"), and Kiersten Holman ("Holman").[2] Before the Court is Plaintiff's motion for partial summary judgment on the basis that Crawford unlawfully conducted a pat-down search of Lea and prolonged the traffic stop beyond its initial purpose. (Pl.'s Mem. Supp. Mot. Summ. J. 2, at DN 54-1). Defendants also seek summary judgment on all claims based upon, *inter alia*, qualified immunity. (Defs.' Mem. Supp. Mot. Summ. J. 5-25, DN 65-1).

## II.   JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction. *See* 28 U.S.C. § 1331. In addition, the Court has supplemental jurisdiction over Lea's state law claims. *See* 28 U.S.C. § 1367(a).

## III.   STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When bodycam footage of the events at issue are available, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed

---

[2] Lea voluntarily dismissed his claims against Holman and McNeil, as well as the claim for excessive force. (Pl.'s Resp. Defs.' Mot. Summ. J. 2, DN 71).

3

in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he has the burden of proof. *Id.* Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### IV.   DISCUSSION

#### A.   Qualified Immunity

Defendants argue they are entitled to qualified immunity in their individual capacities. (Defs.' Mem. Supp. Mot. Summ. J. 13). Qualified immunity shields government officials from individual liability for claims arising out of their performance of discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). When evaluating a qualified immunity claim on summary judgment, the proper two-part inquiry is: (1) "whether the facts, viewed in the light most favorable to the plaintiff, could support a finding that the defendant has violated the plaintiff's constitutional rights"; and (2) whether "the defendant violated 'clearly established' constitutional rights." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 485 (6th Cir. 2007) (citation omitted). "Both prongs of this test must be met 'for the case to go to a factfinder to decide if [the] officer's conduct in the particular circumstances

4

violated a Plaintiff's clearly established constitutional rights. If either one is not satisfied, qualified immunity will shield the officer from civil damages.'" *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021) (alteration in original) (citations omitted). Ultimately, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Rodriguez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011) (citations omitted).

        **1.**     ***Fourth Amendment Search***

            **a.**     **Whether a Right Was Violated**

Lea's partial motion for summary judgment seeks a determination that his Fourth Amendment right against unlawful search was violated by Crawford's pat down. (Pl.'s Mem. Supp. Partial Mot. Summ. J. 12-14). This issue will therefore be addressed in conjunction with first step of the qualified immunity discussion.

The Fourth Amendment recognizes "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. In order to legally perform a frisk on an individual, an officer must have reasonable suspicion that a person is armed and dangerous. *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). Lea argues that Crawford did not have such reasonable suspicion to justify Crawford frisking him for weapons. (Pl.'s Mem. Supp. Partial Mot. Summ. J. 12). To have reasonable suspicion, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The officer's belief is judged by an objective standard. *Id.* at 22. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id.* (citation omitted). "Reasonable suspicion

'requires more than a mere hunch.'" *United States v. Pedicini*, 804 F. App'x 351, 355 (6th Cir. 2020) (citation omitted). "It demands 'a particularized and objective basis for suspecting [that] *the particular person*' is armed and dangerous." *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014) (alteration in original) (emphasis added) (citation omitted). To claim an action was reasonable, "the officer must be able to give specific, articulable reasons for believing that a particular person is dangerous before he or she may frisk the suspect." *Pacheco*, 841 F.3d at 392 (citation omitted). Furthermore, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).

Crawford, who performed the pat-down, stated that the indicators of criminal activity he saw were "nervousness" and "lying to us about the weapon." (Crawford Dep. 51:13-17, Mar. 24, 2021, DN 54-5). The "weapon" in question was "a bat or a stick" that was in Lea's car tucked between the front passenger seat and the console. (Crawford Dep. 51:20-25; Crawford Video 1:33-1:36). Lea avers he had "a miniature Louisville Slugger bat in plain view inside the vehicle," which is borne out by Hellard's bodycam video.[3] (Pl.'s Resp. Defs.' Mot. Summ. J. 12; Hellard Video 1:25-1:29). When asked if he believed Lea was armed after Crawford inquired if Lea had any weapons, Crawford responded, "I didn't have any reason to believe he wasn't. I mean, he could have had a gun on him. I didn't know." (Crawford Dep. 46:21-25). Crawford testified that he believed Lea had lied and may have possessed other weapons based on his failure to disclose the souvenir bat. (Crawford Dep. 41:8-12). At no point during search does the body camera

---

[3] An Amazon.com listing for an apparently similar bat notes that its weight is six ounces. *Louisville Slugger 18" Mini Bat*, Amazon.com, https://www.amazon.com/Louisville-Slugger-18-Mini-Bat/dp/B0773PHPYH (last visited Aug. 8, 2022).

footage show Crawford or Hellard examine the miniature bat, nor did either attempt to secure the purported cause of Crawford's concern.

In order to find that Crawford did *not* violate Lea's rights when he frisked Lea, an officer in Crawford's position is required to reasonably believe that Lea was armed and dangerous. *Pacheco*, 841 F.3d at 390. With respect to the miniature Louisville Slugger, the lawful possession of an object which has the capability to inflict physical damage does not automatically render a person in possession of a weapon.

> A "weapon" could include a brick, a baseball bat, a hammer, a broken bottle, a fishing knife, barbed wire, a knitting needle, a sharpened pencil, a riding crop, a jagged can, rope, a screwdriver, an ice pick, a tire iron, garden shears, a pitch fork, a shovel, a length of chain, a penknife, a fork, metal pipe, a stick, etc. The foregoing only illustrate the variety of lawful objects which are often innocently possessed without wrongful intent . . . .

*Wright v. New Jersey*, 469 U.S. 1146, 1149 n.3 (1985) (Brennan, J., dissenting) (internal quotation marks omitted) (citation omitted). When Crawford was asked what made him believe Lea was armed, he testified that the miniature souvenir bat could have been used as a weapon. (Crawford Dep. 51:20-5). The mere possession of a souvenir bat weighing six ounces, however, does not objectively support a reasonable belief that Lea was armed any more than a screwdriver, a sharpened pencil, or a pair of scissors, had those objects been present inside the car. This is particularly true given that Lea gave no indication of any attempt to brandish or even touch the souvenir bat. Crawford allowed Lea to continue searching his pockets even after the discovery of the souvenir bat, which seriously undermines Crawford's alleged belief that Lea may have been armed and dangerous based upon his supposed lie about not possessing a weapon. (Crawford Dep. 51:13-17; Crawford Video 1:20-2:26). Further, Crawford did not mention the existence of the bat to anyone else on the scene throughout the entire stop. Aside from the initial acknowledgment of

the bat, it was never discussed again, suggesting that its threat as a weapon was not a significant concern to Crawford or any of the other officers.

Crawford testified that the only thing that caused him to believe that Lea was armed was "[j]ust the interaction with him and seeing him display the nervousness." (Crawford Dep. 46:12-17). It is well established that nervousness alone is not a sufficient basis on which to articulate reasonable suspicion, as the Sixth Circuit held in *Pacheco*:

> We found that [the suspect's] nervousness should be discounted because, after witnessing his alleged nervousness, the officer returned to his cruiser, inspected the window tint, and performed a field-sobriety test on the driver, and then performed the pat down on [the suspect]. These actions, we concluded, reflected a lack of suspicion as to a suspect's dangerousness, which an officer needs in order to justify a pat down for weapons.

*Pacheco*, 841 F.3d at 391 (internal citation omitted).[4]

Crawford's testimony is inconsistent with his actions as shown on the bodycam footage. Crawford's video shows he made no acknowledgment of the miniature bat, nor an effort to secure it which contradicts his stated belief that Lea was armed with a weapon, as required to justify the frisk. *Pacheco*, 841 F.3d at 390. Due to the conflicting nature between Crawford's testimony and his actions on the video, as well as the relatively small weight given to nervousness in a traffic stop, Crawford lacked an objectively reasonable basis to believe that Lea was armed and dangerous

---

[4] While nervousness alone is not a sufficient basis for reasonable suspicion, it should be noted that a review of the footage from the traffic stop revealed no objective indications of the "nervousness" Crawford claims to have observed. During the stop and prior to being removed from the vehicle, Lea followed the directions of the officers and answered their questions directly. (Crawford Video 1:00-2:30). When asked to step out of the vehicle, Lea questioned the actions of the officers, not indicating that he was nervous, but rather that he was confused about why the stop had escalated. (Crawford Video 2:26-3:05). Even after Lea was removed from the car, his demeanor and actions cannot be described as nervous, but rather exasperated or annoyed. (*See* Hellard Video 3:30-5:31).

8

so as to justify a frisk for weapons. Thus, unless qualified immunity is available to Crawford, Lea is entitled to summary judgment with respect to Crawford's pat-down search.

### b. Whether the Violated Right Was Clearly Established

Even when there is a constitutional violation, qualified immunity protects the officer unless the right violated was clearly established at the time of the incident. *Williams*, 496 F.3d at 485. A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). As the Supreme Court has noted:

> [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in [*United States v. Lanier*, 520 U.S. 259 (1997)], we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts.

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal quotation marks omitted) (internal citation omitted) (citation omitted).

Under *Terry v. Ohio*, 392 U.S. 1 (1968):

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

9

*Id.* at 27 (citation omitted). "When an officer makes a *Terry* stop, he may also perform a precautionary search—known as a 'frisk' or 'pat down'—whenever he has 'reasonable suspicion' that the person searched may be armed and dangerous." *Pacheco*, 841 F.3d at 390 (citation omitted). It is well established that the relevant inquiry to determine reasonable suspicion is whether "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *Noble*, 762 F.3d at 521-22 (alterations in original) (citation omitted).

Under the circumstances clearly shown in the officers' bodycam footage, a reasonable officer in the same situation would be aware that "[a] lawful stop does not necessarily carry with it the authority to conduct a pat-down search." *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005) (citation omitted). Moreover, "[r]easonable suspicion 'requires more than a mere hunch [that a person is armed and dangerous].'" *Noble*, 762 F.3d at 522 (citation omitted). Furthermore, it is well established that nervousness in a traffic stop is not in and of itself sufficient to create reasonable suspicion shielding an officer from violating a person's Fourth Amendment rights. *United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004); *see also United States v. Wilson*, 506 F.3d 488, 495 (6th Cir. 2007) ("Nervous behavior, standing alone, is not enough to justify a *Terry* search." (citation omitted)). In fact, "[m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear." *Richardson*, 385 F.3d at 630-31. A reasonable officer would have known that nervousness was not a reliable indicator of whether a potential suspect is armed and dangerous.

Accordingly, at the time of the incident in August 2018, it was clearly established that Crawford could not frisk Lea without a reasonable suspicion that he was armed and dangerous, and that Lea's nervousness was insufficient to justify the search. As a result, Crawford is not

entitled to qualified immunity, and Lea is entitled to judgment as a matter of law with respect to his Fourth Amendment search claim.

### 2. *Fourth Amendment Seizure*

#### a. **Whether a Right Was Violated**

Lea's partial motion for summary judgment seeks a finding that his Fourth Amendment right against unlawful seizure was violated through the prolonging of the traffic stop by Crawford. (Pl.'s Mem. Supp. Partial Mot. Summ. J. 14-17). Defendants assert in their motion for summary judgment that Crawford, Hellard, and McCauley are all entitled to qualified immunity because they did not unjustly prolong the traffic stop. (Defs.' Mem. Supp. Mot. Summ. J. 13-19).

"A traffic stop is analogous to a 'Terry stop' in that, following the initial stop, the subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). To determine whether a detention is reasonable, the court should consider "whether the officer's action was justified at its inception, and whether it is reasonably related in scope to the circumstances which justified the interference in the first place." *Wellman*, 185 F.3d at 656 (citation omitted). The typical steps associated with a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354 (citation omitted). Lea does not deny that Crawford had cause to stop Lea's vehicle due to the traffic infraction. (Pl.'s Mem. Supp. Partial

Mot. Summ. J. 14). Rather, Lea argues that the duration of the stop was impermissibly extended so as to violate Lea's Fourth Amendment rights. (Pl.'s Mem. Supp. Mot. Summ. J. 14).

The record reflects that Crawford did not promptly perform the requisite steps of the traffic stop. Crawford approached the vehicle, informed Lea of the improper turn violation, and then asked for his license and registration. (Crawford Video 1:00-1:15). Before addressing the purpose of the stop by verifying Lea's information and writing a citation, Crawford performed the illegal frisk discussed above, sought out McCauley to do a K9 sniff, and then walked around Lea's vehicle while shining a light into the interior, further prolonging the stop while Hellard stood next to Lea. (Crawford Video 3:25-5:00). Crawford testified that he walked around the car with the flashlight in order to check for "anything dangerous to the dog whenever he went in there." (Crawford Dep. 53:20-1).

Crawford claims that he called for the K9 unit to do a sniff because the "criminal indicators" present at Lea's stop were "[h]is nervousness, him lying to us about the weapon." (Crawford Dep. 51:13-17). As noted previously, Crawford's consideration of the miniature bat was not sufficient to establish reasonable suspicion that Lea was armed and dangerous and nervousness is not a reliable indicator of criminal activity. Crawford furthermore has not testified with any specificity his concerns of criminal activity when Lea was stopped, only that he believed something "criminal in nature" was in the vehicle. (Crawford Dep. 55:20-21). Absent a reasonable belief that Lea was armed and dangerous and noting that nervousness alone is insufficient, Crawford has not identified any other criminal activity indicators supporting his suspicion of criminal activity to justify extending the stop by removing Lea from the vehicle, frisking him, deploying a K9 sniff, and delaying performance of the procedures associated with a stop for a traffic violation. Without a particularized suspicion of criminal activity, Crawford extended the

traffic stop beyond its scope and violated Lea's Fourth Amendment right against unreasonable seizure.

With regard to McCauley, who performed the sniff at Crawford's behest, Defendants argue that "there is no reason to believe that McCauley knew that nothing was being done to further the mission of the stop." (Defs.' Reply Mot. Summ. J. 5). Five and a half minutes into the stop, however, Crawford appears to begin running Lea's information after speaking to McCauley and informing him he had yet to run warrants on Lea. (Crawford Video 3:40-5:20). McCauley, knowing at least that Crawford had not checked on Lea's information, then walked the K9 around the vehicle before Crawford or Hellard had addressed the purpose of the stop. (Crawford Video 5:30). McCauley testified that he came to the stop, saw Crawford and Hellard, and was asked to do an exterior sniff of the vehicle, which he performed with the K9. (McCauley Dep. 38:25-39:6, Mar. 9, 2021, DN 65-14). Other than Crawford's statement about warrants, however, there has been no showing that McCauley was aware that his presence with the K9 was contributing to Crawford prolonging the stop.

Lea has not pointed to evidence in the record that McCauley, arriving to the scene after the stop in a support role as a K9 handler, reasonably knew that he was extending the traffic stop beyond a constitutionally permissible length. McCauley is therefore entitled to qualified immunity.

Hellard is also implicated by Lea as contributing to the length of the stop. Throughout the body camera footage, Hellard can be seen standing next to Lea during the majority of the stop. (*See generally* Hellard Video). Hellard testified that he was not the one to stop Lea, but rather was functioning as a support officer. (Hellard Dep. 35:10-11, Mar. 25, 2021, DN 65-5). Hellard stated "if I'm support role, my job is to just be cover as best as I can." (Hellard Dep. 85:3-4). Again,

13

Lea has not pointed to case law or evidence in the record contradicting Hellard's assertion that he did not have the responsibility to execute the purpose of the stop, nor has Lea pointed to any authority to show that Hellard had such a responsibility to prevent the stop from being extended. Hellard is therefore also entitled to qualified immunity.

### b. Whether Lea's Right Against Unlawful Seizure Was Clearly Established

It was clearly established that at the time of the relevant a traffic stop that a reasonable officer would have known that the stop could not be extended beyond the time necessary to complete the requisite steps without cause. In *Rodriguez*, the Supreme Court held the question of whether a stop is unconstitutionally prolonged depends on whether the officer's conduct prolonged the stop beyond its mission. *Rodriguez*, 575 U.S. at 354. The Sixth Circuit has interpreted *Rodriguez* to hold the mission is "to address the traffic violation that warranted the stop and attend to related safety concerns." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (internal citation omitted) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). An officer can extend a traffic stop beyond this mission only through reasonable articulable suspicion, but the reasonable suspicion must arise before the officer seeks to prolong the stop. *Rodriguez*, 575 U.S. at 355; *United States v. Howard*, 815 F. App'x 69, 76 (citing *Lott*, 954 F.3d at 923). "'Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed' unless 'reasonable suspicion of criminal activity justified detaining [the defendant] beyond completion of the traffic infraction investigation.'" *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (alteration in original) (citation omitted). LMPD instructed the officers

that they may not delay a traffic stop while waiting for a dog to complete its search or to arrive on the scene. (Pl.'s Resp. Defs.' Mot. Summ. J. Ex., at 1, DN 71-13).

As Lea points out, *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008), raised similar concerns to those at bar. In *Blair*, the suspect was pulled over for a minor traffic violation. *Blair*, 524 F.3d at 748. The officer informed the suspect that he believed drugs were in the car and then performed a K9 sniff. *Id.* at 752. The officer testified that the indicators which led to his reasonable suspicion of criminal activity included a fear that the suspect would flee, nervousness, and a belief that the suspect had just left a known drug house. *Id.* at 752-53. The Sixth Circuit dismissed the fear of flight as unreasonable and further found that the officer could not have known about the suspect's potential drug involvement before extending the stop. *Id.* The court found that the suspect's nervousness and his reaching under the seat were insufficient to support the officer's suspicion. *Id.* at 752-53. Similarly, in *Richardson*, the Sixth Circuit reiterated that nervousness in a traffic stop is an unreliable indicator of criminal activity and found that the officer did not have a valid reason to extend the stop. *Richardson*, 385 F.3d at 630-31.

When Crawford stopped Lea, it was clearly established that an officer could not extend a traffic stop, including deployment of a K9 sniff, beyond the time necessary to complete a citation without reasonable suspicion of criminal activity. Accordingly, Crawford is not entitled to qualified immunity, and Lea is entitled to summary judgment on his Fourth Amendment unlawful seizure claim.

### B.     *Monell* Claim

Count 6 of the Complaint alleges that Conrad and Hibbs, as leadership of the LMPD and the Ninth Mobile Division respectively, failed to train and supervise the LMPD officers, resulting in a violation of Lea's rights. (Compl. ¶¶ 7, 8, 126-33). Under *Monell v. Department of Social*

*Services of the City of New York*, 436 U.S. 658 (1978), municipalities can be held liable for constitutional violations caused by an official policy. *Id.* at 690-91. To establish municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). A plaintiff may demonstrate the existence of an illegal policy or custom by showing: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted). There must be a causal link between a municipal policy or custom and the alleged constitutional deprivation to hold a municipality responsible. *Monell*, 436 U.S. at 691-92; *Deaton v. Montgomery Cnty.*, 989 F.2d 885, 889 (6th Cir. 1993).

Under an "inaction theory" wherein a policy of tolerating federal rights violations is entrenched but unwritten, a plaintiff must show:

(1) the existence of a clear and persistent pattern of [illegal activity];
(2) notice or constructive notice on the part of the [defendant];
(3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
(4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (alterations in original) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). "[A] negligent failure to adequately supervise, train or control," however, is insufficient to establish a municipality's deliberate indifference. *Hays v. Jefferson Cnty.*, 668 F.2d 869, 873 (6th Cir. 1982). A municipality cannot

be liable on a *respondeat superior* theory for the bad acts of its employees if there is not an overall policy of unconstitutional practices. See *Monell*, 436 U.S. at 691. "[T]he court in *Monell* concluded that the language plainly imposes liability on a governmental entity that, under the color of some official policy, 'causes' an employee to violate another's constitutional rights. Congress did not intend § 1983 liability to attach where causation is absent." *Deaton*, 989 F.2d at 889 (internal citation omitted).

Defendants argue that Lea has not established that any constitutional violations were the result of a "policy, practice, or custom attributable to Metro Government." (Defs.' Mem. Supp. Mot. Summ. J. 7). In response, Lea states:

> When every, single traffic stop citation issued by Crawford and Hellard over three months was to Black citizens, there's a clear indication of discriminatory practices under the Fourteenth Amendment. When 75 percent of exterior dog sniffs produce false positives, there's a clear indication of bad probable cause being established. When thousands of stops are being performed by a Unit over a three-year period and there are only a couple hundred of the required STOPS forms executed by a handful of detectives, while all the rest do none whatsoever, there's a clear indication of actions being taken on the stops that would be better off undocumented.

(Pl.'s Resp. Defs.' Mot. Summ. J. 20).

Although the pat down of Lea violated his constitutional rights and the traffic stop was unjustifiably prolonged, Lea's *Monell* claim fails for lack of causation. Defendants argue that Lea's characterization of McCauley's K9 sniff reports is misleading. (Defs.' Reply Mot. Summ. J. 2). Regardless of this dispute, other than pointing to McCauley's K9 sniff reports and the racial disparity in Crawford and Hellard's citation records, Lea does not point to a policy of the LMPD other than the widespread failure of officers to consistently complete STOPS reports. (Pl.'s Resp. Defs.' Mot. Summ. J. 20).

> The pertinent LMPD standard operating procedure provides:
>
> Officers are required to complete a Vehicle Stop Reporting form for every traffic stop, regardless of whether a citation is written or an arrest is made. The only exceptions are motorist assists, road blocks, and traffic accidents. If an eCitation is issued for a traffic accident, members will check "Other" in the Disposition area of the Vehicle Stop Reporting form and enter "accident" in the box.
> . . . .
> The Vehicle Stop Reporting form data is analyzed and compiled into a report on an annual basis. This report includes a summary of all stops by officers and also includes recommendations for improvement.

(Pl.'s Resp. Defs.' Mot. Summ. J. Ex., at 2-3, DN 71-5). Lea argues that the LMPD was deliberately indifferent to the failure of its officers to complete the STOPS forms. (Pl.'s Resp. Defs.' Mot. Summ. J. 21). Lea states "LMPD's command staff knew or should have known there were numerous, ongoing patterns of constitutional violations occurring within with the performance of the Ninth Mobile members' duties." (Pl.'s Resp. Defs.' Mot. Summ. J. 20).

Regardless of whether the LMPD did in fact fail to enforce a policy that officers complete STOPS forms, Lea fails to connect the failure to fill out STOPS forms to the alleged constitutional violations suffered by him. "Even if [a] policy was not followed here, [the plaintiff] must still show that the policy was the 'moving force' behind the injury he suffered. . . . Accordingly, to give rise to *Monell* liability, the policy must have been the factual and proximate cause of [the plaintiff's] injury." *Crabbs v. Scott*, 800 F. App'x 332, 337-38 (6th Cir. 2020) (internal citation omitted) (citation omitted). Lea does not explain how the failure to complete STOPS forms led to his injury beyond the conclusory claim that had the LMPD been monitoring data on the Ninth Mobile's STOPS reports over a three-month period, it would have been aware of Crawford and Hellard's "discriminatory practices" under the Fourteenth Amendment. (Pl.'s Resp. Defs.' Mot. Summ. J. 20). Instead, there has been no showing whatsoever that any of the other instances of Ninth Mobile traffic stops resulted in constitutional violations.

Lea has not shown that any failure of the LMPD to enforce the use of STOPS forms by officers of the Ninth Mobile was the cause of any constitutional violations committed against him. Without pointing to any evidence in the record to establish that the failure to enforce the use of STOPS forms amounted to tacit approval of a policy of constitutional violations, Lea's *Monell* claim cannot survive.[5]

C. **State Law Claims**

Lea fails to respond to Defendants' arguments regarding the state law claims of negligent training and negligent supervision. As a result Lea has waived those claims, which will therefore be dismissed. *Butler v. City of Cincinnati*, No. 1:17-CV-604, 2020 U.S. Dist. LEXIS 132032, at *29 (S.D. Ohio July 27, 2020) ("Plaintiff does not respond to [an] argument, and the Court will construe his silence as a concession." (internal citation omitted)).

---

[5] Lea's response addresses a Fourteenth Amendment equal protection argument stating, "[i]n their memorandum, the Defendants laud the actions of the Ninth Mobile Unit, a unit which has since been disbanded, for focusing on patrolling areas plagued by violent crime. But Defendants fail to mention that the street squad actions of targeted traffic stops were directed nearly exclusively at Black residents." (Pl.'s Resp. Defs.' Mot. Summ. J. 21). Defendants reply to Lea's Fourteenth Amendment argument on the merits. (Defs.' Reply Mot. Summ. J. 7). Defendants' motion for summary judgment, however, does not seek a ruling on a Fourteenth Amendment claim as Lea did not assert a Fourteenth Amendment claim in the Complaint. By previous order, this Court dismissed Lea's reliance on the Fourteenth Amendment in Count 1 and Count 3 of the Complaint. (Mem. Op. & Order 10, DN 23). As a result, Lea's Fourteenth Amendment argument will not be considered.

## V.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.     Plaintiff's Partial Motion for Summary Judgment (DN 54) is **GRANTED** with respect to his claims for violations of his rights against unlawful search and seizure from the prolonged traffic stop.  Lea's claims for damages against Crawford will proceed.

2.     Defendants' Motion for Summary Judgment (DN 65) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's Section 1983 claims against McCauley, Hellard, Conrad, and Hibbs in their official and/or individual capacities are **DISMISSED**.  Plaintiff's state law claims are **DISMISSED**.

Greg N. Stivers, Chief Judge
United States District Court

September 14, 2022

cc:     counsel of record